**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

CATHERINE MOLNER, Derivatively on    )
Behalf of Nominal Defendant SUNRISE    )
SENIOR LIVING, INC.,    )
                   Plaintiff,    )
                           )
           v.    )      No. _____
                           )
PAUL J. KLAASSEN, DAVID W.    )
FAEDER, TIMOTHY S. SMICK,    )
THOMAS B. NEWELL, BRIAN C.    )
SWINTON, CHRISTIAN B.A. SLAVIN,    )
LARRY E. HULSE, TIFFANY L.    )
TOMASSO, ROBERT R. SLAGER, CARL )
ADAMS, RONALD V. APRAHAMIAN,    )
CRAIG R. CALLEN, DAVID G.    )
BRADLEY, J. DOUGLAS HOLLADAY    )
and THOMAS J. DONOHUE,    )
                           )
Defendants,    )
                           )
       SERVE ALL DEFENDANTS AT:    )
                           )
       7902 WESTPARK DRIVE    )
       MCLEAN, VA  22102    )
                           )
                           )
          and    )      **JURY TRIAL DEMANDED**
                           )
SUNRISE SENIOR LIVING, INC.,    )
                           )
       SERVE:    )
       Any officer, director or managing    )
       Agent at:    )
       7902 WESTPARK DRIVE    )
       MCLEAN, VA  22102    )
                           )
                           )
           Nominal Defendant.    )
_____ )

**SHAREHOLDER DERIVATIVE COMPLAINT**

1

Plaintiff, by the undersigned attorneys, submits this Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.    This is a shareholder's derivative action brought for the benefit of nominal defendant Sunrise Senior Living, Inc. ("Sunrise" or the "Company") against certain members of its Board of Directors (the "Board"), and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment, statutory violations, and other violations of law.

2.    For at least five years, a majority of Sunrise directors, together with its top officers, engaged in a secret scheme to grant undisclosed, in-the-money stock options[1] to themselves and others by backdating stock option grants to coincide with historically low closing prices of Sunrise's common stock, thus manufacturing artificially low option exercise prices. In fact, in a striking pattern over four consecutive years – 1997-2000 – Sunrise's Board purportedly granted options on the same day when Sunrise stock was trading near its yearly low price. Moreover, eleven out of thirteen option grants dated from May 1997 through November 2001 were backdated,[2] eight of which were granted to some, if not all, of Sunrise's five highest compensated executives.

---

[1] A "stock option" is a contract that gives the holder the option to purchase a designated quantity of shares of a company's stock at a set price. When the option is exercised, the holder acquires the designated number of shares of the company's stock at the stated price, regardless of the stock's contemporaneous market price. "In-the-money" refers to when the exercise price of an option is below the market price of the underlying stock, resulting in an immediate gain for the option holder upon the exercise of the option.

[2] Automatic grants to directors on or near the date of the annual stockholders' meeting or pursuant to their appointment/election as directors are excluded from this pattern, as are option grants that were later exchanged pursuant to Sunrise's stock option re-pricing plan implemented by the Stock Option Committee on September 14, 1998.

3.    By engaging in this unlawful scheme, the Individual Defendants (defined herein) were able to conceal that Sunrise was not recording material compensation expenses and was materially overstating the Company's net income and earnings for at least 1997 to 2006.  From 1997 to 2006, the Individual Defendants collectively realized over $172 million in illicit proceeds through the sale of Sunrise stock based on their knowledge of material non-public information regarding the Company's backdating scheme.  By contrast, Sunrise has suffered, and will continue to suffer, significant financial and non-monetary damages and injuries, several of which were identified in a May 16, 2006 Center for Financial Research and Analysis report entitled "Options Backdating – Which Companies Are at Risk?":

- SEC investigation risk – The SEC has begun information investigations at many companies in recent months and has also begun to call for improved disclosures around all areas of executive compensation.

- Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

- Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

- Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholder, the reputation of management (and the related stock premium for superior management) could take a hit.

4.    The Individual Defendants' illegal backdating scheme not only lined the pockets of the recipients of the backdated options and caused Sunrise to issue materially false financial statements, but also undermined the key purpose of stock option-based executive compensation: to provide incentive to improve the Company's performance and increase the Company's stock price and market capitalization.  By manipulating options such that they carried an exercise price

3

lower than the trading price of the stock on the date of grant, Sunrise insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition.

5.      Sunrise shareholders first filed derivative lawsuits concerning the Company's stock option granting practices against certain of the Company's officers and directors in August and September 2006, in the Circuit Court of Fairfax County, Virginia.    Sunrise's Board subsequently appointed undisclosed persons to a special independent committee "to review recent insider sales of Sunrise stock and the Company's historical practices related to stock option grants."

6.      In gross breach of their fiduciary duties as officers and/or directors of Sunrise, the Individual Defendants colluded with one another to:

>    a.    improperly backdate dozens of grants of Sunrise stock options to Sunrise executives and directors, in violation of the Company's shareholder-approved stock option plans;
>
>    b.    improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");
>
>    c.    improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and
>
>    d.    produce and disseminate to Sunrise shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

7.      As a result of the Individual Defendants' egregious misconduct, Sunrise has sustained millions of dollars in damages, and the recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## JURISDICTION AND VENUE

4

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

10.       Plaintiff Catherine Molner is, and was at all relevant times, a shareholder of nominal defendant Sunrise.

11.      Nominal defendant Sunrise is a Delaware corporation with its principal executive offices located at 7902 Westpark Drive, McLean, Virginia 22102.  According to its public filings, Sunrise is a provider of senior living services with over 415 communities in the United States, Canada, the United Kingdom, and Germany.

### Director Defendants

12.      Defendant Ronald V. Aprahamian ("Aprahamian") has served as a director of the Company since 1995, and as a member of the Audit Committee of the Board ("Audit Committee") since 1996, chairing the Audit Committee since 2003.  Aprahamian also served as a member of the Stock Option Committee of the Board ("Stock Option Committee") in 1997.  Aprahamian also served as a consultant to the Company beginning in May 1997.

13.     Defendant Craig R. Callen ("Callen") has served as a director of the Company since 1999. Callen served as a member of the Audit Committee in 1999 and since 2004, and as a member of the Stock Option Committee from 1999 to August 23, 2002, when the Stock Option Committee merged with the Compensation Committee of the Board ("Compensation Committee").

14.     Defendant Thomas J. Donohue ("Donohue") has served as a director of Sunrise since 1995 and as a member of the Audit Committee since 1996. Donohue served as a member of the Stock Option Committee from 1996 to August 23, 2002.

15.     Defendant David G. Bradley ("Bradley") served as a director from 1997 to 2005, as a member of the Stock Option Committee from 1998 to August 23, 2002, and as a member of the Audit Committee from 2002 to 2004.

16.     Defendant J. Douglas Holladay ("Holladay") has served as a director of Sunrise since 2000, and as a member of the Audit Committee in 2001.

17.     Collectively, defendants Aprahamian, Callen, Donohue, Bradley and Holladay are referred to herein as the "Director Defendants."

**Option Recipient Defendants**

18.     Defendant Paul J. Klaassen ("Klaassen") founded the Company with his wife, Sunrise Director Teresa M. Klaassen ("Teresa Klaassen"), and has served as Chairman of the Board and Chief Executive Officer of Sunrise since 1991.

19.     Defendant David W. Faeder ("Faeder") served as the Company's, and its predecessor entities, Executive Vice President and Chief Financial Officer from 1993 to 1997. Faeder also served as the Company's President from July 1997 to April 2000, as a director from 1993 to 2003, as Vice Chairman of the Board from April 2000 to May 2003, and as a consultant

to the Company from April 2000 to March 2004.

20.    Defendant Timothy S. Smick ("Smick") served as Chief Operating Officer of the Company from February 1996 to January 1998, as Executive Vice President of the Company from May 1996 to January 1998, and as a director of the Company from October 1996 to March 1998.

21.    Defendant Thomas B. Newell ("Newell") has served as the Company's President since April 2000, as Executive Vice President from May 1996 to April 2000, as President of Sunrise Development, Inc., the Company's development subsidiary, and as General Counsel from January 1996 to April 2000.

22.    Defendant Brian C. Swinton ("Swinton") served as the Company's Executive Vice President from May 1996 to 2002, as President of the Company's venture subsidiary, Sunrise Senior Ventures, Inc., from April 2000 to 2002, and as President of the Company's joint venture company that provides assisted living services to individuals in their own homes, Sunrise At-Home Senior Living, Inc. from September 2000 to December 2002.

23.    Defendant Christian B. A. Slavin ("Slavin") served as the Company's Chief Investment Officer from November 2003 to July 2004, as Executive Vice President from May 1999 to November 2003, as Chief Financial Officer from May 1999 to April 2000, and as head of the Company's Properties Division from April 2000 to July 2004.

24.    Defendant Tiffany L. Tomasso ("Tomasso") has served as the Company's Chief Operating Officer since November 2003.  Previously Tomasso served as Executive Vice President from March 1998 to November 2003, as President of Sunrise Management Services from April 2000 to November 2003, as Senior Vice President from 1994 to 1998, and as a regional vice president from 1993 to 1994.

25.     Defendant Larry E. Hulse ("Hulse") served as the Company's Chief Accounting Officer from 1995 to March 2000, as Senior Vice President from April 2000 to November 2003, and as Chief Financial Officer from April 2000 to 2005.

26.     Defendant Robert R. Slager ("Slager") served as a director from 1999 to 2001.

27.     Defendant Carl Adams ("Adams") has served as Senior Vice President and Treasurer since December 2005.  Previously, Adams served as Senior Vice President of Sunrise Capital Group from November 2004 to December 2005, and as Sunrise Chief Accounting Officer from May 2000 to November 2004.

28.     Collectively, defendants Klaassen, Faeder, Smick, Newell, Swinton, Slavin, Tomasso, Hulse, Aprahamian, Callen, Donohue, Bradley, Holladay, Slager, and Adams are referred to herein as the "Option Recipient Defendants."

**Individual Defendants**

29.     Collectively, the Director Defendants and Option Recipient Defendants are referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

30.      By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders, so as to benefit all shareholders equally and not for self-aggrandizement.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty

8

to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

    a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

    b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

    c.    exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company; and

    d.    exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

    e.    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

33.     The Individual Defendants were responsible for maintaining and establishing

adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

(1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

   (a)    transactions are executed in accordance with management's general or specific authorization;

   (b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

34.    Sunrise's Audit Committee Charter provides that the Audit Committee shall, among other things,

a.    meet to review and discuss the company's annual audited financial statements and quarterly financials statements with management and the independent auditor, including reviewing the company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

b.    review major issues regarding accounting principles and financial statement presentations, and major issues as to the adequacy of the company's internal controls and any special audit steps adopted in light of material control deficiencies;

c.    review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of financial statements;

d.    determine whether to recommend to the board of directors that the annual audited financial statements be included in the company's

annual report on Form 10-K; and

e.    prepare the audit committee report required by the rules of the SEC to be included in the company's annual proxy statement.

## FACTUAL ALLEGATIONS

### Backdating of Stock Option Grants to the Option Recipient Defendants

35.    According to the Company's annual proxy statements, from June 5, 1996 to August 23, 2002, the Stock Option Committee "ha[d] the power and authority to take all actions and make all determinations under the Company's stock option plans, including the grant of options thereunder."    On August 23, 2002, the Stock Option Committee merged with the Compensation Committee, and thereafter the Compensation Committee was responsible for administering the Company's stock option plans and determining the grants awarded under the stock option plans.

36.    Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1996 Directors' Stock Option Plan ("1996 Director Plan"), the 1997 Stock Option Plan, the 1998 Stock Option Plan, the 1999 Stock Option Plan, the 2000 Stock Option Plan, and the 2001 Stock (collectively, the "Plans"), "[t]he Option Price shall be not less than the greater of par value or 100 percent of the fair market value of a share of Stock on the date on which the Option is granted," where fair market value is defined as "the closing price of the Stock on such exchange or system or in such market … on the trading date immediately before the Option is granted …."

37.    Additionally, each of the Plans specifically provides that "[t]he date of grant of an Option under this Plan shall be the date as of which the Board approves the grant."

38.    Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing

11

stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

39.     Pursuant to Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

40.     From 1997 to 2001, the Stock Option Committee, with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the Plans, APB 25 and Section 162(m) by knowingly and deliberately backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated options.

41.     The members of the Board who were not on the Stock Option Committee had actual knowledge of the backdating and knew that it violated the terms of the Plans, ABP 25 and Section 162(m).  All of the members of the Board knew that the publicly reported grant dates and statements that the Company followed APB 25 and granted options with exercise prices equal to the fair market value of Sunrise stock on the date of grant were false because the grants were in

fact backdated.  The entire Board knowingly and deliberately approved the backdating scheme with knowledge of its consequences, e.g., its effects on Sunrise's financial statements.

### 1997 Backdated Option Grants

42.    Purportedly on May 2, 1997, Sunrise granted 525,000 stock options to five of the Option Recipient Defendants, including four of the five highest compensated executives as disclosed in the Company's proxy statement.  These stock options were backdated to the **second lowest price of Sunrise stock for the entire year**, as demonstrated below:[3]



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price[4] | Adjusted Number of Options |
|---|---|---|---|---|---|
| 05/02/97 | Faeder | $24.38 | 100,000 | $12.19 | 200,000 |
| | Smick | $24.38 | 150,000 | $12.19 | 300,000 |
| | Newell | $24.38 | 100,000 | $12.19 | 200,000 |

---

[3] All graphs in the Complaint use adjusted exercise prices and adjusted closing prices.

[4] All tables in this complaint depict adjusted exercise prices and adjusted numbers of options to account for the Company's 2-for-1 stock split effective October 4, 2005.

| | | | | |
|---|---|---|---|---|
| Swinton | $24.38 | 75,000 | $12.19 | 150,000 |
| Aprahamian | $24.38 | 100,000 | $12.19 | 200,000 |

43.    Purportedly on August 28, 1997, Sunrise granted Tomasso 30,000 stock options.[5]

These stock options were backdated to the **second lowest Price of Sunrise stock for the fiscal**

**quarter**, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 08/28/97 | Tomasso | $30.75 | 30,000 | $15.38 | 60,000 |

44.    Purportedly on November 4, 1997, Sunrise granted Hulse 25,000 stock options.[6]

---

[5] These options were later re-priced pursuant to a re-pricing program authorized and implemented by the Stock Option Committee. The re-pricing program allowed Sunrise officers to trade in options with an exercise price of more than $29.00 in exchange for an equal number of options at an exercise price of $25.00, which was the closing price of Sunrise stock on September 14, 1998.

[6] Id.

These stock options were backdated to one of the lowest prices of Sunrise Stock for the fiscal quarter, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 11/04/97 | Hulse | $36.63 | 25,000 | $18.31 | 50,000 |

### 1998 Backdated Option Grants

45.     Purportedly on September 14, 1998, Sunrise granted a total of 755,000 stock options to five of the Option Recipient Defendants, including four of the five highest compensated executives as disclosed in the Company's proxy statement. These grants, pursuant to a re-pricing plan to give the Option Recipient Defendants additional profits, were backdated to one of the lowest prices of Sunrise stock for the fiscal year. Additionally, all the underwater

options[7] that were re-priced in favor of the Option Recipient Defendants were profitable again by the end of the year, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 09/14/98 | Faeder | $25.00 | 200,000 | $12.50 | 400,000 |
| | Newell | $25.00 | 200,000 | $12.50 | 400,000 |
| | Swinton | $25.00 | 100,000 | $12.50 | 200,000 |
| | Tomasso | $25.00 | 230,000 | $12.50 | 460,000 |
| | Hulse | $25.00 | 25,000 | $12.50 | 50,000 |

46.    Purportedly on October 8, 1998, Donohue, a member of both the Stock Option Committee and the Audit Committee at the time, was granted 10,000 stock options. These options were backdated to the **lowest price of Sunrise stock for the fiscal quarter**, as demonstrated below:

---

[7] An underwater option is a term used for options whose exercise price is above the current market stock price, and as such would be useless to exercise because the grantee would have to pay more to obtain the stock than the for what the grantee could sell the stock.



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 10/08/98 | Donohue | $30.81 | 10,000 | $15.41 | 20,000 |

47.    Purportedly on December 10, 1998, Sunrise granted Hulse 21,666 stock options. These options were backdated to a point just prior to a precipitous rise in the price of Sunrise stock, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 12/10/98 | Hulse | $41.19 | 21,666 | $20.59 | 43,332 |

### 1999 Backdated Option Grants

48.     Purportedly on March 5, 1999, Sunrise granted Hulse and Slavin a total of at least 165,000 stock options.[8]   However, Slavin **did not even begin his employment with the Company until May 1999**, according to the Company's 2003 proxy statement.  These options were backdated to one of the lowest prices of Sunrise stock for the fiscal quarter, as demonstrated below:

---

[8] Where the total number of options is unknown, *i.e.* where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

18



03/05/99: Options granted at 03/04/99 stock price of $18.81

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 03/05/99 | Hulse | $37.63 | 15,000 | $18.81 | 30,000 |
| | Slavin | $37.63 | At Least 150,000 | $18.81 | At Least 300,000 |

49.    Purportedly on November 8, 1999, Sunrise granted a total of 350,000 stock options to seven of the Option Recipient Defendants, including four of the five highest compensated executives as disclosed in the Company's proxy statement.  Callen, one of the recipients of these options, was on the Stock Option Committee and the Audit Committee on the date of grant.  These options were backdated to one of the lowest prices of Sunrise stock for the fiscal year, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 11/08/99 | Faeder | $12.75 | 65,000 | $6.38 | 130,000 |
| | Newell | $12.75 | 65,000 | $6.38 | 130,000 |
| | Swinton | $12.75 | 40,000 | $6.38 | 80,000 |
| | Tomasso | $12.75 | 65,000 | $6.38 | 130,000 |
| | Hulse | $12.75 | 35,000 | $6.38 | 70,000 |
| | Slavin | $12.75 | 70,000 | $6.38 | 140,000 |
| | Callen | $12.75 | 10,000 | $6.38 | 20,000 |

## 2000 Backdated Option Grants

50.    Purportedly on February 25, 2000 and March 28, 2000, Sunrise granted a total of over 420,000 options to eleven of the Option Recipient Defendants, including four of the five highest compensated executives as disclosed in the Company's proxy statement.  Furthermore, Donohue and Bradley, two of the recipients of the February 25, 2000 options, were members of the Stock Option Committee on the date of grant, and Aprahamian, Donohue, and Callen, all recipients of the February 25, 2000 options, comprised the entire Audit Committee on the date of

grant. These options were backdated to two of the lowest prices of Sunrise stock for the fiscal

year, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 02/25/00 | Newell | $12.38 | 60,000 | $6.19 | 120,000 |
| | Slavin | $12.38 | 55,000 | $6.19 | 110,000 |
| | Swinton | $12.38 | 45,000 | $6.19 | 90,000 |
| | Tomasso | $12.38 | 55,000 | $6.19 | 110,000 |
| | Faeder | $12.38 | 60,000 | $6.19 | 120,000 |
| | Hulse | $12.38 | 7,222 | $6.19 | 14,444 |
| | Donahue | $12.38 | 16,000 | $6.19 | 32,000 |
| | Aprahamian | $12.38 | 11,000 | $6.19 | 22,000 |
| | Slager | $12.38 | 5,000 | $6.19 | 10,000 |
| | Bradley | $12.38 | 7,000 | $6.19 | 14,000 |
| | Callen | $12.38 | 8,000 | $6.19 | 16,000 |
| 03/28/00 | Newell | $12.44 | 25,000 | $6.22 | 50,000 |
| | Slavin | $12.44 | 15,000 | $6.22 | 30,000 |
| | Swinton | $12.44 | 15,000 | $6.22 | 30,000 |
| | Tomasso | $12.44 | 15,000 | $6.22 | 30,000 |
| | Hulse | $12.44 | 25,000 | $6.22 | 50,000 |

51.     Purportedly on May 22, 2000, Sunrise granted Adams and Holladay a total of at least 14,500 stock options.  These options were backdated to a point just prior to a precipitous rise in the price of Sunrise stock, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 05/22/00 | Adams | $15.56 | At least 2,500 | $7.78 | At least 5,000 |
| | Holladay | $15.56 | At Least 12,000 | $18.81 | At Least 24,000 |

52.     Purportedly on September 11, 2000, Co-founder, Chairman of the Board, and CEO Klaassen was granted 350,000 stock options.  The Company's proxy statement indicates that this was pursuant to an new employment agreement entered into with Klaassen in September of 2000, which conveniently granted stock options to him when Sunrise stock was **at the lowest price of the month of September** and near the lowest price of the fiscal quarter, as

demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 09/11/00 | Klaassen | $17.00 | 350,000 | $8.50 | 700,000 |

53.    Purportedly on November 24, 2000, Sunrise granted 75,000 options to Slavin. These options were backdated to a point just prior to a precipitous rise in the price of Sunrise stock, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 11/24/00 | Slavin | $26.31 | 75,000 | $13.16 | 150,000 |

### 2001 Backdated Option Grants

54.     Purportedly on November 12, 2001, Sunrise granted 60,000 stock options to Slavin.  These options were backdated to a point just prior to a precipitous rise in the price of Sunrise Stock as demonstrated below:



11/12/01: Options granted at 11/09/01 stock price of $13.48

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 11/12/01 | Slavin | $26.96 | 60,000 | $13.48 | 120,000 |

55.     Each and every one of the aforementioned stock option grants were dated just before a significant increase in Sunrise stock price and/or at or near Sunrise's lowest closing price of the pertinent fiscal quarter or year. The reason for the extraordinary patterns set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, at the behest of the Option Recipient Defendants, the Stock Option Committee, with the knowledge and approval of the other members of the Board, knowingly and deliberately backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby unduly benefiting the Option Recipient Defendants. This improper backdating, which violated the terms of the Company's

25

stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options and improperly reduced the amounts the Option Recipient Defendants had to pay the Company upon exercise of the options.

## Ultra Vires Stock Option Grants

56.    As discussed above, pursuant to all of the Plans, stock options granted by Sunrise must be granted at least at fair market value and require a one-day look back to the preceding day's closing price to determine what that fair market value is.

57.    However, two stock option grants by Sunrise during the relevant period violated one or both of these provisions in direct contradiction of the shareholder-approved stock option plans, and therefore are ultra vires, and void. Defendants Faeder, Newell, Swinton, Tomasso, Hulse, Adams, Donohue, Bradley and Callen were the recipients of these ultra vires options, and are hereinafter referred to at the "Ultra Vires Option Recipient Defendants."

58.    Purportedly on March 3, 1998, Sunrise granted 600,000 stock options to four of the five highest compensated executives as disclosed in the Company's proxy statement. The exercise price of these options was $43.50, according the Sunrise's 1999 proxy statement, but the closing price on March 2, 1998 was $43.63. These options were granted at a price below fair market value in violation of the shareholder-approved stock option plans.

59.    The following chart indicates the recipients of these stock options and the stock options' adjusted value:

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 03/03/98 | Faeder | $43.50 | 200,000 | $26.75 | 400,000 |
| | Newell | $43.50 | 200,000 | $26.75 | 400,000 |
| | Swinton | $43.50 | 100,000 | $26.75 | 200,000 |
| | Tomasso | $43.50 | 100,000 | $26.75 | 200,000 |

60.    Despite the fact that these options were later re-priced pursuant to the Company's re-pricing plan enacted on September 14, 1998, the new options granted to the Ultra Vires Option Recipient Defendants listed above were exchanged for ultra vires options granted at an exercise price below fair market value.

61.    The second ultra vires option grant was purportedly dated May 11, 2001, the date of the annual shareholders' meeting.  The over 240,000 stock options granted on this date failed to use the one day look-back provision to determine fair market value for the exercise price of the options from the closing price on the day preceding the date of grant, but instead granted the options at the closing price on the date of grant.  This grant date was **the only time in the entire history of Sunrise's stock option grants that a one day look-back was not used** to determine the exercise price of the options and substantially favored the recipients of stock options on that date.  If a one day look-back provision had been applied the exercise price of options would have been $20.97, instead of the $20.00 exercise price at which the stock options were granted. Furthermore, the options were granted at one of the lowest prices of Sunrise Stock for the fiscal year, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 05/11/01 | Faeder | $20.00 | 50,000 | $10.00 | 100,000 |
| | Newell | $20.00 | 70,000 | $10.00 | 140,000 |
| | Swinton | $20.00 | 30,000 | $10.00 | 60,000 |
| | Tomasso | $20.00 | 30,000 | $10.00 | 60,000 |
| | Hulse | $20.00 | 25,000 | $10.00 | 50,000 |
| | Adams | $20.00 | At least 15,000 | $10.00 | At least 30,000 |
| | Donohue | $20.00 | 12,000 | $10.00 | 24,000 |
| | Bradley | $20.00 | 7,000 | $10.00 | 14,000 |
| | Callen | $20.00 | 10,000 | $10.00 | 20,000 |

62.    Both of the aforementioned stock option grants to the Ultra Vires Option Recipient Defendants were granted in violation of the shareholder-approved stock option plans, and therefore are ultra vires, and void.

**The Individual Defendants' Dissemination of False Financial Statements**

63.    The Individual Defendants prepared, approved and/or signed Sunrise's annual and quarterly SEC reports during the relevant period.  The Individual Defendants knowingly and deliberately caused the Company to disseminate materially false and misleading statements in the periodic filings that the Indivdiual Defendants prepared, approved, and/or signed.

64.    The Individual Defendants' option backdating scheme caused each of Sunrise's Forms 10-K and Forms 10-Q for the relevant period to materially understate Sunrise's compensation expense and materially overstate the Company's net income or materially understate its net loss, because the Individual Defendants failed to expense the in-the-money portion of Sunrise's stock option grants during the period as required by APB 25.

65.    As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants,

    a.    violated the terms of the Company's shareholder-approved stock option plans by granting stock options with exercise prices less than the fair market value of the price of Sunrise stock on the date of grant;

    b.    violated APB 25 by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

    c.    violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

    d.    produced and disseminated to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants, and thereby understated compensation expense and overstated net income.

66.    The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following

Form 10-K filings:

a.    Form 10-K for the fiscal year ended December 31, 1997, filed with the SEC on March 31, 1998 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Bradley and Donohue;

b.    Form 10-K for the fiscal year ended December 31, 1998, filed with the SEC on March 31, 1999 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Bradley and Donohue;

c.    Form 10-K for the fiscal year ended December 31, 1999, filed with the SEC on March 30, 2000 and signed by defendants Klaassen, Faeder, Slavin, Hulse, Aprahamian, Callen, Bradley, Slager and Donohue;

d.    Form 10-K for the fiscal year ended December 31, 2000, filed with the SEC on March 30, 2001 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Callen, Adams, Bradley, Holladay and Donohue;

e.    Form 10-K for the fiscal year ended December 31, 2001, filed with the SEC on March 29, 2002 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Callen, Adams, Bradley, Holladay and Donohue;

f.    Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 27, 2003 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Adams, Callen, Bradley, Holladay and Donohue;

g.    Form 10-K for the fiscal year ended December 31, 2003, filed with the SEC on March 12, 2004 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Adams, Callen, Bradley, Holladay and Donohue;

h.    Form 10-K for the fiscal year ended December 31, 2004, filed with the SEC on March 16, 2005 and signed by defendants Klaassen, Hulse, Aprahamian, Callen, Bradley, Holladay and Donohue; and

i.    Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on March 16, 2006 and signed by defendants Klaassen, Aprahamian, Callen, Holladay and Donohue.

67.    Specifically, in the Company's annual reports on Form 10-K for fiscal years 1996 to 2003, the Individual Defendants caused Sunrise to falsely state that "the Company has elected to follow Accounting Principles Board Opinion No. 25, 'Accounting for Stock Issued to Employees' ('APB 25'), and related interpretations, in accounting for its employee and director

30

stock option and stock incentive plans.  Under APB 25, if the exercise price of the Company's stock options is not less than the market price of the underlying stock on the date of grant, no compensation expense is recognized."  Such statements were materially false and misleading in each of these years because Sunrise had granted stock options at prices that were below fair market value on the date of the grant and failed to account for the in-the-money options as required by APB 25.

68.    As alleged previously, APB 25 required the Individual Defendants to record compensation expense for options that were in-the-money on the date of grant.  However, they did not do so, thereby materially understating Sunrise's compensation expense and materially overstating Sunrise's net income or materially understating its net loss.  These statements were designed to conceal, and did in fact conceal, the fact that the Individual Defendants were engaged in a continuous and systematic scheme of backdating stock option grants to Sunrise insiders in violation of state and federal laws.

69.    Additionally, Sunrise's materially false and misleading financial statements for fiscal years 1998 to 2002 were included in its Forms 10-K filed for subsequent fiscal years.  For this reason, and to the extent they included financials from earlier periods, Sunrise's annual reports on Form 10-K for fiscal years 2003 to 2005 were also materially false and misleading.  By participating in the secret backdating scheme, and by reviewing and/or signing these subsequent annual reports, the Individual Defendants knew, or were reckless in not knowing, that the financial statements in these later filings were materially false and misleading.

70.    Furthermore, Defendants Klaassen and Hulse filed false Certifications of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "Certification"), certifying that

each Annual Report of Sunrise on Form 10-Ks "fully complies with the requirements of section 13(a) and 15(d) of the Securities Exchange Act of 1934; and the information contained in the Report fairly presents, in all material respects, the financial conduction and results of operations of the Company."  Defendants Klaassen and Hulse signed the following certifications:

       a.      for the Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 27, 2003

       b.      for the Form 10-K for the fiscal year ended December 31, 2003, filed with the SEC on March 12, 2004;

       c.      for the Form 10-K for the fiscal year ended December 31, 2004, filed with the SEC on March 16, 2005; and

       d.      for the Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on March 16, 2006[9].

### The Individual Defendants' Concealment of Their Misconduct

71.    The Individual Defendants caused Sunrise to send shareholders proxy statements in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the relevant period.  The Individual Defendants prepared and/or reviewed each proxy statement between 1999 and 2006.  Moreover, they knew, or were deliberately reckless in not knowing, that the proxies were materially false and misleading.

72.    The Sunrise proxy statements that were sent to shareholders by the Individual Defendants annually in connection with annual shareholders' meeting concerned the election of directors, the approval and adoption of a new Sunrise stock option plan, and ratification of the selection of Sunrise's independent auditor.  Each proxy statement sent to shareholders during this

---

[9] Defendant Hulse did not sign this Certification as he was no longer the Chief Financial Officer in 2006.

period contained materially false and misleading disclosures or omitted information about Sunrise's stock option practices, as detailed above.

73.     From 1998 to 2002, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Individual Defendants and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant," as follows:

a.     Sunrise's proxy statement filed with the SEC on April 3, 1998 falsely reported that options granted to Faeder, Smick, Newell, and Swinton were granted on May 2, 1997, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

b.     Sunrise's proxy statement filed with the SEC on April 6, 1999 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on September 14, 1998, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

c.     Sunrise's proxy statement filed with the SEC on April 14, 2000 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on November 8, 1999, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

d.     Sunrise's proxy statement filed with the SEC on March 29, 2001 falsely reported that options granted to Klaasen were granted on September 11, 2000, that options granted to Newell, Slavin, Swinton, and Tomasso were granted on February 25, 2000 and March 28, 2000, and that options granted to Slavin were granted on November 24, 2000, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

    e.    Sunrise's proxy statement filed with the SEC on April 5, 2002 falsely reported that options granted to Newell, Swinton, Tomasso, and Hulse were granted on May 11, 2001 and that options granted to Slavin were granted on November 12, 2001, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

74.    Moreover, in the Compensation Committee Reports included in the Company's proxy statements filed from 1998 to 2002, the Company falsely stated that "[t]he full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price," when in fact the backdated stock options and ultra vires stock options provided the Option Recipient Defendants with immediate profits regardless of the Company's stock performance.

75.    Furthermore, from 2003 to 2006, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, filed with the SEC Form 4's that falsely reported the dates of stock option grants to the Individual Defendants, as follows:

    a.    Swinton's Form 4 filed with the SEC on May 21, 2003 falsely reported that options granted to Swinton had been granted on March 28, 2000;

    b.    Faeder's Form 4 filed with the SEC on July 16, 2003 falsely reported that options granted to Faeder had been granted on November 8, 1999;

    c.    Faeder's Form 4 filed with the SEC on August 21, 2003 falsely reported that options granted to Faeder had been granted on May 11, 2001;

    d.    Faeder's Form 4 filed with the SEC on August 22, 2003 falsely reported that options granted to Faeder had been granted on May 11, 2001;

    e.    Newell's Form 4 filed with the SEC on August 25, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

    f.    Faeder's Form 4 filed with the SEC on September 2, 2003 falsely reported that options granted to Faeder had been granted on May 11, 2001;

g.  Hulse's Form 4 filed with the SEC on September 5, 2003 falsely reported that options granted to Faeder had been granted on February 25, 2000 and March 28, 2000;

h.  Newell's Form 4 filed with the SEC on September 23, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

i.  Faeder's Form 4 filed with the SEC on October 3, 2003 falsely reported that options granted to Faeder had been granted on May 2, 1997;

j.  Swinton's Form 4 filed with the SEC on October 3, 2003 falsely reported that options granted to Swinton had been granted on February 25, 2000;

k.  Swinton's Form 4 filed with the SEC on October 14, 2003 falsely reported that options granted to Swinton had been granted on November 8, 1999;

l.  Swinton's two Form 4's filed with the SEC on October 21, 2003 falsely reported that options granted to Swinton had been granted on May 11, 2001;

m.  Newell's Form 4 filed with the SEC on October 23, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

n.  Swinton's Form 4 filed with the SEC on October 29, 2003 falsely reported that options granted to Swinton had been granted on May 11, 2001;

o.  Tomasso's Form 4 filed with the SEC on October 30, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999;

p.  Tomasso's Form 4 filed with the SEC on October 31, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999 and March 28, 2000;

q.  Swinton's Form 4 filed with the SEC on November 6, 2003 falsely reported that options granted to Swinton had been granted on May 2, 1997;

r.  Slavin's Form 4 filed with the SEC on November 7, 2003 falsely reported that options granted to Slavin had been granted on February 25, 2000;

s.  Tomasso's Form 4 filed with the SEC on November 7, 2003 falsely reported that options granted to Tomasso had been granted on February 25, 2000;

t.     Hulse's Form 4 filed with the SEC on November 12, 2003 falsely reported that options granted to Hulse had been granted on May 11, 2001;

u.     Slavin's Form 4 filed with the SEC on November 12, 2003 falsely reported that options granted to Slavin had been granted on November 8, 1999, February 25, 2000, March 28, 2000, November 24, 2000, and November 12, 2001;

v.     Faeder's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Faeder had been granted on November 8, 1999;

w.     Hulse's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Hulse had been granted on November 8, 1999;

x.     Swinton's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Swinton had been granted on November 8, 1999;

y.     Tomasso's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999;

z.     Slavin's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Slavin had been granted on November 8, 1999;

aa.    Newell's Form 4 filed with the SEC on November 26, 2003 falsely reported that options granted to Newell had been granted on March 28, 2000;

bb.    Slavin's Form 4 filed with the SEC on December 5, 2003 falsely reported that options granted to Slavin had been granted on November 24, 2000 and November 12, 2001;

cc.    Tomasso's Form 4 filed with the SEC on December 22, 2003 falsely reported that options granted to Tomasso had been granted on May 11, 2001;

dd.    Newell's Form 4 filed with the SEC on December 23, 2003 falsely reported that options granted to Newell had been granted on November 8, 1999 and March 28, 2000;

ee.    Newell's Form 4 filed with the SEC on January 23, 2004 falsely reported

that options granted to Newell had been granted on November 8, 1999;

ff.    Newell's Form 4 filed with the SEC on February 25, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

gg.    Hulse's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Hulse had been granted on February 25, 2000;

hh.    Tomasso's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Tomasso had been granted on February 25, 2000;

ii.    Faeder's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Faeder had been granted on February 25, 2000;

jj.    Slavin's Form 4 filed with the SEC on March 4, 2004 falsely reported that options granted to Slavin had been granted on February 25, 2000;

kk.    Slavin's Form 4 filed with the SEC on March 5, 2004 falsely reported that options granted to Slavin had been granted on February 25, 2000;

ll.    Swinton's Form 4 filed with the SEC on March 9, 2004 falsely reported that options granted to Swinton had been granted on February 25, 2000;

mm.    Newell's Form 4 filed with the SEC on March 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

nn.    Hulse's Form 4 filed with the SEC on March 31, 2004 falsely reported that options granted to Hulse had been granted on March 28, 2000;

oo.    Tomasso's Form 4 filed with the SEC on March 31, 2004 falsely reported that options granted to Tomasso had been granted on March 28, 2000;

pp.    Slavin's Form 4 filed with the SEC on March 31, 2004 falsely reported that options granted to Slavin had been granted on March 28, 2000;

qq.    Newell's Form 4 filed with the SEC on April 23, 2004 falsely reported that options granted to Newell had been granted on February 25, 2000;

rr.    Newell's Form 4 filed with the SEC on May 24, 2004 falsely reported that options granted to Newell had been granted on February 25, 2000;

ss.    Hulse's Form 4 filed with the SEC on May 26, 2004 falsely reported that options granted to Hulse had been granted on May 11, 2001;

tt.      Newell's Form 4 filed with the SEC on June 23, 2004 falsely reported that options granted to Newell had been granted on March 28, 2000;

uu.      Newell's Form 4 filed with the SEC on July 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999 and March 28, 2000;

vv.      Newell's Form 4 filed with the SEC on August 24, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

ww.     Newell's Form 4 filed with the SEC on September 24, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

xx.      Newell's Form 4 filed with the SEC on October 25, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

yy.      Newell's Form 4 filed with the SEC on November 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

zz.      Tomasso's Form 4 filed with the SEC on December 16, 2004 falsely reported that options granted to Tomasso had been granted on May 11, 2001;

aaa.     Newell's Form 4 filed with the SEC on December 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

bbb.     Newell's Form 4 filed with the SEC on January 25, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ccc.     Newell's Form 4 filed with the SEC on February 24, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ddd.     Newell's Form 4 filed with the SEC on March 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

eee.     Newell's Form 4 filed with the SEC on April 26, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

fff.     Hulse's Form 4 filed with the SEC on May 12, 2005 falsely reported that options granted to Hulse had been granted on May 2, 1997;

ggg.     Newell's Form 4 filed with the SEC on May 24, 2005 falsely reported that

options granted to Newell had been granted on May 2, 1997;

hhh.   Aprahamian's Form 4 filed with the SEC on May 24, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

iii.    Aprahamian's Form 4 filed with the SEC on May 26, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

jjj.    Aprahamian's Form 4 filed with the SEC on May 31, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

kkk.   Newell's Form 4 filed with the SEC on June 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

lll.    Newell's Form 4 filed with the SEC on July 25, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

mmm. Newell's Form 4 filed with the SEC on August 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

nnn.   Newell's Form 4 filed with the SEC on September 26, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ooo.   Donohue's Form 4 filed with the SEC on November 22, 2005 falsely reported that options granted to Donohuel had been granted on February 25, 2000;

ppp.   Aprahamian's Form 4 filed with the SEC on April 20, 2006 falsely reported that options granted to Aprahamian had been granted on May 2, 1997.

76.    The Individual Defendants have never disclosed the true grant dates of the stock options described herein.

**Backdating Revealed at Sunrise**

77.    On December 11, 2006, Sunrise announced an SEC investigation of the Company and the appointment of a special committee whose bifurcated purpose was to review insider sales of Sunrise stock and the Company's historical practices relating to stock option grants:

Sunrise Senior Living, Inc. (NYSE: SRZ) today announced that its Board of Directors has appointed a special independent committee to review recent insider sales of Sunrise stock and the Company's historical practices related to stock option grants. The Board's decision followed receipt of a letter from a union shareholder that was simultaneously sent to news outlets, which resulted in media coverage and a subsequent request by the Securities and Exchange Commission (SEC) for information about matters raised in the media reports. The special committee has retained independent outside legal counsel to assist in its review.

Sunrise is committed to sound corporate governance and transparency and the Board has determined that a comprehensive review by a special committee and independent counsel is the most appropriate way to address these matters in a timely manner.

The review by the special committee will be conducted in parallel with the Company's ongoing efforts to complete the previously announced restatement of its financial statements. In view of these ongoing efforts and the special committee review, the Company now anticipates that its restated 2005 Form 10-K will be delayed beyond year-end, but still expects to be current in all of its filings with the SEC by March 1, 2007.

78.    As of the filing date of this Complaint, Sunrise has not released any finding from the special committee.  However on January 15, 2007, the Company did admit that Sunrise will not be current in all of its filings with the SEC by March 1, 2007 as previously announced in the December 11, 2006 press release.

**Individual Defendants' Insider Selling**

79.    From 1997 to 2006, certain of the Individual Defendants, while in possession of materially adverse non-public information regarding the backdating and ultra vires granting of stock options and the false financial statements resulting therefrom, sold more than $172 million in Sunrise stock, a significant portion of which was obtained through the exercise of improperly backdated stock options, as demonstrated below:

| Defendant | Dates of Sales | Shares Sold | Proceeds |
|-----------|----------------|-------------|----------|
| Adams | 09/03/03 to 06/07/04 | 17,841 | $590,106.75 |
| Aprahamian | 07/02/01 to 04/18/06 | 215,200 | $8,848,497.20 |

| Callen | 05/26/05 | 10,000 | $521,093.00 |
| Donohue | 01/29/04 to 11/21/05 | 134,378 | $3,732,527.28 |
| Faeder | 03/09/98 to 02/25/04 | 749,727 | $22,118,963.33 |
| Holladay | 05/12/05 to 03/21/06 | 39,000 | $1,873,125.00 |
| Hulse | 03/10/98 to 08/12/05 | 239,897 | $9,304,495.07 |
| Klaassen[10] | 12/17/97 to 05/02/06 | 1,462,106 | $56,363,094.63 |
| Newell | 03/09/98 to 04/24/06 | 733,886 | $26,230,945.70 |
| Slavin | 12/29/00 to 05/17/04 | 278,546 | $8,990,534.92 |
| Smick | 03/26/98 to 06/30/98 | 60,417 | $2,125,947.25 |
| Swinton | 12/01/97 to 03/05/04 | 461,307 | $14,493,371.22 |
| Tomasso | 03/09/98 to 02/02/05 | 472,335 | $17,265,701.75 |
| **TOTAL** | | **4,874,640** | **$172,458,403.10** |

### SUNRISE'S FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP, SEC REGULATIONS AND IRS RULES AND REGULATIONS

80.    As a result of the Individual Defendants' improper backdating of stock options, the Individual Defendants caused Sunrise to violate GAAP, SEC regulations and IRS rules and regulations.

81.    Sunrise's financial results for 1994 through 2006 were included in reports filed with the SEC and in other shareholder reports. In these reports, the Individual Defendants represented that Sunrise's financial results were presented in a fair manner and in accordance with GAAP.

82.    The Individual Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

---

[10] This includes proceeds of sales by Paul Klaassen and his wife Teresa Klaassen as they filed Form 4s jointly reporting their transactions starting in May of 2002.

83.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

### Violations of GAAP

84.     During the relevant period, the Individual Defendants caused the Company to understate its compensation expenses by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.

85.     Under well-settled accounting principles in effect throughout the relevant period, Sunrise did not need to record an expense for options granted to employees at the current market price ("at the money").  The Company was, however, required to record an expense in its financial statements for any options granted below the current market price ("in the money").  In order to provide Sunrise executives and employees with far more lucrative "in the money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), the Individual Defendants systematically falsified Company records to create the false appearance that options had been granted at the market price on an earlier date.

86.     Throughout the relevant period, Sunrise accounted for stock options using the intrinsic method described in APB No. 25, "Accounting for Stock Issued to Employees."  Under APB No. 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date."  An option that is in-the-

money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option.  Options that are at-the-money or out-of-the-money on the measurement date need not be expensed.  Excluding non-employee directors, APB No. 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were in-the-money or not on the date of grant.

### Sunrise's GAAP Violations Were Material

87.    Sunrise's false and misleading relevant period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality.  SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality.  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative, as well as quantitative, considerations.  For example, if a known misstatement would cause a significant market reaction that reaction should be taken into account in determining the materiality of the misstatement.

88.    SAB Topic 1M further states:

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

\*        \*        \*

whether the misstatement masks a change in earnings or other trends

whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

\*        \*        \*

whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the

43

registrant's operations or profitability.

89.     SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

90.     Sunrise's misstatements satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

### Sunrise's Financial Statements Violated Fundamental Concepts of GAAP

91.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

44

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

92.     Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

**Sunrise's Financial Statements Violated SEC Regulations**

93.     During the relevant period, the Individual Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

94.     Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers – the Company's CEO and its next four most highly paid executives.  Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year.  In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any

"[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options. . . . If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant. . . ." Item 402(c)(2)(iv).

95.    The Individual Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted options with exercise prices below the market value on the date that the Stock Option Committee approved the grant.

### Sunrise's Violations of IRS Rules and Regulations

96.    During the relevant period, the Individual Defendants further caused Sunrise to violate IRS rules and regulations due to its improper accounting for the backdated stock options. As a result, the Company's tax liabilities were understated, exposing Sunrise to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

97.    The Individual Defendants caused the Company to violate IRS Code §162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based." In order for compensation to be performance-based, the Stock Option Committee must have set pre-established and objective performance goals. The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant. Accordingly, properly issued stock options do not have to be taken into account in

calculating whether an executive's compensation has exceeded the $1 million compensation cap.

98.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance. This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

99.    The Individual Defendants caused Sunrise to violate IRS Code §162(m) by providing backdated options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant. As a result all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

100.    The Individual Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the exercise of Sunrise's stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options ("ISOs").

101.    ISOs are a form of equity compensation that may be provided to a company's employees. ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment as they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of

exercise). Stock options that do not qualify as ISOs are considered to be NSOs. NSOs are not entitled to preferential treatment as they are subject to income tax and FICA withholding upon exercise. As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

102.    By improperly treating its backdated options as ISOs, the Individual Defendants failed to provide proper income tax and FICA withholdings upon the exercise of its options by its executives and employees in violation of IRS rules and regulations.

103.    The chart below illustrates Sunrise's false and misleading fiscal year financial results which materially understated its compensation expenses and thus overstated its earnings:

| Fiscal Year Ended | Reported Net Income (Loss) In Thousands | Reported Diluted Earnings (Loss) Per Share |
|---|---|---|
| December 31, 1997 | $4,001 | $0.20 |
| December 31, 1998 | $22,312 | $1.16 |
| December 31, 1999 | $20,213 | $0.94 |
| December 31, 2000 | $24,278 | $1.10 |
| December 31, 2001 | $49,101 | $1.04 |
| December 31, 2002 | $54,661 | $1.12 |
| December 31, 2003 | $62,178 | $1.32 |
| December 31, 2004 | $50,687 | $1.12 |
| December 31, 2005 | $79,742 | $1.67 |

104.    Meanwhile, the Option Recipient Defendants were causing the Company to grant them hundreds of thousands of backdated Sunrise stock options. The Company's executives and directors received a significant number of backdated Sunrise stock options as compensation during the relevant period.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

105.    In a misguided effort to attract and retain employees in a competitive environment, the Individual Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme.  The Individual Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company.  Specifically, the Individual Defendants breached their fiduciary duties by:

    a.      colluding with each other to backdate stock option grants;

    b.      colluding with each other to violate GAAP and Section 162(m);

    c.      colluding with each other to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.      colluding with each other to file false proxy statements, false financial statements, and False Form 4's in order to conceal the improper backdating of stock options.

106.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

107.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company is required to incur, loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grants, costs and expenses

incurred in connection with the Company's internal investigation and restatement of historical financial statements, and the SEC investigation of the Company.

108.    As alleged herein, certain of the Option Recipient Defendants have exercised hundreds of thousands of backdated Sunrise stock options at improperly low prices and have then sold the shares for substantial profits.  Consequently, these defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

109.    On May 26, 2006, *Forbes*, in an article titled, "The Next Big Scandal," quoted Former Securities and Exchange Commission ("SEC") Chairman Harvey L. Pitt, saying "What's so terrible about backdating options grants?  For one thing, it likely renders a company's proxy materials false and misleading.  Proxies typically indicate that options are granted at fair market value.  But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

110.    On June 18, 2006, in an article titled, "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here' . . . It's a question of knowingly betting on a race that's already been run."

111.    On July 22, 2006, *The San Francisco Chronicle* recounted SEC Chairman Christopher Cox's announcement in San Francisco on July 20, 2006 where he said, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . . It is securities fraud if you falsify books and records.  It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted

accounting principles. There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"

112.    On September 6, 2006, MarketWatch, in an article titled "SEC Probing more than 100 firms on options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard Shelby, saying that manipulation of options grant dates "appears to be a ***black-and-white example of securities fraud***," and "Corporate officers and directors engaging in this practice are cheating the owners of the company and should be held accountable to the fullest extent possible."

113.    Shortly thereafter, on September 6, 2006, the United States Senate Committee on Finance held a hearing on "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits." At the Senate Finance Committee Hearing, the Senate Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated: "[Options backdating] is behavior that, to put it bluntly, is disgusting and repulsive. It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves. And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

114.    Further, at the Senate Finance Committee Hearing, SEC Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws." The

Commissioner of the IRS Mark Everson agreed and further stated, "Picking a date on which the stock price was low in comparison with the current price gives the employee the largest potential for gain on the option and makes it possible for the employee to benefit from corporate performance that occurred before the option was granted."

115.    In his statement before the Senate Finance Committee, Deputy Attorney General Paul J. McNulty described the practice of stock option backdating "as a brazen abuse of corporate power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders," and said "for some of those companies that have now disclosed backdated grants, corporate reputations have been tarnished and shareholder value has diminished substantially. . .."

116.    In addition to the foregoing, a recent academic study revealed that outside directors of companies were also benefiting from backdating and were recipients of manipulated stock option grants, as detailed in the following *Wall Street Journal* article published on December 18, 2006:

> A new academic study suggests that many outside directors received manipulated stock-option grants, a finding that may help explain why the practice of options backdating wasn't stopped by the boards of some companies.
>
> The statistical study, which names no individuals or firms, estimates that 1,400 outside directors at 460 companies received questionable option grants, suggesting the widespread practice extended well beyond the executive suite.
>
> The study is notable because it suggests that outside, or independent, directors -- who are supposed to play a special role safeguarding against cozy board relationships with management -- may have been co-opted in options backdating by receiving manipulated grants themselves. The New York Stock Exchange requires that a majority of board seats, and all compensation- and audit-committee members, be independent . . . .

The evidence "contributes to understanding the possible factors that led to or enabled manipulation to occur," states the unpublished study, which was conducted by professors at Harvard and Cornell universities and the French business school Insead . . . .

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

117.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

118.    Plaintiff is an owner of Sunrise common stock and was an owner of Sunrise common stock at all times relevant hereto.

119.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

120.    As a result of the facts set forth herein, plaintiff has not made any demand on the Sunrise Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

121.    At the time this action was commenced the Board consisted of seven directors: defendants Klaassen, Aprahamian, Callen, Donohue, and Holladay and directors Teresa Klaassen and William G. Little ("Little"). The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

    a.    Klaassen, Aprahamian, Callen, Donohue, and Holladay, because they are directly interested in the improperly backdated stock option grants complained of herein;

    b.    Klaassen, because as Chief Executive Officer of the Company, Klaassen stands to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation, all of which must be approved by defendants Aprahamian, Callen, and Donohue, who are the current members of the Compensation Committee;

c.  Aprahamian, Callen, and Donohue, because as members of the Stock Option Committee, they knowingly and deliberately backdated stock option grants, as alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein.  Moreover, by colluding with the Option Recipient Defendants, as alleged herein, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Option Recipient Defendants;

d.  Aprahamian, Callen, Donohue, and Holladay, because as members of the Audit Committee, they knowingly and deliberately participated in and approved the filing of false financial statements and other false SEC filings as alleged herein and knowingly and deliberately participated in and approved the Company's violations of GAAP and Section 162(m) as alleged herein, and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein.  Moreover, by colluding with the Option Recipient Defendants, as alleged herein, Aprahamian, Callen, Donohue, and Holladay have demonstrated that they are unable or unwilling to act independently of the Option Recipient Defendants;

e.  Teresa Klaassen, the wife of defendant Klaassen and the co-founder of the Company, because of her close familial and business relationship with Klaassen; and

f.  Klaassen, Donohue, and Little, because they share a long-standing personal and professional relationship, specifically as fellow members on the Board of Directors of the U.S. Chamber of Commerce, of which Donohue is the CEO and President, and as fellow members on the Board of Directors of the National Chamber Foundation, of which Donohue is the President and Little is the Chairman of the Board of Directors;

g.  Klaassen, Teresa Klaassen, and Donohue, because they share a long standing personal and professional relationship, in addition to what is described above, Klaassen and Teresa Klaassen lived with Donohue for a period of time, and Donohue also invested in the Klaassen's first home;

h.  Klaassen, because he shares a personal and professional relationship with defendant Swinton, specifically as they are both "Fellows and Instructors in Executive Education" at the University of Maryland, Baltimore County (UMBC), Erickson School of Aging Studies; and

      i.     Callen, because he and his employers Donaldson, Lufkin & Jenrette Securities Corporation, Credit Suisse First Boston, and Aetna, have done business with Sunrise Senior Living during virtually his entire tenure on the board.

122.    Defendants Klaassen, Aprahamian, Callen, Donohue, and Holladay's positions during the relevant period are summarized in the table below:

| Defendant | Recipient of Backdated Stock Options | Member of the Stock Option Committee | Member of the Audit Committee |
|---|---|---|---|
| Klaassen | x | | |
| Aprahamian | x | x | x |
| Callen | x | x | x |
| Donohue | x | x | x |
| Holladay | x | | x |

123.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. As represented in Sunrise's proxy statements, the stated purposes of granting stock options is to attract and retain skilled executive personnel and align their interests with those of the stockholders, specifically the Compensation Committee reports state "[s]tock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains."   However, by granting Sunrise stock options with backdated exercise prices, the Individual Defendants undermined the purpose of the stock option plans by awarding employees compensation that had intrinsic value regardless of Sunrise's performance. In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders and the Company.

124.    The Individual Defendants could have achieved the stated purpose of attracting and retaining executives by granting those employees additional stock options under their

incentive plans, or by granting stock options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants. Instead, the Director Defendants backdated stock option grants in violation of the Plans and improperly reported these grants in their financial disclosures to improve their bottom line.

125. The practice of backdating stock options cannot be a valid exercise of business judgment because it has subjected Sunrise to potentially massive liability. The SEC has initiated an investigation into Sunrise's stock option granting practices. Sunrise will also likely suffer tax liabilities for the additional compensation it will have to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I

### Against the Individual Defendants for
### Violations of §10(b) and Rule 10b-5 of the Securities and Exchange Act

126. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127. Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.

128. The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and/or directors of the Company, each of the Individual Defendants was able to and did control the conduct complained of herein.

129. The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and/or directors of the Company and were therefore directly responsible for the fraud alleged herein.

130. The Company relied upon the Individual Defendants' fraud in granting the Option Recipient Defendants options to purchase shares of the Company's common stock, as alleged herein.

131. As a direct and proximate result of the Individual Defendants' fraud, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company is required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

## COUNT II

### Against the Individual Defendants for
### Violations of §14(a) of the Securities Exchange Act

132. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133. Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14-A-9.

134.    The proxy statements described herein violated §14(a) and Rule 14-A-9 because they omitted material facts, including the fact that the Individual Defendants were causing Sunrise to engage in an option backdating scheme, a fact which the Individual Defendants were aware of and participated in from at least 1997.

135.    In the exercise of reasonable care, the Individual Defendants should have known that the proxy statements were materially false and misleading.

136.    The misrepresentations and omissions in the proxy statements were material.  The proxy statements were an essential link in the accomplishment of the continuation of the Individual Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of the shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

137.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT III

### Against Klaassen, Faeder, Slavin, Hulse and the Director Defendants for Violations of §20(a) of the Securities Exchange Act

138.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

139.    Klaassen, Faeder, Slavin, Hulse and the Director Defendants, by virtue of their positions with Sunrise and their specific acts, were, at the time of the wrongs alleged herein,

controlling persons of Sunrise within the meaning of §20(a) of the Exchange Act. They had the power and influence and exercised the same to cause Sunrise to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### Against the Individual Defendants for Accounting

140.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

141.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

142.    As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

143.    The Individual Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants.

144.    As a result of the Individual Defendants' misconduct, Sunrise has been damaged financially and is entitled to a recovery as a result thereof.

145.    Plaintiff demands an accounting be made of all stock option grants made to any of the Option Recipient Defendants, including, but not limited to, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the dates the stock

options were exercised, as well as the disposition of any proceeds received by any of the Option

Recipient Defendants via sale or other exercise of the grants.

## COUNT V

### Against the Individual Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting

146.    Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

147.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty

to, among other things, refrain from unduly benefiting themselves and other Company insiders at

the expense of the Company.

148.    As alleged in detail herein, the Individual Defendants breached their fiduciary

duties by, among other things, engaging in a scheme to grant backdated stock options to

themselves and/or certain other officers and directors of the Company and cover up their

misconduct.

149.    In breach of their fiduciary duties of loyalty and good faith, the Individual

Defendants agreed to and did participate with and/or aided and abetted one another in a

deliberate course of action designed to divert corporate assets to themselves and/or other

Company insiders.

150.    The Individual Defendants' foregoing misconduct was not, and could not have

been, an exercise of good faith business judgment.  Rather, it was intended to and did, unduly

benefit the Option Recipient Defendants at the expense of the Company.

151.    As a direct and proximate result of the Individual Defendants' foregoing breaches

of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not

limited to, the additional compensation expenses and tax liabilities the Company is required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

## COUNT VI

### Against the Option Recipient Defendants for
### Unjust Enrichment

152.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

153.   The Option Recipient Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

154.   To remedy the Option Recipient Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT VII

### Against the Option Recipient Defendants for
### Recission

155.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

156.   As a result of the acts alleged herein, the stock option contracts between the Option Recipient Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit and abuse of control.  Further, the

backdated Sunrise stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

157.    All contracts which provide for stock option grants to the Option Recipient Defendants and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executor contracts cancelled and declared void.

## COUNT VIII

### Against the Ultra Vires Option Recipient Defendants for Unjust Enrichment

158.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

159.    The Ultra Vires Option Recipient Defendants were unjustly enriched by their receipt and retention of ultra vires stock option grants and the proceeds they received through exercising ultra vires stock options, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

160.    To remedy the Ultra Vires Option Recipient Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the ultra vires stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT IX

### Against the Ultra Vires Option Recipient Defendants for Rescission

161.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

62

162.    As a result of the acts alleged herein, the stock option contracts between the Ultra Vires Option Recipient Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' breaches of fiduciary duties.  Further, the ultra vires stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

163.    All contracts which provide for stock option grants to the Ultra Vires Option Recipient Defendants and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Ordering the Individual Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

C.    Ordering the Ultra Vires Option Recipient Defendants to disgorge to the Company all of the ultra vires stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized, and imposing a constructive trust thereover;

D.    Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

E.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: 1/31/07

Respectfully submitted,

LAW OFFICES OF JOHN C. PASIERB, PLC

John C. Pasierb (Bar No. 414458)
2200 Wilson Boulevard, Suite 800
Arlington, VA 22201
Telephone: (703) 525-2260
Fax: (703) 525-2489

SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP
Eric L. Zagar
Lee D. Rudy
Michael C. Wagner
J. Daniel Albert
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (610) 667-7056

*Attorneys for Plaintiff*

## VERIFICATION

I, Catherine Molner, hereby verify that I have authorized the filing of the attached Shareholder Derivative Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: *1 – 29 – 07*

*Catherine Molner*
Catherine Molner

**JS-44**
**(Rev. 1/05 DC)**

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| CATHERINE MOLNER, Derivatively on Behalf of Nominal Defendant SUNRISE SENIOR LIVING, INC., | PAUL J. KLAASSEN, DAVID W. FAEDER, TIMOTHY S. SMICK, THOMAS B. NEWELL, BRIAN C. SWINTON, CHRISTIAN B.A. SLAVIN, LARRY E. HULSE, TIFFANY L.TOMASSO, ROBERT R. SLAGER, CARL ADAMS, RONALD V. APRAHAMIAN, CRAIG R. CALLEN, DAVID G. BRADLEY, J. DOUGLAS HOLLADA, THOMAS J. DONOHUE, SUNRISE SENIOR LIVING, INC., |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Alexandria, VA
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Fairfax, VA
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

John C. Pasierb
Law Offices of John C. Pasierb, PLC
2200 Wilson Blvd., #800
Arlington, VA 22201
(&03)785-2260

ATTORNEYS (IF KNOWN)

CASE NUMBER 1:07CV00227
JUDGE: Reggie B. Walton
DECK TYPE: General Civil
DATE STAMP: /31/2007

## II. BASIS OF JURISDICTION
**(PLACE AN x IN ONE BOX ONLY)**

○ 1 U.S. Government Plaintiff
◉ 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP
**FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**◉ E. General Civil (Other)** OR **○ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

○ **G.** *Habeas Corpus/ 2255*

☐ 530 Habeas Corpus-General
☐ 510 Motion/Vacate Sentence

○ **H.** *Employment Discrimination*

☐ 442 Civil Rights-Employment
(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

○ **I.** *FOIA/PRIVACY ACT*

☐ 895 Freedom of Information Act
☐ 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

○ **J.** *Student Loan*

☐ 152 Recovery of Defaulted Student Loans (excluding veterans)

○ **K.** *Labor/ERISA (non-employment)*

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Labor Railway Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

○ **L.** *Other Civil Rights (non-employment)*

☐ 441 Voting (if not Voting Rights Act)
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights
☐ 445 American w/Disabilities-Employment
☐ 446 Americans w/Disabilities-Other

○ **M.** *Contract*

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholder's Suits
☐ 190 Other Contracts
☐ 195 Contract Product Liability
☐ 196 Franchise

○ **N.** *Three-Judge Court*

☐ 441 Civil Rights-Voting (if Voting Rights Act)

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

**VII. REQUESTED IN COMPLAINT**  ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint   JURY DEMAND: YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☒  NO ☐  If yes, please complete related case form.

DATE January 31, 2007   SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.