## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| In Re SUNRISE SENIOR LIVING, INC. ) | **Civil Action No. 07-00143** |
| Derivative Litigation ) | |
| _____ ) | **AMENDED CONSOLIDATED** |
| ) | **SHAREHOLDER DERIVATIVE** |
| ) | **COMPLAINT** |
| This Document Relates To: ) | |
| ) | **JURY TRIAL DEMANDED** |
| ALL ACTIONS ) | |
| _____ ) | |

Plaintiffs, by the undersigned attorneys, submit this Amended Consolidated Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

1.      This is a shareholders' derivative action brought for the benefit of nominal defendant Sunrise Senior Living, Inc. ("Sunrise" or the "Company") against certain members of its Board of Directors (the "Board"), and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations, and other violations of law.

2.      From 1997 through 2005, a majority of Sunrise directors and top officers colluded to devise numerous mechanisms to manipulate the Company's financial statements and at the same time profit from awards of backdated stock options and sales of Sunrise stock at artificially inflated prices.  By engaging in these unlawful schemes, the Defendants (defined herein) were able to conceal that Sunrise was not recording material compensation expenses and was materially overstating the Company's net income and earnings for at least 1997 to 2006.  From 1997 to 2006, the Defendants collectively realized over $174 million in illicit proceeds through

the sale of Sunrise stock based on their knowledge of material non-public information regarding the Company's schemes. By contrast, Sunrise has suffered, and will continue to suffer, significant financial and non-monetary damages and injuries.

3.    According to a recently filed complaint against the Company by Bradley B. Rush ("Rush"),[1] Sunrise's former Chief Financial Officer, there are numerous "issues and irregularities with regard to Sunrise's accounting methodology." These irregularities included: (i) improper application of the Hypothetical Liquidation at Book Value ("HLBV") methodology in accounting for joint ventures with equity partners; (ii) the use of excess insurance reserves to cover earnings shortfalls; (iii) improper accounting treatment of gains on the sale of real estate assets which were subject to guarantees and commitments; and (iv) improper accounting treatment for losses relating to construction projects under development. As a direct result of the Company's improper accounting of partnership profits derived from joint ventures and improper accounting of the sale of real estate subject to guarantees, Sunrise announced on July 31, 2006 that it would restate its financial statements for fiscal years 2003 through 2005.

4.    Moreover, Rush alleges that Sunrise senior management and the Company's Board pressured him to complete the restatement hastily regardless of its accuracy in an attempt to sell the Company to private investors. Such a sale prior to an accurate restatement would have allowed Defendants to reap huge profits at the expense of Sunrise shareholders, because the misconduct of Defendants would never have come to light.

5.    Specifically, for at least seven years, Sunrise directors and top officers improperly accounted for joint venture real estate developments in which the Company had a minority stake

---

[1] *Rush v. Sunrise Senior Living, Inc.*, No. CL-2007-11322, (Circuit Court of Fairfax County, Virginia filed Sept. 18, 2007)

(typically 20%) and gave preferential distributions and financial guarantees to the Company's majority partners and financiers. Under applicable accounting rules, if Sunrise structured its joint ventures with preferential guarantees and distributions to its partners, Sunrise, as the managing entity in the joint venture, was required to absorb 100% of the early period or start-up losses of the new facilities, rather than just its 20% share, and was allowed to recoup those early period losses only when the joint venture's facility was operating successfully and profitably and/or was sold. Additionally, Sunrise could not record profits on sales of facilities if it provided financial guarantees in connection with the sale. Accounting for its joint venture operations or real estate sales in the manners described above – which was required by Generally Accepted Accounting Principles ("GAAP") and principles of fair presentation – would heavily penalize Sunrise's reported financial results, depriving it of real estate sales profits, while requiring it to recognize millions of dollars of current period losses from the joint venture operations. This would prevent it from showing the kind of strong profitable growth which was indispensable for the success of its business plan and necessary to allow its insiders to personally profit from large annual bonuses and to push its stock price to the high levels they desired so they could sell off their Sunrise stock at inflated – and very profitable – prices.

6.     Thus, to achieve the ends they desired, defendants cheated and pursued an improper course of business that misled Sunrise's investors. Instead of following the required accounting rules and principles, Sunrise's top officers and directors, including the members of its Audit Committee, knowingly caused or allowed Sunrise to report inflated profits from at least 1999-2005 and, by the Company's own admission, report over **$100 million** in improperly accounted for profits and conceal significant joint venture losses, which enabled Sunrise insiders to pocket large and unjustified cash bonuses and to personally profit by insider trading to take

3

advantage of the artificially inflated price of Sunrise's common stock.

7.    Moreover, for at least five years, a majority of Sunrise directors, together with its top officers, engaged in a secret scheme to grant undisclosed, in-the-money stock options to themselves and others by backdating stock option grants to coincide with historically low closing prices of Sunrise's common stock, thus manufacturing artificially low option exercise prices.  In fact, in a striking pattern over four consecutive years – 1997-2000 – Sunrise's Board purportedly granted options when Sunrise stock was trading at or near its yearly low price.  Moreover, thirteen out of sixteen discretionary option grants dated from May 1997 through November 2001 were backdated,[2] eight of which were granted to some, if not all, of Sunrise's five most highly compensated executives.  Furthermore, at least two additional option grants during this period were granted in direct violation of the Company's shareholder-approved stock option plans.  This option backdating scheme not only lined the pockets of Sunrise's officers and directors, it also contributed materially to the Company's overstatement of net income because, in violation of GAAP, Defendants knowingly understated compensation expenses that Sunrise was required to take to account for in-the-money stock option grants.

8.    The Defendants' illegal accounting manipulation schemes not only lined the pockets of the recipients of the backdated options and other inside sellers of stock, and caused Sunrise to issue materially false financial statements, but also undermined the key purpose of stock option-based executive compensation: to provide incentive to improve the Company's performance and increase the Company's stock price and market capitalization.    By

---

[2] Automatic grants to directors on or near the date of the annual stockholders' meeting or pursuant to their appointment/election as directors as well as grants to employees on or near their hiring date are excluded from this pattern.

manipulating options such that they carried an exercise price lower than the trading price of the stock on the date of grant, Sunrise insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition.

9.      Sunrise shareholders first filed derivative lawsuits concerning the Company's stock option granting practices against certain of the Company's officers and directors in August and September 2006 in the Circuit Court of Fairfax County, Virginia.  Sunrise's Board subsequently appointed undisclosed persons to a special committee "to review recent insider sales of Sunrise stock and the Company's historical practices related to stock option grants."

10.      In gross breach of their fiduciary duties as officers and/or directors of Sunrise, the Defendants colluded with one another to:

    a      improperly account for real estate joint venture profits, losses and sales, in violation of GAAP;

    b      improperly apply excess insurance reserves to other areas of the Company's balance sheet inflating the Company's financial statements;

    c      improperly account for gains recognized on the sale of real estate that were subject to guarantees and commitments;

    d      improperly account for losses related to construction projects under development;

    e      improperly backdate dozens of grants of Sunrise stock options to Sunrise executives and directors, in violation of the Company's shareholder-approved stock option plans;

    f      improperly record and account for the backdated stock options, in violation of GAAP;

    g      improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

    h      produce and disseminate to Sunrise shareholders and the market

false financial statements and other Securities and Exchange Commission ("SEC") filings that improperly recorded and accounted for the Company's real estate joint ventures and backdated option grants and concealed the improper accounting of real estate joint ventures and backdating of stock options.

11.    As a result of the Defendants' egregious misconduct, Sunrise has sustained millions of dollars in damages, and the recipients of the backdated stock options and insider sellers of Sunrise stock have garnered millions of dollars in unlawful profits.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

### Plaintiffs

14.    Lead Plaintiffs Catherine Molner and Robert Anderson and Plaintiff Janie Morrison are, and were at all relevant times, shareholders of nominal defendant Sunrise.

15.    Lead Plaintiff Catherine Molner is a shareholder of Sunrise, was a shareholder of Sunrise at the time of the wrongdoing alleged herein, and has been a shareholder of Sunrise

continuously since that time.

16.    Lead Plaintiff Robert Anderson is a shareholder of Sunrise, was a shareholder of Sunrise at the time of the wrongdoing alleged herein, and has been a shareholder of Sunrise continuously since that time.

17.    Plaintiff Janie Morrison is a shareholder of Sunrise, was a shareholder of Sunrise at the time of the wrongdoing alleged herein, and has been a shareholder of Sunrise continuously since that time.

**Nominal Defendant**

18.    Nominal defendant Sunrise is a Delaware corporation with its principal executive offices located at 7902 Westpark Drive, McLean, Virginia 22102.    According to its public filings, Sunrise is a provider of senior living services with over 415 communities in the United States, Canada, the United Kingdom, and Germany.

**<u>Defendants</u>**

19.    Defendants, husband and wife, Paul J. Klaassen ("Klaassen") and Teresa M. Klaassen ("Teresa Klaassen" and collectively, "the Klaassens") co-founded Sunrise and have served as directors of the Company since 1981.    Klaassen has also served as Chairman of the Board and Chief Executive Officer of the Company since 1991.    Teresa Klaassen has served as Chief Cultural Officer of the Company since 2001, and previously served as Secretary from 1981 to 2005 and as Executive Vice President from 1981 to November 2003.    Klaassen received at least 700,000 backdated stock options.[3]    Moreover, the Klaassens, together, sold 1,462,106 of their personally held shares of Sunrise common stock for $56,363,094.63 based on their

---

[3] Calculations of stock options granted to defendants are adjusted for the Company's 2-for-1 stock split effective October 4, 2005.

7

knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants.    Furthermore, Sunrise paid Klaassen the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|---|
| Klaassen | 2005 | $473,890 | $454,925 | $1,181,952 | - | $225,324 |
| | 2004 | $463,742 | - | - | - | $234,545 |
| | 2003 | $420,910 | $146,865 | $58,751 | - | $150,884 |
| | 2002 | $373,414 | $400,000 | - | - | $54,680 |
| | 2001 | $300,000 | $412,500 | - | - | - |
| | 2000 | $242,000 | $37,500 | - | 350,000 | $350,000 |
| | 1999 | $200,000 | $75,000 | - | - | - |
| | 1998 | $200,000 | - | - | - | - |
| | 1997 | $200,000 | - | - | - | $942 |

20.    Defendant Ronald V. Aprahamian ("Aprahamian") has served as a director of Sunrise since 1995, and as a member of the Audit Committee of the Board ("Audit Committee") since 1996, chairing the Audit Committee since 2001.  Aprahamian also served as a member of the Stock Option Committee of the Board ("Stock Option Committee") in 1996.  Aprahamian also served as a consultant to the Company beginning in May 1997.  Aprahamian received at least 222,000 backdated stock options.  Moreover, Aprahamian sold 215,200 of his personally held shares of Sunrise common stock for $8,848,497.20 based on his knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants.

21.    Defendant Craig R. Callen ("Callen") has served as a director of Sunrise since 1999.  Callen served as a member of the Audit Committee in 1999 and since 2004, and as a member of the Stock Option Committee from 1999 to August 23, 2002, when the Stock Option

Committee merged with the Compensation Committee of the Board ("Compensation Committee"). Callen received at least 36,000 backdated stock options. Moreover, Callen sold 10,000 of his personally held shares of Sunrise common stock for $521,093.00 based on his knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants.

22.    Defendant Thomas J. Donohue ("Donohue") has served as a director of Sunrise since 1995 and as a member of the Audit Committee since 1996. Donohue served as a member of the Stock Option Committee from 1996 to August 23, 2002, serving as chairman for part of his tenure. Donohue received at least 52,000 backdated stock options. Moreover, Donohue sold 134,378 of his personally held shares of Sunrise common stock for $3,732,527.28 based on his knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants.

23.    Defendant J. Douglas Holladay ("Holladay") has served as a director of Sunrise since 2000, and as a member of the Audit Committee in 2000. Holladay sold 39,000 of his personally held shares of Sunrise common stock for $1,873,125.00 based on his knowledge of material, non-public information concerning the numerous improper accounting manipulations and backdating of stock options masterminded by the Defendants.

24.    Defendant William G. Little ("Little") has served as a director of Sunrise since 2004.

25.    Defendant David G. Bradley ("Bradley") served as a director of Sunrise from August 1997 to 2005, as a member of the Stock Option Committee from 1997 to August 23,

2002, and as a member of the Audit Committee from 2001 to 2003. Bradley received at least 14,000 backdated stock options.

26.     Defendant Peter A. Klisares ("Klisares") served as a director of Sunrise from 2000 to 2004. Klisares sold 28,664 of his personally held shares of Sunrise common stock for $999,177.05 based on his knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants.

27.     Defendant Scott F. Meadow ("Meadow") served as a director of Sunrise from January 1995 to August 1995 and from February 1996 to November 1999. Meadow also served as a member of the Stock Option Committee from 1996 to 1999.

28.     Defendant Robert R. Slager ("Slager") served as a director from 1999 to 2001. Slager received at least 10,000 backdated stock options.

29.     Defendant Thomas B. Newell ("Newell") has served as the Company's President since April 2000, as Executive Vice President from May 1996 to April 2000, as President of Sunrise Development, Inc., the Company's development subsidiary, and as General Counsel from January 1996 to April 2000. Newell received at least 900,000 backdated stock options. Moreover, Newell sold 733,886 of his personally held shares of Sunrise common stock for $26,230,945.70 based on his knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants. Furthermore, Sunrise paid Newell the following compensation during the relevant period:

10

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|-------------------------|-------------------------------|
| Newell | 2005 | $396,498 | $309,344 | $96,000 | 100,000 |
| | 2004 | $360,688 | $446,000 | - | - |
| | 2003 | $339,769 | $87,500 | - | - |
| | 2002 | $289,897 | $225,000 | $3,268,530 | - |
| | 2001 | $252,465 | $131,000 | - | 70,000 |
| | 2000 | $215,600 | $37,500 | - | 85,000 |
| | 1999 | $175,000 | $75,000 | - | 65,000 |
| | 1998 | $175,000 | - | - | 400,000 |
| | 1997 | $175,000 | - | - | 100,000 |

30.    Defendant Tiffany L. Tomasso ("Tomasso") has served as the Company's Chief Operating Officer since November 2003.   Previously Tomasso served as Executive Vice President from March 1998 to November 2003, as President of Sunrise Management Services from April 2000 to November 2003, as Senior Vice President from 1994 to 1998, and as a regional vice president from 1993 to 1994.   Tomasso received at least 730,000 backdated stock options.   Moreover, Tomasso sold 472,335 of her personally held shares of Sunrise common stock for $17,265,701.75 based on her knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants.   Furthermore, Sunrise paid Tomasso the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|-------------------------|-------------------------------|
| Tomasso | 2005 | $348,138 | $204,716 | $626,598 | 100,000 |
| | 2004 | $309,162 | $160,000 | - | - |
| | 2003 | $283,812 | $80,000 | $974,825 | - |
| | 2002 | $221,012 | $112,500 | - | 60,000 |
| | 2001 | $207,423 | $105,000 | - | 30,000 |
| | 2000 | $197,000 | $37,500 | - | 70,000 |
| | 1999 | $165,000 | $50,000 | - | 65,000 |

11

| | 1998 | $165,000 | - | - | 430,000 |
|---|---|---|---|---|---|

31.     Defendant John F. Gaul ("Gaul") has served as the Company's General Counsel since October 2002 and as Secretary since May 2005.  Previously, Gaul served as Senior Vice President from October 2002 to November 2003.  Gaul sold 26,503 of his personally held shares of Sunrise common stock for $1,090,491.08 based on his knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants.  Furthermore, Sunrise paid Gaul the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|---|---|---|---|---|---|
| Gaul | 2004 | $206,108 | $194,667 | - | - |
| | 2003 | $194,808 | $33,333 | $389,944 | - |
| | 2002 | $38,365 | $32,500 | - | 50,000 |

32.     Defendant Bradley B. Rush ("Rush") served as Sunrise's Chief Financial Officer ("CFO") from August 2005 until his termination on May 2, 2007.  Previously, Rush served as Chief Investment Officer from January 2005 to August 2005, Managing Director and Senior Vice President, Capital Group (a division of Sunrise) from September 2004 to January 2005 and Executive Vice President of the Company's properties division from July 2003 to September 2004.  Rush sold 6,937 of his personally held shares of Sunrise common stock for $432,143.87 based on his knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants.  Sunrise paid Rush the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|---|---|---|---|---|---|
| Rush | 2005 | $286,711 | $177,421 | $1,658,927 | 80,000 |

33.    Defendant Carl Adams ("Adams") has served as Senior Vice President and Treasurer since December 2005.  Previously, Adams served as Senior Vice President of Sunrise Capital Group from November 2004 to December 2005, and as Sunrise Chief Accounting Officer from May 2000 to November 2004.  Adams received at least 5,000 backdated stock options.  Moreover, Adams sold 17,481 of his personally held shares of Sunrise common stock for $590,106.75 based on his knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants.

34.    Defendant David W. Faeder ("Faeder") served as the Company's, and its predecessor entities, Executive Vice President and Chief Financial Officer from 1993 to 1997.  Faeder also served as the Company's President from July 1997 to April 2000, as a director from 1993 to 2003, as Vice Chairman of the Board from April 2000 to May 2003, and as a consultant to the Company from April 2000 to March 2004.  Faeder received at least 850,000 backdated stock options.  Moreover, Faeder sold 749,727 of his personally held shares of Sunrise common stock for $22,118,963.33 based on his knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants.  Furthermore, Sunrise paid Faeder the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| Faeder | 1999 | $175,000 | $75,000 | 65,000 | - |
| | 1998 | $175,000 | - | 400,000 | - |
| | 1997 | $175,000 | - | 100,000 | $838 |

35.    Defendant Larry E. Hulse ("Hulse") served as the Company's Chief Accounting Officer from 1995 to March 2000, as Senior Vice President from April 2000 to November 2003, and as Chief Financial Officer from April 2000 to 2005.  Hulse received at least 257,776 backdated stock options.  Moreover, Hulse sold 239,897 of his personally held shares of Sunrise common stock for $9,304,495.07 based on his knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants.  Furthermore, Sunrise paid Hulse the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|---|---|---|---|---|---|
| Hulse | 2004 | $257,635 | $212,333 | - | - |
| | 2003 | $235,933 | $41,667 | $487,413 | - |
| | 2002 | $181,809 | $92,500 | $34,485 | 40,000 |
| | 2001 | $170,939 | $86,500 | - | 25,000 |
| | 2000 | $157,000 | $30,000 | - | 32,222 |
| | 1999 | $105,000 | $30,000 | - | 50,000 |

36.    Defendant Timothy S. Smick ("Smick") served as Chief Operating Officer of the Company from February 1996 to January 1998, as Executive Vice President of the Company from May 1996 to January 1998, and as a director of the Company from October 1996 to March 1998.  Smick received at least 300,000 backdated stock options.  Moreover, Smick sold 60,417 of his personally held shares of Sunrise common stock for $2,125,947.25 based on his knowledge of material, non-public information concerning the numerous improper accounting

14

manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants. Furthermore, Sunrise paid Smick the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options |
|---|---|---|---|---|
| Smick | 1997 | $175,000 | - | 150,000 |

37.     Defendant Brian C. Swinton ("Swinton") served as the Company's Executive Vice President from May 1996 to 2002, as President of the Company's venture subsidiary, Sunrise Senior Ventures, Inc., from April 2000 to 2002, and as President of the Company's joint venture company that provides assisted living services to individuals in their own homes, Sunrise At-Home Senior Living, Inc. from September 2000 to December 2002. Swinton received at least 550,000 backdated stock options. Moreover, Swinton sold 461,307 of his personally held shares of Sunrise common stock for $14,493,371.22 based on his knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants. Furthermore, Sunrise paid Swinton the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options |
|---|---|---|---|---|
| Swinton | 2001 | $207,423 | $27,500 | 30,000 |
| | 2000 | $197,000 | - | 60,000 |
| | 1999 | $165,000 | $50,000 | 40,000 |
| | 1998 | $165,000 | - | 200,000 |
| | 1997 | $165,000 | - | 75,000 |

38.     Defendant Christian B. A. Slavin ("Slavin") served as the Company's Chief Investment Officer from November 2003 to July 2004, as Executive Vice President from May

1999 to November 2003, as Chief Financial Officer from May 1999 to April 2000, and as head of the Company's Properties Division from April 2000 to July 2004. Slavin received at least 850,000 backdated stock options. Moreover, Slavin sold 278,546 of his personally held shares of Sunrise common stock for $8,990,534.92 based on his knowledge of material, non-public information concerning the numerous improper accounting manipulations and the illegal and undisclosed stock option grant backdating practices masterminded by the Defendants. Furthermore, Sunrise paid Slavin the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|-------------------------|-------------------------------|
| Slavin | 2003 | $283,812 | $80,000 | $974,825 | - |
| | 2002 | $221,012 | $112,500 | - | 60,000 |
| | 2001 | $207,423 | $105,000 | - | 60,000 |
| | 2000 | $197,000 | $37,500 | - | 145,000 |
| | 1999 | $111,000 | - | - | 220,000 |

## DUTIES OF THE DEFENDANTS

39.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders, so as to benefit all shareholders equally and not for self-aggrandizement. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

16

40.    The Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

41.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

> a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;
>
> b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;
>
> c.    exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company; and
>
> d.    exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and
>
> e.    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

42.    The Defendants, particularly the executive officer and the members of the Audit Committee, which at various times was comprised of defendants Aprahamian, Callen, Donohue and Holladay, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on

accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Defendants were required to:

> (1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> (2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> > (a)    transactions are executed in accordance with management's general or specific authorization;
> >
> > (b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

43.    Further, Sunrise's Audit Committee Charter provides that Audit Committee members Aprahamian, Callen, Donohue and Holladay shall, among other things:

> a.    meet to review and discuss the company's annual audited financial statements and quarterly financial statements with management and the independent auditor, including reviewing the company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"
>
> b.    review major issues regarding accounting principles and financial statement presentations, and major issues as to the adequacy of the company's internal controls and any special audit steps adopted in light of material control deficiencies;
>
> c.    review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of financial statements;
>
> d.    determine whether to recommend to the board of directors that the annual audited financial statements be included in the company's annual report on Form 10-K; and
>
> e.    prepare the audit committee report required by the rules of the SEC

to be included in the company's annual proxy statement.

**FACTUAL ALLEGATIONS**

**The Defendants' Improper Accounting of
the Company's Real Estate Joint Ventures**

44.     For years, but specifically from 2005 to 2006, Defendants the Klaassens, Newell,

Gaul, Rush, Aprahamain, Callen and Donohue forced the Company to make material

misrepresentations regarding the overall performance of the Company and specifically the

performance of Sunrise's real estate joint ventures in relationship to the Company's overall

performance.

45.     On August 4, 2005, Defendants the Klaassens, Newell, Gaul, Rush, Aprahamain,

Callen and Donohue knowingly caused or allowed Sunrise to report its second quarter of fiscal

year 2005 results via a press release which referred to "growth in equity in earnings on

investments in unconsolidated senior living properties."  The press release stated in part:

> "We are extremely pleased with the results we are reporting today," said
> Paul Klaassen, Sunrise Senior Living chairman and CEO."  We are benefiting
> from our typical growth drivers which include revenue growth in our operating
> portfolio of management properties, additional community openings and new
> construction . . . ."

> \* \* \*

> "At the end of the quarter, we had minority equity interests in 132
> communities held in joint ventures, with a balance sheet investment book value of
> over $108 million," said Thomas Newell, president, Sunrise Senior Living. "***Since
> a substantial majority of our new development activity, and most of our
> acquisitions, are being conducted through joint ventures, we expect our
> minority equity investments to continue to grow.  We participate in the earnings
> of the joint venture communities based on our percentage ownership and we
> also expect to continue to receive incentives as these ventures exceed
> performance thresholds.  As a result, we expect to see substantial growth in our
> income from earnings and returns on equity investments going forward***."

46.     On the same day, defendants held a telephone conference call for analysts to

19

discuss the Company's business and financial results.  During the call, the following occurred:

> **[P. Klaassen – CEO:]** [We] had an excellent second quarter.  Virtually every segment performed at or above expected levels.  As a result we had a significant increase in core earnings which we define as total earnings excluding income from property sales and acquisitions transition expenses.

> \* \* \*

> We have now met or exceeded expectations every quarter for the past six years and we continued that unbroken streak in the second quarter as *we significantly exceeded the high end of our guidance range* .…  *In hindsight, our forecast was probably a bit conservative as we outperformed in occupancy growth, management and professional services fees, earnings from joint ventures and lower interest costs.*

> \* \* \*

> **[Question:]** [O]ne of the things that drove numbers for the quarter I guess was little unexpected from my part was the equity in earnings line and I understand some of that were incentive fees related to sale. And I was wondering - if we can get a little more color on exactly the transaction for the quarter, and also if you can give us any help on thinking about projecting that on a go forward basis, additional sales and incentive fees that we might see?

> **[P. Klaassen:]** The transaction in the quarter I'm not going to break down too much -- we negotiate these things every day and I do not want to hurt ourselves in those negotiations by giving too much information on it. … We try to make the best deal that we can. You can see the growth that occurred in that line item that gives you an idea sort of about the range. But for competitive reasons, I do not want to get too detailed.  … [A]ll I can say is those investments are long-term. We are very happy with the structure which rewards Sunrise for upside end results and we think those are good investments, the $108 million now $130 million was spent wisely. And we think over the long-term, they'll pay off.

47.    On September 13, 2005, officers of Sunrise met with Davenport Equity Research ("Davenport").  On September 14, 2005, Davenport reported the results of that meeting to the market, repeating what Sunrise's officers had told them.  Davenport's September 14, 2005 report stated:

> •    **Reiterate Buy rating following meetings with management**.  We are comfortable with our forecast for 15% earnings growth for the next several years.  We believe our investment thesis remains sound, while the

company continues to execute its **growth strategies under its new management services orientation**.

* * *

•   **Management services business model generates stable revenue and reduces the company's risk profile**.   The sale of most consolidated facilities and subsequent increase in management contracts has made SRZ's revenue stream more predictable with upside potential from performance bonuses and the minority interest usually retained.   In addition, capital, construction, and fill-ups risks are now shared with the development partners.

48.   On November 8, 2005, Defendants the Klaassens, Newell, Gaul, Rush, Aprahamain, Callen and Donohue knowingly caused or allowed the Company to issue a press release entitled "Sunrise Reports Third-Quarter 2005 Results and Re-Affirms Full Year 2005 Earnings Guidance."  Specifically, the press release stated:

Sunrise Senior Living, Inc. today reported third-quarter 2005 earnings per share of $0.24 (diluted) compared to $0.21 (diluted) per share in the third quarter of 2004.  **The 14 percent increase in third-quarter, year-over-year earnings per share reflects ... growth in equity in earnings and return on investments in unconsolidated senior living properties**.

* * *

**Sunrise's income from equity in earnings and return on investments in unconsolidated senior living properties increased to $7.8 million in the third quarter of 2005 from $2.1 million in the prior year period primarily as a result of a transaction in which a venture partner sold its equity portion of 13 senior living communities**.  Through this transaction, Sunrise's ownership interest in the venture increased to 25 percent from 20 percent and Sunrise received performance incentive distributions under the terms of the venture agreement. Sunrise venture agreements typically include provisions rewarding Sunrise through various performance incentives.  Sunrise continues to manage these 13 senior living communities under long-term management contracts.

"**We continue to benefit from** our management services business model and **our minority equity investments in unconsolidated properties**," said Thomas Newell, president, Sunrise Senior Living.  "At the end of the third quarter, we had minority equity investments in 152 communities in unconsolidated ventures with a balance sheet investment book value of $128 million.  We strive to create value for our investment partners through operational excellence and when we succeed

21

we also generate substantial returns for Sunrise through our percentage ownership in these communities and the incentives triggered when these ventures exceed performance thresholds. We have set a long-term target to earn a 15 percent annual return on our investments in unconsolidated senior living properties."

49.   On November 8, 2005, certain Defendants held a conference call for analysts to

discuss its business and finances. During the call, the following occurred:

[P. Klaassen, CEO:] Our income statement, balance sheet, and cash flow are all in excellent shape and ready to support a very strong '06 outlook. Our growth drivers are producing consistent with our expectations and as a result we are able to report earnings per share excluding acquisition transition and hurricane related expenses of $0.26 a share in Q3 after adjusting for our recent two for one stock split .... *As anticipated, we also continued to benefit from growth in our equity and earnings line. Our 152 joint venture communities are making substantial contributions to our growth through our percentage ownership in these communities*. … We target a 15% annual return on our $128 million investment in these unconsolidated senior living properties. And we expect to continue to benefit from our percentage ownership in these joint venture communities for many years to come.

* * *

[Question:]  I wanted to actually just ask a little bit about equity and earnings and guidance. The equity and earnings bounces around a little bit because you're selling properties. You have got various things coming in. I guess I wanted to see if we could get some additional guidance on that beyond what you provided and also just clarify maybe what your own assumptions are say in '05, '06 numbers for that?

[Newell – President:] We have given a target long-term of 15% earnings on the 128 million we've invested. That's through 152 properties and joint ventures and it is lumpy as you said because included in that line will be startup losses from homes and development ventures as they open. As they ramp up then, we begin to share in the earnings and cash from those joint ventures. And as performance hurdles are met, we began to share disproportionately which is what you saw in this quarter and in the last quarter as investor partners received distributions in excess of the hurdles we begin to generate substantial returns. Our assumptions internally are that over time from those investments we will hit a 15% IRR. We model out all 152 communities over a long period of time and calculate that in our guidance. It's very difficult to predict out more than one or two quarters. We have a sense of what's coming, we do our best in giving guidance what we are very confident of these are very good investments in

communities that are performing very well. For the long run for Sunrise, we will generate a great return on that.

50.    On March 7, 2006, Defendants the Klaassens, Newell, Gaul, Rush, Aprahamain, Callen and Donohue knowingly caused or allowed the Company to issue a press release entitled "Sunrise Reports Fourth-Quarter 2005 Results, Reaffirms Full-Year 2006 Earnings Guidance and Expects 15 to 20 Percent Full-Year 2007 EPS Growth."  The press release stated in part:

> Sunrise Senior Living, Inc. today reported fourth-quarter 2005 earnings of $1.01 per share (diluted) compared to $0.28 (diluted) per share in the fourth quarter of 2004.  For the full year 2005, Sunrise reported earnings per share of $1.67 (diluted) compared to earnings per share of $1.12 (diluted) in 2004.

> \* \* \*

> "The fourth quarter and year closed strongly, as we expected, and positions us for a very good 2006 during which we will be celebrating our 25th anniversary," said Paul Klaassen, Sunrise Senior Living's chairman and CEO.

> \* \* \*

> "We are extremely excited about the opportunities that lie ahead for our business," said Thomas Newell, president of Sunrise Senior Living.  "*As we move forward, we expect to continue to benefit from our expanded development program and our management services business model.  In 2006, we anticipate a record number of community openings and substantial returns from our minority investments in joint venture partnerships.  In addition, the strength of our balance sheet is expected to provide significant flexibility as we enter into the next phase of our growth strategy.*"

> \* \* \*

> Sunrise's 2006 earnings per share is expected to be driven ... by further growth in earnings generated by Sunrise's equity investments in unconsolidated ventures.

> \* \* \*

> Sunrise expects earnings generated by its equity investments in unconsolidated ventures to continue to play a significant role in its ability to grow overall EPS for the next several years.

51.    On the same day, certain Defendants held a conference call for analysts to discuss

Sunrise business and finances.  During the call, the following occurred:

> **[P. Klaassen – CEO:]** The fourth quarter closed out strongly as we expected and ended a busy and successful year for Sunrise. All four of our growth engines, are firing on all cylinders. As you may know, those four growth engines are: 1, growth from new construction, 2, growth from new management contract acquisition: 3, internal growth from existing operations, and 4, growth generated by our balance sheet. …

> \* \* \*

> Our success in 2005 was the result of many factors ....

> \* \* \*

> ***Regarding equity in earnings, excluding the 3.6 million one-time write-down of our original investment in the At-Home venture, we would have reported equity in earnings of unconsolidated senior-living communities of approximately 3.8 million in Q4, and, I guess that would be $16.8 million for the year. We expect an additional 15 % growth in this business segment in 2006.*** Our ownership percentage in these 156 unconsolidated joint-venture communities in which we have invested $138 million should therefore generate about 19 million in pretax income this year. ***These minority ownership positions align our interests with our capital partners, and allows us to participate in community performance upside, without the negative impact of increased debt levels or additional amortization and depreciation expenses***.

52.    In March 2006, Defendants the Klaassens, Newell, Gaul, Rush, Aprahamain, Callen and Donohue knowingly caused or allowed Sunrise to issue its 2005 Annual Report to Shareholders.  The 2005 Annual Report contained a letter signed by Klaassen and Newell which stated:

> **2005 Results**   Overall, we are very pleased with our performance in 2005.

> \* \* \*

> **Joint Venture Partners**      Strong industry demographics, operational excellence, and our strong financial condition continue to accelerate interest among our impressive group of joint venture partners.  At the end of 2005, 156 of our communities were held in joint ventures, and ***nearly all of our new development and acquisitions are conducted through joint ventures***.  Through our percentage ownership in these communities and the incentives we receive for exceeding performance thresholds, ***these partnerships contributed significantly***

24

*to our growth in 2005*.  In addition, these joint venture partnerships reduce our corporate risk profile *since we share capital and construction risk with our partners*.

53.    Elsewhere, the 2005 Annual Report stated:

**Equity in Earnings and Return on Investment in Unconsolidated Senior Living Communities**

Equity in earnings and return on investment in unconsolidated senior living communities represents our allocation of the results of operations and returns on our investment from the distributions of proceeds from transactions with our unconsolidated ventures.

**2005 Compared to 2004**

Equity in earnings and return on investment in unconsolidated senior living communities was $13.2 million in 2005 compared to $9.4 million in 2004, an increase of $3.8 million, or 41%, which was primarily comprised of:

- $8.8 million return on our investment pursuant to the terms of a venture agreement;

- a decrease of $4.9 million from our portion of start-up losses associated with two international development ventures.  In 2005, these two ventures opened four communities which incurred losses in 2005;

- $2.9 million return on our investment whereby an unconsolidated venture sold two senior living communities to Sunrise REIT;

- $3.0 million return on our investment whereby an unconsolidated venture sold its three senior living communities and distributed the proceeds to its members.  We recognized the $3.0 million of cash received in excess of our investment;

- a decrease of $3.6 million from the write-down of our interest in Sunrise at Home; and

- a decrease of $2.5 million from the results of operations from other unconsolidated ventures, including our portion of start-up losses from development ventures.

**2004 Compared to 2003**

Equity in earnings and return on investment in unconsolidated senior living communities was $9.4 million in 2004 compared to $5.3 million in 2003, an increase of $4.1 million, or 76%, which primarily resulted from improved operations and additional incentive fees.

54.    The 2005 Annual Report also contained a section stating:

25

**Management's Report on Internal Control over Financial Reporting**

Management of Sunrise Senior Living, Inc. (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting and for the assessment of the effectiveness of internal control over financial reporting. As defined by the Securities and Exchange Commission, internal control over financial reporting is a process designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the consolidated financial statements in accordance with U.S. generally accepted accounting principles.

The Company's internal control over financial reporting is supported by written policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the Company's transactions and dispositions of the Company's assets; [and] (2) *provide reasonable assurance that transactions are recorded as necessary to permit preparation of the consolidated financial statements in accordance with generally accepted accounting principles* . . . .

\* \* \*

In connection with the preparation of the Company's annual consolidated financial statements, management has undertaken an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO Framework). *Management's assessment included an evaluation of the design of the Company's internal control over financial reporting and testing of the operational effectiveness of those controls*.

*Based on this assessment, management has concluded that as of December 31, 2005, the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles*.

55.    Note 2 to Sunrise's 2005 financial statements represented:

*Investments in Unconsolidated Senior Living Communities*

Sunrise holds an interest in ventures established to develop or acquire and own senior living communities. When these ventures are considered to be variable interest entities ("VIEs") in accordance with FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* ("FIN 46R"), Sunrise consolidates the ventures if it is determined to be the primary beneficiary. When Sunrise has

determined it is not the primary beneficiary or, for non-VIEs when it determines that it owns a non-controlling interest (because other partners or members control or participate in the management decisions of these ventures), *the investments are accounted for under the equity method*.

*The equity method investments are recorded at cost* and subsequently are adjusted for equity in net income (losses) and distributions. Sunrise determines its share of the investees' earnings or losses based on the distributions of cash flow from a hypothetical liquidation of the investee's assets and liabilities. The equity earnings are adjusted for the impact on the investee's reported earnings, if any, for the basis differences between Sunrise's carrying value of the equity investments and the investee's underlying assets. Sunrise recognizes profits on sales of services to these ventures to the extent of the ventures' outside ownership interest.

*Sunrise owned interests in 187 unconsolidated senior living communities (31 of which are under development) through ownership interests in 30 unconsolidated ventures at December 31, 2005 that are accounted for under the equity method and one unconsolidated venture accounted for under the cost method*. Those ventures are generally limited liability companies and partnerships. Sunrise's interest in those ventures generally range from five to 25%. Sunrise has one community in which it owns less than 10%, 147 communities in which it owns between 10% and 20%, and 20 communities in which it owns between 10% and 30%, and 19 communities in which it owns more than 30%.

### Variable Interest Entities

At December 31, 2005, Sunrise had an interest in 11 ventures that are considered VIEs. Sunrise is the primary beneficiary and, therefore, consolidates eight of these VIEs. Seven of these consolidated VIEs are development communities in which Sunrise has a majority of the voting interest and is developing for Sunrise REIT (see Note 4). At December 31, 2005, included in Sunrise's consolidated balance sheet were $56.1 million of development costs and $50.7 million of debt, including $6.6 million of third-party construction debt secured by the development communities and $44.1 million of borrowings from Sunrise REIT guaranteed by Sunrise. The only recourse to Sunrise with respect to these seven VIEs is under borrowings from Sunrise REIT.

56. Despite the multitude of representations by the Defendants the Klaassens, Newell, Gaul, Rush, Aprahamain, Callen and Donohue regarding Sunrise's robust performance, in reality Defendants the Klaassens, Newell, Gaul, Rush, Aprahamain, Callen and Donohue were knowingly concealing material information and improper accounting techniques, as follows:

- Sunrise's 2003, 2004 and 2005 and prior year financial results, including its net income, EPS, profit and shareholders' equity, were all materially overstated due to improper accounting for minority interests in joint ventures and real estate sales and contrivances and manipulations in the administration of Sunrise's stock options, including backdating, and failing to properly record or account for the actual amount and tax consequences of the compensation expense of its executives.

- Sunrise's excellent financial and operating results reported, at times relevant hereto, were not due to the skill and business acumen of its top executives and directors, their successful management of its business or the outstanding performance of its business units, as represented. In fact, a significant part was due to manipulation of Sunrise's financial statements by improperly avoiding recognizing losses on minority interests in joint ventures, improper recognition of gains on real estate sales and not properly accounting for and understating the true compensation expense of its executive and management team.

- The Defendants were manipulating the Company's stock option plan so as to enrich themselves by backdating the stock options they were granted to set the options at a much lower exercise price – one well below the market price or fair value of the stock when the option was actually granted – or by granting them before the release of positive corporate news that would boost the stock, thus giving them an instant, riskless profit, while exposing the Company to the risk of regulatory investigations, tax penalties and even criminal proceedings.

- Sunrise's internal financial and accounting controls were materially deficient and ineffective in providing the necessary and required degrees of assurance that Sunrise's financial results and reports were fairly and accurately presented and free from fraud.

57.    Defendants the Klaassens, Newell, Gaul, Rush, Aprahamain, Callen and Donohue's improper accounting manipulations and contrivances had an enormous impact on Sunrise's publicly issued financial statements.  For instance, in a joint venture in which Sunrise had a 20% interest and its partner an 80% interest, where the venture suffered $1 million in losses during its start-up and early operations phase, GAAP required Sunrise to recognize and report 100% of these losses, or $1 million.  However, by manipulating the Company's accounting and acting as if the joint venture did not have a distribution preference, defendants caused Sunrise to recognize and report losses of only $200,000.   This tricky manipulation, when combined with Sunrise's manipulated real estate accounting to improperly recognize profits on sales where Sunrise provided guarantees, overstated Sunrise's reported profits by at least $100 million from 1999 through 2005, as Sunrise was ultimately forced to admit when in July 2006 the company announced a multi-year restatement of its historical financial statements (*see* ¶¶ 231, 238, *infra*)

**Background of the Stock Option Backdating Scandal**

58.    Under accounting rules in effect prior to 2004, public companies in the United States were permitted to grant stock options to employees without recording an expense, so long as the option's strike price was at or above the market's closing price for the stock on the day the options were granted.  If the option granted was priced below the market price on the date granted, known as an "in the money" option grant, SEC regulations required that any publicly

traded company recognize and record the difference as a compensation expense in its financial statements. See, e.g., APB 25, superseded in 2004 by FAS 123(R). Accounting rules also required that companies recognize the same compensation expense if "in the money" options were granted to non-employees. Thus while "in the money" stock options are more valuable to those to whom they are granted, the additional expenses, if disclosed, reduce the total amount of net income reported to shareholders of a publicly traded company.

59.    In addition, pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's most highly compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

60.    The practice of backdating stock options was first publicly disclosed on March 18, 2006, when The Wall Street Journal published an article entitled "The Perfect Payday," in which it described stock option backdating practices by a number of companies at which executives had achieved extremely fortuitous stock option paydays, the likelihood of which defied random chance. The Wall Street Journal, together with finance professors Eric Lie, of the Tippie College of Business at the University of Iowa, David Yermack, of New York University Stern School of Business, and Professor John Emerson, a statistician at Yale University, studied

patterns of particularly favorable stock grants at certain companies and calculated the probability of such patterns occurring randomly and concluded that the odds were improbable.

61.     Since the date of The Wall Street Journal article which first revealed the illegal practice of backdating stock options, more than 130 companies have reported internal and/or governmental investigations of their backdating practices.  Perfect Payday Options Scorecard, The Wall Street Journal (updated regularly, available at http://online.wsj.com/public/resources/documents/info-optionsscore06-full.html).

62.     Additional research by Professor Lie suggests that between 1996 and 2005, 18.9% of unscheduled "in the money" option grants to top executives were backdated or manipulated, by nearly one-third of the companies investigated.

63.     As the scrutiny has intensified, backdating has been revealed not only as a practice to maximize the grant recipients' gain, while concealing company expenses, but also as a tax avoidance vehicle for some executives.  Reporting on an analysis written by an economist at the SEC, the San Jose Mercury News reported, "[i]n a new wrinkle in the scandal over backdating stock options, an analyst has found evidence that some executives manipulated the exercise dates of their options in order to cheat on their taxes."  Marcy Gordon, SEC: Backdating Done to Avoid Paying More Taxes, San Jose Mercury News, December 13, 2006, available online at http://www.mercurynews.com/search/ci_4831931.

## Backdating of Stock Option Grants to the Defendants

64.     Indeed, like the stock option grants examined by The Wall Street Journal, the pattern of option grants identified herein is more than randomly fortuitous, and the more likely reason for the extraordinary pattern is that the stock options were improperly backdated.

65.     During the time that Defendants engaged in their secret scheme to backdate stock

options, there were six stock option plans in effect: the 1996 Directors' Stock Option Plan (the "1996 Director Plan"), the 1997 Stock Option Plan (the "1997 Plan"), the 1998 Stock Option Plan (the "1998 Plan"), the 1999 Stock Option Plan (the "1999 Plan"), the 2000 Stock Option Plan (the "2000 Plan"), and the 2001 Stock Option Plan (the "2001 Plan" and collectively, the "Plans").

66.    Pursuant to the terms of the Company's Plans, "[t]he Option Price shall be not less than the greater of par value or 100 percent of the fair market value of a share of Stock on the date on which the Option is granted," where fair market value is defined as "the closing price of the Stock on such exchange or system or in such market … on the trading date immediately before the Option is granted …."

67.    Additionally, each of the Plans specifically provides that "[t]he date of grant of an Option under this Plan shall be the date as of which the Board approves the grant."

68.    According to the Company's annual proxy statements, from June 5, 1996 to August 23, 2002, the Stock Option Committee "ha[d] the power and authority to take all actions and make all determinations under the Company's stock option plans, including the grant of options thereunder."   On August 23, 2002, the Stock Option Committee merged with the Compensation Committee, and thereafter the Compensation Committee was responsible for administering the Company's stock option plans and determining the grants awarded under the stock option plans.

69.    Thirteen out of sixteen discretionary option grants to Defendants from May 1997 through November 2001 were backdated, as the pattern of grants was more than fortuitous – five of the grants were purportedly made near the lowest price of the fiscal year; three were made at or near the lowest price of the quarter, and the remaining six were made just before a substantial

32

rise in the price of Sunrise common stock.

70.    Further, Merrill Lynch & Co., Inc. ("Merrill Lynch") published an analysis of options grants made at various companies in a report dated May 22, 2006 as further evidence that the returns enjoyed by options grantees at many companies were not by mere chance. The report analyzes the twenty day performance of each option grant reported in a company's proxy statements during the relevant backdating period. The analysis also calculates the annualized return of the option grants at twenty days after the grant and compares that annualized return with the company's overall annual return.

71.    Plaintiffs have conducted a statistical analysis identical in methodology to that of the Merrill Lynch analysis that has been recently advocated by the Delaware Court of Chancery and a number of federal district courts as indicative of a pattern of backdating.[4] The result of plaintiffs' statistical analysis indicates that in the period from 1997 through 2001 the average annualized return for stock option grants to Sunrise executives based on a twenty-day trading window following the date of grant was 148%. This is more than seven times the average annualized investor return of 20% over the same period. The difference of over 125% is strong evidence of backdating.

72.    Moreover, a large institutional shareholder in Sunrise, SEIU Master Trust, conducted its own statistical analysis examining all proxy grants reported by the Company in its proxy statements from 1996 through 2005. The results of this analysis indicated that:

the average return in the 30 days prior to each grant was negative, -2.7%. In the

---

[4] The statistical analysis involved examines the twenty-day return of each stock option grant listed in the Company's proxy statement for each year of the relevant period. The twenty-day returns for all the grants made during each individual fiscal year were averaged and then annualized to represent what the twenty-day return would correspond to for an entire year. The average annualized returns for each year during the relevant period were then averaged and compared to the average of an investor's annual return for each year over the relevant period.

30 days after each grant, the average return was positive, 12.1%. Additionally, Sunrise stock performed worse than the overall market before option grants and better after them. During the period the stock traded on NASDAQ (covering a majority of the grants), the average return [for Sunrise] in the 30 days before an option grant was -4.1%, compared to an average gain of 15% in the 30 days after an option grant. By comparison, the NASDAQ Composite index gained an average of 3.9% in the 30 days before stock option grants and lost an average of 0.6% in the 30 days after. A similar pattern has occurred since the stock moved to the NYSE.

73.    From 1997 to 2001, the Stock Option Committee, which at certain times consisted of defendants Callen, Donohue, Bradley and Meadow, with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the Plans, APB 25 and Section 162(m) by knowingly and deliberately backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated options.

74.    All of the members of the Board and the Stock Option Committee had actual knowledge of the backdating and knew that it violated the terms of the Plans, ABP 25 and Section 162(m). All of the members of the Board knew that the publicly reported grant dates and statements that the Company followed APB 25 and granted options with exercise prices equal to the fair market value of Sunrise stock on the date of grant were false because the grants were in fact backdated. The entire Board knowingly and deliberately approved the backdating scheme with knowledge of its consequences, e.g., its effects on Sunrise's financial statements.

75.    Between 1998 and 2002, the Defendants repeated in proxy statements that "[s]tock options are granted by the stock option committee at an exercise price equal to the market price of the common stock at the date of the grant." However, the Defendants concealed that the stock option grants were repeatedly and consciously backdated to ensure that the strike

34

price associated with the option grants was below fair market value.

76.    Even more egregious, Defendants, in bad faith, sought shareholder approval of the 1998 Plan, the 1999 Plan, the 2000 Plan and the 2001 Plan, with representations that stock options granted under these plans would be granted at fair market value on the date of grant. However, Defendants violated each and every one of these plans by granting stock options below the fair market value of Sunrise common stock on the date of grant, and secured shareholder approval of these plans under false pretenses based on misrepresentations.

77.    On information and belief, the Stock Option Committee members, including Defendants Callen, Donohue, Bradley and Meadow, who issued the grants, and certain Defendants (listed herein) who received each grant, would review historical stock prices before issuing stock options to determine the date upon which stock prices were significantly below the current market price.  They would then falsify the relevant documents to make it appear as if the stock options were granted on the earlier date.

78.    As a result, the individual to whom the options were granted could realize the gain observed between the historical and actual grant date while the Company's records would appear to show no difference between the option price and the market price on the purported date of the grant, thereby avoiding both the reporting requirement and the additional compensation expense.

79.    In addition, in order to maximize remuneration to its officers and employees, and to attract non-employee executives to the Company's ranks without impacting its reported income, the Defendants engaged in a practice of backdating the issue date of stock options to certain key personnel and other Sunrise employees

**1997 Backdated Option Grants**

35

80.    The Stock Option Committee had the sole authority to choose the dates and, in fact, did choose the dates on which the 1997 stock options were granted.  For the purported May 2, 1997 stock option grants, defendants Donohue and Meadow, as Stock Option Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

81.    Defendants Donohue and Meadow were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Donohue and Meadow approved these grants on a date after the reported grant date and knowingly used hindsight to select a date when Sunrise's stock was near its yearly low. Defendants Donohue and Meadow knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

82.    Defendants Donohue and Meadow granted Faeder, Smick, Newell, Swinton and Aprahamian stock options dated May 2, 1997 with an exercise price of $24.38, knowing that May 2, 1997 was not the date they actually approved the grants.  The May 2, 1997 grants were approved by Donohue and Meadow on a later date, occurring between the next day on May 3, 1997 and the end of the fiscal year.

83.    The May 2, 1997 grants to Faeder, Smick, Newell, Swinton and Aprahamian coincided with Sunrise's second lowest closing price for the fiscal quarter as well as the entire fiscal year, as shown below.[5]  By the end of the year, Sunrise's stock price had nearly doubled to $43.13, an increase of 76.9%.   Moreover, employing the same Merrill Lynch analysis used for

---

[5] All graphs in this complaint depict adjusted exercise prices and stock prices to account for the Company's 2-for-1 stock split effective October 4, 2005.  Moreover for all graphs, the stock option grant date does not fall on the line representing the Company's historical stock price because the Company granted options at the fair market value of Sunrise common stock on the day immediately proceeding the date of grant as reflected in the graphs.

the entire relevant period to this single grant results in a twenty day return of 29%, or 522% annualized, as compared to a 25% annualized return for investors – a difference of 497%.



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price[6] | Adjusted Number of Options |
|---|---|---|---|---|---|
| 05/02/97 | Faeder | $24.38 | 100,000 | $12.19 | 200,000 |
| | Smick | $24.38 | 150,000 | $12.19 | 300,000 |
| | Newell | $24.38 | 100,000 | $12.19 | 200,000 |
| | Swinton | $24.38 | 75,000 | $12.19 | 150,000 |
| | Aprahamian | $24.38 | 100,000 | $12.19 | 200,000 |

84.    For the purported August 28, 1997 stock option grant, defendants Donohue, Meadow and Bradley, as Stock Option Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

85.    Defendants Donohue, Meadow and Bradley were aware that the stock option

---

[6] All tables in this complaint depict adjusted exercise prices and adjusted numbers of options to account for the Company's 2-for-1 stock split effective October 4, 2005.

plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Donohue, Meadow and Bradley approved this grant on a date after the reported grant date and knowingly used hindsight to select a date when Sunrise's stock was near its quarterly low. Defendants Donohue, Meadow and Bradley knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

86. Defendants Donohue, Meadow and Bradley granted Tomasso stock options dated August 28, 1997 with an exercise price of $30.75, knowing that August 28, 1997 was not the date they actually approved the grants.[7] The August 28, 1997 grant was approved by Donohue, Meadow and Bradley on a later date, occurring between the next day on August 29, 1997 and the end of the fiscal year.

87. The August 28, 1997 grant to Tomasso coincided with Sunrise's second lowest closing price for the fiscal quarter, as shown below. By the end of the year, Sunrise's stock price had risen to $43.13, an increase of 40.2%. Moreover, employing the same Merrill Lynch analysis used for the entire relevant period to this single grant results in a twenty day return of 20%, or 360% annualized, as compared to a 25% annualized return for investors – a difference of 335%.

---

[7] These options were later re-priced pursuant to a re-pricing program authorized and implemented by the Stock Option Committee. The re-pricing program allowed Sunrise officers to trade in options with an exercise price of more than $29.00 in exchange for an equal number of options at an exercise price of $25.00, which was the closing price of Sunrise stock on September 14, 1998.



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 08/28/97 | Tomasso | $30.75 | 30,000 | $15.38 | 60,000 |

88.    For the purported November 4, 1997 stock option grant, defendants Donohue, Meadow and Bradley, as Stock Option Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

89.    Defendants Donohue, Meadow and Bradley were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant.   Defendants Donohue, Meadow and Bradley approved this grant on a date after the reported grant date and knowingly used hindsight to select a date just prior to a precipitous rise in the price of Sunrise's stock.   Defendants Donohue, Meadow and Bradley knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

90.    Defendants Donohue, Meadow and Bradley granted Hulse stock options dated

39

November 4, 1997 with an exercise price of $36.63, knowing that November 4, 1997 was not the date they actually approved the grant.[8]  The November 4, 1997 grant was approved by Donohue, Meadow and Bradley on a later date, occurring between the next day on November 5, 1997 and the end of the fiscal year.

91.    The November 4, 1997 grant to Hulse preceded a dramatic rise in the price of Sunrise stock, as shown below.  In the five days following the date of grant, Sunrise's stock price traded at an average of $38.76, an average increase of 5.8%.  This rise in the price of Sunrise stock can be directly attributed to the Company's November 4, 1997 third quarter earnings release, which reported a 110% increase in third quarter revenues from the previous year and profits of $.09 per share, which topped analysts' estimates by $.02 per share.    Based on the preceding information, Defendants Donohue, Meadow and Bradley "spring-loaded" this option grant to take advantage of the non-public material information regarding Sunrise's better than expected earnings figures which they were privy to and which they knew would positively affect the stock price.  By "spring-loading" this stock option grant to Hulse, Donohue, Meadow and Bradley provided Hulse with options that were essentially in-the-money because, as expected, the stock price would immediately rise upon the Company's announcement of good news.

---

[8] *Id.*



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 11/04/97 | Hulse | $36.63 | 25,000 | $18.31 | 50,000 |

### 1998 Backdated Option Grants

92.    The Stock Option Committee had the sole authority to choose the dates and, in fact, did choose the dates on which the 1998 stock options were granted.  For the purported September 14, 1998 stock option grants, defendants Donohue, Meadow and Bradley, as Stock Option Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

93.    Defendants Donohue, Meadow and Bradley were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant.  Defendants Donohue, Meadow and Bradley approved these grants on a date after the

41

reported grant date and knowingly used hindsight to select a date when Sunrise's stock was near its yearly low. Defendants Donohue, Meadow and Bradley knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

94.    Defendants Donohue, Meadow and Bradley granted Faeder, Newell, Swinton, Tomasso and Hulse re-priced stock options dated September 14, 1998 with an exercise price of $25.00,[9] knowing that September 14, 1998 was not the date they actually approved the grants. The September 14, 1998 grants were approved by Donohue, Meadow and Bradley on a later date, occurring between the next day on September 15, 1998 and November 10, 1998 when Sunrise first announced the re-pricing plan on Form 10-Q.

95.    The September 14, 1998 grants were allegedly part of a re-pricing program implemented by the Stock Option Committee. However, the September 14, 1998 grant date coincided with one of the lowest prices of Sunrise's stock for the fiscal quarter, as well as the fiscal year, as shown below. By November 10, 1998, when Sunrise first publicly disclosed the re-pricing plan, Sunrise's stock price had ballooned to $42.63, an increase of 70.5%. Moreover, employing the same Merrill Lynch analysis used for the entire relevant period to this single grant results in a twenty day return of 32%, or 576% annualized, as compared to a 20% annualized return for investors – a difference of 556%.

96.    Like the other option grants, the re-priced options were backdated by Defendants Donohue, Meadow and Bradley. Additionally, all the underwater options[10] that were re-priced

---

[9] The September 14, 1998 re-priced grants are granted with an exercise price equal to fair market value of Sunrise common stock on the purported dated of grant, rather than the day immediately preceding the date of grant as directed by the Company's Plans.

[10] "Underwater options" is a term used for options whose exercise price is above the current market stock price, and as such would be useless to exercise because the grantee would have to pay more to obtain the stock than the price at which the grantee could sell the stock.

in favor of Defendants Faeder, Newell, Swinton, Tomasso and Hulse were profitable again by the end of the year.



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 09/14/98 | Faeder | $25.00 | 200,000 | $12.50 | 400,000 |
| | Newell | $25.00 | 200,000 | $12.50 | 400,000 |
| | Swinton | $25.00 | 100,000 | $12.50 | 200,000 |
| | Tomasso | $25.00 | 230,000 | $12.50 | 460,000 |
| | Hulse | $25.00 | 25,000 | $12.50 | 50,000 |

97.    For the purported October 8, 1998 stock option grant, defendants Donohue, Meadow and Bradley, as Stock Option Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

98.    Defendants Donohue, Meadow and Bradley were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of

43

grant.  Defendants Donohue, Meadow and Bradley approved this grant on a date after the reported grant date and knowingly used hindsight to select a date when Sunrise's stock was at its quarterly low.  Defendants Donohue, Meadow and Bradley knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

99.    Defendants Donohue, Meadow and Bradley granted Donohue stock options dated October 8, 1998 with an exercise price of $30.81, knowing that October 8, 1998 was not the date they actually approved the grants.  The October 8, 1998 grant was approved by Donohue, Meadow and Bradley on a later date, occurring between the next day on October 9, 1998 and the end of the fiscal year.

100.    The October 8, 1998 grant to Donohue is especially egregious because Donohue was a member of both the Stock Option Committee and the Audit Committee at the time he participated in granting himself backdated stock options coinciding with the lowest closing price of Sunrise common stock for the fiscal quarter, as shown below.  By the end of the year, Sunrise's stock price had risen to $51.88, an increase of 68.3%.  Moreover, employing the same Merrill Lynch analysis used for the entire relevant period to this single grant results in a twenty day return of 30%, or 540% annualized, as compared to a 20% annualized return for investors – a difference of 520%.



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 10/08/98 | Donohue | $30.81 | 10,000 | $15.41 | 20,000 |

101.    For the purported December 10, 1998 stock option grant, defendants Donohue, Meadow and Bradley, as Stock Option Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

102.    Defendants Donohue, Meadow and Bradley were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant.  Defendants Donohue, Meadow and Bradley approved this grant on a date after the reported grant date and knowingly used hindsight to select a date just prior to a precipitous rise in the price of Sunrise's stock.   Defendants Donohue, Meadow and Bradley knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

103.    Defendants Donohue, Meadow and Bradley granted Donohue stock options dated

45

December 10, 1998 with an exercise price of $41.19, knowing that December 10, 1998 was not the date they actually approved the grants. The December 10, 1998 grant was approved by Donohue, Meadow and Bradley on a later date, occurring between the next day on December 11, 1998 and the end of the fiscal year.

104.    The December 10, 1998 grant to Hulse precipitated a significant rise in the price of Sunrise stock, as shown below. By the end of the year, in just 14 trading days, Sunrise's stock price had risen to $51.88, an increase of 26%. Moreover, employing the same Merrill Lynch analysis used for the entire relevant period to this single grant results in a twenty day return of 21%, or 378% annualized, as compared to a 20% annualized return for investors – a difference of 358%.



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 12/10/98 | Hulse | $41.19 | 21,666 | $20.59 | 43,332 |

**1999 Backdated Option Grants**

105.    The Stock Option Committee had the sole authority to choose the dates and, in fact, did choose the dates on which the 1999 stock options were granted.  For the purported March 5, 1999 stock option grants, defendants Donohue, Meadow and Bradley, as Stock Option Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

106.    Defendants Donohue, Meadow and Bradley were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant.  Defendants Donohue, Meadow and Bradley approved these grants on a date after the reported grant date and knowingly used hindsight to select a date when Sunrise's stock was near its quarterly low.   Defendants Donohue, Meadow and Bradley knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

107.    Defendants Donohue, Meadow and Bradley granted Hulse and Slavin stock options dated March 5, 1999 with an exercise price of $37.63, knowing that March 5, 1999 was not the date they actually approved the grants. The March 5, 1999 grants were approved by Donohue, Meadow and Bradley on a later date, occurring between the next day on March 6, 1999 and the end of the fiscal year.

108.    The March 5, 1999 grants to Hulse and Slavin coincided with one of the lowest prices of Sunrise's stock for the fiscal quarter, as shown below.  However, Slavin did not even begin his employment with the Company until May 1999, according to the Company's 2003 proxy statement, which means the options granted to Slavin must necessarily be backdated. Additionally, on the very next trading day following the purported date of grant, March 8, 1999, Sunrise's stock price had soared to $46.38, an increase of 23.3% *in one day*.  In the ten days

following the March 5, 1999 grant, Sunrise stock traded at an average price of $43.66, an average increase of 16%. Moreover, employing the same Merrill Lynch analysis used for the entire relevant period to this single grant results in a twenty day return of 12%, or 216% annualized, as compared to a -73% annualized return for investors – a difference of 289%.



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 03/05/99 | Hulse | $37.63 | 15,000 | $18.81 | 30,000 |
| | Slavin | $37.63 | At Least[11] 150,000 | $18.81 | At Least 300,000 |

109. For the purported November 8, 1999 stock option grants, defendants Donohue and Bradley, as Stock Option Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not

---

[11] Where the total number of options is unknown, *i.e.* where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

allow for delegation of their authority.

110.    Defendants Donohue and Bradley were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Donohue and Bradley approved these grants on a date after the reported grant date and knowingly used hindsight to select a date when Sunrise's stock was near its yearly low. Defendants Donohue and Bradley knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

111.    Defendants Donohue and Bradley granted Faeder, Newell, Swinton, Tomasso, Hulse, Slavin and Callen stock options dated November 8, 1999 with an exercise price of $12.75, knowing that November 8, 1999 was not the date they actually approved the grants. The November 8, 1999 grants were approved by Donohue and Bradley on a later date, occurring between the next day on November 8, 1999 and the end of the fiscal year.



| Purported | Defendant | Exercise | Number of | Adjusted | Adjusted |

| Grant Date | | Price | Options | Exercise Price | Number of Options |
|---|---|---|---|---|---|
| 11/08/99 | Faeder | $12.75 | 65,000 | $6.38 | 130,000 |
| | Newell | $12.75 | 65,000 | $6.38 | 130,000 |
| | Swinton | $12.75 | 40,000 | $6.38 | 80,000 |
| | Tomasso | $12.75 | 65,000 | $6.38 | 130,000 |
| | Hulse | $12.75 | 35,000 | $6.38 | 70,000 |
| | Slavin | $12.75 | 70,000 | $6.38 | 140,000 |
| | Callen | $12.75 | 10,000 | $6.38 | 20,000 |

### 2000 Backdated Option Grants

112.    The Stock Option Committee had the sole authority to choose the dates and, in fact, did choose the dates on which the 2000 stock options were granted.  For the purported February 25, 2000[12] and March 28, 2000 stock option grants, defendants Donohue, Bradley and Callen, as Stock Option Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

113.    Defendants Donohue, Bradley and Callen were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Donohue, Bradley and Callen approved these grants on a date after the reported grant date and knowingly used hindsight to select a date when Sunrise's stock was near its yearly low. Defendants Donohue, Bradley and Callen knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

114.    Defendants Donohue, Bradley and Callen granted Newell, Slavin, Swinton,

---

[12] According to the Company's proxy statement filed with the SEC on April 14, 2000, the Board approved the Company's 2000 Stock Option Plan on February 25, 2000.  However, there is no evidence to indicate that these grants of stock options were in any way connected to the passage of the 2000 Stock Option Plan,  Moreover, the veracity of the whether the Company truly passed the 2000 Stock Option Plan on February 25, 2000 is called into question by the numerous false statements which are prevalent in Sunrise's public filings.

Tomasso, Faeder, Hulse, Donohue, Aprahamian, Slager, Bradley and Callen stock options dated February 25, 2000 with an exercise price of $12.38, knowing that February 25, 2000 was not the date they actually approved the grants. Moreover, these backdated grants were made to the entire Stock Option Committee (Donohue, Bradley and Callen) and the entire Audit Committee (Aprahamian, Donohue and Callen), who were aware of the backdating. The February 25, 2000 grants were approved by Donohue, Bradley and Callen on a later date, occurring between the next day on February 26, 2000 and April 10, 2000 when the options were first reported by the recipients on Forms 4 filed with the SEC.

115.    Defendants Donohue, Bradley and Callen granted Newell, Slavin, Swinton, Tomasso and Hulse stock options dated March 28, 2000 with an exercise price of $12.44, knowing that March 28, 2000 was not the date they actually approved the grants. The March 28, 2000 grants were approved by Donohue, Bradley and Callen on a later date, occurring between the next day on March 29, 2000 and April 10, 2000 when the options were first reported by the recipients on Forms 4 filed with the SEC.

116.    The February 25, 2000 grants to Newell, Slavin, Swinton, Tomasso, Faeder, Hulse, Donohue, Aprahamian, Slager, Bradley, and Callen and the March 28, 2000 grants to Newell, Slavin, Swinton, Tomasso, and Hulse coincided with two of Sunrise's lowest closing prices for the fiscal quarter as shown below. Plaintiffs employed a slight variation of the Merrill Lynch analysis used for the entire relevant period to these individual grants because of when they were reported on Form 4 to the SEC. These Merrill Lynch analyses result in a ten day return for the February 25, 2000 grant of 27%, or 486% annualized, as compared to an 82% annualized return for investors – a difference of 404%, and a nine day return for the March 28, 2000 grant of 12%, or 216% annualized, as compared to an 82% annualized return for investors

– a difference of 134%.



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 02/25/00 | Newell | $12.38 | 60,000 | $6.19 | 120,000 |
| | Slavin | $12.38 | 55,000 | $6.19 | 110,000 |
| | Swinton | $12.38 | 45,000 | $6.19 | 90,000 |
| | Tomasso | $12.38 | 55,000 | $6.19 | 110,000 |
| | Faeder | $12.38 | 60,000 | $6.19 | 120,000 |
| | Hulse | $12.38 | 7,222 | $6.19 | 14,444 |
| | Donohue | $12.38 | 16,000 | $6.19 | 32,000 |
| | Aprahamian | $12.38 | 11,000 | $6.19 | 22,000 |
| | Slager | $12.38 | 5,000 | $6.19 | 10,000 |
| | Bradley | $12.38 | 7,000 | $6.19 | 14,000 |
| | Callen | $12.38 | 8,000 | $6.19 | 16,000 |
| 03/28/00 | Newell | $12.44 | 25,000 | $6.22 | 50,000 |
| | Slavin | $12.44 | 15,000 | $6.22 | 30,000 |
| | Swinton | $12.44 | 15,000 | $6.22 | 30,000 |
| | Tomasso | $12.44 | 15,000 | $6.22 | 30,000 |
| | Hulse | $12.44 | 25,000 | $6.22 | 50,000 |

117.    For the purported September 11, 2000 stock option grant, defendants Donohue,

52

Bradley and Callen, as Stock Option Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

118.    Defendants Donohue, Bradley and Callen were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Donohue, Bradley and Callen approved this grant on a date after the reported grant date and knowingly used hindsight to select a date just prior to a precipitous rise in the price of Sunrise's stock.   Defendants Donohue, Bradley and Callen knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

119.    Defendants Donohue, Bradley and Callen granted Klaassen stock options dated September 11, 2000 with an exercise price of $17.00, knowing that September 11, 2000 was not the date they actually approved the grants.   The September 11, 2000 grant was approved by Donohue, Bradley and Callen on a later date, occurring between the next day on September 12, 2000 and the announcement of the grant in the Company's Form 10-Q filed with the SEC on November 13, 2000.

120.    The September 11, 2000 grant to Klaassen was allegedly pursuant to an employment agreement with Sunrise which took effect on September 12, 2000, the day after the stock options were granted, but was not publicly disclosed until November 13, 2000. Remarkably the stock options granted to Klaassen coincided with the lowest closing price of Sunrise stock for the month of September and one of the lowest closing prices of the fiscal quarter, as shown below.  Additionally, on November 13, 2000, when the option grant was first publicly disclosed, Sunrise's stock price had soared to $24.56, and reached a high of more than $28.00, an increase of 44.5%.  Moreover, employing the same Merrill Lynch analysis used for

the entire relevant period to this single grant results in a twenty day return of 15%, or 270% annualized, as compared to an 82% annualized return for investors – a difference of 188%.



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 09/11/00 | Klaassen | $17.00 | 350,000 | $8.50 | 700,000 |

121.    For the purported November 24, 2000 stock option grant, defendants Donohue, Bradley and Callen, as Stock Option Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

122.    Defendants Donohue, Bradley and Callen were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Donohue, Bradley and Callen approved this grant on a date after the reported grant date and knowingly used hindsight to select a date just prior to a precipitous rise in the price of Sunrise's stock.   Defendants Donohue, Bradley and Callen knew that backdating option grants

54

to a date with a lower price violated the Company's stock option plans.

123.    Defendants Donohue, Bradley and Callen granted Slavin stock options dated November 24, 2000 with an exercise price of $26.31, knowing that November 24, 2000 was not the date they actually approved the grants. The November 24, 2000 grant was approved by Donohue, Bradley and Callen on a later date, occurring between the next day on November 25, 2000 and the end of the fiscal year.

124.    The November 24, 2000 grant to Slavin preceded a dramatic rise in the price of Sunrise stock, as shown below. In the ten days following the date of grant, Sunrise's stock price traded at an average of $27.60, an average increase of 4.9%.



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 11/24/00 | Slavin | $26.31 | 75,000 | $13.16 | 150,000 |

**2001 Backdated Option Grants**

125.    The Stock Option Committee had the sole authority to choose the dates and, in

fact, did choose the dates on which the 2001 stock options were granted. For the purported November 12, 2001 stock option grant, defendants Donohue, Bradley and Callen as Stock Option Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

126.    Defendants Donohue, Bradley and Callen were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Donohue, Bradley and Callen approved this grant on a date after the reported grant date and knowingly used hindsight to select a date just prior to a precipitous rise in the price of Sunrise's stock. Defendants Donohue, Bradley and Callen knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

127.    Defendants Donohue, Bradley and Callen granted Slavin stock options dated November 12, 2001 with an exercise price of $26.96, knowing that November 12, 2001 was not the date they actually approved the grants. The November 12, 2001 grant was approved by Donohue, Bradley and Callen on a later date, occurring between the next day on November 13, 2001 and the end of the fiscal year.

128.    The November 12, 2001 grant to Slavin coincided with one of the lowest closing prices of Sunrise stock for the fiscal quarter, as shown below. By the end of the year, Sunrise's stock price had risen to $29.11, an increase of 8%. Moreover, employing the same Merrill Lynch analysis used for the entire relevant period to this single grant results in a twenty day return of 5%, or 90% annualized, as compared to a 16% annualized return for investors – a difference of 74%.



11/12/01: Options granted at 11/09/01 stock price of $13.48

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 11/12/01 | Slavin | $26.96 | 60,000 | $13.48 | 120,000 |

129.    Each and every one of the aforementioned stock option grants was dated just before a significant increase in Sunrise stock price and/or at or near Sunrise's lowest closing price of the pertinent fiscal quarter or year. The reason for the extraordinary patterns set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, at the behest of the Defendants, the Stock Option Committee, with the knowledge and approval of the other members of the Board, knowingly and deliberately backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of backdated stock options. This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value

of the options and improperly reduced the amounts the Defendants had to pay the Company upon exercise of the options.

130.    From 1997 to 2001, the Stock Option Committee (comprised of Defendant Donohue from 1996 until August 23, 2002, Defendant Bradley from 1997 until August 23, 2002, Defendant Callen from 1999 until August 23, 2002 and Defendant Meadow from 1996 to 1999) purportedly granted option awards on twenty-one (21) different dates, sixteen (16) of which were discretionary option awards.  Thirteen (13) of the sixteen (16) discretionary grants made during this time frame were suspiciously dated to coincide with either the lowest closing price of Sunrise's stock during the entire year, quarter or month in which they were granted and/or to precede a substantial rise in Sunrise's stock price.  One of the three remaining discretionary grants dated March 3, 1998, while not necessarily backdated, was granted below fair market value in violation of the Company's shareholder-approved stock option plan as explained below, and was later backdated pursuant to the re-pricing on September 14, 1998.  Another of the remaining discretionary grants dated January 19, 1998 was also backdated pursuant to the September 14, 1998 re-pricing.  So while the Stock Option Committee may have initially neglected to backdate two of these discretionary grants, defendants Donohue, Meadow and Bradley, with the help and support of the entire Board, later "corrected" this "oversight" by backdating these re-priced options purportedly granted on September 14, 1998.

131.    The reason for the extraordinary pattern set forth above is that the purported grant dates on thirteen (13) of the sixteen (16) discretionary stock options granted during this period were not the actual dates on which the stock option grants were made.  Rather, at the behest of those Defendants listed herein who received backdated options, the Stock Option Committee knowingly and deliberately backdated options to make it appear as though the grants were made

on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates. This improper backdating, which violated the terms of the Company's shareholder-approved stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to those Defendants who received the improper options and improperly reduced the amounts they had to pay the Company upon exercise of the options.

132.    Four of the five remaining option grants made during this time frame were automatic grants which corresponded to the date of Sunrise's annual shareholder meetings on April 28, 1997, April 27, 1998, April 26, 1999 and May 11, 2001. The last of these grants, while not backdated, was granted in violation of the Company's shareholder-approved stock option plan as explained below. The fifth grant, dated May 22, 2000, was automatically granted pursuant to Defendant Holladay's appointment to the Board and Defendant Adams' commencement of his employment.

## Ultra Vires Stock Option Grants

133.    As discussed above, pursuant to all of the Plans, stock options granted by Sunrise must be granted at least at fair market value and require a one-day look back to the preceding day's closing price to determine what that fair market value is.

134.    However, two stock option grants by Sunrise during the relevant period violated one or both of these provisions in direct contradiction of the shareholder-approved stock option plans, and therefore are ultra vires and void. Defendants Faeder, Newell, Swinton, Tomasso, Hulse, Adams, Donohue, Bradley and Callen were the recipients of these ultra vires options.

135.    Purportedly on March 3, 1998, the Stock Option Committee, which consisted of defendants Donohue, Meadow and Bradley, granted 600,000 stock options to four of the five

59

most highly compensated executives as disclosed in the Company's proxy statement. The exercise price of these options was $43.50 according to Sunrise's 1999 proxy statement, but the closing price on March 2, 1998 was $43.63. These options were granted at a price below fair market value in violation of the shareholder-approved stock option plans.

136.    The following chart indicates the recipients of these stock options and the stock options' adjusted value:

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 03/03/98 | Faeder | $43.50 | 200,000 | $26.75 | 400,000 |
| | Newell | $43.50 | 200,000 | $26.75 | 400,000 |
| | Swinton | $43.50 | 100,000 | $26.75 | 200,000 |
| | Tomasso | $43.50 | 100,000 | $26.75 | 200,000 |

137.    Despite the fact that these options were later re-priced pursuant to the Company's re-pricing plan enacted on September 14, 1998, the new options granted to Faeder, Newell, Swinton and Tomasso listed above were exchanged for ultra vires options granted at an exercise price below fair market value.

138.    The second ultra vires option grant was purportedly dated May 11, 2001, the date of the Company's annual shareholders' meeting. The Stock Option Committee, which consisted of defendants Donohue, Bradley and Callen, granted 240,000 stock options to themselves and defendants Faeder, Newell, Swinton, Tomasso, Hulse and Adams on this date that violated the Company's shareholder-approved stock option plans' definition of fair market value. As noted above, the Plans defined fair market value as the closing price of the Company's stock on the trading day immediately preceding the date of grant. However the options granted on May 11, 2001 were granted at the closing price of the Company's stock on the date of grant. In addition

to the September 14, 1998 re-priced option grants discussed above, this grant date was **the only time in the entire history of Sunrise's stock option grants that a one day look-back was not used** to determine the exercise price of the options and substantially favored the recipients of stock options on that date.  If the one day look-back provision had been applied the exercise price of options would have been $20.97, instead of the $20.00 exercise price at which the stock options were granted.

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 05/11/01 | Faeder | $20.00 | 50,000 | $10.00 | 100,000 |
| | Newell | $20.00 | 70,000 | $10.00 | 140,000 |
| | Swinton | $20.00 | 30,000 | $10.00 | 60,000 |
| | Tomasso | $20.00 | 30,000 | $10.00 | 60,000 |
| | Hulse | $20.00 | 25,000 | $10.00 | 50,000 |
| | Adams | $20.00 | At least 15,000 | $10.00 | At least 30,000 |
| | Donohue | $20.00 | 12,000 | $10.00 | 24,000 |
| | Bradley | $20.00 | 7,000 | $10.00 | 14,000 |
| | Callen | $20.00 | 10,000 | $10.00 | 20,000 |

139.    Both of the aforementioned stock option grants to defendants Faeder, Newell, Swinton, Tomasso, Hulse, Adams, Donohue, Bradley and Callen were granted in violation of the shareholder-approved stock option plans, and therefore are ultra vires and void.

### The Defendants' Dissemination of False Financial Statements

140.    Defendants Klaassen, Faeder, Aprahamian, Bradley, Donohue, Slavin, Callen, Slager, Smick, Meadow, Holladay, Adams and Rush prepared, approved and/or signed Sunrise's annual and quarterly SEC reports during the relevant period.  Defendants Klaassen, Faeder, Aprahamian, Bradley, Donohue, Slavin, Callen, Slager, Smick, Meadow, Holladay, Adams and Rush knowingly and deliberately caused the Company to disseminate materially false and misleading statements in the periodic filings that they prepared, approved, and/or signed.

141.    The Defendants' improper accounting manipulations and options backdating scheme caused each of Sunrise's Forms 10-K and Forms 10-Q for the relevant period to materially understate Sunrise's compensation expense, materially overstate the Company's net income and/or materially understate its net loss, because the Defendants failed to properly account for profits realized and losses sustained in the real estate joint ventures, and improperly recognized gains on the sale of real estate per the proper GAAP methods and expense the in-the-money portion of Sunrise's stock option grants during the period as required by APB 25.

142.    As a result of the improper accounting of the Company's real estate joint ventures and backdating of stock options, the Company, with the knowledge, approval, and participation of each of defendants Klaassen, Faeder, Aprahamian, Bradley, Donohue, Slavin, Callen, Slager, Smick, Meadow, Holladay, Adams, Little, Klisares, Teresa Klaassen and Rush:

  a.  violated GAAP, as set forth in AICPA Statement of Position ("SOP") 78-9, Accounting for Investments in Real Estate Ventures, by not eliminating inter-company profits until realized;

  b.  violated GAAP, as set forth in FASB Interpretation ("FIN") No. 46R, addressing consolidation of companies of variable interest entities, by not consolidating entities in which it lacked controlling financial interest;

  c.  violated GAAP, as set forth in FASB Statements of Financial Accounting Standards ("SFAS") No. 66, Accounting for Sales of Real Estate, by providing guarantees on the return of investment of its joint venture partners and the transfer of assets as a sale;

  d.  violated the terms of the Company's shareholder-approved stock option plans by granting stock options with exercise prices less than the fair market value of the price of Sunrise stock on the date of grant;

  e.  violated APB 25 by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

  f.  violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's

shareholder-approved stock option plans; and

g.    produced and disseminated to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants, and thereby understated compensation expense and overstated net income.

143.    The Company, with the knowledge, approval, and participation of each of the defendants Klaassen, Faeder, Aprahamian, Bradley, Donohue, Slavin, Callen, Slager, Smick, Meadow, Holladay, Adams, Little, Klisares, T. Klaassen and Rush, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

a.    Form 10-K for the fiscal year ended December 31, 1997, filed with the SEC on March 31, 1998 and signed by defendants Klaassen, Teresa Klaassen, Faeder, Hulse, Aprahamian, Bradley, Meadow and Donohue;

b.    Form 10-K for the fiscal year ended December 31, 1998, filed with the SEC on March 31, 1999 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Bradley, Donohue, Teresa Klaassen and Meadow;

c.    Form 10-K for the fiscal year ended December 31, 1999, filed with the SEC on March 30, 2000 and signed by defendants Klaassen, Faeder, Slavin, Hulse, Aprahamian, Callen, Bradley, Teresa Klaassen, Slager and Donohue;

d.    Form 10-K for the fiscal year ended December 31, 2000, filed with the SEC on March 30, 2001 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Callen, Adams, Teresa Klaassen, Bradley, Klisares, Holladay and Donohue;

e.    Form 10-K for the fiscal year ended December 31, 2001, filed with the SEC on March 29, 2002 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Callen, Adams, Bradley, Holladay, Teresa Klaassen, Klisares and Donohue;

f.    Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 27, 2003 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Callen, Bradley, Holladay, Adams, Klisares and Donohue, Teresa Klaassen;

g.    Form 10-K for the fiscal year ended December 31, 2003, filed with the SEC on March 12, 2004 and signed by defendants Klaassen, Faeder,

Hulse, Aprahamian, Adams, Callen, Bradley, Holladay, Teresa Klaassen and Donohue;

h.    Form 10-K for the fiscal year ended December 31, 2004, filed with the SEC on March 16, 2005 and signed by defendants Klaassen, Hulse, Aprahamian, Callen, Bradley, Holladay, and Donohue, Little and Teresa Klaassen; and

i.    Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on March 16, 2006 and signed by defendants Klaassen, Rush, Aprahamian, Callen, Holladay, Little, Teresa Klaassen and Donohue.

## The 1997 Form 10-K

144.    On or about March 31, 1998, Sunrise filed its 1997 Report on Form 10-K with the SEC.  Defendants Klaassen, Teresa Klaassen, Faeder, Hulse, Aprahamian, Bradley, Meadow and Donohue approved the Form 10-K that included Sunrise's 1997 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for real estate joint ventures and accounting for the backdated stock options.  As stated above, Audit Committee members Aprahamian and Donohue, Compensation Committee members Aprahamian, Donohue and Meadow and Stock Option Committee members Donohue, Bradley and Meadow with the knowledge and participation of co-founders the Klaassens, CFO Faeder and Controller Hulse, improperly accounted for real estate joint ventures and backdated 1997 stock option grants to dates when Sunrise's stock price was lower, thereby benefiting the option recipients (Faeder, Smick, Newell, Swinton, Aprahamian, Tomasso and Hulse who received backdated grants in 1997) and other Defendants to the detriment of the Company.  As a result, Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse and Faeder knew that Sunrise's compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 1997 filed on March 31, 1998.

145.    In addition, Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley,

Hulse and Faeder made the following misrepresentations about Sunrise's stock options and accounting treatment in the 1997 Report on Form 10-K:

> The information set forth under the captions "Compensation of Directors" and "Executive Compensation and Other Information" in the Company's 1998 Annual Meeting Proxy Statement, which the Company intends to file within 120 days after its fiscal year-end, is incorporated herein by reference.

146.    These aforementioned sections in the Company's 1998 proxy statement are rife with materially false representations and their incorporation by reference in Sunrise's Form 10-K filed on March 31, 1998 caused the annual report to be false and misleading.

147.    In the "Compensation of Directors" section of Sunrise's 1998 proxy statement Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse and Faeder caused the Company to state that "[t]he per share option exercise prices for all such options equaled the fair market value of a share of Company Common Stock on the date of grant, as determined in accordance with the terms of the respective stock option plan" referring in part to the backdated stock option grant to Aprahamian on May 2, 1997.

148.    In the "Executive Compensation and Other Information" section of Sunrise's 1998 proxy statement Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse and Faeder caused the Company to state that options were granted to Faeder, Smick, Newell and Swinton on May 2, 1997.

149.    Furthermore, Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse and Faeder caused the Company to falsely state in the 1997 Form 10-K that:

> The Company grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant.   The Company accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees and accordingly recognizes no compensation expense for the

stock option grants.

150.    As detailed above, these statements were knowingly false and misleading because stock options were not granted at "the fair market value of a Share of Company Common Stock on the date of grant" with respect to Aprahamian but in fact had an exercise price less than the stock price on the actual date of grant and the options granted to Faeder, Smick, Newell and Swinton were not granted on May 2, 1997 but rather granted on a date between May 3, 1997 and the end of the fiscal year and as such were not granted "with an exercise price equal to the fair value of the shares at the date of grant."   Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse and Faeder knew the statements were false and misleading when they made the representation in the 1997 Form 10-K because they were involved in the backdating of grants in 1997.

151.    The 1997 Form 10-K was signed by defendants Klaassen, Teresa Klaassen, Faeder, Hulse, Aprahamian, Bradley, Meadow and Donohue, and because of their involvement in the backdating scheme and other accounting manipulations, the Klaassens, Faeder, Aprahamian, Bradley, Hulse, Meadow and Donohue knowingly approved the filing of the false Form 10-K for fiscal year 1997.

**The 1998 Form 10-K**

152.    On or about March 31, 1999, Sunrise filed its 1998 Report on Form 10-K with the SEC.   Defendants Klaassen, Faeder, Hulse, Aprahamian, Bradley, Donohue, Teresa Klaassen and Meadow approved the Form 10-K that included Sunrise's 1998 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for real estate joint ventures and accounting for the backdated stock options.   As stated above, Audit Committee members Aprahamian and Donohue, Compensation

Committee members Aprahamian, Donohue and Meadow and Stock Option Committee Members Meadow, Bradley and Donohue with the knowledge and participation of co-founders the Klaassens, CFO Faeder and Controller Hulse, improperly accounted for real estate joint ventures and backdated 1998 stock option grants to dates when Sunrise's stock price was lower, thereby benefiting the option recipients (Faeder, Newell, Swinton, Tomasso, Donohue and Hulse who received backdated grants in 1998) and the other Defendants to the detriment of the Company. As a result, Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse and Faeder knew that Sunrise's compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 1998 filed on March 31, 1999.

153. In addition, Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse and Faeder falsely represented that options granted to Tomasso were granted on August 28, 1997 and that those options along with hundreds of thousands of other stock options granted to Faeder, Newell, Swinton and Tomasso were re-priced to an exercise price of $25.00 pursuant to a purported September 1998 re-pricing.

154. Furthermore, Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse and Faeder caused the Company to falsely state in the 1998 Form 10-K that:

> The Company grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant. The Company accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees and accordingly recognizes no compensation expense for the stock option grants.

155. As detailed above, these statements were knowingly false and misleading because the August 28, 1997 grant to Tomasso was in fact backdated as were the stock options granted

pursuant to the September 1998 re-pricing plan, and as such were not granted "with an exercise price equal to the fair value of the shares at the date of grant." Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse and Faeder knew the statements were false and misleading when they made the representation in the 1998 Form 10-K because they were involved in the backdating of grants in 1998.

156.    The 1998 Form 10-K was signed by Defendants Klaassen, Faeder, Hulse, Aprahamian, Bradley, Donohue, Teresa Klaassen and Meadow and because of their involvement in the backdating scheme and other improper accounting manipulations, the Klaassens, Faeder, Aprahamian, Hulse, Bradley Teresa Klaassen, Meadow and Donohue knowingly approved the filing of the false Form 10-K for fiscal year 1998.

**The 1999 Form 10-K**

157.    On or about March 30, 2000, Sunrise filed its 1999 Report on Form 10-K with the SEC. Defendants Klaassen, Faeder, Slavin, Hulse, Aprahamian, Callen, Bradley, Teresa Klaassen, Slager and Donohue approved the Form 10-K that included Sunrise's 1999 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for real estate joint ventures, improper treatment of gains resulting from real estate sales and accounting for the backdated stock options. As stated above, Audit Committee members Aprahamian, Callen and Donohue, Compensation Committee members Aprahamian, Donohue and Callen and Stock Option Committee Members Callen, Bradley and Donohue with the knowledge and participation of co-founders the Klaassens, President Faeder, CFO Slavin and Chief Accounting Officer Hulse, improperly accounted for real estate joint ventures, the gains from sales of real estate and backdated 1999 stock option grants to dates when Sunrise's stock price was lower, thereby benefiting the option recipients

(Hulse, Slavin, Faeder, Newell, Swinton, and Tomasso who received backdated grants in 1999) and the other Defendants to the detriment of the Company. As a result, Defendants the Klaassens, Faeder, Slavin, Hulse, Aprahamian, Callen, Bradley, Slager and Donohue knew that Sunrise's compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 1999 filed on March 30, 2000.

158.    In addition, Defendants the Klaassens, Faeder, Slavin, Hulse, Aprahamian, Callen, Bradley, Slager and Donohue made the following misrepresentations about Sunrise's stock options and accounting treatment in the 1999 Report on Form 10-K:

> The information set [sic] contained in the sections "Compensation of Directors" and "Executive Compensation and Other Information" in the Sunrise's 2000 Annual Meeting Proxy Statement, which Sunrise intends to file within 120 days after its fiscal year-end, is incorporated by reference herein.

159.    These aforementioned sections in the Company's 2000 proxy statement are rife with materially false representations and their incorporation by reference in Sunrise's Form 10-K filed on March 30, 2000 caused the annual report to be false and misleading.

160.    In the "Executive Compensation and Other Information" section of Sunrise's 2000 proxy statement Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse, Slager and Faeder caused the Company to state that options were granted to Faeder, Newell, Tomasso and Swinton on November 8, 1999.

161.    Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse, Slager and Faeder also made the following false statements regarding profits from the sale of real estate:

> Sunrise has expanded its previously-announced plan of selling selected real estate assets, subject to market conditions, as a normal part of its operations while retaining long-term management through operating

> agreements, to include the potential sale of approximately 20 properties each year. This strategy of selling selected real estate assets as a normal part of operations should enable Sunrise to reduce debt, redeploy its capital into new development projects and realize gains on appreciated real estate. In June 1999, Sunrise completed the sale of two assisted living facilities located in Columbia, Maryland and Norwod, Massachusetts for an aggregate sales price of $27.9 million in cash. The transaction will result in the realization of up to an $11.3 million gain over 3 quarters following the sale. As of December 31, 1999, Sunrise recognized $5.1 million of the gain. Previously, in September 1998, Sunrise completed the sale of two assisted living facilities located in Maryland for an aggregate sales price of $29.3 million in cash that will result in the realization of up to a $6.4 million gain over a maximum of 15 quarters following the sale. As of December 31, 1999, Sunrise has recognized $3.4 million of the gain. The remaining gain is deferred, the recognition of which is contingent upon future events. For tax purposes, the transactions were set up as tax-free exchanges. Sunrise continues to operate the facilities under long-term operating agreements.

162.    The 1999 Form 10-K also misrepresented that "[i]n 1999, Sunrise recognized gains of $7.0 million on the sale of assisted living communities compared to $2.0 million in 1998."

163.    Additionally, Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse, Slager and Faeder made false statements due to their improper accounting for the allocation of real estate joint venture losses:

> Equity in (losses) earnings of unconsolidated assisted living facilities. Equity in losses of unconsolidated assisted living facilities for 1999 was $1.2 million compared to earnings of approximately zero for 1998. The $1.2 million increase in equity in losses of unconsolidated assisted living facilities is primarily due to startup losses of the 10 joint venture properties that opened in 1999, in which Sunrise has ownership interests ranging from 9% to 15%.

164.    Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse, Slager and Faeder also stated:

> In 1999, Sunrise also invested $63.6 million to facilitate the development of assisted living facilities with third parties, compared to $45.3 million in

70

> 1998. These investing activities were offset, in part, by proceeds from the sale of two assisted living facilities in June 1999 amounting to $26.9 million plus $7.6 million of proceeds from investments and notes receivable.

165.    Furthermore, Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse, Slager and Faeder caused Sunrise to falsely state in the 1999 Form 10-K that:

> Sunrise grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant.  Sunrise accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees, and accordingly recognizes no compensation expense for the stock option grants.

166.    As detailed above, these statements were knowingly false and misleading because the November 8, 1999 grant to Faeder, Newell, Tomasso and Swinton was in fact backdated and granted on a date after November 8, 1999 and as such were not granted "with an exercise price equal to the fair value of the shares at the date of grant."  The statements regarding profits from the sale of real estate and earnings from joint ventures were false because of the improper accounting techniques employed by the Defendants.  Defendants the Klaassens, Aprahamian, Donohue, Meadow, Bradley, Hulse, Slager and Faeder knew the statements were false and misleading when they made the representation in the 1999 Form 10-K because they were involved in the backdating of grants in 1999 and the application of improper accounting techniques.

167.    The 1999 Form 10-K was signed by Defendants Klaassen, Faeder, Slavin, Hulse, Aprahamian, Callen, Bradley, Slager, Teresa Klaassen and Donohue and because of their involvement in the backdating scheme and improper accounting manipulations, Klaassen, Faeder, Slavin, Hulse, Aprahamian, Callen, Bradley, Slager, Teresa Klaassen and Donohue knowingly approved the filing of the false Form 10-K for fiscal year 1999.

**The 2000 Form 10-K**

168.    On or about March 30, 2001, Sunrise filed its 2000 Report on Form 10-K with the SEC.    Defendants Klaassen, Faeder, Hulse, Adams, Teresa Klaassen, Klisares, Holladay, Aprahamian, Callen, Bradley and Donohue approved the Form 10-K that included Sunrise's 2000 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for real estate joint ventures and accounting for the backdated stock options.    As stated above, Audit Committee members Aprahamian, Donohue and Holladay, Compensation Committee members Aprahamian, Donohue and Callen and Stock Option Committee members Donohue, Bradley and Callen with the knowledge and participation of co-founders the Klaassens, Vice Chairman of the Board Faeder, CFO Hulse and Chief Accounting Officer Adams, improperly accounted for real estate joint ventures and backdated 2000 stock option grants to dates when Sunrise's stock price was lower, thereby benefiting the option recipients (Klaassen, Faeder, Newell, Swinton, Slavin, Aprahamian, Tomasso, Hulse, Slager, Bradley, Callen and Adams who received backdated grants in 2000) and other Defendants to the detriment of the Company.    As a result, Defendants the Klaassens, Faeder, Hulse, Adams, Klisares, Holladay, Aprahamian, Callen, Bradley and Donohue knew that Sunrise's compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 2000 filed on March 30, 2001.

169.    In addition, Defendants the Klaassens, Faeder, Hulse, Adams, Klisares, Holladay, Aprahamian, Callen, Bradley and Donohue made the following misrepresentations about Sunrise's stock options and accounting treatment in the 2000 Report on Form 10-K:

> The information contained in the sections "Compensation of Directors" and "Executive Compensation and Other Information" in Sunrise's 2001 Annual Meeting Proxy Statement, which Sunrise intends to file within 120

72

days after its fiscal year-end, is incorporated by reference herein.

170.   These aforementioned sections in the Company's 2001 proxy statement are rife with materially false representations and their incorporation by reference in Sunrise's Form 10-K filed on March 30, 2001 caused the annual report to be false and misleading.

171.   In the "Executive Compensation and Other Information" section of Sunrise's 2001 proxy statement Defendants the Klaassens, Faeder, Hulse, Adams, Klisares, Holladay, Aprahamian, Callen, Bradley and Donohue caused the Company to state that options were granted to Newell, Slavin, Tomasso and Swinton on February 25, 2000 and March 28, 2000, that options were granted to Klaassen on September 11, 2000 and that option were granted to Slavin on November 24, 2000.

172.   Furthermore, Defendants the Klaassens, Faeder, Hulse, Adams, Klisares, Holladay, Aprahamian, Callen, Bradley and Donohue caused Sunrise to falsely state in the 2001 Form 10-K that:

> Sunrise grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant.  Sunrise accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees, and accordingly recognizes no compensation expense for the stock option grants.

173.   As detailed above, these statements were knowingly false and misleading because the February 25, 2000 and March 28, 2000 grants to Newell, Slavin, Tomasso and Swinton were in fact backdated and granted on a date after their purported grant dates as were the September 11, 2000 grant to Klaassen and the November 24, 2000 grant to Slavin, and as such these options were not granted "with an exercise price equal to the fair value of the shares at the date of grant." Defendants the Klaassens, Faeder, Hulse, Adams, Klisares, Holladay, Aprahamian, Callen,

Bradley and Donohue knew the statements were false and misleading when they made the representation in the 2000 Form 10-K because they were involved in the backdating of grants in 2000.

174.    The 2000 Form 10-K was signed by Defendants the Klaassens, Faeder, Hulse, Adams, Klisares, Holladay, Aprahamian, Callen, Bradley and Donohue, and because of their involvement in the backdating scheme and other accounting manipulations, the Klaassens, Faeder, Aprahamian, Bradley, Hulse, Aprahamian, Callen, Bradley and Donohue knowingly approved the filing of the false Form 10-K for fiscal year 2000.

**The 2001 Form 10-K**

175.    On or about March 29, 2002, Sunrise filed its 2001 Report on Form 10-K with the SEC.  Defendants Klaassen, Faeder, Hulse, Aprahamian, Adams, Holladay, Teresa Klaassen, Klisares, Callen, Bradley and Donohue approved the Form 10-K that included Sunrise's 2001 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for real estate joint ventures and accounting for the backdated stock options.  As stated above, Audit Committee members Aprahamian, Donohue and Bradley, Compensation Committee members Aprahamian, Donohue and Callen and Stock Option Committee members Donohue, Bradley and Callen with the knowledge and participation of co-founders the Klaassens, Vice Chairman of the Board Faeder, CFO Hulse and Chief Accounting Officer Adams, improperly accounted for real estate joint ventures and backdated 2001 stock option grants to dates when Sunrise's stock price was lower, thereby benefiting the option recipients (Slavin who received backdated grants in 2001) and other Defendants to the detriment of the Company.  As a result, Defendants the Klaassens, Faeder, Hulse, Aprahamian, Adams, Holladay, Klisares, Callen, Bradley and Donohue knew that Sunrise's compensation

expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 2001 filed on March 29, 2002.

176.    In addition, Defendants the Klaassens, Faeder, Hulse, Aprahamian, Adams, Holladay, Klisares, Callen, Bradley and Donohue made the following misrepresentations about Sunrise's stock options and accounting treatment in the 2001 Report on Form 10-K:

> The information contained in the sections "Compensation of Directors" and "Executive Compensation and Other Information" in Sunrise's 2002 Annual Meeting Proxy Statement, which the Sunrise intends to file within 120 days after its fiscal year-end, is incorporated by reference herein.

177.    These aforementioned sections in the Company's 2002 proxy statement are rife with materially false representations and their incorporation by reference in Sunrise's Form 10-K filed on March 29, 2002 caused the annual report to be false and misleading.

178.    In the "Executive Compensation and Other Information" section of Sunrise's 2002 proxy statement Defendants the Klaassens, Faeder, Hulse, Aprahamian, Adams, Holladay, Klisares, Callen, Bradley and Donohue caused the Company to state that options were granted to Slavin on November 12, 2001.  Moreover, the Stock Option Committee comprised of Donohue, Bradley and Callen made the following false statements:

> On November 24, 2000, the stock option committee determined that, as a result of declines in the market price of the common stock, Christopher B.A. Slavin, a Sunrise executive officer, held options on 150,000 shares at an exercise price of $37.625 per share that limited their effectiveness as a tool for employee retention and as a long−term incentive. After considering the matter, the stock option committee voted to offer Mr. Slavin a grant of options on 75,000 shares in exchange for his agreement to cancel options on 150,000 shares with an exercise price of $37.625 per share six months and one day after the grant. Mr. Slavin accepted the offer and his options for 150,000 shares were cancelled on May 24, 2001. The exercise price of the repriced options repricing was $26.3125 per share which equaled fair market value on the date of grant. Except for the option exercise price, the new stock option was identical to the canceled options.

179.    Additionally, Defendants the Klaassens, Faeder, Hulse, Aprahamian, Adams, Holladay, Klisares, Callen, Bradley and Donohue made false statements due to their improper accounting for the allocation of real estate joint venture losses:

> For all of our development joint ventures, we earn pre-opening fees for site selection, zoning, construction supervision, employee selection, licensing, training and marketing efforts. These fees are included in the "Management and contract services" line item on our consolidated income statement. As we are minority owners in these joint ventures, we only record the fee revenue associated with the third-party ownership percentage of the joint venture. For example, our joint venture partner has a 75% ownership interest in the joint venture, we only record 75% of the fee revenue. We also typically provide development completion guarantees that ensure that the construction of the facility will be completed for the cost approved by all partners in the joint venture. At December 31, 2001, seven properties are under construction and subject to completion guarantees.

180.    Furthermore, Defendants the Klaassens, Faeder, Hulse, Aprahamian, Adams, Holladay, Klisares, Callen, Bradley and Donohue caused Sunrise to falsely state in the 2001 Form 10-K that:

> Sunrise grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant.  Sunrise accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees, and accordingly recognizes no compensation expense for the stock option grants.

181.    As detailed above, these statements were knowingly false and misleading because the November 21, 2001 grant to Slavin was in fact backdated and granted on a date after the purported grant date, and the November 24, 2000 backdated grant to Slavin was not granted at an exercise price "which equaled fair market value on the date of grant.". Defendants the Klaassens, Faeder, Hulse, Aprahamian, Adams, Holladay, Klisares, Callen, Bradley and Donohue knew the statements were false and misleading when they made the representation in the 2001 Form 10-K

because they were involved in the backdating of grants in 2001 and the improper accounting for real estate joint ventures.

182.    The 2001 Form 10-K was signed by defendants Klaassens, Faeder, Hulse, Aprahamian, Adams, Holladay, Klisares, Callen, Bradley and Donohue, and because of their involvement in the backdating scheme and other improper accounting manipulations, the Klaassens, Faeder, Hulse, Aprahamian, Adams, Holladay, Klisares, Callen, Bradley and Donohue knowingly approved the filing of the false Form 10-K for fiscal year 2001.

**The 2002 Form 10-K**

183.    On or about March 27, 2003, Sunrise filed its 2002 Report on Form 10-K with the SEC.  Defendants Klaassen, Hulse, Callen, Holladay, Adams, Faeder, Aprahamian, Klisares, Bradley, Donohue and Teresa Klaassen approved the Form 10-K, which they knew was materially false and misleading and presented in violation of GAAP, due to improper accounting for real estate joint ventures and recognition of real estate sales.  As stated above, Audit Committee members Aprahamian, Donohue and Bradley, with the knowledge and participation of co-founders the Klaassens, Vice Chairman of the Board Faeder, CFO Hulse and Chief Accounting Officer Adams, improperly accounted for real estate joint ventures and real estate sales.  As a result, Defendants the Klaassens, Faeder, Hulse, Aprahamian, Adams, Callen, Bradley, Holladay, Klisares and Donohue knew that Sunrise's net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 2002 filed on March 27, 2003.

184.    Sunrise's materially false and misleading financial statements for fiscal years 1998 to 2001 were included in its Form 10-K filed for fiscal year 2002.  For this reason, and to the extent that the 2002 Form 10-K included financials from earlier periods, Sunrise's annual report on Form 10-K for fiscal year 2002 was also materially false and misleading.  By

participating in these accounting schemes, and by reviewing and/or signing these subsequent annual reports, Defendants Klaassen, Hulse, Callen, Holladay, Adams, Faeder, Aprahamian, Klisares, Bradley, Donohue and Teresa Klaassen knew, or were reckless in not knowing, that the financial statements in these later filings were materially false and misleading.

185.    In addition, Defendants Klaassen, Hulse, Callen, Holladay, Adams, Faeder, Aprahamian, Klisares, Bradley, Donohue and Teresa Klaassen made the following misrepresentations about Sunrise's accounting treatment in the 2005 Report on Form 10-K.

186.    Specifically, in the Company's annual report on Form 10-K for 2002, the Company represented the following regarding FIN No. 46R:

> In January 2003, the FASB issued FASB Interpretation No. 46, Consolidation of Variable Interest Entities ("FIN 46"). Under this new Interpretation, companies will be required to determine if they are the primary beneficiary of a variable interest entity. If they are the primary beneficiary, the variable interest entity must be consolidated. All companies with variable interests in variable interest entities created after January 31, 2003 must apply the provisions of the Interpretation immediately. Public companies with a variable interest in a variable interest entity created before February 1, 2003 must apply the provisions of the Interpretation to that entity no later than the beginning of the first interim or annual reporting period beginning after June 15, 2003. If it is reasonably possible that a company will consolidate or disclose information about a variable interest entity when this interpretation becomes effective, certain disclosures are required in all financial statements issued after January 31, 2003.
>
> Sunrise is currently evaluating the impact of FIN 46 on its financials. Based on Sunrise's preliminary review of FIN 46, Sunrise believes that its joint ventures will be considered variable interest entities and is currently evaluating whether Sunrise is the primary beneficiary. See Note 6 - Transactions with Unconsolidated Entities. Sunrise's joint ventures fall into one of three categories. First, Sunrise enters into development joint ventures whereby a third-party investor and Sunrise capitalize a joint venture to develop and operate senior living properties. Second, Sunrise and a third-party investor capitalize a joint venture to acquire an existing senior living property. Finally, as a part of Sunrise's sale long-term manage back program, Sunrise sells wholly owned properties into a joint

venture structure that is capitalized by a third-party investor in which Sunrise holds a minority interest. These partnerships obtain non-recourse third-party debt. Sunrise does not have future requirements to contribute additional capital over and above the original capital commitments. All three types of joint ventures are established as real estate partnerships to own the underlying property. Sunrise will then enter into a long-term management contract to operate the property on behalf of the joint venture. Sunrise's total investment in these joint ventures is comprised of Sunrise's direct capital investment in these joint ventures, sub-debt provided to the joint ventures and other short-term advances to these joint ventures (Sunrise's investment). As of December 31, 2002, this total investment was $156 million, not including any guarantees provided to these joint ventures as described in Note 15. The realization of this investment is dependent upon the ongoing operations of the joint ventures. See Note 6 for operating results of the joint ventures

187.    However, Defendants Klaassen, Hulse, Callen, Holladay, Adams, Faeder, Aprahamian, Klisares, Bradley, Donohue and Teresa Klaassen failed to properly apply FIN No. 46R to the accounting of the Company's real estate joint ventures and as a result the above statements regarding the application of FIN No. 46R were materially false and misleading.

**The 2003 Form 10-K**

188.    On or about March 12, 2004, Sunrise filed its 2003 Report on Form 10-K with the SEC.  Defendants Klaassen, Faeder, Hulse, Aprahamian, Adams, Callen, Bradley, Holladay, Teresa Klaassen and Donohue approved the Form 10-K, which they knew was materially false and misleading and presented in violation of GAAP, due to improper accounting for real estate joint ventures and recognition of real estate sales.  As stated above, Audit Committee members Aprahamian, Donohue and Bradley, with the knowledge and participation of co-founders the Klaassens, Vice Chairman of the Board Faeder, CFO Hulse and Chief Accounting Officer Adams, improperly accounted for real estate joint ventures and real estate sales.  As a result, Defendants the Klaassens, Faeder, Hulse, Aprahamian, Adams, Callen, Bradley, Holladay and Donohue knew that Sunrise's net earnings were overstated and thus knowingly approved the

false Form 10-K for fiscal year 2003 filed on March 12, 2004.

189.     Sunrise's materially false and misleading financial statements for fiscal years 1999 to 2001 were included in its Form 10-K filed for fiscal year 2003.  For this reason, and to the extent that the 2003 Form 10-K included financials from earlier periods, Sunrise's annual report on Form 10-K for fiscal year 2003 was also materially false and misleading.  By participating in these accounting schemes, and by reviewing and/or signing these subsequent annual reports, Defendants Klaassen, Faeder, Hulse, Aprahamian, Adams, Callen, Bradley, Holladay, Teresa Klaassen and Donohue knew, or were reckless in not knowing, that the financial statements in these later filings were materially false and misleading.

190.     In addition, Klaassen, Faeder, Hulse, Aprahamian, Adams, Callen, Bradley, Holladay, Teresa Klaassen and Donohue made the following misrepresentations about Sunrise's accounting treatment in the 2003 Report on Form 10-K.

191.     Specifically, in the Company's annual report on Form 10-K for 2003, the Company represented that it had adopted and was in compliance with FIN No. 46R:

> On February 1, 2003, we adopted FASB Interpretation No. 46, Consolidation of Variable Interest Entities ("FIN 46"). Under this new Interpretation, companies are required to determine if they are the primary beneficiary of a variable interest entity. If they are the primary beneficiary, the variable interest entity must be consolidated. All companies with variable interests in variable interest entities created after January 31, 2003 must apply the provisions of the Interpretation immediately. Public companies with calendar year-end quarters with a variable interest in a variable interest entity created before February 1, 2003 must apply the provisions of this Interpretation as of March 31, 2004 in accordance with FIN 46 Revised.
>
> Based on our review of FIN 46, we have determined that there are three joint ventures in which Sunrise has an interest that are variable interest entities under FIN 46. Two of the variable interest entities are development joint ventures, which were established in 1999 and 2003 and contain seven operating senior living communities. The other variable

interest entity is an operating joint venture formed in 2000. We are not considered the primary beneficiary of these three variable interest entities and therefore will continue to account for these investments under the equity method of accounting. Our remaining joint venture interests are not variable interest entities under FIN 46 as, among other factors, there is adequate equity in the joint ventures to support expected operations, there is sufficient third party capital and no guarantees of returns or capital, and we would not be deemed the primary beneficiary in these ventures. We are in the process of determining the effect of FIN 46, as passed in December 2003, on these three variable interest entities. Sunrise's maximum exposure from these entities was $28 million at December 31, 2003.

192.    However, Defendants Klaassen, Faeder, Hulse, Aprahamian, Adams, Callen, Bradley, Holladay, Teresa Klaassen and Donohue failed to properly apply FIN No. 46R to the accounting of the Company's real estate joint ventures which caused the Company to report inflated earnings for the fiscal year ended December 31, 2003. As a result the above statements regarding the application of FIN No. 46R were materially false and misleading in the Company's 2003 Form 10-K.

**The 2004 Form 10-K**

193.    On or about March 16, 2005, Sunrise filed its 2004 Report on Form 10-K with the SEC. Defendants Klaassen, Hulse, Aprahamian, Callen, Bradley, Holladay, Donohue, Little and Teresa Klaassen approved the Form 10-K, which they knew was materially false and misleading and presented in violation of GAAP, due to improper accounting for real estate joint ventures and recognition of real estate sales. As stated above, Audit Committee members Aprahamian, Donohue and Bradley, with the knowledge and participation of co-founders the Klaassens and CFO Hulse, improperly accounted for real estate joint ventures and real estate sales. As a result, Defendants the Klaassens, Hulse, Aprahamian, Callen, Bradley, Holladay, Little and Donohue knew that Sunrise's net earnings were overstated and thus knowingly approved the false Form

81

10-K for fiscal year 2004 filed on March 16, 2005.

194.    Sunrise's materially false and misleading financial statements for fiscal years 2000 to 2001 were included in its Form 10-K filed for fiscal year 2004. For this reason, and to the extent that the 2004 Form 10-K included financials from earlier periods, Sunrise's annual report on Form 10-K for fiscal year 2004 was also materially false and misleading. By participating in these accounting schemes, and by reviewing and/or signing these subsequent annual reports, Defendants the Klaassens, Hulse, Aprahamian, Callen, Bradley, Holladay, Little and Donohue knew, or were reckless in not knowing, that the financial statements in these later filings were materially false and misleading.

195.    In addition, the Klaassens, Hulse, Aprahamian, Callen, Bradley, Holladay, Little and Donohue made the following misrepresentations about Sunrise's accounting treatment in the 2004 Report on Form 10-K.

196.    Specifically, in the Company's annual report on Form 10-K for 2004, the Company represented that it had adopted and was in compliance with FIN No. 46R:

> On February 1, 2003, Sunrise adopted FASB Interpretation No. 46, Consolidation of Variable Interest Entities ("FIN 46"). Under FIN 46, companies are required to determine if they are the primary beneficiary of a variable interest entity. If they are the primary beneficiary, the variable interest entity must be consolidated. All companies with variable interests in variable interest entities created after January 31, 2003 were required to apply the provisions of FIN 46 as of the date the entity was created (immediately). Public companies with calendar year-end quarters with a variable interest in a variable interest entity created before February 1, 2003 were required to apply the provisions of FIN 46 at March 31, 2004.
>
> *    *    *
>
> At December 31, 2004, there are eight joint ventures in which Sunrise had an interest that are variable interest entities under FIN 46. Five of the variable interest entities are development joint ventures, which were established between 1999 and 2004 and contain a total of three operating

82

properties and 15 properties under development. One of the variable interest entities is an operating joint venture formed in 2000. The other variable interest entity is a sale/long-term manage back joint venture that contains a total of 28 operating properties. The final variable interest entity is a newly formed joint venture that contains five operating properties recapitalized from a development venture, nine operating properties recapitalized from a sale/manage back venture and two operating properties that were previously wholly owned by Sunrise. Sunrise is not considered the primary beneficiary for any of these joint ventures and therefore, continues to account for these investments under the equity method of accounting. Sunrise's maximum exposure from these eight entities was $80 million at December 31, 2004

197.    However, Defendants Klaassens, Hulse, Aprahamian, Callen, Bradley, Holladay, Little and Donohue failed to properly apply FIN No. 46R to the accounting of the Company's real estate joint ventures which caused the Company to report inflated earnings for the fiscal year ended December 31, 2004.  As a result the above statements regarding the application of FIN No. 46R were materially false and misleading in the Company's 2004 Form 10-K

**The 2005 Form 10-K**

198.    On or about March 16, 2006, Sunrise filed its 2005 Report on Form 10-K with the SEC.  Defendants Klaassen, Rush, Aprahamian, Callen, Holladay, Little, Teresa Klaassen and Donohue approved the Form 10-K that included Sunrise's 2005 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for real estate joint ventures and accounting for the backdated stock options.  As stated above, Audit Committee members Aprahamian, Donohue and Callen and Compensation Committee members Aprahamian, Donohue and Callen and participation of co-founders the Klaassens, and CFO Rush improperly accounted for real estate joint ventures and previously backdated stock option grants to the detriment of the Company.  As a result, Defendants the Klaassens, Rush, Aprahamian, Callen, Holladay, Little, and Donohue knew that Sunrise's

compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 2005 filed on March 16, 2006.

199.   In addition, Defendants the Klaassens, Rush, Aprahamian, Callen, Holladay, Little, and Donohue made the following misrepresentations about Sunrise's accounting treatment in the 2005 Report on Form 10-K.

200.   Specifically, in the Company's annual report on Form 10-K for 2005, the Company represented that it had complied with FIN No. 46R:

> **Investments in Unconsolidated Senior Living Communities**
>
> Sunrise holds an interest in ventures established to develop or acquire and own senior living communities.   When these ventures are considered to be variable interest entities ("VIES") in accordance with FASB Interpretation No. 46, Consolidation of Variable Interest Entities ("FIN 46R"), Sunrise consolidates the ventures if it is determined to be the primary beneficiary.   When Sunrise has determined it is not the primary beneficiary or, for non-VIE's when and it [sic] determines that it owns a non-controlling interest (because other partners or members control or participate in the management decisions of these ventures), the investments are accounted for under the equity method.

201.   Also, in the Company's annual report on Form 10-K for 2005, the Company stated that "[w]e generally have ownership interests in these unconsolidated ventures ranging from five to 25%.   We will manage these communities pursuant to long-term management contracts."   However, in 2005, Sunrise reported $13.2 million in equity earnings from unconsolidated ventures.   Yet those ventures' total income was $19.2 million.   It is incongruous that Sunrise could recognize 69% of the income from ventures when it generally owned between five and twenty-five percent.   Thus Sunrise inflated its earnings through improper accounting for these unconsolidated ventures.   Moreover, the financial guarantees Sunrise provided to its joint venture partners prohibited the Company from recognizing the sales of real estate immediately.

202.   Finally, defendants Klaassen, Hulse and Rush filed false Certifications of Chief

Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "Certification"), certifying that each Annual Report of Sunrise on Form 10-Ks "fully complies with the requirements of section 13(a) and 15(d) of the Securities Exchange Act of 1934; and the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  Defendants Klaassen and Hulse signed the following Certifications for years 2003 through 2005, whereas defendants Klaassen and Rush signed the Certification in 2006:

    a.    for the Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 27, 2003

    b.    for the Form 10-K for the fiscal year ended December 31, 2003, filed with the SEC on March 12, 2004;

    c.    for the Form 10-K for the fiscal year ended December 31, 2004, filed with the SEC on March 16, 2005; and

    d.    for the Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on March 16, 2006.

### The Defendants' Concealment of Their Misconduct

203.  Defendants the Klaassens, Faeder, Aprahamian, Donohue, Callen and Bradley caused Sunrise to issue false proxy statements in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the relevant period.  These defendants prepared and/or reviewed the 1998-2002 proxy statements before the statements were disseminated to shareholders and filed with the SEC.  Moreover, the Klaassens, Faeder, Aprahamian, Donohue, Callen and Bradley knew that the proxies were materially false and misleading as they participated in the backdating of stock option grants from May 1997 to November 2001.

204.    Sunrise shareholders routinely relied upon the false and misleading proxy statements issued by the Company and voted for the Company's stock option plans under which these defendants backdated stock option grants in order to benefit Company insiders at the expense of the Company and its shareholders.

205.    From 1998 to 2002, the Company, with the knowledge, approval and participation of Defendants the Klaassens, Faeder, Aprahamian, Donohue, Callen and Bradley, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to Defendants Klaassen, Swinton, Smick, Faeder, Newell, Tomasso, Hulse, Slavin, Aprahamian, Callen, Donohue, Bradley and Slager and falsely stated that options were granted to them at the fair market value of the Company's common stock on the date of grant.

**1998 Proxy Statement**

206.    In Sunrise's proxy statement filed with the SEC on April 3, 1998, Defendants the Klaassens, Faeder, Aprahamian, Donohue, Meadow and Bradley falsely reported that stock options granted to Faeder, Smick, Newell and Swinton were granted on May 2, 1997 when they were in fact granted at a later date.  Defendants the Klaassens, Faeder, Aprahamian, Donohue, Meadow and Bradley made the following representations about Sunrise's granting practices:

**REPORT ON EXECUTIVE COMPENSATION**

The Board of Directors and its Compensation and Stock Option Committees have prepared the following report on the Company's policies with respect to the compensation of executive officers for 1997. The Board of Directors makes all decisions on compensation of the Company's executive officers (other than stock options), based upon recommendations of the Compensation Committee. Decisions as to the grant of stock options are made by the Stock Option Committee.

\*          \*          \*

86

Stock options are considered an effective long−term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant. The options typically vest in equal portions over a four year period, and are exercisable within ten years from the date of grant. The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to the Company's stockholders through appreciation of the stock price. Management of the Company believes that stock options have been helpful in attracting and retaining skilled executive personnel.

\*          \*          \*

Reflecting the Company's belief in the value and desirability of all employees having a proprietary interest in the Company, during 1997, the Company granted stock options covering a total of 1,364,922 shares of Common Stock to 258 employees. Such number includes options covering an aggregate of 425,000 shares of Common Stock granted to four of the Company's executive officers. The per share option exercise prices of such options ranged from $24.375 to $36.625, which equaled the fair market value of a share of the Company's Common Stock on the date of grant.

207.    Each of the above statements concerning the value of the stock options on the date of grant was knowingly false and misleading because the option grants to defendants Faeder, Newell, Swinton and Smick purportedly granted on May 2, 1997 were backdated and were granted at less than the current market price as indicated in the report and as prohibited by the Company's stock option plans. The Report on Executive Compensation was signed by the entire Board, which included Defendants Klaassen, Teresa Klaassen, Aprahamian, Donohue, Faeder, Meadow and Bradley. Due to the above false representations, none of the backdated options were ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

**1999 Proxy Statement**

208.    In Sunrise's proxy statement filed with the SEC on April 6, 1998, Defendants the Klaassens, Faeder, Aprahamian, Donohue, Meadow and Bradley falsely reported that stock

options granted to Faeder, Newell, Tomasso and Swinton were re-priced on September 14, 1998

when they were in fact granted at a later date. Specifically, Defendants Donohue, Meadow and

Bradley, the members of the Stock Option Committee stated the following:

**REPORT ON OPTION REPRICING**

On September 14, 1998, the stock option committee determined that, as a result of declines in the market price of the common stock, many employees, including Sunrise's executive officers, held options at exercise prices that limited their effectiveness as a tool for employee retention and as a long−term incentive. After considering the matter, the stock option committee voted to offer employees the ability to cancel all of their options with an exercise price of greater than $29.00 per share and to regrant to employees who accepted the offer new stock options on a one−for−one basis with an exercise price of $25.00 per share. The closing price of Sunrise common stock on the Nasdaq National Market on the day preceding the repricing was $24.1875 per share.

209.    Defendants the Klaassens, Faeder, Aprahamian, Donohue, Meadow and Bradley

also made the following representations about Sunrise's granting practices:

**REPORT ON EXECUTIVE COMPENSATION**

The board of directors and its compensation and stock option committees have prepared the following report on Sunrise's policies with respect to the compensation of executive officers for 1998. The board of directors makes all decisions on compensation of Sunrise's executive officers, other than stock options, based upon recommendations of the compensation committee. Decisions as to the grant of stock options are made by the stock option committee.

*          *          *

Stock options are considered an effective long−term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options are granted by the stock option committee at an exercise price equal to the market price of the Common Stock at the date of the grant. The options typically vest in equal portions over a four year period, and are exercisable within ten years from the date of grant. The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price. Management of Sunrise believes that stock options have been helpful in attracting and retaining skilled executive personnel.

*            *            *

Reflecting Sunrise's belief in the value and desirability of all employees having a proprietary interest in Sunrise, in January and March 1998, Sunrise granted stock options covering a total of 3,417,095 shares of common stock, of which 1,573,532 shares were regranted in connection with the repricing, to approximately 650 employees. This number includes options covering an aggregate of 1,430,000 shares of common stock granted to Messrs. Faeder, Newell and Swinton and Ms. Tomasso, of which 730,000 shares were regranted in connection with the repricing. In September 1998, the stock option committee determined that, as a result of declines in the market price of the common stock, many employees, including Sunrise's executive officers, held options at exercise prices that limited their effectiveness as a tool for employee retention and as a long−term incentive. After considering the matter, the stock option committee voted to offer employees the ability to cancel all of their options with an exercise price of greater than $29.00 per share and to regrant to employees who accepted the offer new stock options on a one−for−one basis with an exercise price of $25.00 per share.

210.    Each of the above statements concerning the value of the stock options on the date of grant was knowingly false and misleading because the option grants to defendants Faeder, Newell, Swinton and Tomasso purportedly granted on September 14, 1998 were backdated and ultra vires as they were granted at less than the current market price as indicated in the report and as prohibited by the Company's stock option plans. The Report on Executive Compensation was signed by the entire Board, which included Defendants Klaassen, Teresa Klaassen, Aprahamian, Donohue, Faeder, Meadow and Bradley.  Due to the above false representations, none of the backdated options were ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

**2000 Proxy Statement**

211.    In Sunrise's proxy statement filed with the SEC on April 14, 2000, Defendants the Klaassens, Faeder, Aprahamian, Donohue, Slager and Bradley falsely reported that stock options granted to Faeder, Newell, Tomasso and Swinton were granted on November 8, 1999

when they were in fact granted at a later date. Defendants the Klaassens, Faeder, Aprahamian, Donohue, Slager and Bradley made the following representations about Sunrise's granting practices:

**REPORT ON EXECUTIVE COMPENSATION**

The current members of the board of directors and the current members of its compensation and stock option committees who participated in committee deliberations during 1999 have prepared the following report on the Sunrise's policies with respect to the compensation of executive officers for 1999. Mr. Callen, who joined the board of directors in October 1999 and who also serves as a member of the compensation and stock option committees, did not participate in compensation discussions for executive officers in 1999.

The board of directors makes all decisions on compensation of Sunrise's executive officers, other than stock options, based upon recommendations of the compensation committee. The stock option committee makes decisions regarding the grant of stock options.

\*             \*             \*

Stock options are considered an effective long−term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options are granted by the stock option committee at an exercise price equal to the market price of the Common Stock at the date of the grant. The options typically vest in equal portions over a four year period, and are exercisable within ten years from the date of grant. The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price. Management of Sunrise believes that stock options have been helpful in attracting and retaining skilled executive personnel.

\*             \*             \*

Reflecting Sunrise's belief in the value and desirability of all employees having a proprietary interest in Sunrise, in 1999, Sunrise granted stock options covering a total of 684,754 shares of common stock to approximately 413 employees. This number includes options covering an aggregate of 235,000 shares of common stock granted to Messrs. Faeder, Newell and Swinton and Ms. Tomasso.

212. Each of the above statements concerning the value of the stock options on the date of grant was knowingly false and misleading because the option grants to defendants Faeder,

Newell, Swinton and Tomasso purportedly granted on November 8, 1999 were backdated as they were granted at less than the current market price as indicated in the report and as prohibited by the Company's stock option plans. The Report on Executive Compensation was signed by the entire Board, which included Defendants Klaassen, Teresa Klaassen, Aprahamian, Donohue, Faeder, Slager and Bradley.  Due to the above false representations, none of the backdated options were ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

**2001 Proxy Statement**

213.    In Sunrise's proxy statement filed with the SEC on March 29, 2001, Defendants the Klaassens, Faeder, Aprahamian, Donohue, Holladay, Klisares, Callen and Bradley falsely reported that stock options granted to Newell, Tomasso, Slavin and Swinton were granted on February 25, 2000 and March 28, 2000, that stock options granted to Klaassen were granted on September 11, 2000 and that stock options granted to Slavin were granted on November 24, 2000 when they were in fact granted at a later date.   Defendants the Klaassens, Faeder, Aprahamian, Donohue, Holladay, Klisares, Callen and Bradley made the following representations about Sunrise's granting practices:

**REPORT ON EXECUTIVE COMPENSATION**

The board of directors and its compensation and stock option committees have prepared the following report on Sunrise's policies with respect to the compensation of executive officers for 2000.

The board of directors makes all decisions on compensation of the Sunrise's executive officers, other than stock options, based upon recommendations of the compensation committee. The stock option committee makes decisions regarding the grant of stock options.

\*                    \*                    \*

Stock options are considered an effective long−term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options are granted by the stock option committee at an exercise price equal to the market price of the Common Stock at the date of the grant. The options typically vest in equal portions over a four year period, and are exercisable within ten years from the date of grant. The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price. Management of Sunrise believes that stock options have been helpful in attracting and retaining skilled executive personnel.

*          *          *

Reflecting Sunrise's belief in the value and desirability of all employees having a proprietary interest in Sunrise, in 2000, Sunrise granted stock options covering a total of 1,902,999 shares of common stock to approximately 1,009 employees. This number includes options covering an aggregate of 710,000 shares of common stock granted to Messrs. Klaassen, Slavin and Swinton and Ms. Tomasso.

214.    Each of the above statements concerning the value of the stock options on the date of grant was knowingly false and misleading because the option grants to defendants Klaassen, Newell, Swinton, Slavin and Tomasso purportedly granted on February 25, 2000, March 28, 2000, September 11, 2000 and November 24, 2000 were backdated as they were granted at less than the current market price as indicated in the report and as prohibited by the Company's stock option plans. The Report on Executive Compensation was signed by the entire Board, which included Defendants Klaassen, Teresa Klaassen, Aprahamian, Donohue, Faeder, Holladay, Klisares, Callen and Bradley. Due to the above false representations, none of the backdated options were ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

## 2002 Proxy Statement

215.    In Sunrise's proxy statement filed with the SEC on April 5, 2002, Defendants the Klaassens, Faeder, Aprahamian, Donohue, Holladay, Klisares, Callen and Bradley falsely

reported that stock options granted to Slavin were granted on November 12, 2001 when they were in fact granted at a later date. Defendants the Klaassens, Faeder, Aprahamian, Donohue, Holladay, Klisares, Callen and Bradley made the following representations about Sunrise's granting practices:

**REPORT ON EXECUTIVE COMPENSATION**

> The board of directors and its compensation and stock option committees have prepared the following report on Sunrise's policies with respect to the compensation of executive officers for 2001.

> \*           \*           \*

> The stock option committee makes decisions regarding the grant of stock options. In addition, during 2001, some of Sunrise's executive officers received restricted stock or partnership unit awards in two of our joint ventures.

> \*           \*           \*

> Stock options are considered an effective long−term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options are granted by the stock option committee at an exercise price equal to the market price of the Common Stock at the date of the grant. The options typically vest in equal portions over a four year period, and are exercisable within ten years from the date of grant. The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price. Management of Sunrise believes that stock options have been helpful in attracting and retaining skilled executive personnel.

> \*           \*           \*

> Reflecting Sunrise's belief in the value and desirability of all employees having a proprietary interest in Sunrise, in 2001, Sunrise granted stock options covering a total of 1,208,875 shares of common stock to approximately 694 employees. This number includes options covering an aggregate of 215,000 shares of common stock granted to Messrs. Newell, Slavin, Swinton and Hulse and Ms. Tomasso.

216.     Each of the above statements concerning the value of the stock options on the date of grant was knowingly false and misleading because the option grants to defendants Newell, Swinton, Slavin, Hulse and Tomasso purportedly granted on May 31, 2001 were ultra vires and the option grant to Defendant Slavin purportedly granted on November 24, 2001 was backdated as they were granted at less than the current market price as indicated in the report and as prohibited by the Company's stock option plans. The Report on Executive Compensation was signed by the entire Board, which included Defendants Klaassen, Teresa Klaassen, Aprahamian, Donohue, Faeder, Holladay, Klisares, Callen and Bradley.    Due to the above false representations, none of the backdated options were ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

217.     Moreover, as noted in the preceding, in the Reports on Executive Compensation included in the Company's proxy statements filed from 1998 to 2002, the Company falsely stated that "[t]he full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price," when in fact the backdated stock options and ultra vires stock options provided the Defendants who received these options with immediate profits regardless of the Company's stock performance.

218.     Furthermore, from 2003 to 2006, the Company, with the knowledge, approval, and participation of Defendants the Klaassens, Donohue, Callen, Aprahamian, Bradley, for the purpose and with the effect of concealing the improper option backdating, filed with the SEC Forms 4 that falsely reported the dates of stock option grants to the Defendants, as follows:

> a.     Swinton's Form 4 filed with the SEC on May 21, 2003 falsely reported that options granted to Swinton had been granted on March 28, 2000;

b.     Faeder's Form 4 filed with the SEC on July 16, 2003 falsely reported that options granted to Faeder had been granted on November 8, 1999;

c.     Faeder's Form 4 filed with the SEC on August 21, 2003 reported that options were granted to Faeder on May 11, 2001 with the improper exercise price of $20.00, the closing price on May 11, 2001, instead of the proper May 10, 2001 closing price of $20.97;

d.     Faeder's Form 4 filed with the SEC on August 22, 2003 reported that options were granted on May 11, 2001 with the improper exercise price of $20.00, the closing price on May 11, 2001, instead of the proper May 10, 2001 closing price of $20.97;

e.     Newell's Form 4 filed with the SEC on August 25, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

f.     Faeder's Form 4 filed with the SEC on September 2, 2003 reported that options were granted to Faeder on May 11, 2001 with the improper exercise price of $20.00, the closing price on May 11, 2001, instead of the proper May 10, 2001 closing price of $20.97;

g.     Hulse's Form 4 filed with the SEC on September 5, 2003 falsely reported that options granted to Faeder had been granted on February 25, 2000 and March 28, 2000;

h.     Newell's Form 4 filed with the SEC on September 23, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

i.     Faeder's Form 4 filed with the SEC on October 3, 2003 falsely reported that options granted to Faeder had been granted on May 2, 1997;

j.     Swinton's Form 4 filed with the SEC on October 3, 2003 falsely reported that options granted to Swinton had been granted on February 25, 2000;

k.     Swinton's Form 4 filed with the SEC on October 14, 2003 falsely reported that options granted to Swinton had been granted on November 8, 1999;

l.     Swinton's two Forms 4 filed with the SEC on October 21, 2003 reported that options were granted to Swinton on May 11, 2001 with the improper exercise price of $20.00, the closing price on May 11, 2001, instead of the proper May 10, 2001 closing price of $20.97;

m.     Newell's Form 4 filed with the SEC on October 23, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

n.    Swinton's Form 4 filed with the SEC on October 29, 2003 reported that options were granted to Swinton on May 11, 2001 with the improper exercise price of $20.00, the closing price on May 11, 2001, instead of the proper May 10, 2001 closing price of $20.97;

o.    Tomasso's Form 4 filed with the SEC on October 30, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999;

p.    Tomasso's Form 4 filed with the SEC on October 31, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999 and March 28, 2000;

q.    Swinton's Form 4 filed with the SEC on November 6, 2003 falsely reported that options granted to Swinton had been granted on May 2, 1997;

r.    Slavin's Form 4 filed with the SEC on November 7, 2003 falsely reported that options granted to Slavin had been granted on February 25, 2000;

s.    Tomasso's Form 4 filed with the SEC on November 7, 2003 falsely reported that options granted to Tomasso had been granted on February 25, 2000;

t.    Hulse's Form 4 filed with the SEC on November 12, 2003 reported that options were granted to Hulse on May 11, 2001 with the improper exercise price of $20.00, the closing price on May 11, 2001, instead of the proper May 10, 2001 closing price of $20.97;

u.    Slavin's Form 4 filed with the SEC on November 12, 2003 falsely reported that options granted to Slavin had been granted on November 8, 1999, February 25, 2000, March 28, 2000, November 24, 2000, and November 12, 2001;

v.    Faeder's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Faeder had been granted on November 8, 1999;

w.    Hulse's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Hulse had been granted on November 8, 1999;

x.    Swinton's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Swinton had been granted on November 8, 1999;

y.     Tomasso's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999;

z.     Slavin's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Slavin had been granted on November 8, 1999;

aa.     Newell's Form 4 filed with the SEC on November 26, 2003 falsely reported that options granted to Newell had been granted on March 28, 2000;

bb.     Slavin's Form 4 filed with the SEC on December 5, 2003 falsely reported that options granted to Slavin had been granted on November 24, 2000 and November 12, 2001;

cc.     Tomasso's Form 4 filed with the SEC on December 22, 2003 reported that options were granted to Tomasso on May 11, 2001 with the improper exercise price of $20.00, the closing price on May 11, 2001, instead of the proper May 10, 2001 closing price of $20.97;

dd.     Newell's Form 4 filed with the SEC on December 23, 2003 falsely reported that options granted to Newell had been granted on November 8, 1999 and March 28, 2000;

ee.     Newell's Form 4 filed with the SEC on January 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

ff.     Newell's Form 4 filed with the SEC on February 25, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

gg.     Hulse's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Hulse had been granted on February 25, 2000;

hh.     Tomasso's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Tomasso had been granted on February 25, 2000;

ii.     Faeder's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Faeder had been granted on February 25, 2000;

jj.     Slavin's Form 4 filed with the SEC on March 4, 2004 falsely reported that options granted to Slavin had been granted on February 25, 2000;

kk.    Slavin's Form 4 filed with the SEC on March 5, 2004 falsely reported that options granted to Slavin had been granted on February 25, 2000;

ll.    Swinton's Form 4 filed with the SEC on March 9, 2004 falsely reported that options granted to Swinton had been granted on February 25, 2000;

mm.    Newell's Form 4 filed with the SEC on March 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

nn.    Hulse's Form 4 filed with the SEC on March 31, 2004 falsely reported that options granted to Hulse had been granted on March 28, 2000;

oo.    Tomasso's Form 4 filed with the SEC on March 31, 2004 falsely reported that options granted to Tomasso had been granted on March 28, 2000;

pp.    Slavin's Form 4 filed with the SEC on March 31, 2004 falsely reported that options granted to Slavin had been granted on March 28, 2000;

qq.    Newell's Form 4 filed with the SEC on April 23, 2004 falsely reported that options granted to Newell had been granted on February 25, 2000;

rr.    Newell's Form 4 filed with the SEC on May 24, 2004 falsely reported that options granted to Newell had been granted on February 25, 2000;

ss.    Hulse's Form 4 filed with the SEC on May 26, 2004 reported that options were granted to Hulse on May 11, 2001 with the improper exercise price of $20.00, the closing price on May 11, 2001, instead of the proper May 10, 2001 closing price of $20.97;

tt.    Newell's Form 4 filed with the SEC on June 23, 2004 falsely reported that options granted to Newell had been granted on March 28, 2000;

uu.    Newell's Form 4 filed with the SEC on July 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999 and March 28, 2000;

vv.    Newell's Form 4 filed with the SEC on August 24, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

ww.    Newell's Form 4 filed with the SEC on September 24, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

xx.    Newell's Form 4 filed with the SEC on October 25, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

98

yy.     Newell's Form 4 filed with the SEC on November 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

zz.     Tomasso's Form 4 filed with the SEC on December 16, 2004 reported that options were granted to Tomasso on May 11, 2001 with the improper exercise price of $20.00, the closing price on May 11, 2001, instead of the proper May 10, 2001 closing price of $20.97;

aaa.    Newell's Form 4 filed with the SEC on December 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

bbb.    Newell's Form 4 filed with the SEC on January 25, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ccc.    Newell's Form 4 filed with the SEC on February 24, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ddd.    Newell's Form 4 filed with the SEC on March 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

eee.    Newell's Form 4 filed with the SEC on April 26, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

fff.    Hulse's Form 4 filed with the SEC on May 12, 2005 reported that options were granted to Hulse on May 11, 2001 with the improper exercise price of $20.00, the closing price on May 11, 2001, instead of the proper May 10, 2001 closing price of $20.97;

ggg.    Newell's Form 4 filed with the SEC on May 24, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

hhh.    Aprahamian's Form 4 filed with the SEC on May 24, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

iii.    Aprahamian's Form 4 filed with the SEC on May 26, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

jjj.    Aprahamian's Form 4 filed with the SEC on May 31, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

kkk.    Newell's Form 4 filed with the SEC on June 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

lll.    Newell's Form 4 filed with the SEC on July 25, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

mmm.    Newell's Form 4 filed with the SEC on August 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

nnn.    Newell's Form 4 filed with the SEC on September 26, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ooo.    Donohue's Form 4 filed with the SEC on November 22, 2005 falsely reported that options granted to Donohue had been granted on February 25, 2000;

ppp.    Aprahamian's Form 4 filed with the SEC on April 20, 2006 falsely reported that options granted to Aprahamian had been granted on May 2, 1997.

219.    The Defendants have never disclosed the true grant dates of the stock options described herein.

220.    Moreover, as described by Defendant Rush in his complaint against Sunrise, the Board and senior management of the Company continued to attempt to conceal the accounting improprieties at Sunrise by forcing Rush to expedite the restatement of the Company's historical financial statements without concern for the completeness or accuracy of the restatement in an effort to sell the Company privately and extinguish the Board and senior management's liability for the misconduct contained herein.

## Backdating and Other Accounting Improprieties Revealed at Sunrise

221.    On May 8, 2006, Sunrise's value was as high as $39.30 per share.  On May 9, 2006, the Company was forced to suddenly reveal that it was "rescheduling its first quarter 2006 earnings release to allow additional time for further review of the accounting treatment applied to

100

its investments in unconsolidated senior living communities, and to complete the review of its Form 10-Q for the first quarter ended March 31, 2006."  On May 10, 2006, Sunrise was forced to reveal that the accounting treatment review was focused on the allocation of profits and losses for a "limited number" of Sunrise's joint ventures where Sunrise was a minority partner and the capital partner received a preference, either on the return of its capital over Sunrise's capital in the event of a refinancing or sale of the venture's properties, or cash flow from operations.  On May 11, 2006, Sunrise disclosed "it has decided to use a different methodology to allocate profits and losses in its joint ventures."

222.    During a May 11, 2006 conference call, the following occurred:

**[P. Klaassen – CEO:]** During the final preparation of our first-quarter Form 10-Q, an issue arose that required additional time for review by our team and our outside accountants to ensure the integrity and the accuracy of our financial statements.  The issue that necessitated this additional review has to do with the accounting treatment applied to certain of our investments in unconsolidated senior living communities.  Specifically, this accounting treatment review is focused on the allocation of profits and losses for those joint ventures in which Sunrise is a minority partner and the capital partner receives a preference on return of its capital over Sunrise's capital, in the event of a refinancing or sale of the venture's properties.

Now, approximately 15% of Sunrise's communities are held by joint ventures that would fall into this category.  Throughout the year, and in connection with our quarterly filings, we conduct a review of our various accounting policies, including the methodology we use to allocate profits and losses in our joint ventures where our capital partner is entitled to a preferential return.  In connection with this review, our accounting team determined and then brought to the attention of our auditors that there is a more preferable method under generally accepted accounting principles for allocating such profits and losses among the partners of these ventures and for determining the timing of such allocations during the lifecycle of the ventures, from startup losses to stabilized cash flow to refinancing or sale of the property.

***Now, as a result, we are now in the process of assessing the implications of adopting this alternate methodology and whether adjustments are necessary to prior period financial statements***.  In order to have time to effectively complete this review, we will not be filing our Form 10-Q with the Securities and

Exchange Commission today. Instead, we will take the time it takes to carefully review and finalize this matter. ... [W]e do not expect the outcome of this review to adversely affect our previously furnished earnings guidance for 2006 or 2007, due to the limited number of current joint ventures affected and because of the various stages of those ventures.

\* \* \*

*[W]e will completely avoid this accounting issue in the future by no longer providing preferential return on capital in any future ventures. We were able to do this now because of the successful track record that we have established for these ventures*.

\* \* \*

The general effect of using this different methodology – known, I am told, as the hypothetical liquidation at book value method – *is to shift more of any losses to Sunrise in the early days of any venture where the capital partner has a preference for return of capital*. ...

Perhaps a simplified example will help illustrate this rather technical and complicated issue. Assuming a one-property development venture built a $20 million Sunrise community, if the venture obtains 75% or $15 million of construction debt, the partners would contribute $5 million of equity. If it is a typical 80/20 partnership, *our share of the equity would be 1 million* and our capital partner would contribute 4 million. In our now typical model, where there is no capital return preference to our partner, all losses and profits *would be allocated 80/20* ....

Now, if this partnership were to experience 1 million of initial losses ... Sunrise would initially recognize *20% or $200,000 of the $1 million of losses* ... for a total of *$1 million profit from the venture*. ...

Now, if the same venture had included a capital return preference ... Sunrise would be allocated 100% or all million dollars of the initial losses ....

\* \* \*

**Derrick Dagnan, Analyst – Avondale Partners:** Is the new accounting method or the new treatment under GAAP – is that a new option to you, or has that been available to you for a number of years and you just recently found it?

**[Rush – CFO:]** It has been available for a number of years. And again, with the scrutiny that Paul and Tom mentioned earlier, it came into consideration late in 2005. And when we took a look at it, we thought we should look deeper.

223. On June 15, 2006, *MarketWatch* reported that:

102

Sunrise Senior Living, Inc. had one quarter and two years' worth of per-share earnings estimates cut by Stifel Nicolaus on Thursday .... Preliminary first-quarter results provided by the company, coupled with the buyout of 10 management contracts by Five Start Quality Care Inc., prompted Stifel Nicolaus to take its full-year 2006 outlook to $1.15 from $1.18 a share.  The firm also reduced its full-year 2007 per-share forecast to $1.32 from $1.36, and lowered its first-quarter forecast to 21 cents from 23 cents.

224.    After this occurred, Sunrise's value dropped to $27.89 per share on June 15, 2006 and to as low as $26.29 on June 20, 2006, three trading days later.  On June 15, 2006, Stifel Nicolaus reported:

- •    SRZ shares declined 5.3% yesterday, with most of the damage coming late in the day on a couple of large block trades.

- •    Shares are down 26.3% from their 4/4/06 high due to general market conditions. Sunrise's delay in reporting 1Q06 results as a result of an accounting issue concerning its development joint ventures and yesterday's block sales

225.    By late July 2006, Sunrise value fell to as low as $25.08 per share as rumors circulated of a massive financial restatement by Sunrise.  On July 27, 2006, Stifel Nicolaus reported:

**Announced July 31, 2006 Date for Releasing 1Q06 Earnings Rapidly Approaching**

- •    SRZ shares are down 31.5% since the company delayed 1Q06 earnings due to an accounting question about recognition of earnings on some of its joint venture investments.

- •    In a 6/30/06 press release announcing an acquisition, Sunrise said it "expects to complete its accounting review **prior to July 31, 2006**."

- •    We believe the release of Sunrise's much delayed 1Q06 results will be a catalyst for the stock to rebound.

- •    With three business days to go, Sunrise has not scheduled an earnings release and it is our sense that the company may or may not meet its expected timetable for completing its accounting review.

226.    On July 31, 2006, Sunrise was forced to announce a huge, multi-year financial

103

restatement.  Sunrise's press release stated in part:

> [T]he Company will **restate** its financial statements for the years ended December 31, 2003, 2004 and 2005 primarily to adjust the accounting treatment related to ventures that contain partner preferences and the timing of sale accounting and recognition of income from prior sales of real estate.  The cumulative impact of the restatement is expected to reduce net income for all periods impacted, including the years 1999 through 2005, by an estimated $60 million to $110 million. ... Sunrise is unable at this time to provide the precise impacts of the restatement since its review of these issues has not yet concluded. ... The Company noted that its previously issued audited consolidated financial statements for the years ended December 31, 2003, 2004 and 2005, including the associated auditor's report currently on file with the SEC in the Company's 2005 Form 10-K, and its unaudited quarterly financial statements during these years **should no longer be relied upon**.

227.    In its July 31, 2006 announcement, Sunrise was forced to admit it had been *improperly accounting for its joint venture investments and operations and for certain real estate sales*, and that it would no longer engage in real estate sales with guarantees and other ongoing financial commitments.  On July 31, 2006, Sunrise stock fell to as low as $24.40 per share.  In November 2006, Sunrise disclosed its accounting review was still not completed and that, subject to completion of its auditor's review and clearing comments from the SEC, Sunrise expected to file its restated 2005 Form 10-K before year-end, which would be followed by the filing of Sunrise's Forms 10-Q for the first three quarters of 2006, and to be current in its filings with the SEC, it would file its 2006 Form 10-K on or before March 1, 2007.  Sunrise indicated that the cumulative impact of the restatement was anticipated to reduce net income for all periods impacted, including 1999 through 2005, by approximately $100 million.  Approximately 50% of this amount related to the periods from 1999 through 2002.

228.    A November 26, 2006 *New York Times* article by Gretchen Morgenson, stated in part:

Shareholders of Sunrise Senior Living, a provider of residential communities and services for the elderly, have seen their holdings decline 17 percent since last spring. Problematic bookkeeping kept the company from filing three quarterly financial statements on time, forced it to restate earnings for 2003 through 2005, drew Securities and Exchange Commission inquiries about its accounting and led it to warn that its internal controls were probably inadequate.

All of that resulted in a $342 million hit to the market value of the company, based in McLean, VA. But a raft of insiders escaped some of that damage. Three of the company's directors and its two founders sold $32 million worth of Sunrise stock in the six months leading up to the May 9 announcement that it was changing its accounting practices and delaying its financial filing.

Reviewing stock sales over the six months before the announcement is relevant because, during a conference call with investors in May, Sunrise officials said that "late in 2005" they had begun contemplating the accounting shift that later clobbered Sunrise shares.

* * *

Selling during the period were Paul J. Klaassen, the founder and chief executive; Theresa M. Klaassen, his wife and Sunrise's chief cultural officer; Ronald V. Aprahamian, a consultant and investor who is chairman of Sunrise's audit committee; Thomas J. Donohue, a Sunrise director who is chairman of the United States Chamber of Commerce; and J. Douglas Holladay, a founder of a private equity firm and a director.

* * *

The biggest sellers of Sunrise stock were the Klaassens, who generated $21.4 million in sales of 600,000 shares from December 2005 to April 4, 2006. The sales began last Dec. 19, around the time the company first contemplated the accounting review that resulted in the restatements. They were part of a series of planned sales put in place in December by the executives.

An especially timely stock sale by Mr. and Mrs. Klaassen came a week before the company announced it was delaying its financial filings. On May 1 and 2, they sold 100,000 shares at an average price of $36.91. The day of the announcement, the price fell to $32.35. On Friday, the stock closed at $32.50

Reached last Wednesday at a vacation home in Florida, Mrs. Klaassen, who is also a director, declined to comment. The Klaassens continue to hold a large stake in Sunrise – 5.2 million shares, or approximately 10 percent of the stock outstanding. Although they entered into a derivatives contract relating to a forward sale of 750,000 shares last year, the 600,000-share sales are their first outright disposal of Sunrise stock since the company went public in 1996.

\*   \*   \*

Another apparently well-timed sale took place last April 18, exactly three weeks before the company announced its filing delay, when Mr. Aprahamian, chairman of the company's audit committee, sold 20,000 shares at $37.85 each, generating $757,040. Mr. Aprahamian declined to comment when reached last Wednesday at his home in Virginia. He said he had not seen the shareholder letter, addressed to Sunrise directors and hand-delivered to the company last Monday. He declined to provide a fax number or e-mail address where a reporter could send a copy.

Mr. Donohue, the Chamber of Commerce chairman, has been a Sunrise director since 1995 and heads its compensation committee. He is also a member of its audit committee. On Nov. 21, 2005, he sold shares worth $3.4 million, according to regulatory filings. Mr. Klaassen is on both the Chamber of Commerce's board and that of its research arm, the National Chamber Foundation.

229.    Then on December 11, 2006, Sunrise announced an SEC investigation of the Company and the appointment of a special committee whose bifurcated purpose was to review insider sales of Sunrise stock and the Company's historical practices relating to stock option grants:

Sunrise Senior Living, Inc. (NYSE: SRZ) today announced that its Board of Directors has appointed a special independent committee to review recent insider sales of Sunrise stock and the Company's historical practices related to stock option grants. The Board's decision followed receipt of a letter from a union shareholder that was simultaneously sent to news outlets, which resulted in media coverage and a subsequent request by the Securities and Exchange Commission (SEC) for information about matters raised in the media reports. The special committee has retained independent outside legal counsel to assist in its review.

Sunrise is committed to sound corporate governance and transparency and the Board has determined that a comprehensive review by a special committee and independent counsel is the most appropriate way to address these matters in a timely manner.

The review by the special committee will be conducted in parallel with the Company's ongoing efforts to complete the previously announced restatement of its financial statements. In view of these ongoing efforts and the special committee review, the Company now anticipates that its restated 2005 Form 10-K will be delayed beyond year-end, but still expects to be current in all of its filings with the SEC by March 1, 2007.

106

230.    On January 15, 2007, the Company indicated that Sunrise would not be current in all of its filings with the SEC by March 1, 2007 as previously announced in the December 11, 2006 press release.  The Company stated, "Sunrise believes that it is close – weeks, not months – to submitting its recast 2005 financial information to the SEC for its review . . . ."

231.    However, on February 27, 2007, a month and a half later, Sunrise continued to maintain that it was "close" to completing its restatement, but admitted that the accounting improprieties perpetrated by the Company would result in a restatement that "reduce[d] net income for all periods impacted, included 1999 through 2005, by approximately **$98 to $107 million**."

232.    On March 2, 2007, Sunrise announced that it had extended the mandate of the Special Committee beyond reviewing certain insider sales and the Company's historical stock option grant practices to include a "review of facts and circumstances relating to the historical accounting treatment of certain categories of transactions in the pending restatement of the Company's financial statements."

233.    Moreover, documents related to the investigation of the improper transactions may not even be available, as defendant Rush was suspended as CFO for failing to comply with the Company's document retention policies.  Specifically, Sunrise stated in an April 25, 2007 press release:

> On April 23, 2007, Bradley B. Rush, the chief financial officer of Sunrise Senior Living, Inc. (the "Company"), was suspended with pay.  The action was taken by the Board following a briefing to the independent directors by independent legal counsel retained by the special independent committee of the Board.  As previously disclosed, the special independent committee is reviewing recent insider sales of the Company's stock, the Company's historical practices related to stock option grants and the facts and circumstances relating to the historical accounting treatment of certain categories of transactions in the previously announced pending restatement of the Company's financial statements (the

"Special Committee Investigation"). **The Board concluded that actions taken by Mr. Rush were not consistent with the document retention directives issued by the Company.** Mr. Rush has served as the chief financial officer of the Company since August 2005.

234.    One week later, on May 2, 2007, Sunrise terminated defendant Rush for cause related to his failure to comply with the document retention policies instituted by the Company.

235.    On May 29, 2007, Sunrise announced that the SEC had commenced a formal investigation of the Company's insider stock sales, historical stock option granting practices and other accounting practices.

236.    Less than a month ago, on September 28, 2007, Sunrise announced that the Special Committee had completed the fact-finding portion of its investigation with respect to three of the issues to which it was tasked:

> The first involves the timing of certain stock option grants. The second involves the facts and circumstances with respect to two significant categories of errors in the pending restatement relating to real estate accounting: accounting for the effect of certain Sunrise guarantees and commitments on timing of sale accounting and recognition of income upon sale of real estate; and accounting for allocation of profits and losses in those ventures in which Sunrise's partners received a preference on cash flow. The third involves whether directors and executive officers had non-public knowledge of possible accounting errors related to these real estate transactions prior to Sunrise's May 2006 announcement of its accounting review.

237.    According to the Special Committee, whose membership has yet to be announced by Sunrise and whose conclusions are not to be believed, there was no evidence of backdating, accounting manipulations, or insider trading on the basis of knowledge of accounting errors despite the following findings of the Special Committee which admittedly will materially affect Sunrise's financial statements :

- *The September 1998 option repricing, after which a substantial period of time elapsed from the date the Stock Option Committee approved the repricing and when most employees signed their repricing*

*acknowledgments, and during which the Company's stock price increased substantially*.

- Grants made in 2000 and 2001 in connection with an opportunity provided to certain employees with options exercisable above the then applicable market price to cancel those options and receive new, market-priced options.

- *Three grants in which the exercise price for the options was set at the closing price for the Company's stock on the date of the grant, rather than at the closing price of the trading date immediately prior to the date of the grant, as contemplated by the terms of the Company's stock option plans*.

- *Certain grants which lacked sufficient documentation to determine when the stock option grant was authorized*.

- Certain grants in connection with which the Company corrected administrative errors retroactively, which included adding grants to new hires who had been inadvertently omitted from a recommendation list and correcting the number of options granted to individuals.

- *Certain grants in which the Company modified the terms of a grant after it was made*.

- Certain grants in which the Company granted options to consultants but accounted for such options as grants issued to employees

238.    The Special Committee also acknowledged that Sunrise had numerous internal control deficiencies that resulted in the Company's restatement approximated to be between $100 and $120 million dollars.  Specifically, Sunrise stated:

> As previously disclosed by the Company, the occurrence of a restatement of previously issued financial statements is a strong indicator that material weaknesses in internal controls exist. In connection with the Company's pending restatement of its historical financial statements, the Company's management is evaluating management's report on internal controls included in the Company's previously filed Annual Report on Form 10-K for the year ended December 31, 2005 to assess the effectiveness of its internal control over financial reporting as of December 31, 2005. To date, the Company's management has preliminarily identified the following three control deficiencies:
>
> - Lack of personnel with sufficient technical accounting expertise to determine and document the appropriate application of accounting principles. This deficiency impacted the Company's accounting for real estate sales, capitalization of direct and indirect costs of real estate

projects, equity accounting for variable interest entities, accounting for guarantees and accounting for stock options.

- Lack of policies and procedures to ensure proper accounting of significant transactions. This deficiency impacted the Company's accounting for real estate sales and equity accounting.

- Lack of a sufficient level of experienced personnel to enable the Company to close its books in a timely and accurate manner.

239.    Additionally, shareholder advocacy groups are criticizing the conclusions of Sunrise's Special Committee and the handling of the Company's long overdue annual shareholder meeting, which was held in part as a result of Plaintiffs' efforts in this litigation.  For example, Richard Clayton, Director of Research at the CtW Investment Group stated, "[t]here is some concern about whether the investigation reached the appropriate conclusion . . . there is a whole cluster of issues that speaks directly to the board's failure to keep tight reins on company management.  Shareholders have a very clear interest in making changes [at Sunrise]." Moreover, due to the lack of available finalized restated financial statements Sunrise was unable to file with the SEC and mail to shareholders a definitive proxy statement and as a result the Company's shareholders had little information and were at a significant disadvantage to the Company's insiders.  One of the nation's leading proxy advisory firms, Institutional Shareholder Services, warned Sunrise shareholders that they "must take special steps in order to attend this meeting in person or have a proxy generated [themselves]."  Melissa Davis, *Sunrise Meeting Shrouded in Darkness*, TheStreet.Com, October 15, 2007, available online at http://www.thestreet.com/newsanalysis/healthcare/10384258.html.

240.    Moreover, at the Company's annual shareholder meeting held on October 16, 2007, both Defendants Klaassen and Callen were up for election.  Of the shareholder votes cast, more than 22% of shareholders withheld their votes for the re-election of Defendant Klaassen

110

and an overwhelming majority of 62% withheld their votes for the re-election of Defendant Callen. Additionally, 84% of the shareholders who voted approved a shareholder proposal to declassify the Board, such that directors must be elected annually instead of on a staggered basis every three years. Despite the vote of "no-confidence" by the shareholders for Defendant Callen and the overwhelming support for the shareholder proposal to declassify the Board, Defendant Callen was re-elected to a new three-year term, prompting Stephen Abrecht, executive director of the shareholder pension fund Service Employees International Union, to state "[t]he attendance and vote confirm that shareholders demand new directors and meaningful corporate governance reforms at Sunrise. . . . The first two steps are clear: Mr. Callen should resign and the board should start the process to declassify itself." Martha Graybow, *Shareholders Call for Sunrise Director to Resign*, Reuters, October 22, 2007.

### Defendants' Insider Selling

241. The Special Committee's bogus conclusions notwithstanding, from 1997 to 2006, Defendants Adams, Aprahamian, Callen, Donohue, Faeder, Gaul, Holladay, Hulse, Klaassen, Teresa Klaassen, Klisares, Newell, Rush, Slavin, Smick, Swinton and Tomasso, based on their knowledge of materially adverse non-public information regarding the backdating and ultra vires granting of stock options and the false financial statements resulting therefrom, as well as the improper accounting treatment for the recognition of profits from real estate joint ventures and real estate sales, sold more than $174 million in Sunrise stock, a significant portion of which was obtained through the exercise of improperly backdated stock options, as demonstrated below:

| Defendant | Dates of Sales | Shares Sold | Proceeds |
|---|---|---|---|
| Adams | 09/03/03 to 06/07/04 | 17,841 | $590,106.75 |
| Aprahamian | 07/02/01 to 04/18/06 | 215,200 | $8,848,497.20 |
| Callen | 05/26/05 | 10,000 | $521,093.00 |
| Donohue | 01/29/04 to 11/21/05 | 134,378 | $3,732,527.28 |

| Faeder | 03/09/98 to 02/25/04 | 749,727 | $22,118,963.33 |
| Gaul | 06/02/04 to 04/20/06 | 26,503 | $1,090,491.08 |
| Holladay | 05/12/05 to 03/21/06 | 39,000 | $1,873,125.00 |
| Hulse | 03/10/98 to 08/12/05 | 239,897 | $9,304,495.07 |
| Klaassen[13] | 12/17/97 to 05/02/06 | 1,462,106 | $56,363,094.63 |
| Klisares | 11/25/03 to 05/07/04 | 28,664 | $999,177.05 |
| Newell | 03/09/98 to 04/24/06 | 733,886 | $26,230,945.70 |
| Rush | 09/08/05 to 09/12/05 | 6,937 | $432,143.87 |
| Slavin | 12/29/00 to 05/17/04 | 278,546 | $8,990,534.92 |
| Smick | 03/26/98 to 06/30/98 | 60,417 | $2,125,947.25 |
| Swinton | 12/01/97 to 03/05/04 | 461,307 | $14,493,371.22 |
| Tomasso | 03/09/98 to 02/02/05 | 472,335 | $17,265,701.75 |
| **TOTAL** | | **4,936,744** | **$174,980,215.10** |

242.    Particularly troubling are Defendants the Klaassens' sales of 600,000 shares of Sunrise stock in twelve transactions between December 19, 2005 and May 2, 2006 garnering proceeds of $21,426,580. The timing of these transactions just prior to the Company's announcement that it would have to restate its historical financial statements due to improper accounting methods is extremely suspect and plainly indicates that the Klaassens were dumping a large amount of shares with the knowledge that Sunrise's impending restatement announcement would cause the stock price to plummet.

### SUNRISE'S FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP, SEC REGULATIONS AND IRS RULES AND REGULATIONS

243.    As a result of Defendants the Klaassens, Newell, Donohue, Callen, Aprahamian, Faeder, Hulse, Adams, Bradley, Gaul and Rush's improper backdating of stock options and other accounting improprieties, Defendants the Klaassens, Newell, Donohue, Callen, Aprahamian, Faeder, Hulse, Adams, Bradley, Gaul and Rush caused Sunrise to violate GAAP, SEC regulations and IRS rules and regulations.

---

[13] This includes proceeds of sales by Paul Klaassen and his wife Teresa Klaassen as they filed Forms 4 jointly reporting their transactions starting in May of 2002.

244.    Sunrise's financial results for 1997 through 2006 were included in reports filed with the SEC and in other shareholder reports. In these reports, Defendants the Klaassens, Newell, Donohue, Callen, Aprahamian, Faeder, Hulse, Adams, Bradley, Gaul and Rush represented that Sunrise's financial results were presented in a fair manner and in accordance with GAAP.

245.    Defendants the Klaassens, Newell, Donohue, Callen, Aprahamian, Faeder, Hulse, Adams, Bradley, Gaul and Rush's representations were false and misleading as to the financial information reported, because such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

246.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

### Violations of GAAP

247.    During the relevant period from 1997 through 2001, Defendants the Klaassens, Newell, Donohue, Callen, Aprahamian, Faeder, Hulse, Adams and Bradley caused the Company to understate its compensation expenses by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.

248.    Under well-settled accounting principles in effect throughout the relevant period,

113

Sunrise did not need to record an expense for options granted to employees at the current market price ("at the money"). The Company was, however, required to record an expense in its financial statements for any options granted below the current market price ("in the money"). In order to provide Sunrise executives and employees with far more lucrative "in the money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), the Defendants systematically falsified Company records to create the false appearance that options had been granted at the market price on an earlier date.

249. Throughout the relevant period, Sunrise accounted for stock options using the intrinsic method described in APB No. 25, "Accounting for Stock Issued to Employees." Under APB No. 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are at-the-money or out-of-the-money on the measurement date need not be expensed. Excluding non-employee directors, APB No. 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were in-the-money or not on the date of grant.

### Sunrise's GAAP Violations Were Material

250. Sunrise's false and misleading relevant period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality. SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality. Among other items, SAB Topic 1M says: "A matter is 'material' if there is a

substantial likelihood that a reasonable person would consider it important." It also stresses that materiality requires qualitative, as well as quantitative, considerations. For example, if a known misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.

251.    SAB Topic 1M further states:

> Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –
>
>                     *     *     *
>
> whether the misstatement masks a change in earnings or other trends
>
> whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
>
>                     *     *     *
>
> whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

252.    SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

253.    Sunrise's misstatements satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

### Sunrise's Financial Statements Violated Fundamental Concepts of GAAP

254.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

> (a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)      The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(c)      The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶40);

(d)      The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)      The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)      The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

255.    Further, the undisclosed adverse information concealed by the Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

**Sunrise's Financial Statements Violated SEC Regulations**

256. During the relevant period, the Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

257. Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers – the Company's CEO and its next four most highly paid executives. Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year. In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options. . . . If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant. . . ." Item 402(c)(2)(iv).

258. The Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted options with exercise prices below the market value on the date that the Stock Option Committee approved the grant.

### Sunrise's Violations of IRS Rules and Regulations

259. During the relevant period, the Defendants further caused Sunrise to violate IRS rules and regulations due to its improper accounting for the backdated stock options. As a result,

the Company's tax liabilities were understated, exposing Sunrise to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

260.    The Defendants caused the Company to violate Section 162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based."  In order for compensation to be performance-based, the Stock Option Committee must have set pre-established and objective performance goals.  The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant.  Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

261.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance.  This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

262.    The Defendants caused Sunrise to violate Section 162(m) by providing backdated options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant.  As a result, all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax

118

purposes.

263.    The Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the exercise of Sunrise's stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options ("ISOs").

264.    ISOs are a form of equity compensation that may be provided to a company's employees.  ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment as they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise).  Stock options that do not qualify as ISOs are considered to be NSOs.  NSOs are not entitled to preferential treatment as they are subject to income tax and FICA withholding upon exercise.  As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

265.    By improperly treating its backdated options as ISOs, the Defendants failed to provide proper income tax and FICA withholdings upon the exercise of its options by its executives and employees in violation of IRS rules and regulations.

266.    The chart below illustrates Sunrise's false and misleading fiscal year financial results which materially understated its compensation expenses and thus overstated its earnings:

| Fiscal Year Ended | Reported Net Income (Loss) In Thousands | Reported Diluted Earnings (Loss) Per Share |
|---|---|---|
| December 31, 1997 | $4,001 | $0.20 |

| December 31, 1998 | $22,312 | $1.16 |
| December 31, 1999 | $20,213 | $0.94 |
| December 31, 2000 | $24,278 | $1.10 |
| December 31, 2001 | $49,101 | $1.04 |
| December 31, 2002 | $54,661 | $1.12 |
| December 31, 2003 | $62,178 | $1.32 |
| December 31, 2004 | $50,687 | $1.12 |
| December 31, 2005 | $79,742 | $1.67 |

267.    Meanwhile, Defendants the Klaassens, Newell, Donohue, Callen, Aprahamian, Faeder, Hulse, and Bradley were causing the Company to grant them and other members of senior management hundreds of thousands of backdated Sunrise stock options.  The Company's executives and directors received a significant number of backdated Sunrise stock options as compensation during the relevant period.

### THE DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

268.    Defendants breached their fiduciary duties to Sunrise and the Company's shareholders by engaging in numerous improper accounting manipulations that improperly portrayed the financial condition of the Company.  Defendants' failure to properly account for proceeds from their real estate joint ventures and their improper recognition of gains on real estate sales violated GAAP and cannot be considered the product of legitimate business judgment.

269.    Moreover, in a misguided effort to attract and retain employees in a competitive environment, the Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme.  The Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company. Specifically, the Defendants breached their fiduciary duties by:

a    colluding with each other to improperly account for Sunrise's real estate joint venture start-up losses and real estate sale gains;

b    colluding with each other to backdate stock option grants;

c    colluding with each other to violate GAAP and Section 162(m);

d    colluding with each other to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

e    colluding with each other to file false proxy statements, false financial statements, and False Form 4's in order to conceal the improper backdating of stock options.

270.    The Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Defendants at the expense of the Company.

271.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company is required to incur, loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grants, costs and expenses incurred in connection with the Company's internal investigation and restatement of historical financial statements, and the SEC investigation of the Company.

272.    As alleged herein, certain of the Defendants have exercised hundreds of thousands of backdated Sunrise stock options at improperly low prices and have then sold the shares for substantial profits.  Consequently, these defendants have been unjustly enriched by garnering

millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

273.    On May 26, 2006, *Forbes*, in an article titled, "The Next Big Scandal," quoted former SEC Chairman Harvey L. Pitt, saying "What's so terrible about backdating options grants?  For one thing, it likely renders a company's proxy materials false and misleading. Proxies typically indicate that options are granted at fair market value.  But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

274.    On June 18, 2006, in an article titled, "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here' . . . It's a question of knowingly betting on a race that's already been run."

275.    On July 22, 2006, *The San Francisco Chronicle* recounted SEC Chairman Christopher Cox's announcement in San Francisco on July 20, 2006 where he said, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . . It is securities fraud if you falsify books and records.  It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles.  There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"

276.    On September 6, 2006, MarketWatch, in an article titled "SEC Probing more than 100 firms on options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard Shelby, saying that manipulation of options grant dates "appears to be a ***black-and-white example of securities fraud***," and "Corporate officers and directors engaging in this practice are

cheating the owners of the company and should be held accountable to the fullest extent possible."

277.    Shortly thereafter, on September 6, 2006, the United States Senate Committee on Finance held a hearing on "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits." At the Senate Finance Committee Hearing, the Senate Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated: "[Options backdating] is behavior that, to put it bluntly, is disgusting and repulsive.  It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves. And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

278.    Further, at the Senate Finance Committee Hearing, SEC Chairman Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws." The Commissioner of the IRS Mark Everson agreed and further stated, "Picking a date on which the stock price was low in comparison with the current price gives the employee the largest potential for gain on the option and makes it possible for the employee to benefit from corporate performance that occurred before the option was granted."

279.    In his statement before the Senate Finance Committee, Deputy Attorney General Paul J. McNulty described the practice of stock option backdating "as a brazen abuse of

corporate power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders," and said "for some of those companies that have now disclosed backdated grants, corporate reputations have been tarnished and shareholder value has diminished substantially. . . ."

280.     In addition to the foregoing, a recent academic study revealed that outside directors of companies were also benefiting from backdating and were recipients of manipulated stock option grants, as detailed in the following *Wall Street Journal* article published on December 18, 2006:

> A new academic study suggests that many outside directors received manipulated stock-option grants, a finding that may help explain why the practice of options backdating wasn't stopped by the boards of some companies.
>
> The statistical study, which names no individuals or firms, estimates that 1,400 outside directors at 460 companies received questionable option grants, suggesting the widespread practice extended well beyond the executive suite.
>
> The study is notable because it suggests that outside, or independent, directors -- who are supposed to play a special role safeguarding against cozy board relationships with management -- may have been co-opted in options backdating by receiving manipulated grants themselves. The New York Stock Exchange requires that a majority of board seats, and all compensation- and audit-committee members, be independent . . . .
>
> The evidence "contributes to understanding the possible factors that led to or enabled manipulation to occur," states the unpublished study, which was conducted by professors at Harvard and Cornell universities and the French business school Insead . . . .

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

281.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

282.     Plaintiffs bring this action derivatively in the right and for the benefit of the

Company to redress defendants' breaches of fiduciary duties, unjust enrichment, statutory violations and other violations of law.

283.    Plaintiffs are owners of Sunrise common stock and have been owners of Sunrise common stock continuously since the time of the wrongdoing alleged herein.

284.    Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

285.    As a result of the facts set forth herein, plaintiffs have not made any demand on the Sunrise Board of Directors to institute this action against the Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

286.    At the time this action was commenced the Board consisted of seven directors: defendants Klaassen, Teresa Klaassen, Aprahamian, Callen, Donohue, Holladay and Little.  All seven members of the Board are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

### Defendant Klaassen

287.    Defendant Klaassen is interested in the transactions complained of herein because he directly and personally benefited from the backdating of stock options.  Klaassen, as Co-founder, Chairman of the Board and CEO of Sunrise, knowingly and deliberately participated in and approved the improper backdating of stock options and other accounting violations as alleged herein, and knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.  Furthermore, Klaassen's principal occupation is his employment as CEO of the Company.  As such, Klaassen

stands to earn millions of dollars in annual salary, bonuses, and other compensation, all of which must be approved by defendants Aprahamian, Callen and Donohue, who are the current members of the Compensation Committee. Finally, Klaassen exerts a tremendous degree of influence over the Board through his role as Sunrise's Co-founder, Chairman and CEO since the Company's inception. Thus, at the time this suit was commenced, Defendant Klaassen was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

288.    Klaassen is directly interested in the stock option backdating scheme that is the subject of this Complaint as he received backdated stock options to purchase approximately 700,000 shares of Sunrise common stock. Moreover, Klaassen, with his wife Teresa Klaassen, received more than $56 million in illegal proceeds from their sale of Sunrise stock.

289.    Klaassen is substantially likely to be held liable for orchestrating and participating in the improper accounting schemes as alleged herein.

290.    Klaassen is the husband of Teresa Klaassen and is incapable of independently considering a demand to commence and vigorously prosecute this action against his wife due to their close familial and business relationship.

291.    Klaassen shares a long-standing personal and professional relationship with Donohue and Little as fellow members on the Board of Directors of the U.S. Chamber of Commerce, of which Donohue is the CEO and President, and as fellow members on the Board of Directors of the National Chamber Foundation, of which Donohue is the President and Little is the Chairman of the Board of Directors. As such Klaassen is incapable of independently considering a demand to commence and prosecute this action against Donohue and Little due to their close personal and business relationships.

292.    Klaassen shares a long-standing personal and professional relationship with Donohue, in addition to what is described above, Klaassen and Donohue have served together on the Board of Trustees of Marymount Univeristy, Klaassen lived with Donohue for a period of time, Donohue also invested in the Klaassen's first home, and prior to Klaassen's employment with Sunrise he was employed as Donohue's driver.   As such Klaassen is incapable of independently considering a demand to commence and prosecute this action against Donohue due to their close personal and business relationships.

293.    Klaassen shares a personal and professional relationship with defendant Swinton, specifically as they are both "Fellows and Instructors in Executive Education" at the University of Maryland, Baltimore County (UMBC), Erickson School of Aging Studies.   As such Klaassen is incapable of independently considering a demand to commence and prosecute this action against Swinton due to their close personal and business relationships.

**Defendant Teresa Klaassen**

294.    Defendant Teresa Klaassen is interested in the transactions complained of herein because she directly and personally benefited from the backdating of stock options to her husband Klaassen.   Teresa Klaassen, as Co-founder, Director and Chief Cultural Officer of Sunrise, knowingly and deliberately participated in and approved the improper backdating of stock options and other accounting violations alleged herein, and knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.   Furthermore, Teresa Klaassen's principal occupation is her employment as Chief Cultural Officer of the Company.   As such, Teresa Klaassen stands to earn millions of dollars in annual salary, bonuses, and other compensation, all of which must be

127

approved by defendants Aprahamian, Callen and Donohue, who are the current members of the Compensation Committee.  Finally, Teresa Klaassen, in association with her husband, exerts a tremendous degree of influence over the Board through her role as Sunrise's Co-founder and Director of the Company since Sunrise's inception.  Thus, at the time this suit was commenced, Defendant Teresa Klaassen was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

295.    Teresa Klaassen is indirectly interested in the stock option backdating scheme that is the subject of this Complaint as her husband Klaassen received backdated stock options to purchase approximately 700,000 shares of Sunrise common stock.  Moreover, Teresa Klaassen, with her husband Klaassen, received more than $56 million in illegal proceeds from their sale of Sunrise stock.

296.    Teresa Klaassen is the wife of Klaassen and is incapable of independently considering a demand to commence and vigorously prosecute this action against her husband due to their close familial and business relationship.

297.    Teresa Klaassen shares a long-standing personal and professional relationship with Donohue, as Teresa Klaassen lived with Donohue for a period of time and Donohue also invested in the Klaassen's first home.  As such Teresa Klaassen is incapable of independently considering a demand to commence and prosecute this action against Donohue due to their close personal and business relationships.

**Defendant Aprahamian**

298.    Defendant Aprahamian is interested in the transactions complained of herein because he faces a substantial likelihood of being held liable for knowingly and deliberately approving the filing of false financial statements and other false SEC filings as a member of the

Audit Committee throughout the relevant period. Aprahamian knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein. Thus, at the time this suit was commenced, Defendant Aprahamian was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

299.    Aprahamian is also directly interested in the stock option backdating scheme that is the subject of this Complaint as he received backdated stock options to purchase approximately 220,000 shares of Sunrise common stock. Moreover, Aprahamian received more than $8.8 million in illegal proceeds from his sale of Sunrise stock.

### Defendant Donohue

300.    Defendant Donohue is interested in the transactions complained of herein because he faces a substantial likelihood of being held liable for: (1) knowingly and deliberately approving the backdated and ultra vires options as a member of the Stock Option Committee during the relevant period and (2) knowingly and deliberately approving the filing of false financial statements and other false SEC filings as a member of the Audit Committee at all relevant times. Donohue, as a member of the Stock Option Committee throughout the entire relevant period, was responsible for approving the option grants to executive officers including the backdated and ultra vires stock option grants as alleged herein. As alleged herein, Donohue knowingly and deliberately participated in and approved the improper backdating of stock options, and, as a member of the Audit Committee throughout the entire relevant period, knowingly and deliberately participated in and approved the Company's filing of false financial

statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein. Thus, at the time this suit was commenced, Defendant Donohue was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

301.   Donohue is also directly interested in the stock option backdating scheme that is the subject of this Complaint as he received backdated and/or ultra vires stock options to purchase approximately 76,000 shares of Sunrise common stock. Moreover, Donohue received more than $3.7 million in illegal proceeds from his sale of Sunrise stock.

302.   Donohue shares a long-standing personal and professional relationship with Klaassen and Little as fellow members on the Board of Directors of the U.S. Chamber of Commerce, of which Donohue is the CEO and President, and as fellow members on the Board of Directors of the National Chamber Foundation, of which Donohue is the President and Little is the Chairman of the Board of Directors. As such Donohue is incapable of independently considering a demand to commence and prosecute this action against Klaassen and Little due to their close personal and business relationships.

303.   Donohue shares a long-standing personal and professional relationship with the Klaassens, in addition to what is described above, the Klaassens lived with Donohue for a period of time, Donohue also invested in the Klaassen's first home, and prior to Klaassen's employment with Sunrise he was employed as Donohue's driver. As such Donohue is incapable of independently considering a demand to commence and prosecute this action against the Klaassens due to their close personal and business relationships.

**Defendant Callen**

304.   Defendant Callen is interested in the transactions complained of herein because he

faces a substantial likelihood of being held liable for: (1) knowingly and deliberately approving the backdated and ultra vires options as a member of the Stock Option Committee during the relevant period and (2) knowingly and deliberately approving the filing of false financial statements and other false SEC filings as a member of the Audit Committee. Callen, as a member of the Stock Option Committee from 1999 through 2002, was responsible for approving the option grants to executive officers including the backdated and ultra vires stock option grants as alleged herein. As alleged herein, Callen knowingly and deliberately participated in and approved the improper backdating of stock options, and, as a member of the Audit Committee in 1999 and since 2005, knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein. Thus, at the time this suit was commenced, Defendant Callen was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

305.    Callen is also directly interested in the stock option backdating scheme that is the subject of this Complaint as he received backdated and/or ultra vires stock options to purchase approximately 56,000 shares of Sunrise common stock. Moreover, Callen received more than $500,000 in illegal proceeds from his sale of Sunrise stock.

306.    Additionally, Callen is incapable of independently and disinterestedly considering a demand to vigorously prosecute this action because he and his employers Donaldson, Lufkin & Jenrette Securities Corporation, Credit Suisse First Boston, and Aetna, have done business with Sunrise Senior Living during virtually his entire tenure on the board. For example, in 2000 and 2001, Donaldson, Lufkin & Jenrette Securities Corporation provided financial advisory services to Sunrise.

131

**Defendant Holladay**

307.   Defendant Holladay is interested in the transactions complained of herein because he faces a substantial likelihood of being held liable for knowingly and deliberately approving the filing of false financial statements and other false SEC filings as a member of the Audit Committee during the relevant period.  Holladay knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.  Thus, at the time this suit was commenced, Defendant Holladay was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

308.   Moreover, Holladay received more than $1.8 million in illegal proceeds from his sale of Sunrise stock.

**Defendant Little**

309.   Defendant Little is interested in the transactions complained of herein because he faces a substantial likelihood of being held liable for knowingly and deliberately approving the filing of false financial statements and other false SEC filings as a director of the Company during the relevant period.  Little knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.  Thus, at the time this suit was commenced, Defendant Little was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

310.   Little shares a long-standing personal and professional relationship with Donohue and Klaassen as fellow members on the Board of Directors of the U.S. Chamber of Commerce,

of which Donohue is the CEO and President, and as fellow members on the Board of Directors of the National Chamber Foundation, of which Donohue is the President and Little is the Chairman of the Board of Directors. As such Little is incapable of independently considering a demand to commence and prosecute this action against Donohue and Klaassen due to their close personal and business relationships.

311. Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

312. The Board's decision to authorize the repurchase of over $202.1 million of Sunrise's shares from 2000 to 2005 was not the product of valid business judgment. Defendants Klaassen, Aprahamian, Donohue and Callen, who engaged in illegal backdating, were self dealing because they were improperly benefiting from an appreciation of their backdated option grants. Defendants Klaassen, Teresa Klaassen, Aprahamian, Donohue, Holladay and Callen, were also engaging in self dealing because they were improperly benefiting from the sales of their personally held shares while in possession of material non-public information concerning the improper accounting. The stock repurchases facilitated their illegal insider sales. Because the decision to approve the repurchases was not the product of valid business judgment, defendants Klaassen, Teresa Klaassen, Aprahamian, Donohue, Holladay, Callen and Little, who approved the repurchases, are interested. Thus, demand is futile.

313. Additionally, as represented in Sunrise's proxy statements, the stated purposes of granting stock options is to attract and retain skilled executive personnel and align their interests with those of the stockholders, specifically the Reports on Executive Compensation state "[s]tock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains." However, by granting

Sunrise stock options with backdated exercise prices, and then authorizing false statements to the contrary that stock options were granted at fair market value on the date of grant, Defendants Klaassen, Teresa Klaassen, Aprahamian, Donohue, Holladay and Callen undermined the purpose of the stock option plans by awarding employees compensation that had intrinsic value regardless of Sunrise's performance. In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders and the Company.

314. Defendants Klaassen, Teresa Klaassen, Aprahamian, Donohue, Holladay, Callen could have achieved the stated purpose of attracting and retaining executives by granting those employees additional stock options under their incentive plans, or by granting stock options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants. Instead, Defendants Donohue and Callen with the knowledge and participation of Defendants the Klaassens, Aprahamian, and Holladay backdated stock option grants in violation of the Plans and improperly reported these grants in their financial disclosures to improve their bottom line.

315. The practice of backdating stock options cannot be a valid exercise of business judgment because it has subjected Sunrise to potentially massive liability including an enormous restatement of the Company's historical financial statements estimated to be more than $100 million. The SEC has initiated an investigation into Sunrise's stock option granting practices. Sunrise will also likely suffer tax liabilities for the additional compensation it will have to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I

134

**Against Defendants Klaassen, Teresa Klaassen, Faeder, Newell, Donohue, Callen, Bradley, Holladay, Aprahamian, Little, Rush, Hulse, Adams, Meadow, Klisares, Slager and Gaul for Violations of §10(b) and Rule 10b-5 of the Securities and Exchange Act**

316.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

317.    Throughout the relevant period, Defendants Klaassen, Teresa Klaassen, Faeder, Newell, Donohue, Callen, Bradley, Holladay, Aprahamian, Little, Rush, Hulse, Adams, Meadow, Klisares, Slager and Gaul individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.

318.    Defendants Klaassen, Teresa Klaassen, Faeder, Newell, Donohue, Callen, Bradley, Holladay, Aprahamian, Little, Rush, Hulse, Adams, Meadow, Klisares, Slager and Gaul, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and/or directors of the Company, each of these Defendants was able to and did control the conduct complained of herein.

319.    Defendants Klaassen, Teresa Klaassen, Faeder, Newell, Donohue, Callen, Bradley, Holladay, Aprahamian, Little, Rush, Hulse, Adams, Meadow, Klisares, Slager and Gaul acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Defendants Klaassen, Teresa Klaassen, Faeder, Newell, Donohue, Callen, Bradley, Holladay, Aprahamian, Little, Rush, Hulse, Adams,

135

Meadow, Klisares, Slager and Gaul were among the senior management and/or directors of the Company and were therefore directly responsible for the fraud alleged herein.

320.   The Company relied upon the Defendants Klaassen, Teresa Klaassen, Faeder, Newell, Donohue, Callen, Bradley, Holladay, Aprahamian, Little, Rush, Hulse, Adams, Meadow, Klisares, Slager and Gaul's fraud in granting the recipients of backdated and ultra vires stock options to purchase shares of the Company's common stock, and the improper accounting treatment for the recognition of profits from real estate joint ventures and gains on the sale of real estate, as alleged herein.

321.   As a direct and proximate result of the Defendants Klaassen, Teresa Klaassen, Faeder, Newell, Donohue, Callen, Bradley, Holladay, Aprahamian, Little, Rush, Hulse, Adams, Meadow, Klisares, Slager and Gaul's fraud, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company is required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant and the costs and expenses of the restatement of the Company's historical financial statement resulting from the numerous improper accounting violations.

## COUNT II

### Against Defendants Klaassen, Teresa Klaassen, Faeder, Meadow, Bradley, Callen, Aprahamian, Donohue, Klisares, Little, Holladay and Slager for Violations of §14(a) of the Securities Exchange Act

322.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

136

323. Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14-A-9.

324. The proxy statements described herein violated §14(a) and Rule 14-A-9 because they omitted material facts, including the fact that Defendants Klaassen, Teresa Klaassen, Faeder, Meadow, Bradley, Callen, Aprahamian, Donohue, Klisares, Little, Holladay and Slager were causing Sunrise to engage in an option backdating scheme, a fact which Defendants Klaassen, Teresa Klaassen, Faeder, Meadow, Bradley, Callen, Aprahamian, Donohue, Klisares, Little, Holladay and Slager were aware of and participated in for various years since at least 1997.

325. In the exercise of reasonable care, the Defendants Klaassen, Teresa Klaassen, Faeder, Meadow, Bradley, Callen, Aprahamian, Donohue, Klisares, Little, Holladay and Slager should have known that the proxy statements were materially false and misleading.

326. The misrepresentations and omissions in the proxy statements were material. The proxy statements were an essential link in the accomplishment of the continuation of the Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of the shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

327. The Company was damaged as a result of the material misrepresentations and omissions in the proxy statements.

**COUNT III**

**Against Klaassen, Teresa Klaassen, Newell, Faeder, Slavin, Hulse,
Aprahamian, Callen, Donohue, Holladay, Bradley, Meadow, Klisares, Slager and Little for
Violations of §20(a) of the Securities Exchange Act**

328.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

329.    Klaassen, Teresa Klaassen, Faeder, Newell, Slavin, Hulse, Aprahamian, Callen, Donohue, Holladay, Bradley, Meadow, Klisares, Slager and Little, by virtue of their positions with Sunrise and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Sunrise within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause Sunrise to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### Against the Defendants for
### Accounting

330.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

331.    As alleged in detail herein, each of the Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

332.    As alleged in detail herein, the Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

333.    The Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants.

334.    As a result of the Defendants' misconduct, Sunrise has been damaged financially and is entitled to a recovery as a result thereof.

335.    Plaintiffs demand an accounting be made of all stock option grants made to any of the Defendants, including, but not limited to, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the dates the stock options were exercised, as well as the disposition of any proceeds received by any of the Defendants via sale or other exercise of the grants.

### COUNT V

### Against the Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting
### Related to Stock Option Backdating

336.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

337.    As alleged in detail herein, each of the Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

338.    As alleged in detail herein, the Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

139

339.     In breach of their fiduciary duties of loyalty and good faith, the Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

340.     The Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to and did, unduly benefit the Defendants at the expense of the Company.

341.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company is required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

## COUNT VI

**Against Defendants Klaassen, Teresa Klaassen, Aprahamian, Callen, Donohue, Adams, Hulse, Faeder, Newell, Gaul, Holladay, Rush, Slavin, Bradley, Klisares, Slager and Little for Breach of Fiduciary Duty and/or Aiding and Abetting Related to Improper Accounting Manipulations**

342.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

343.     As alleged in detail herein, each of Defendants Klaassen, Teresa Klaassen, Aprahamian, Callen, Donohue, Adams, Hulse, Faeder, Newell, Gaul, Holladay, Rush, Slavin, Bradley, Klisares, Slager and Little had a fiduciary duty to, among other things, refrain from employing improper accounting practices in violation of GAAP.

344.     As alleged in detail herein, Defendants Klaassen, Teresa Klaassen, Aprahamian, Callen, Donohue, Adams, Hulse, Faeder, Newell, Gaul, Holladay, Rush, Slavin, Bradley, Klisares, Slager and Little breached their fiduciary duties by, among other things, engaging in numerous accounting manipulations that  portrayed an inaccurate account of Sunrise's financial condition.

345.     In breach of their fiduciary duties of loyalty and good faith, Defendants Klaassen, Teresa Klaassen, Aprahamian, Callen, Donohue, Adams, Hulse, Faeder, Newell, Gaul, Holladay, Rush, Slavin, Bradley, Klisares, Slager and Little agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to conceal the true financial condition of the Sunrise from the Company's shareholders.

346.     Defendants Klaassen, Teresa Klaassen, Aprahamian, Callen, Donohue, Adams, Hulse, Faeder, Newell, Gaul, Holladay, Rush, Slavin, Bradley, Klisares, Slager and Little foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to and did, unduly benefit the Defendants at the expense of the Company.

347.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional tax liabilities the Company is required to incur, and the costs of the restatement and investigation.

## COUNT VII

### Against Defendants Klaassen, Smick, Swinton, Newell, Tomasso, Slavin, Faeder, Hulse, Adams, Aprahamian, Donohue, Callen and Bradley, for Unjust Enrichment Related to Backdate Stock Options

348.     Plaintiffs incorporate by reference and reallege each and every allegation set forth

141

above though fully set forth herein.

349.    The recipients of backdated stock options were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

350.    To remedy the unjust enrichment of the recipients of backdated stock options, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT VIII

### Against Defendants Klaassen, Smick, Swinton, Newell, Tomasso, Slavin, Faeder, Hulse, Adams, Aprahamian, Donohue, Callen and Bradley for Rescission Related to Backdated Stock Option Contracts

351.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

352.    As a result of the acts alleged herein, the stock option contracts between the recipients of backdated stock options and the Company entered into during the relevant period were obtained through the Defendants' fraud, deceit and abuse of control.  Further, the backdated Sunrise stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

353.    All contracts which provide for stock option grants to the recipients of backdated stock options and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executor contracts cancelled and declared void.

## COUNT IX

142

**Against Defendants Faeder, Newell, Swinton, Tomasso, Hulse, Adams,
Donohue, Callen and Bradley for
Unjust Enrichment Related to Ultra Vires Stock Options**

354.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

355.    Defendants Faeder, Newell, Swinton, Tomasso, Hulse, Adams, Donohue, Callen and Bradley were unjustly enriched by their receipt and retention of ultra vires stock option grants and the proceeds they received through exercising ultra vires stock options, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

356.    To remedy the Defendants Faeder, Newell, Swinton, Tomasso, Hulse, Adams,

357.    Donohue, Callen and Bradley's  unjust enrichment, the Court should order them to disgorge to the Company all of the ultra vires stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

**COUNT X**

**Against Defendants Faeder, Newell, Swinton, Tomasso, Hulse, Adams,
Donohue, Callen and Bradley for
Rescission Related to Ultra Vires Stock Option Contracts**

358.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

359.    As a result of the acts alleged herein, the stock option contracts between Defendants Faeder, Newell, Swinton, Tomasso, Hulse, Adams, Donohue, Callen and Bradley and the Company entered into during the relevant period were obtained through Defendants

Faeder, Newell, Swinton, Tomasso, Hulse, Adams, Donohue, Callen and Bradley's breaches of fiduciary duties. Further, the ultra vires stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

360. All contracts which provide for stock option grants to Defendants Faeder, Newell, Swinton, Tomasso, Hulse, Adams, Donohue, Callen and Bradley and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT XI

### Against Defendants Adams, Aprahamian, Callen, Donohue, Faeder, Gaul, Holladay, Hulse, Klaassen, Teresa Klaassen, Klisares, Newell, Rush, Slavin, Smick, Swinton and Tomasso for Insider Selling and Misappropriation of Information

361. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

362. At the time of the stock sales as set forth herein, Defendants Adams, Aprahamian, Callen, Donohue, Faeder, Gaul, Holladay, Hulse, Klaassen, Teresa Klaassen, Klisares, Newell, Rush, Slavin, Smick, Swinton and Tomasso knew the information described above, and sold Sunrise common stock based on such information.

363. The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which Defendants Adams, Aprahamian, Callen, Donohue, Faeder, Gaul, Holladay, Hulse, Klaassen, Teresa Klaassen, Klisares, Newell, Rush, Slavin, Smick, Swinton and Tomasso used for their own benefit when they sold Sunrise common stock.

144

364.    At the time of their stock sales, the Defendants Adams, Aprahamian, Callen, Donohue, Faeder, Gaul, Holladay, Hulse, Klaassen, Teresa Klaassen, Klisares, Newell, Rush, Slavin, Smick, Swinton and Tomasso knew that the Company's revenues were materially overstated because of the undisclosed stock option grants and other related compensation expenses.    Defendants Adams, Aprahamian, Callen, Donohue, Faeder, Gaul, Holladay, Hulse, Klaassen, Teresa Klaassen, Klisares, Newell, Rush, Slavin, Smick, Swinton and Tomasso also knew that the Company's revenues were materially overstated because of the undisclosed accounting manipulations.    Defendants Adams, Aprahamian, Callen, Donohue, Faeder, Gaul, Holladay, Hulse, Klaassen, Teresa Klaassen, Klisares, Newell, Rush, Slavin, Smick, Swinton and Tomasso's sales of Sunrise common stock while in possession and control of this material, adverse and non-public information was a breach of their fiduciary duties of loyalty and good faith.

365.    Since the use of the Company's proprietary information for their own gain constitutes a breach of Defendants Adams, Aprahamian, Callen, Donohue, Faeder, Gaul, Holladay, Hulse, Klaassen, Teresa Klaassen, Klisares, Newell, Rush, Slavin, Smick, Swinton and Tomasso's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the those Defendants obtained thereby.

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties;

B.    Ordering the Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

C.    Ordering the Defendants to disgorge to the Company all of the ultra vires

145

stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized, and imposing a constructive trust thereover;

D.    Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

E.    Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

146

Dated: October 26, 2007                    Respectfully submitted,

                                           DAVIS, COWELL & BOWE, LLP

                                           /s/ Mark Hanna
                                           George R. Murphy (DC Bar 75200)
                                           Mark Hanna (DC Bar 471960)
                                           Joni S. Jacobs (DC Bar 493846)
                                           1701 K Street NW, Suite 210
                                           Washington, DC 20006
                                           Tel. (202) 223-2620
                                           Fax: (202) 223-8651
                                           *Liaison Counsel*

                                           SCHIFFRIN BARROWAY TOPAZ
                                           & KESSLER, LLP
                                           Eric L. Zagar
                                           Eric Lechtzin
                                           J. Daniel Albert
                                           280 King of Prussia Road
                                           Radnor, PA 19087
                                           Telephone: (610) 667-7706
                                           Facsimile: (610) 667-7056

                                           SAXENA WHITE P.A.
                                           Maya Saxena
                                           Joseph E. White III
                                           2424 North Federal Highway, Suite 257
                                           Boca Raton, FL  33431
                                           Telephone:  (561) 394-3399
                                           Facsimile:  (561) 394-3382

                                           ROBBINS, UMEDA, & FINK LLP
                                           Brian J. Robbins
                                           Felipe J. Arroyo
                                           Ashley R. Palmer
                                           610 West Ash Street, Suite 1800
                                           San Diego, CA  92101
                                           Telephone:  (619) 525-3990
                                           Facsimile:  (619) 525-3991

                                           *Co-Lead Counsels for Plaintiffs*

                                                    147

## VERIFICATION

I, Catherine Molner, hereby verify that I have authorized the filing of the attached Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.   I declare under penalty of perjury that the foregoing is true and correct.

DATE: 10/20/07

**CATHERINE MOLNER**

## SUNRISE SENIOR LIVING INCORPORATED VERIFICATION

I, Janie Morrison, hereby verify under the penalty of perjury that I am familiar with the allegations in the Amended Consolidated Shareholder Derivative Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: October 26, 2007

Janie Morrison

<u>VERIFICATION</u>

I, Robert Anderson, have read the Sunrise Senior Living, Inc. Amended Consolidated Shareholder Derivative Complaint and know the contents thereof. The Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _Oct 26, 2007_

_____
ROBERT ANDERSON