## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In Re SUNRISE SENIOR LIVING, INC. | ) ) ) ) ) ) ) ) ) | **Civil Action No. 07-00143 (RBW)** |
| This Document Relates to: | | |
| ALL ACTIONS | | |

### DEFENDANT BRADLEY B. RUSH'S MOTION TO DISMISS THE AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(6), and 9(b), Defendant Bradley B. Rush ("Mr. Rush"), by and through undersigned counsel, hereby moves this honorable Court to dismiss the Amended Consolidated Shareholder Derivative Complaint (the "Amended Complaint") with prejudice for lack of personal jurisdiction and for failure to state a claim against Mr. Rush.

As demonstrated in the attached Memorandum of Points and Authorities, the plaintiffs have set forth no facts demonstrating that this Court may exercise personal jurisdiction over Mr. Rush.  Thus, the Amended Complaint should be dismissed as to Mr. Rush for lack of personal jurisdiction.

As further demonstrated in Mr. Rush's Memorandum of Points and Authorities, the Amended Complaint should be dismissed with prejudice because the plaintiffs have failed to state a claim against Mr. Rush.  When considering a Rule 12(b)(6) motion to dismiss, "the material allegations of the complaint are taken as admitted."  Jenkins v. McKeithen, 395 U.S. 411, 421 (1969).  While the Court construes the complaint liberally, id., "the court need not

accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the

complaint.  Nor must the Court accept legal conclusions cast in the form of factual allegations."

Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276, (D.C. Cir. 1994).  Even given a

liberal construction of the Amended Complaint, the plaintiffs have failed to state any claims

against Mr. Rush, and thus the Amended Complaint must be dismissed with prejudice.

Dated:  June 16, 2008                     Respectfully submitted,

                                          AKIN GUMP STRAUSS HAUER & FELD, LLP


                                          /s/ Elizabeth C. Peterson_____
                                          John M. Dowd (DC Bar 003525)
                                          Jeffrey M. King (DC Bar 461644)
                                          Elizabeth C. Peterson (DC Bar 460259)
                                          James E. Sherry (DC Bar 500797)
                                          Robert S. Strauss Building
                                          1333 New Hampshire Avenue, NW
                                          Washington, DC 20036
                                          Telephone:  (202) 887-4000
                                          Facsimile:  (202) 887-4288

                                          *Counsel for Defendant Bradley B. Rush*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that , DEFENDANT'S MOTION TO DISMISS, DEFENDANT'S

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO

DISMISS, AND PROPOSED ORDER were served this 16th day of June 2008, in accordance

with the Court's CM/ECF Guidelines.  In addition, the forgoing was served this 16th day of June

2008, via first-class mail, postage prepaid, on:

George R. Murphy
Mark Hanna
Joni S. Jacobs
DAVIS, COWELL & BOWE, LLP
1701 K. Street NW, Suite 210
Washington, DC 20006

Eric L. Zagar
Michael C. Wagner
J. Daniel Albert
SCHIFFRIN BARROWAY TOPAZ & KESSLER LLP
280 King of Prussia Road
Radnor, PA 19087

Brian J. Robbins
Felipe J. Arroyo
Ashley R. Palmer
ROBBINS, UMEDA, & FINK, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101

Maya Saxena
Joseph White
SAXENA WHITE, P.A.
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431

*Co-Lead Counsel for Plaintiffs*

George H. Mernick, III
N. Thomas Connally
Jon M. Talotta
HOGAN & HARTSON, LLP

Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004

*Counsel for Nominal Defendant Sunrise Senior Living, Inc.*


John C. Millian
Matthew R. Estabrook
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306

*Counsel for the Individual Defendants*


Philip A. Sechler
Scott K. Dasovich
WILLIAMS & CONNOLLY, LLP
725 12th Street, NW
Washington, DC 20005-5901

*Counsel for Defendant David G. Bradley*


_/s/ Elizabeth C. Peterson_____

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| In Re SUNRISE SENIOR LIVING, INC. | ) ) ) | **Civil Action No. 07-00143 (RBW)** |
| This Document Relates to: | ) ) ) | |
| ALL ACTIONS | ) ) ) | |

**DEFENDANT BRADLEY B. RUSH'S MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF HIS MOTION TO DISMISS THE AMENDED**
<u>**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

AKIN GUMP STRAUSS HAUER & FELD, LLP

John M. Dowd (DC Bar 003525)
Jeffrey M. King (DC Bar 461644)
Elizabeth C. Peterson (DC Bar 460259)
James E. Sherry (DC Bar 500797)

*Counsel For Defendant Bradley B. Rush*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

ARGUMENT .........................................................................................................................5

I.     THE PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR SECURITIES
FRAUD AGAINST MR. RUSH UNDER SECTION 10(b) OF THE EXCHANGE
ACT AND RULE 10b-5 (COUNT I) ...........................................................................5

     A.     Plaintiffs' Burden and Standard of Review ...................................................5

     B.     The Plaintiffs' Allegations of Options Backdating Fail To State a
Securities Fraud Claim Against Mr. Rush ....................................................8

     C.     The Plaintiffs' Allegations of False Statements and Accounting
Manipulations Fail To State a Securities Fraud Claim Against Mr. Rush ............10

          1.     The Plaintiffs Improperly Rely on Group Pleading ...................................11

          2.     The Plaintiffs Fail To Specify How the One Statement Attributed
Specifically to Mr. Rush Is False ..............................................................12

          3.     The Plaintiffs Fail to Plead Facts Sufficient To Create a "Strong
Inference" of Scienter ................................................................................13

II.    THE PLAINTIFFS' STATE LAW CLAIMS AGAINST MR. RUSH MUST BE
DISMISSED FOR FAILURE TO STATE A CLAIM (COUNTS IV, V, VI, & XI) ...........17

     A.     The Plaintiffs Fail To State a Claim Against Mr. Rush for an Accounting
(Count IV) ....................................................................................................17

     B.     The Plaintiffs Fail To State a Claim Against Mr. Rush for Breach of
Fiduciary/Aiding and Abetting Related to Stock Option Backdating
(Count V) .....................................................................................................18

     C.     The Plaintiffs Fail To State a Claim Against Mr. Rush for Breach of
Fiduciary/Aiding and Abetting Related to Improper Accounting
Manipulations (Count VI) ............................................................................19

     D.     The Plaintiffs Fail To State a Claim Against Mr. Rush for Insider Selling
and Misappropriation of Information (Count XI) ..........................................20

III.   THE PLAINTIFFS' STATE LAW CLAIMS AGAINST MR. RUSH MUST BE
DISMISSED FOR LACK OF PENDENT SUBJECT MATTER JURISDICTION
(COUNTS IV, V, VI, & XI) .......................................................................................23

IV.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE
        FAILED TO MAKE A PRIMA FACIE SHOWING THAT THIS COURT HAS
        PERSONAL JURISDICTION OVER MR. RUSH ........................................................24

        A.      Plaintiffs' Burden and Standard of Review.............................................24

        B.      The Plaintiffs Have Failed To Plead Facts Showing That The Court Has
                Personal Jurisdiction Over Mr. Rush With Respect To The Securities
                Fraud Claim (Count I).............................................................................25

        C.      The Plaintiffs' State Law Claims Against Mr. Rush Must Also Be
                Dismissed For Lack Of Pendent Personal Jurisdiction (Counts IV, V, VI, &
                XI). ...........................................................................................................27

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alfus v. Pyramid Tech. Corp., 745 F. Supp. 1511 (N.D. Cal. 1990)..................................22

In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1 (D.D.C. 2000) ............................................12

In re Baan Co. Secs. Litig., 245 F. Supp. 117 (D.D.C. 2003) .........................................25

Backman v. Polaroid Corp., 540 F. Supp. 667 (D. Mass. 1982) ........................................22

Bates v. Northwestern Human Servs., 466 F. Supp. 2d 69 (D.D.C. 2006) ........................17

Belizan v. Hershon, 495 F.3d 686 (D.C. Cir. 2007) ............................................................7

Brody v. Transitional Hosps. Corp., 280 F.3d 997 (9th Cir. 2002) ...................................23

Burman v. Phoenix Worldwide Indus., 384 F. Supp. 2d 316 (D.D.C. 2005) .....................15

Burman v. Phoenix Worldwide Indus., Inc., 437 F. Supp. 2d 142 (D.D.C. 2006).......24, 26

In re Cable & Wireless, PLC Sec. Litig., 321 F. Supp. 2d 749 (E.D. Va. 2004)................16

Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627 (2005)..................................5

Edmond v. U.S. Postal Serv. Gen. Counsel, 949 F.2d 415 (D.C. Cir. 1991) ....................24

*In re Fannie Mae Sec. Litig., 503 F. Supp. 2d 25 (D.D.C. 2007) ..............................6, 7, 12

Hockey v. Medhekar, 30 F. Supp. 2d 1209 (N.D. Cal. 1998) .............................................12

Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697 (2d Cir. 1994)..............21

*Kowal v. MCI Commc'ns Corp., 16 F.3d 1271 (D.C. Cir. 1994)..........................................6

Kushner v. Beverly Enterprises, Inc., 317 F.3d 820 (8th Cir. 2003)..................................14

Laventhall v. Gen. Dynamics Corp., 704 F.2d 407 (8th Cir. 1983) ..................................21

Martin & Assocs. v. Malouf, No. 03-1281, 2006 U.S. Dist. LEXIS 6863 (D.D.C.
    Feb. 6, 2006) ................................................................................................................25

Meng v. Schwartz, 116 F. Supp. 2d 92 (D.D.C. 2000) ......................................................24

In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620 (E.D. Va. 2000)......................16

Oetiker v. Jurid Werke G.m.b.H., 556 F.2d 1 (D.C. Cir. 1977) ..........................................27

Olin Corp. v. Fisons PLC, 47 F. Supp. 2d 151 (D. Mass. 1999)........................................27

*In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236 (S.D.N.Y. 2007) ......................9, 14

In re Oxford Health Plan Sec. Litig., 187 F.R.D. 133 (S.D.N.Y. 1999)............................22

Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015 (11th Cir. 2005)..................................12

*Poling v. Farrah, 131 F. Supp. 2d 191 (D.D.C. 2001)................................................25, 27

Quinto v. Legal Times, 506 F. Supp. 554 (D.D.C. 1981)...................................................25

R2 Invs. LDC v. Phillips, 401 F.3d 638 (5th Cir. 2005) ....................................................21

In re Sagent Tech., Inc. Derivative Litig., 278 F. Supp. 2d 1079 (N.D. Cal. 2003).............4

Southland Sec. Corp. v. Inspire Ins. Solutions, Inc., 365 F.3d 353 (5th Cir. 2004)...........12

*Tellabs, Inc. v. Makor Issues & Rights Ltd., 127 S. Ct. 2499 (2007)................7, 12, 13, 14

United Mine Workers v. Gibbs, 383 U.S. 715, 86 S. Ct. 1130 (1966)...............................24

United States v. Botefuhr, 309 F.3d 1263 (10th Cir. 2002)...............................................27

United States v. Falcone, 257 F.3d 226 (2nd Cir. 2001) ....................................................21

In re Verestar, Inc., 343 B.R. 444 (Bankr. S.D.N.Y. 2006) .........................................18, 19

*In re VeriSign, Inc. Derivative Litig., 531 F. Supp. 2d 1173 (N.D. Cal. 2007) .......9, 14, 16

In re Verifone Sec. Litig., 784 F. Supp. 1471 (N.D. Cal. 1992).........................................22

Vess v. Ciba-Geigy Corp., 317 F.3d 1097 (9th Cir. 2003) ................................................20

Wiggins v. Equifax, Inc., 853 F. Supp. 500 (D.D.C. 1994) ...............................................25

Williams v. WMX Techs., Inc., 112 F.3d 175 (5th Cir. 1997) ............................................7

Wilson v. Comtech Telecommunications Corp., 648 F.2d 88 (2d Cir. 1981) ...................22
Wool v. Tandem Computers, Inc., 818 F.2d 1433 (9th Cir. 1987) .....................................12
*In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165 (D.D.C. 2007)...........6

## STATE CASES

*Albert v. Alex Brown Mgmt. Servs. Inc., Nos. 762-N, 763-N, 2005 WL. 2130607
    (Del. Ch. Aug. 26, 2005)..................................................................................18, 19, 20
Aronson v. Lewis, 473 A.2d 805 (Del. 1984) ...................................................................4
Brehm v. Eisner, 746 A.2d 244 (Del. 2000)......................................................................4
Lewis v. Ward, C.A. No. 15255, 2003 WL. 22461894 (Del. Ch. Oct. 29, 2003) .............18
In re Oracle Corp. Derivative Litig., 867 A.2d 904 (Del. Ch. 2004) ................................23
Rhodes v. Silkroad Equity, LLC, No. 2133-VCN, 2007 Del. Ch. LEXIS 96 (Del.
    Ch. July 11, 2007)...........................................................................................................17
Trenwick Am. Litig. Trust v. Billett, No. 495, 2007 WL. 2317768 (Del. Aug. 14,
    2007) ...........................................................................................................................19
Trenwick Am. Litig. Trust v. Ernst & Young L.L.P., 906 A.2d 168 (Del. Ch. 2006) ........18

## DOCKETED CASES

In re Sunrise Senior Living Securities Litigation, 07-CV-00102 (D.D.C. filed Jan.
    16, 2007) .........................................................................................................................1
Von Guggenberg v. Klaassen, C.A. No. CL-2006-10174 (Va. Cir. Ct. Sept. 15,
    2006) ...............................................................................................................................1
Von Guggenberg v. Klaassen, No. 062587 (Va. Apr. 27, 2007)...........................................1
Young v. Klaassen, C.A. No 2770-VCL (Del. Ch. filed Mar. 6, 2007) ..............................1

## STATUTES

*15 U.S.C. § 78aa .......................................................................................................24, 25
15 U.S.C. § 78j(b) .............................................................................................................22
15 U.S.C. § 78t-1 .........................................................................................................21, 22
*15 U.S.C. § 78u-4 ..........................................................................................6, 7, 11, 13, 22
28 U.S.C. § 1658(b) ..........................................................................................................10
The Insider Trading and Securities Fraud Enforcement Act of 1988, Pub. L. 100-
    704, 102 Stat. 4677 (1988).............................................................................................21

## LEGISLATIVE HISTORY

H.R. Rep. No. 104-369 (1995)....................................................................................6, 16
S. Rep. No. 104-98 at 4 (1995) ..................................................................................6, 16

iv

## <u>INTRODUCTION</u>

The instant derivative suit is one of numerous putative shareholder derivative and class

action lawsuits filed against Sunrise Senior Living, Inc. ("Sunrise") and various past and present

officers and directors of Sunrise.[1]  Although based on the same facts as the other lawsuits, this

action is the only one in which Bradley B. Rush ("Mr. Rush") is named as a defendant.

Mr. Rush first joined Sunrise in July 2003 as Executive Vice President of the Properties

Division.  In July 2004 he was promoted to acting Chief Investment Officer, and in January of

2005 he became the permanent Chief Investment Officer.  Only seven months later, on August 4,

2005, Mr. Rush was promoted again, this time to Chief Financial Officer ("CFO").  <u>See</u> Am.

Compl. ¶ 32.[2]

The facts alleged in the Amended Complaint show plainly that Mr. Rush is a mere "add

on" to this lawsuit, named solely because he was Sunrise's CFO at the time the plaintiffs filed

their original complaints, not because the plaintiffs had any reason to believe Mr. Rush was

involved in any fraud at Sunrise.  Accordingly, while the plaintiffs attempt to implicate Mr. Rush

in supposed "accounting manipulations" at Sunrise, they acknowledge that Mr. Rush was

---

[1] Also pending before this Court is a class action lawsuit against Sunrise and other individual defendants.  <u>See</u> <u>In re Sunrise Senior Living Securities Litigation</u>, 07-CV-00102 (D.D.C. filed Jan. 16, 2007).  Notably, Mr. Rush was not named as a defendant in the Amended Complaint filed on June 6, 2008 in this class action litigation.  <u>See</u> Am. Compl. (Docket No. 41 in 07-CV-00102).  In addition to the suits filed in this Court, a similar action is pending in Delaware Chancery Court.  <u>See</u> <u>Young v. Klaassen</u>, C.A. No 2770-VCL (Del. Ch. filed Mar. 6, 2007).  Yet another backdating case was filed in Virginia State Court, but was dismissed because the plaintiff shareholders failed to make a pre-suit demand on the Company's Board.  <u>See</u> <u>Von Guggenberg v. Klaassen</u>, C.A. No. CL-2006-10174 (Va. Cir. Ct. Sept. 15, 2006).  The Virginia Supreme Court subsequently denied the plaintiffs' petition for appeal.  <u>See</u> <u>Von Guggenberg v. Klaassen</u>, No. 062587 (Va. Apr. 27, 2007).  Mr. Rush is not named as a defendant in the Delaware or Virginia actions.

[2] Mr. Rush is incorrectly described as a director in the Court's Memorandum and Opinion of May 1, 2008 in support of its March 28, 2008 Order.  <u>See</u> Mem. & Op. at 8 (Docket No. 60 in 07-CV-00143).

pressured to complete work on the accounting restatement while he was employed as Sunrise's CFO.  See Am. Compl. ¶ 220.  This admission flies in the face of the plaintiffs' claim that Mr. Rush acted with the intent to defraud or mislead and explains why the plaintiffs are able to muster only conclusory and unsupported allegations of fraud as against Mr. Rush.  Similarly, the backbone of the plaintiffs' claims, both in their original Complaint and in their Amended Complaint, is a series of unsubstantiated allegations that certain director and officer stock option grants were fraudulently backdated.  Yet the plaintiffs do not — because they cannot — allege that Mr. Rush received backdated options, participated in the alleged backdating scheme, or was even employed by Sunrise during the period that the backdating allegedly occurred.  See Am. Compl. ¶ 32.  In short, the plaintiffs' own allegations demonstrate that Mr. Rush should not be a defendant in this lawsuit, and explain why the plaintiffs are unable to marshal any particularized facts showing that Mr. Rush was involved in the supposed fraudulent schemes at Sunrise, or that he ever acted with the intent to defraud.

## **BACKGROUND**

The plaintiffs' Amended Complaint attempts to state eleven causes of action against the defendants.  Of these, only five (Counts I, IV, V, VI, and XI) name Mr. Rush as a defendant.[3]

---

[3] The plaintiffs' original Complaint attempted to state ten causes of action against Mr. Rush, but the plaintiffs have now dropped five of those counts as to Mr. Rush.  Notably, the causes of action as to which Mr. Rush is no longer a defendant all concern the allegedly fraudulent options grants.  See Am. Compl. Count II (violation of § 14(a) of Exchange Act based on dissemination of proxy statements that were false as a result of options backdating); Count VII (unjust enrichment based on receipt of backdated options); Count VIII (for recission based on receipt of backdated options); Count IX (unjust enrichment based on receipt of "ultra vires" options); Count X (for recission based on receipt of "ultra vires" options).  It is not surprising that the plaintiffs withdrew these claims as to Mr. Rush given that, as Mr. Rush pointed out in his first motion to dismiss, he was not even employed by Sunrise at the time the allegedly backdated options were granted.

The plaintiffs' first, and principal, claim against Mr. Rush is for securities fraud in violation of Section 10(b) of the Securities Exchange Act (the "Exchange Act") and Rule 10b-5 thereunder. This claim is based on two theories of fraud. First, the plaintiffs allege that Mr. Rush and others committed securities fraud by engaging in an options backdating scheme between 1999 and 2001. Yet the plaintiffs also acknowledge that Mr. Rush never received any backdated options and was not even employed by Sunrise until 2003, more than a year <u>after</u> the last instance of alleged backdating. Despite these gaping holes in the plaintiffs' theory, they nonetheless attempt to claim, without any specific factual allegations in support, that Mr. Rush somehow participated in the backdating scheme after it was already over and even though he never personally benefited from the scheme. These allegations are insufficient to support a claim for securities fraud against Mr. Rush.

Second, the plaintiffs claim that Mr. Rush and other defendants engaged in "accounting manipulations" and then made statements and public disclosures about Sunrise's financial condition that they knew to be materially false and misleading as a result of such "accounting manipulations." This theory is also insufficiently pled to support a claim against Mr. Rush because: (1) the plaintiffs have failed to allege with particularity that Mr. Rush participated in the alleged accounting manipulations; (2) the plaintiffs have failed to allege facts sufficient to create a "strong inference" that Mr. Rush acted with the intent to defraud when he made any statements attributed to him in the Amended Complaint; (3) in nearly all instances the plaintiffs have not even alleged that Mr. Rush was responsible for the relevant statements identified in the Amended Complaint; and (4) the plaintiffs have largely failed to explain why or how the alleged statements were false or misleading.

The plaintiffs' four other claims against Mr. Rush are all grounded in the same basic factual allegations, and thus fail for the same reasons. In particular, the plaintiffs' two claims of breach of fiduciary duty fail because the plaintiffs have neither pled facts that plausibly implicate Mr. Rush in the supposed backdating scheme nor facts that suggest that he acted with gross negligence with respect to any alleged accounting errors. The plaintiffs' attempt to state a claim for insider trading against Mr. Rush likewise fails because the plaintiffs do not specify a legal basis for their insider trading claim. But further, under any potential theory of insider trading, the plaintiffs fail to sufficiently plead an insider trading claim against Mr. Rush and thus this claim must be dismissed as well. Finally, the plaintiffs' claim for an accounting fails because an accounting is a remedy, not a cause of action, and because equitable relief of this kind is not recoverable from an individual former officer of Sunrise such as Mr. Rush.[4]

Finally, in addition to these pleading defects, the plaintiffs have failed to allege any facts demonstrating that this Court has personal jurisdiction over Mr. Rush. The Amended Complaint must therefore be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2) as well.

---

[4] The Amended Complaint should be dismissed on two additional grounds. First, the plaintiffs have failed to either (1) make a pre-suit demand on Sunrise's board of directors to take appropriate action to address the plaintiffs' concerns, or (2) allege particularized facts explaining why making such a demand would be futile. See Del. Ch. Ct. R. 23.1; Aronson v. Lewis, 473 A.2d 805, 808 (Del. 1984), rev'd on other grounds by Brehm v. Eisner, 746 A.2d 244, 254 (Del. 2000). Mr. Rush adopts and incorporates herein the arguments on this issue set forth in the Memorandum of Points and Authorities in Support of the Motion to Dismiss the Amended Complaint Or, in the Alternative, to Stay by Nominal Defendant Sunrise Senior Living, Inc. Second, the plaintiffs have failed to plead facts sufficient to show that they have standing to pursue derivative claims by failing to plead when they purchased their Sunrise stock. See In re Sagent Tech., Inc. Derivative Litig., 278 F. Supp. 2d 1079, 1096 (N.D. Cal. 2003). Mr. Rush adopts and incorporates herein the arguments on this issue set forth in the Memorandum of Points and Authorities in Support of the Motion to Dismiss the Amended Complaint by the Individual Defendants.

## ARGUMENT

I.   **THE PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR SECURITIES FRAUD AGAINST MR. RUSH UNDER SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 (COUNT I)**

Count I of the Amended Complaint alleges that Sunrise and certain of its directors and officers, including Mr. Rush, violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by committing "fraud in granting the recipients of backdated and <u>ultra vires</u> stock options to purchase shares of the Company's common stock, and the improper accounting treatment for the recognition of profits from real estate joint ventures and gains on the sale of real estate." Am. Compl. ¶ 320. The plaintiffs' securities fraud claim thus rests on two broad allegations of fraudulent conduct by the defendants. First, the plaintiffs allege that the defendants committed securities fraud by improperly backdating certain stock options awards. <u>See</u> Am. Compl. ¶¶ 3, 7, 64-132. Second, the plaintiffs allege that the defendants committed securities fraud by engaging in improper accounting practices and then making public statements about Sunrise's financial condition that they knew to be false as a result of these improper accounting practices. <u>See</u> ¶¶ 3, 5-6, 44-57, 140-202.

As explained below, the plaintiffs' securities fraud claim against Mr. Rush must be dismissed under Federal Rules of Civil Procedure 12(b)(6) and 9(b) for failure to state a claim because neither of the plaintiffs' theories has been pled with the required particularity.

### A.   **Plaintiffs' Burden and Standard of Review**

To state a claim for securities fraud against Mr. Rush under Section 10(b) of the Exchange Act and Rule 10b-5, the plaintiffs must allege that Mr. Rush: (1) made a false statement or used a manipulative or deceptive device; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiffs relied; and (5) which proximately caused economic loss to the plaintiffs. <u>See</u> <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 341-42,

125 S. Ct. 1627, 1629-32 (2005); Kowal v. MCI Commc'ns. Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); In re Fannie Mae Sec. Litig., 503 F. Supp. 2d 25, 38 (D.D.C. 2007); In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165, 175 (D.D.C. 2007).  Because the plaintiffs' claim sounds in fraud, the plaintiffs may not rely on the liberal "notice pleading" standards of Rule 8, but instead must plead each element with the particularity required by Rule 9(b).  See Kowal, 16 F.3d at 1278; In Re XM, 479 F. Supp. 2d at 175.  To satisfy Rule 9(b), the plaintiffs must specifically allege "the time, place and content of the false misrepresentations, the fact misrepresented, and what was retained or given up as a consequence of the fraud."  Kowal, 16 F.3d at 127; In Re XM, 479 F. Supp. 2d at 175.  And while the court must construe the Amended Complaint liberally in the plaintiffs' favor, it "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint."  Kowal, 16 F.3d at 1276; In re Fannie Mae, 503 F. Supp. 2d at 31.

In order to avoid dismissal of their securities fraud claim, the plaintiffs must also meet the stringent pleading standards imposed by the Private Securities Litigation Reform Act of 1995 (the "Reform Act").  See 15 U.S.C. § 78u-4.  Congress enacted the Reform Act because it recognized that cases such as this one "are often based on nothing more than a company's announcement of bad news, not evidence of fraud."  S. Rep. No. 104-98 at 4 (1995), as reprinted in 1995 U.S.C.C.A.N. 679, 683; see also H.R. Rep. No. 104-369 (1995) (Conf. Rep.), as reprinted in 1995 U.S.C.C.A.N. 730, 730-31 (noting that Reform Act was needed in order to combat "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer").  The Reform Act therefore gives the courts powerful tools for disposing of baseless cases at the outset of litigation.  Chief among these tools are the Reform Act's "[e]xacting

pleading requirements," which Congress enacted "[a]s a check against abusive litigation by private parties." Tellabs, Inc. v. Makor Issues & Rights Ltd., 127 S. Ct. 2499, 2504 (2007).

To satisfy the Reform Act's "exacting pleading requirements," the plaintiffs must plead with heightened particularity in two specific respects. See 15 U.S.C.A, § 78u-4(b); Belizan v. Hershon, 495 F.3d 686, 691 (D.C. Cir. 2007); In re Fannie Mae, 503 F. Supp. 2d at 36-37. First, the plaintiffs must state with particularity "the facts constituting the alleged violation." Belizan, 495 F.3d at 691 (D.C. Cir. 2007). To meet this standard, the plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading." 15 U.S.C. 78u-4(b). Second, the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. (emphasis added). In the securities fraud context, this requires factual allegations sufficient to raise a strong inference that the defendants acted with the intent to deceive, manipulate, or defraud, see Belizan, 495 F.3d at 691 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, 96 S. Ct. 1375, 1381 n. 12 (1976)), or, at the very least, with "extreme recklessness." See In re Fannie Mae, 503 F. Supp. 2d at 37 (citing SEC v. Steadman, 967 F.2d 636, 641-42 (D.C. Cir. 1992)). To satisfy the Reform Act's requirement of a "strong" inference of fraudulent intent, the plaintiffs must plead facts that raise an inference of fraud that is "more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 127 S. Ct. at 2505; In re Fannie Mae, 503 F. Supp. 2d at 37 n.9. In assessing whether the plaintiffs have cleared these high hurdles, prolixity must not be confused with particularity, since "a garrulous style is not an uncommon mask for an absence of detail." Williams v. WMX Techs., Inc., 112 F.3d 175, 178 (5th Cir. 1997).

The Amended Complaint, despite its 143 pages and 365 paragraphs, fails each of these tests. First, with respect to the backdating allegations, the plaintiffs acknowledge that Mr. Rush was not even employed by Sunrise when the backdating allegedly occurred, and have pled no other facts implicating Mr. Rush in the alleged backdating scheme. See Am. Compl. ¶ 32. Second, with respect to the alleged "false statements" and "accounting manipulations," the plaintiffs have failed to plead facts sufficient to raise a "strong inference" that Mr. Rush participated in the alleged manipulations or acted with the requisite scienter. Moreover, the plaintiffs' claims also fail because in some cases the plaintiffs have made no attempt to explain why or how the statements were false and have not identified the individuals responsible for the statements, let alone alleged that Mr. Rush made the statements. For these reasons, the plaintiffs' securities fraud claim against Mr. Rush must be dismissed.

### B. The Plaintiffs' Allegations of Options Backdating Fail To State a Securities Fraud Claim Against Mr. Rush

The plaintiffs allege that certain Sunrise directors and senior officers committed securities fraud by engaging in a "scheme" to backdate stock options awards between 1997 and 2001. These allegations are insufficient to support a claim of securities fraud against Mr. Rush because the allegations are insufficiently pled as to Mr. Rush and because any claim based on the alleged backdating is barred by the applicable statute of limitations.

According to the Amended Complaint, the earliest of the allegedly backdated options was dated May 2, 1997, and the allegedly fraudulent backdating of this award occurred sometime "between the next day on May 3, 1997 and the end of the fiscal year," or no later than December 31, 1997. See Am. Compl. ¶ 82. The latest of the allegedly backdated options was dated November 12, 2001, and the allegedly fraudulent backdating of this award occurred sometime

"between the next day on November 13, 2001 and the end of the fiscal year," or no later than December 31, 2001.  See id. ¶ 127.

By the plaintiffs' own admission, Mr. Rush was not even employed by Sunrise until July 2003, more than a year after the last instance of allegedly fraudulent backdating occurred, and was not employed as Sunrise's CFO until August 2005, more than three years after the last instance of allegedly fraudulent backdating.  See Am. Coml. ¶ 32.  These admissions are plainly fatal to the plaintiffs' attempt to implicate Mr. Rush in any way in the alleged backdating scheme.  See In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 251-52 (S.D.N.Y. 2007) (dismissing securities fraud claim against CEO and CFO whose tenures postdated the alleged options backdating scheme).  The plaintiffs' backdating claims also fail as to Mr. Rush because they have not alleged that Mr. Rush himself received any backdated stock options.  Finally, given that the plaintiffs have alleged no facts whatsoever that suggest that Mr. Rush participated in an illegal backdating scheme from which he himself never benefited, they have failed to plead a strong inference of scienter.  See In re Openwave, 528 F. Supp. 2d at 251-52 (plaintiffs failed to plead scienter with respect to certain defendants because they failed to allege that those defendants had received backdated options); In re VeriSign, Inc., Derivative Litig., 531 F. Supp. 2d 1173, 1207 (N.D. Cal. 2007) (same).  Given that Mr. Rush neither received any allegedly backdated options nor was even employed at Sunrise when the backdating allegedly occurred, the plaintiffs have not stated — because they simply cannot do so — a claim for securities fraud against Mr. Rush based upon the alleged backdating scheme.

Moreover, even if Mr. Rush were somehow implicated in the backdating scheme, these allegations must be dismissed because any claim based on the backdating allegations is barred by the statute of limitations.  In 2002, as part of the Sarbanes-Oxley Act, Congress codified the

statute of limitations for private causes of action for securities violations. Plaintiffs are required to bring their claims within two years of "the discovery of facts constituting the violation," but in no case later than five years after the violation. 28 U.S.C. § 1658(b). Here, the last of the fourteen alleged backdated options was dated November 12, 2001, and the allegedly fraudulent backdating of this option occurred sometime "between the next day on November 13, 2001 and the end of the fiscal year," or no later than December 31, 2001. See Am. Compl. ¶ 127. The plaintiffs were thus required to file their Rule 10b-5 claim no later than December 31, 2006, but did not file their first complaint in this case until January 16, 2007. The plaintiffs offer no reason why the statute of limitations should be tolled. Nor could they, given that, as the Amended Complaint reveals, the alleged backdating claims are based on public information that was disclosed years ago. See, e.g., Am. Compl. ¶¶ 7, 64-132. Thus, all of the plaintiffs' claims related to grants of backdated options are barred by the statute of limitations.

### C. The Plaintiffs' Allegations of False Statements and Accounting Manipulations Fail To State a Securities Fraud Claim Against Mr. Rush

The plaintiffs also allege that certain Sunrise directors and senior officers committed securities fraud by engaging in "accounting manipulations" and then making public statements and financial filings with the SEC that they knew to be materially false and misleading as a result of such accounting manipulations — specifically, improper accounting for joint venture profits and gains on the sale of real estate. See ¶¶ 3, 5-6, 44-57, 140-202.[5] The plaintiffs' allegations

---

[5] These allegations, which also appeared in the plaintiffs' original complaint, are based wholly on Sunrise's own public disclosures, including its disclosure on May 11, 2006, when Sunrise announced that it was reevaluating its historical financial treatment of these two items, and its disclosure on July 31, 2006, wherein Sunrise announced that it had decided to restate its financial statements for the years 2003-2005 in order to adjust the accounting for these items. See id. ¶¶ 221, 227.

are insufficiently pled to support a claim for securities fraud against Mr. Rush in a number of respects.

### 1.    The Plaintiffs Improperly Rely on Group Pleading

Most of the statements identified in the Amended Complaint are attributed to large groups of defendants, sometimes (but not always) including Mr. Rush, with no attempt to identify who among the group was actually responsible for the contents of the statements.  See Am. Compl. ¶¶ 44, 45, 48, 50, 52-55, 140, 141,143-202, 221-23, 244, 254.  The plaintiffs use this blanket approach with respect to numerous kinds of statements, including press releases (¶¶ 45, 48, 50), annual reports (¶¶ 52-55, 244, 254), and financial reports to the SEC on Forms 10-Q and 10-K (¶¶ 141, 143-202, 257), never specifying which of the defendants was actually responsible for making these allegedly false statements, let alone identifying Mr. Rush as having made the statements.[6]

This use of "group pleading" by definition establishes that the Amended Complaint is fatally lacking in particularity.  Statements or omissions alleged to have been made by groups of defendants or the company as a whole cannot be attributed to Mr. Rush because the Reform Act requires specificity with regard to the allegations made against each individual defendant.  See 15 U.S.C. § 78u-4(b)(1) & (2).  Such group pleadings fail to allege the who, what, when, where, and how required by the Reform Act and Rule 9(b).

Prior to the enactment of the Reform Act, some courts recognized a group pleadings presumption, also known as the "group statements doctrine," in corporate fraud cases.  Under

---

[6] The plaintiffs also allege that certain other defendants made materially false statements in proxy solicitations and on Forms 4 filed with the SEC, see Am. Compl. ¶¶ 203-19, but the plaintiffs do not allege that Mr. Rush was responsible for or involved in any way with making these statements.

this presumption, any actions attributable to the company as a whole, such as press releases or annual reports, were presumed to be attributable to any of the officers or directors of the company.  See, e.g., Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir. 1987), superseded by statute as recognized in Hockey v. Medhekar, 30 F. Supp. 2d 1209, 1217 (N.D. Cal. 1998).  In recent years, however, numerous circuits and district courts, including this one, have found that the Reform Act's particularity requirements eradicated the group pleading presumption with regard to pleading scienter.  See, e.g., Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1018 (11th Cir. 2005); Southland Sec. Corp. v. Inspire Ins. Solutions, Inc., 365 F.3d 353, 365-66 (5th Cir. 2004); In re Fannie Mae, 503 F. Supp. 2d at 40; In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 17 (D.D.C. 2000).  In fact, in the recent Tellabs case, the Supreme Court noted the circuits' disagreement as to whether group pleading meets the pleading requirements of the Reform Act, and expressly refused to disturb the Seventh Circuit's holding that plaintiffs could not rely on the group pleading presumption.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2511 n.6 (2007).  The plaintiffs' broad, conclusory allegations against large groups of defendants are therefore insufficient to plead material misleading statements by Mr. Rush.

### 2. The Plaintiffs Fail To Specify How the One Statement Attributed Specifically to Mr. Rush Is False

In the sole instance where the Amended Complaint specifically identifies a statement that Mr. Rush made, the plaintiffs have failed to explain how or why that statement was misleading or false.  In Paragraph 107, the plaintiffs allege that Mr. Rush made a statement on May 11, 2006 in response to an analyst's question about a new accounting methodology that Sunrise had decided to implement:

> [The accounting methodology] has been available for a number of years.  And again, with the scrutiny that Paul [Klaassen] and Tom [Newell] mentioned earlier,

it came into consideration late in 2005. And when we took a look at it, we
thought we should look deeper.

Am. Compl. ¶ 222. But the plaintiffs never allege that this statement was false or in any way

misleading, much less the reasons why it was misleading. This allegation is therefore

insufficiently pled under the Reform Act to support a claim for securities fraud against Mr. Rush.

See 15 U.S.C. § 78u-4(b)(1) & (2).

### 3.    The Plaintiffs Fail to Plead Facts Sufficient To Create a "Strong Inference" of Scienter

Even if the Court were to find that the plaintiffs had adequately identified a false

statement attributable to Mr. Rush, their claim for securities fraud would still fail because they

have not pled facts sufficient to give rise to a strong inference of scienter. 15 U.S.C. 78u-4(b);

see Tellabs 127 S. Ct. at 2504. Specifically, the plaintiffs have failed to plead facts indicating

that Mr. Rush knew of or participated in the purported options backdating or accounting

manipulations at the time he made any statements attributable to him, or that he knew any

statements to be false as a result of these allegedly fraudulent schemes.

This shortcoming is particularly salient with respect to statements that the plaintiffs claim

were misleading as a result of the alleged options backdating scheme. As demonstrated above,

this scheme ceased, according to the plaintiffs' own allegations, more than a year before Mr.

Rush was hired by Sunrise, and more than three years before he was named Sunrise's CFO.

Accordingly, even with respect to the SEC filings that the plaintiffs allege Mr. Rush signed, or

the single statement that plaintiffs allege Mr. Rush made himself, the plaintiffs have failed to

allege facts sufficient to give rise to a "strong inference" that Mr. Rush acted with scienter as to

any inaccuracies in these filings or statements related to the supposed backdating scheme.

Indeed, patently absent from the Amended Complaint are any facts demonstrating that Mr. Rush

had any knowledge whatsoever of the alleged scheme that completely pre-dated his tenure at

Sunrise, let alone that he somehow committed fraud in connection with the alleged scheme.  The backdating allegations are therefore insufficient to support a claim of securities fraud against Mr. Rush.  See In re Openwave, 528 F. Supp. 2d at 251 (plaintiffs failed to plead scienter with respect to CFO who signed SEC filings, but whose tenure pre-dated alleged backdating scheme and who was not alleged to have received backdated options); In re Verisign, 531 F. Supp 2d. at 1207 (plaintiffs failed to plead defendants' knowledge of backdating scheme where complaint cited "not a single fact showing what each defendant knew, when he/she knew it, or how he/she acquired that knowledge").

The plaintiffs also contend that the defendants, including Mr. Rush, knew that many of the financial filings and press releases identified in the Amended Complaint were materially false and misleading as a result of inaccuracies in Sunrise's accounting for joint venture profits and sales on the gain of real estate.  Of these filings and press releases, the only example that the plaintiffs make any attempt to tie to Mr. Rush individually is Sunrise's 2005 10-K, which the plaintiffs allege overstated Sunrise's earnings and which Mr. Rush signed.  See Am. Compl. ¶¶ 198-202.  Yet the plaintiffs do not allege when or how Mr. Rush became aware of, much less participated in, the purported accounting manipulations that rendered these statements inaccurate, and thus fail to create any inference that Mr. Rush acted with the intent to defraud at the time he signed Sunrise's 2005 10-K.  See In re Verisign, 531 F. Supp. 2d at 1207.  Moreover, having failed to plead any facts about when and how Mr. Rush became aware of the purported accounting manipulations, the plaintiffs cannot clear the high hurdle imposed by the Supreme Court in Tellabs, which requires particularized allegations sufficient to create an inference of fraudulent intent that is "at least as compelling as any opposing inference of nonfraudulent intent."  127 S. Ct. at 2504; see also Kushner v. Beverly Enterprises, Inc., 317 F. 3d 820, 827 (8th

Cir. 2003) (plaintiffs failed to plead scienter with requisite particularity by failing to make "allegations of particular facts demonstrating how the defendants knew of the [allegedly fraudulent] scheme at the time they made their statements"). Indeed, the plaintiffs' own chronology of events demonstrates that within a year of Mr. Rush taking over as CFO, Sunrise decided to restate its historical financial statements for a period that almost completely pre-dated Mr. Rush's tenure as CFO, and which pre-dated, in significant part, his employment by the company. This series of events as well as the plaintiffs' acknowledgment that Mr. Rush was pressured by others to complete the restatement, is actually consistent with an inference of nonfraudulent intent on Mr. Rush's part. See Am. Compl. ¶¶ 32, 220-226.

Tellingly, the plaintiffs' scienter allegations never amount to more than bare conclusions unsupported by particularized facts. For instance, the plaintiffs allege that the defendants were "forced" to make public announcements regarding Sunrise's accounting review and restatement, but never specify how or why they were "forced" into making these announcements or who "forced" them to do so. See Am. Compl. ¶¶ 57, 221, 226. In reality, of course, it is the plaintiffs who have been "forced" to make merely this groundless allegation in order to disguise the unhelpful fact that their allegations of accounting manipulations are based entirely on Sunrise's own public disclosures. Likewise, the plaintiffs baldly allege that defendants, including Mr. Rush, "cheated," engaged in "contrivances and manipulations," and acted "knowingly," "intentionally," and "recklessly." See, e.g., id. ¶¶ 6, 56-57, 198, 317, 319. Yet the plaintiffs never specify the facts on which these conclusory allegations are based as to any of the defendants, much less Mr. Rush specifically. These are precisely the kinds of baseless, non-particularized scienter allegations that are insufficient to support a fraud claim under the Reform Act. See Burman v. Phoenix Worldwide Indus., 384 F. Supp. 2d 316, 334 (D.D.C. 2005)

(Walton, J.) (allegation that defendants acted "knowingly and with intent to deceive" was "nothing more than a conclusory allegation" insufficient to support a claim for securities fraud).

In fact, this is precisely the kind of case that the Reform Act was intended to weed out. As with the meritless shareholder actions that led Congress to pass the Reform Act, this case arises out of Sunrise's voluntary announcement of "bad news," its acknowledgement of errors in its historical financial statements, and an attendant, temporary dip in its share price. See S. Rep. No. 104-98 at 4 (1995), as reprinted in 1995 U.S.C.C.A.N. 679, 683; H.R. Rep. No. 104-369 (1995) (Conf. Rep.), as reprinted in 1995 U.S.C.C.A.N. 730, 730-31. The plaintiffs, and their attorneys, have seized upon these uncontested facts — all of which are perfectly consistent with an inference of good faith — and supplied an additional ingredient in an effort to cook up a securities fraud claim, specifically, an allegation that the errors in Sunrise's accounting occurred as the result of deliberate, fraudulent action by the defendants. Unfortunately for the plaintiffs, these baseless allegations fall far short of the Reform Act's requirement of particularized allegations sufficient to raise a "strong inference" of scienter, and are insufficient to support a claim of securities fraud against Mr. Rush. See In re Verisign, 531 F. Supp. 2d at 1207 ("[T]he mere fact that a corporation restates its financial statements does not give rise to a strong inference that any individual defendant acted with intent to defraud."); In re Cable & Wireless, PLC Sec. Litig., 321 F. Supp. 2d 749, 772 (E.D. Va. 2004) ("The Court holds that Plaintiffs' allegations of Defendants GAAP violations, standing alone, is insufficient to establish scienter. Courts have held that GAAP violations, standing alone, are insufficient to establish the strong inference of scienter as required by the PSLRA."); In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 634-35 (E.D. Va. 2000) ("[T]he fact that a restatement of financials occurred is not sufficient to raise a strong inference of scienter, for it is settled that scienter requires more than a

misapplication of accounting principles, and mere allegations that statements made in one report should have been made in earlier reports do not make out a claim of securities fraud.").

For the foregoing reasons, the plaintiffs' securities fraud claim against Mr. Rush should be dismissed for failure to state a claim.

## II.    THE PLAINTIFFS' STATE LAW CLAIMS AGAINST MR. RUSH MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM (COUNTS IV, V, VI, & XI)

In addition to the securities fraud claim set forth in Count I of the Amended Complaint, the plaintiffs assert four state law causes of action against Mr. Rush in Counts IV, V, VI, & XI. As explained below, each of these claims must be dismissed for failure to state a claim.

### A.    The Plaintiffs Fail To State a Claim Against Mr. Rush for an Accounting (Count IV)

Count IV of the Amended Complaint attempts to state a claim for "an accounting" against Mr. Rush and certain other defendants. This claim must be dismissed for two reasons. First, an accounting is not a cause of action; it is an equitable remedy available only if the plaintiffs prevail on their other causes of action. See Rhodes v. Silkroad Equity, LLC, No. 2133-VCN, 2007 Del. Ch. LEXIS 96, at *43 (Del. Ch. July 11, 2007).[7] Because the plaintiffs' other causes of action must be dismissed, their "claim" for an accounting must also be dismissed. See id.

Second, Mr. Rush would not be able to provide the relief that the plaintiffs seek even if the Court were to find that an accounting is warranted. An accounting is an equitable remedy requiring the defendant to render "a detailed statement of the debits and credits between [the] parties arising out of a contract or a fiduciary relation." See Bates v. Northwestern Human Servs., 466 F. Supp. 2d 69, 103-04 (D.D.C. 2006). The purpose of an accounting is to ascertain whether and in what amount the defendant may hold money or property belonging to the

---

[7] All unpubhlished decisions are attached as Exhibit A.

plaintiff, and is available only where plaintiff claims that the defendant has "exclusive control" over the records necessary to make the accounting.  See id. at 104.  Here, there is no allegation that Mr. Rush, whom the plaintiffs admit is no longer employed by Sunrise, see Am. Comp. ¶ 32, has possession at all, let alone "exclusive control," over any property belonging to the plaintiffs. This is particularly so in light of the fact that Mr. Rush is not alleged to have received any backdated stock options, which is the sole basis for the plaintiffs' accounting claim.  See Am. Compl. ¶¶ 332, 335.  The accounting claim must therefore be dismissed as to Mr. Rush.

    **B.**    **The Plaintiffs Fail To State a Claim Against Mr. Rush for Breach of Fiduciary/Aiding and Abetting Related to Stock Option Backdating (Count V)**

In Count V, the plaintiffs claim that the defendants, including Mr. Rush, "breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct."  Am. Compl. ¶ 338.

Where breach of fiduciary claims are based on alleged fraudulent conduct, they must be pled with particularity, as dictated by Federal Rule of Civil Procedure 9(b).  See Lewis v. Ward, C.A. No. 15255, 2003 WL 22461894 at *4 (Del. Ch. Oct. 29, 2003).  Further, to plead a claim of breach of fiduciary duty, a plaintiff must allege facts that demonstrate an officer defendant had "discretionary authority over, and the power to prevent, the complained of transactions."  In re Verestar, Inc., 343 B.R. 444, 474 (Bankr. S.D.N.Y. 2006).  Finally, the plaintiffs must allege facts that support an inference that the officer was at least "grossly negligent" and performed his duties with "a devil-may-care attitude or indifference to duty amounting to recklessness."  Albert v. Alex Brown Mgmt. Servs. Inc., Nos. 762-N, 763-N, 2005 WL 2130607 at *4 (Del. Ch. Aug. 26, 2005).  The required inference of "gross negligence" is similar to the scienter requirement under the Reform Act.  See Trenwick Am. Litig. Trust v. Ernst & Young L.L.P., 906 A.2d 168,

207-08 (Del. Ch. 2006), <u>aff'd sub nom</u>, <u>Trenwick Am. Litig. Trust v. Billett</u>, No. 495, 2007 WL 2317768 (Del. Aug. 14, 2007).  Here, the plaintiffs' allegation that Mr. Rush breached his fiduciary duties by participating in the alleged options backdating scheme fails each of these tests.

As explained in detail above, the plaintiffs admit that Mr. Rush was not even employed by Sunrise until over a year after the last instance of allegedly fraudulent backdating, and that he did not serve as Sunrise's CFO until over three years after the last instance of fraudulent backdating.  The plaintiffs have thus failed to allege that Mr. Rush had "discretionary authority over, and the power to prevent, the complained of transactions."  <u>In re Verestar</u>, 343 B.R. at 474.  The plaintiffs have also failed to allege, in anything other than the most conclusory fashion, that Mr. Rush somehow participated in a scheme involving the alleged backdating, or that he would have had any motive to do so in light of the plaintiffs' admission that he never received any backdated options.  The plaintiffs have thus failed to allege facts supporting an inference that Mr. Rush was at least "grossly negligent" in carrying out his duties.  <u>Albert</u>, 2005 WL 2130607 at *4.  Given these critical defects in the plaintiffs' allegations, their claim against Mr. Rush for breach of fiduciary duty based on the alleged backdating scheme must be dismissed for failure to state a claim.

### C.    The Plaintiffs Fail To State a Claim Against Mr. Rush for Breach of Fiduciary/Aiding and Abetting Related to Improper Accounting Manipulations (Count VI)

In Count VI, the plaintiffs claim that the defendants, including Mr. Rush, "breached their fiduciary duties by, among other things, engaging in numerous accounting manipulations that portrayed an inaccurate account of Sunrise's financial condition."  Am. Compl. ¶ 344.

Here, the plaintiffs' attempt to state a claim fails because the facts alleged in the Amended Complaint fail to support an inference that Mr. Rush acted in a manner that was

"grossly negligent." <u>Albert,</u> 2005 WL 2130607 at *4. Indeed, the plaintiffs' allegations, when stripped of unsupported allegations of bad faith, demonstrate that within a year of Mr. Rush taking over as CFO, Sunrise decided to restate its historical financial statements for a period that almost completely pre-dated Mr. Rush's tenure as CFO, and which pre-dated in significant part his employment by the company. This series of events is hardly sufficient to give rise to an inference that Mr. Rush acted with "a devil-may-care attitude or indifference to duty amounting to recklessness." <u>Albert</u>, 2005 WL 2130607 at *4. Finally, the plaintiffs' blanket allegation that a group of seventeen defendants participated in this scheme to manipulate Sunrise's accounting manifestly fails to sufficiently specify the "who, what, when, where, and how" of each defendant's participation in the alleged manipulations. <u>Vess v. Ciba-Geigy Corp.,</u> 317 F.3d 1097, 1106 (9th Cir. 2003). Given these critical defects in the plaintiffs' allegations, their claim against Mr. Rush for breach of fiduciary duty based on the alleged accounting manipulations must be dismissed for failure to state a claim.

### D. The Plaintiffs Fail To State a Claim Against Mr. Rush for Insider Selling and Misappropriation of Information (Count XI)

In Count XI, plaintiffs allege certain defendants, including Mr. Rush, engaged in insider trading. Although the plaintiffs fail to allege the basis for their insider trading claim, their conclusory and speculative allegations fail under any theory of insider trading. Count XI must be dismissed as against Mr. Rush.

First, the plaintiffs fail to allege an implied private cause of action for insider trading.[8] To state an implied claim for securities fraud under Section 10(b) and Rule 10b5, the plaintiffs must

---

[8] Prior to 1988, courts recognized "implied" private causes of action that were judicially recognized, and not statutory. <u>See, e.g.</u>, <u>Laventhall v. Gen. Dynamics Corp.</u>, 704 F.2d 407, 414 (8th Cir. 1983). The Insider Trading and Securities Fraud Enforcement Act of 1988, Pub. L. 100-704, 102 Stat. 4677 (1988), added Section 20A to the Securities Exchange Act of 1934, and

begin by alleging the five key elements of a 10(b) violation.  These elements are traditionally

stated as:  (1) a misstatement or omission; (2) of material fact; (3) made with scienter; (4) on

which plaintiff relied; and (5) that proximately caused plaintiff's injury.  See, e.g., R2 Invs. LDC

v. Phillips, 401 F.3d 638, 641 (5th Cir. 2005).  The plaintiffs must also show that the defendant's

actions were taken "in connection with" the purchase or sale of securities.  See, e.g., United

States v. Falcone, 257 F.3d 226, 229 (2d Cir. 2001).  Here, the plaintiffs fail to state a claim for

insider trading against Mr. Rush under Rule 10b-5 because, as demonstrated above, the plaintiffs

have failed to properly allege a material misstatement or omission made with scienter that

satisfies the Reform Act's pleading requirements.  Moreover, the plaintiffs have failed to

sufficiently plead the nature of material insider information that Mr. Rush was allegedly aware of

and how such information motivated his sale of securities.

Second, the plaintiffs fare no better at alleging a claim of insider trading pursuant to

Section 20A of the Securities Exchange Act of 1934 for two reasons.  First, to state a claim under

Section 20A, plaintiffs must plead a predicate violation of the federal securities law.  See, e.g.,

Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703 (2d Cir. 1994) ("The

language of the statute is thus quite plain that to state a claim under Section 20A, a plaintiff must

plead a predicate violation of the '34 Act or its rules and regulations.").  Further, the plaintiffs

must plead the predicate violation according to the heightened pleading requirements of the

Reform Act.  See 15 U.S.C. § 78u-4(b) (the PSLRA applies in "any private action arising under

---

thereby created the first statutory, private cause of action for insider trading.  See 15 U.S.C. §
78t-1.  Section 20A left intact the previously existing "implied" causes of action for insider
trading.  See 15 U.S.C. § 78t-1(d).  As demonstrated herein, plaintiffs have failed to allege either
an implied cause of action for insider trading or a Section 20A insider trading claim.

this chapter.").[9]  As discussed above, the plaintiffs have failed to plead a predicate violation of

Rule 10b-5 or Section 10(b) of the Securities Act with particularity as to Mr. Rush, and thus fail

to state a claim for insider trading under Section 20A.

       In addition, a claim of insider trading under Section 20A requires a showing that the

plaintiff bought or sold securities contemporaneously with the defendant.  See 15 U.S.C. § 78t-1.

Courts have construed this requirement strictly.  Alfus v. Pyramid Tech. Corp., 745 F. Supp.

1511, 1522 (N.D. Cal. 1990).  While courts have disagreed on the precise cut-off point for

satisfying the contemporaneous requirement, compare, e.g., Backman v. Polaroid Corp., 540 F.

Supp. 667, 671 (D. Mass. 1982) (two business days later not contemporaneous) with In re

Oxford Health Plan Sec. Litig., 187 F.R.D. 133, 144 (S.D.N.Y. 1999) ("Five trading days is a

reasonable period between the insider's sales and the plaintiff's purchase to be considered

contemporaneous . . ."), a gap of weeks or a month will not satisfy the contemporaneous

requirement, see, e.g., In re Verifone Sec. Litig., 784 F. Supp. 1471, 1489 (N.D. Cal. 1992), aff'd

11 F.3d 865 (9th Cir. 1993) (trades fourteen days or more apart not contemporaneous); Wilson v.

Comtech Telecommunications Corp., 648 F.2d 88, 95 (2d Cir. 1981) (one month later not

contemporaneous).  In the Amended Complaint, the plaintiffs failed to allege on what dates

either they or the company purchased Sunrise stock that would entitle them to a finding that such

purchases were contemporaneous with Mr. Rush's sales of stock between September 8, 2005 and

September 12, 2005.  Thus, the plaintiffs fail to state a claim for insider trading against defendant

Mr. Rush under Section 20A.

---

[9] "This chapter" is Chapter 2B of Title 15 § 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) is included within Chapter 2B.

Third, an insider trading claim pursuant to Rule 14e-3 of the Securities Exchange Act similarly fails because the plaintiffs have not alleged a contemporaneous purchase or sale of securities. While Rule 14e-3 does not explicitly incorporate the contemporaneous language of Section 20A, courts have held that the contemporaneous sale requirement applies nonetheless. See Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1005 (9th Cir. 2002).

Finally, plaintiffs have failed to allege a state law claim of insider trading. To bring a state law claim for insider trading, plaintiffs must show that "1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." In re Oracle Corp. Derivative Litig., 867 A.2d 904, 934 (Del. Ch. 2004), aff'd 872 A.2d 960 (Del. 2005). Here, the plaintiffs have stated in only conclusory fashion that Mr. Rush possessed material, non-public information without specifying what insider information defendant Rush possessed. Further, they have failed to specifically allege how Mr. Rush's sale of securities was motivated "by the substance of that information." Plaintiffs have thus failed to plead a state law claim of insider trading.

For the foregoing reasons, Count XI must be dismissed as to Mr. Rush because plaintiffs fail to state a claim of insider trading under any possible theory.

## III.    THE PLAINTIFFS' STATE LAW CLAIMS AGAINST MR. RUSH MUST BE DISMISSED FOR LACK OF PENDENT SUBJECT MATTER JURISDICTION (COUNTS IV, V, VI, & XI)

The plaintiffs' remaining state law claims against Mr. Rush should also be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because if this Court dismisses the securities fraud claim against Mr. Rush, it no longer has subject matter jurisdiction over any of the other claims against Mr. Rush. With the dismissal of the federal claim, the plaintiffs cannot bring their case against Mr. Rush in this Court pursuant to federal question subject matter

jurisdiction. By extension, this Court does not have pendent jurisdiction over plaintiffs' state law claims. See, e.g., United Mine Workers v. Gibbs, 383 U.S. 715, 725-26, 86 S. Ct. 1130, 1138-39 (1966). As such, plaintiffs' state law claims should likewise be dismissed. See Meng v. Schwartz, 116 F. Supp. 2d 92, 97 (D.D.C. 2000).

## IV. THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO MAKE A PRIMA FACIE SHOWING THAT THIS COURT HAS PERSONAL JURISDICTION OVER MR. RUSH

The plaintiffs' securities fraud claim against Mr. Rush must be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure because the plaintiffs have failed to make a prima facie showing that the Court has personal jurisdiction over Mr. Rush pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa). The plaintiffs' state law claims against Mr. Rush must also be dismissed because there is no basis for the Court to exercise pendent personal jurisdiction over Mr. Rush once the securities fraud claim is dismissed.

### A. Plaintiffs' Burden and Standard of Review

To survive a pre-discovery motion to dismiss for lack of personal jurisdiction, the plaintiff must plead facts that, if true, would establish that the Court has personal jurisdiction over the defendant. See Edmond v. U.S. Postal Serv. Gen. Counsel, 949 F.2d 415, 424 (D.C. Cir. 1991). In order to make this prima facie showing, the plaintiff "must allege specific facts on which personal jurisdiction can be based; [they] cannot rely on conclusory allegations." Burman v. Phoenix Worldwide Indus., Inc., 437 F. Supp. 2d 142, 147 (D.D.C. 2006) (Walton, J). Moreover, the plaintiff must make sufficient jurisdictional allegations as to each defendant individually. The plaintiff "cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant." Id. This requirement of specific and individualized pleading is especially important where the plaintiff has sued both a corporation and its officers individually, because this Court has expressly held

that a corporation's jurisdictional contacts cannot be imputed to its officers for the purpose of

establishing personal jurisdiction over the officers.  See In re Baan Co. Secs. Litig., 245 F. Supp.

2d 117, 127-131 (D.D.C. 2003); Wiggins v. Equifax, Inc., 853 F. Supp. 500, 503 (D.D.C. 1994);

Quinto v. Legal Times, 506 F. Supp. 554, 558 (D.D.C. 1981).

Here, the Court must dismiss the plaintiffs' claims against Mr. Rush because the plaintiffs

have failed to plead any specific facts about Mr. Rush that, if true, would establish that the Court

has personal jurisdiction over him.

**B.     The Plaintiffs Have Failed To Plead Facts Showing That The Court Has Personal Jurisdiction Over Mr. Rush With Respect To The Securities Fraud Claim (Count I)**

For this Court to assert personal jurisdiction over Mr. Rush with respect to the securities

fraud claim, the exercise of jurisdiction must be permissible under Section 27 of the Exchange

Act (15 U.S.C. § 78aa).  This Court has repeatedly held that personal jurisdiction may be

asserted over a defendant pursuant to Section 27 of the Exchange Act only if venue is proper in

the district in which the case is brought.  See Poling v. Farrah, 131 F. Supp. 2d 191, 192-93

(D.D.C. 2001); Martin & Assocs. v. Malouf, No. 03-1281, 2006 U.S. Dist. LEXIS 6863, at *6 n.

3 (D.D.C. Feb. 6, 2006); In re Baan Co., 245 F. Supp. 2d at 126 n. 10.  Pursuant to the venue

provisions of Section 27, venue is proper only in a judicial district where an "act or transaction

constituting the violation occurred" or in a judicial district where the defendant "is found or is an

inhabitant or transacts business."  15 U.S.C. § 78aa.

Here, the plaintiffs have not pled any specific facts to support venue in this judicial

district.  Notably, the plaintiffs have completely failed to allege:  (1) that Mr. Rush committed

any act in this district constituting a violation of the Exchange Act; (2) that Mr. Rush is an

inhabitant of this district or is "found" here; or (3) that Mr. Rush transacts any business in this

district.  In the absence of any such specific allegations, this Court must dismiss the plaintiffs'

securities fraud claim for lack of venue and personal jurisdiction over Mr. Rush.[10]

The plaintiffs' <u>only</u> allegations regarding venue are set forth in Paragraph 13 of the

Complaint, which states in its entirety:

> Venue is proper in this district because a substantial portion of the
> transactions and wrong complained of herein, including the defendants'
> primary participation in the wrongful acts detailed herein, occurred in this
> district.  One of more of the defendants either resides in or maintains
> executive offices in this district, and defendants have received substantial
> compensation in this district by engaging in numerous activities and
> conducting business here, which had an effect in this district.

Compl. ¶ 13.  Paragraph 13 is insufficient to support the exercise of personal jurisdiction over

Mr. Rush for two specific reasons.  First, paragraph 13's vague, blanket allegations fail to

identify any "specific facts" that, if true, would support the exercise of jurisdiction.  <u>See</u> <u>Burman</u>,

437 F. Supp. 2d at 147.  Second, paragraph 13 fails to make any allegations about Mr. Rush

individually, but instead attempts to "aggregate factual allegations concerning multiple

defendants in order to demonstrate personal jurisdiction over any individual defendant."  <u>Id.</u>  The

allegations in paragraph 13 — which are the only allegations in the entire complaint pertinent to

the court's jurisdictional analysis — are thus insufficiently specific or individualized to satisfy

the plaintiffs' burden of showing that the Court has personal jurisdiction over Mr. Rush with

respect to the securities fraud claim.

---

[10] The plaintiffs' failure to make such allegations is no mere accident or oversight.  Mr.
Rush, a Virginia resident, never transacted business or made public statements on Sunrise's
behalf in the District of Columbia, is not an inhabitant of the District of Columbia, and is not
"found" in the District of Columbia.

**C.     The Plaintiffs' State Law Claims Against Mr. Rush Must Also Be Dismissed For Lack Of Pendent Personal Jurisdiction (Counts IV, V, VI, & XI)**

Pursuant to the doctrine of pendent personal jurisdiction, this Court would be able to exercise personal jurisdiction over Mr. Rush as to the plaintiffs' state law claims provided that the Court were also able to assert personal jurisdiction over Mr. Rush with respect to the securities fraud claim pursuant to Section 27 of the Exchange Act. Poling, 131 F. Supp. 2d at 194 (quoting IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056-57 (2d Cir. 1993)); see also Oetiker v. Jurid Werke G.m.b.H., 556 F.2d 1, 4-5 (D.C. Cir. 1977) (recognizing doctrine).[11] As demonstrated above, however, the Court does not have personal jurisdiction over Mr. Rush with respect to the securities fraud claim, and is therefore unable to exercise pendent personal jurisdiction over Mr. Rush with respect to the plaintiffs' state law claims. The state law claims must therefore be dismissed. See United States v. Botefuhr, 309 F.3d 1263, 1273-74 (10th Cir. 2002) (district court abused discretion by exercising pendent personal jurisdiction over pendent claims after "anchor" claim was dismissed); Olin Corp. v. Fisons PLC, 47 F. Supp. 2d 151, 155 (D. Mass. 1999) (where the court dismisses only claim as to which personal jurisdiction exists, it must dismiss pendent claims as well).

<u>**CONCLUSION**</u>

For all the foregoing reasons, plaintiffs' Amended Complaint should be dismissed with prejudice.

---

[11] The doctrine of pendent personal jurisdiction is distinct from the doctrine of pendent subject matter jurisdiction, which is addressed supra Part III.

Dated:  June 16, 2008

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD, LLP


/s/ Elizabeth C. Peterson
John M. Dowd (DC Bar 003525)
Jeffrey M. King (DC Bar 461644)
Elizabeth C. Peterson (DC Bar 460259)
James E. Sherry (DC Bar 500797)
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036

# Exhibit A

LEXSEE 2007 DEL. CH. LEXIS 96



Analysis
As of: Jun 16, 2008

**WILLIAM A. RHODES, III, and WIJNANT VAN DE GROEP, individually and derivatively, Plaintiffs, v. SILKROAD EQUITY, LLC, ANDREW J. FILIPOWSKI, MATTHEW G. ROSZAK, SILKROAD INTERACT HOLDING COMPANY and COLOSSUS, INCORPORATED d/b/a INTERACT PUBLIC SAFETY SYSTEMS, Defendants.**

**C.A. No. 2133-VCN**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2007 Del. Ch. LEXIS 96*

**April 5, 2007, Submitted**
**July 11, 2007, Decided**

**NOTICE:**

THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**PRIOR HISTORY:** *Rhodes v. SilkRoad Equity, LLC, 2007 Del. Ch. LEXIS 20 (Del. Ch., Jan. 29, 2007)*

**COUNSEL:** [*1] Alan J. Stone, Esquire, Mark S. Hurd, Esquire, and Kevin M. Coen, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, Attorneys for Plaintiffs.

Christian Douglas Wright, Esquire and D. Fon Muttamara-Walker, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Harvey J. Barnett, Esquire and Mitchell H. Macknin, Esquire of Sperling & Slater, P.C., Chicago, Illinois, Attorneys for Defendants.

**JUDGES:** NOBLE, Vice Chancellor

**OPINION BY:** NOBLE

**OPINION**

**MEMORANDUM OPINION**

NOBLE, Vice Chancellor

**I. INTRODUCTION**

An investment entity engaged in conduct that caused a software development firm's change in control and, eventually, a complete transfer of ownership to the investment entity. The software development firm's two original--and, at one time, only--shareholders complain that when the investment entity became the firm's senior creditor, it pursued a course of conduct to pressure the firm to agree to give the investment entity an 80% stake in the firm in exchange for, among other things, the restructuring of certain loan obligations. The firm reluctantly consented to such a deal. Accordingly, the firm and its two sole shareholders entered into an acquisition agreement with the investment [*2] entity. As structured, the firm was owned entirely by a holding company, with 80% of the interests in that holding company held by the investment entity and 20% held collectively by the firm's two original shareholders. The parties also entered into a stockholders agreement. That agreement provided the holding company and the investment entity with a repurchase option right should the original shareholders be removed as directors of the holding company.

In this action, the firm's two original shareholders allege that, soon after the execution of these agreements, the investment entity--and the two principals behind the investment entity--initiated a scheme to depress the value of the firm so as to later acquire it at a bargain. The alleged acts in furtherance of this scheme include loading employees of the investment entity onto the firm's

payroll and causing the firm to pay the many personal expenses of the investment entity's two principals. The investment entity would later demand that the firm's two original shareholders agree to a deal in which they would give the investment entity $ 3 of preferred shares in the holding company for every $ 1 that the firm had borrowed. The original  [*3] shareholders balked and eventually brought suit in this forum. The investment entity later caused the termination of the two original shareholders from their positions at the firm and exercised the option to purchase their shares. Shortly thereafter, in meetings with firm employees, one of the investment entity's principals stated that one of the firm's original shareholders had written a firm check to himself, perhaps intimating that it had been done improperly.

The two original shareholders in the software development firm bring suit against the holding company, the investment entity and its principals and, as nominal defendants, the software development firm. They allege causes of action based on breach of fiduciary duty, breach of contract, breach of a North Carolina consumer protection statute, and slander per se, and also seek an accounting. Before the Court is a motion to dismiss.

## II. BACKGROUND
[1]

> 1   The Background is drawn from the Amended Verified Complaint (the "Complaint").

Plaintiffs William A. Rhodes, III ("Rhodes") and Wijnant van de Groep ("van de Groep"), a son-in-law of Rhodes, are former directors, officers, and shareholders of Colossus, Incorporated, which did business  [*4] as InterAct Public Safety Systems ("InterAct" or "the Company"), a North Carolina software development corporation now solely owned by Defendant SilkRoad InterAct Holding Company ("SilkRoad Holding"). [2] Founded in 1975, InterAct manufactures, sells, and supports a range of public safety and homeland security products for use in "911," police, fire, and other public safety dispatch centers. For more than twenty years, the Company introduced an array of successful products. InterAct's fortunes became even brighter in 1999 when it teamed up with BellSouth, a chief competitor at the time, to distribute integrated workstation equipment. The move paid off handsomely. InterAct's revenue soared from roughly $ 7 million in 1999 to $ 30 million in 2003.

> 2   SilkRoad Holding is a Delaware corporation now wholly owned by Defendant SilkRoad Equity, a Delaware limited liability company.

To finance the shift in product mix and the new manufacturing demands that came with it, InterAct sought extra working capital and obtained a traditional bank loan of $ 5.2 million. In 2003, however, InterAct's lender was acquired and its new lender, Capital Bank, became impatient. It demanded two things: repayment in [*5] full by InterAct and personal guarantees by Rhodes, van de Groep, and their spouses. As pressure mounted on InterAct to pay off the loan, Rhodes and van de Groep looked for outside equity investors. The equity firm they selected required InterAct to take on a "seasoned CEO" as one of the conditions of its investment. But when the equity firm's pick pulled out at the last minute, so did the equity firm. Rhodes and van de Groep would eventually come to deal with two individuals: Defendants Andrew J. Filipowski ("Filipowski") and Matthew G. Roszak ("Roszak"). The Plaintiffs' control over InterAct--as its only shareholders and directors--would soon change.

Filipowski learned of InterAct's predicament from a senior partner at the equity firm that had originally planned to invest in InterAct. Shortly thereafter, and without notifying either Rhodes or van de Groep, Filipowski, acting through his company, SilkRoad Equity, LLC ("SilkRoad Equity"), [3] bought the InterAct loan with its personal guarantees from Capital Bank. [4] For InterAct, the practical significance of this transaction was that SilkRoad Equity had become its primary creditor. According to the Complaint, Filipowski and Roszak (i.e.,  [*6] SilkRoad Equity) used this development to their advantage, pressuring Rhodes and van de Group to agree to transactions by which InterAct would eventually become a wholly-owned subsidiary of SilkRoad Holding.

> 3   Filipowski and Roszak own majority and minority equity interests, respectively, in SilkRoad Equity, although their exact allocation is not alleged.
>
> 4   SilkRoad Equity purchased the loan for $ 4.2 million, at a million dollar discount from the balance owed.

In October 2004, SilkRoad Equity acquired 80% of the equity in InterAct--with Rhodes and van de Groep retaining 12% and 8%, respectively--in exchange for a senior note not to exceed $ 10 million. [5] In December of that year, the parties also entered into a stockholders agreement (the "Stockholders Agreement"). Under the agreement, InterAct's board would have seven members: Rhodes, van de Groep, and five designees of SilkRoad Equity. Rhodes and van de Groep's seats, however, were conditioned on their employment with InterAct. [6] The agreement also provided SilkRoad Holding and SilkRoad Equity with options to purchase Rhodes and van de

2007 Del. Ch. LEXIS 96, *

Groep's shares for "fair market value" if they were to be removed as directors. [7]

> 5   The note included [*7] the $ 5.2 million face value of the loan that SilkRoad Equity had acquired.
>
> 6   On December 20, 2004, at the time the Stockholders Agreement was executed, Rhodes and van de Groep also entered into employment agreements with InterAct whereby Rhodes would serve as Executive Vice Chairman and van de Group as President. Filipowski became InterAct's new Executive Chairman and Chief Executive Officer, and Roszak became the Chief Financial Officer.
>
> 7   Under the Stockholders Agreement, "fair market value" was to be determined by SilkRoad Holding's board. If the director refused to tender his shares, they would be deemed transferred under the agreement.

Rhodes and van de Groep bring this suit against the SilkRoad-related entities, InterAct, and both Filipowski and Roszak. [8] They allege that almost immediately after SilkRoad Equity gained a majority stake (80%) in InterAct, Filipowski and Roszak embarked upon a scheme to depress the value of the Company in order to purchase Rhodes and van de Groep's remaining shares at a significant discount.

> 8   Although the Plaintiffs make clear in their briefing that they are not seeking to assert derivative claims, their caption title in this action states that they [*8] are bringing suit both "individually and derivatively."

By way of example, they point out that Filipowski and Rhodes added more than a dozen SilkRoad Equity employees to InterAct's payroll within the first few months of 2005. Contributing little or no economic benefit to InterAct, these employees cost the Company more than $ 5 million in salaries and other expenses. The Plaintiffs also cite SilkRoad Equity's acquisition of TrueSentry, an entity owned by SilkRoad Equity, as evidence of the Defendants' self-dealing, not least of all because numerous TrueSentry employees were shifted to InterAct's payroll.

A common theme running through the Complaint is that Filipowski and Roszak excluded the Plaintiffs from key decisions concerning the Company, while at the same time running the Company from afar and only occasionally descending upon Asheville, North Carolina, the Company's principal place of business. The Plaintiffs allege that they were denied a say in critical decisions involving InterAct, such as the Company's development of a "next generation product" with other SilkRoad

Equity portfolio companies and its taking on of new debt obligations, among other reasons, to pay down certain [*9] InterAct's loans from SilkRoad Equity and finance management fees to SilkRoad Equity. They allege that Filipowski and Roszak denied them access to Inter Act's accounting system and to information on licenses held by the Company. Furthermore, the Plaintiffs allege that Filipowski and Roszak caused InterAct not only to pay themselves exorbitant consulting fees and extremely generous severance packages but also to cover an expanding array of personal travel and entertainment expenses.

By February 2006, SilkRoad Equity had requested that Rhodes and van de Groep agree to a deal whereby $ 3 of preferred InterAct shares would be issued to SilkRoad Equity for every dollar that had been borrowed by InterAct. Filipowski and Roszak were not coy as to how much they wanted Rhodes and van de Groep to agree to the terms. They would exert pressure on the Plaintiffs by refusing to pay quarterly interest and principal repayment on one of InterAct's more onerous loans, a loan through the Bank of Asheville guaranteed personally by Rhodes; refusing to pay InterAct's federal payroll taxes; and withholding funds earmarked for employees' 401(k) accounts. Rhodes and van de Groep were given until May 5, 2006, [*10] to agree to the deal. On that day, however, they chose instead to bring an action before this Court. Three days later, they were fired. [9]

> 9   Rhodes and van de Groep's status as directors was also apparently terminated on May 12, 2006, although they maintain that they never received "prompt" notice of such removal as required by *Section 228* of the Delaware General Corporation Law.

Following the terminations, the Defendants exercised their option under the Stockholders Agreement to buy the Plaintiffs' shares. The Plaintiffs received $ 1,516 million, which they consider inadequate and a product of a flawed valuation effort by Houlihan, Lokey, Howard & Zukin ("Houlihan"), SilkRoad Holding's financial advisor. They also allege that Filipowski explained during meetings with more than 200 InterAct employees that van de Groep, acting through InterAct, had written a $ 50,000 check to himself.

## III. CONTENTIONS

Rhodes and van de Groep's seven-count Complaint alleges direct causes of action for breach of fiduciary duty, breach of contract, violation of North Carolina trade practices law, slander per se, and conduct by Filipowski and Roszak meriting an accounting of InterAct.

In Count One and Count Four, [*11] the Plaintiffs allege that the Defendants breached their fiduciary duties by engaging in self-dealing transactions (e.g., loading SilkRoad Equity employees onto InterAct's payroll, using InterAct funds for personal expenses of Filipowski and Rhodes, causing SilkRoad Holding to acquire TrueSentry) designed to cripple InterAct, depress the Plaintiffs' stake in the Company, and enable the Defendants to acquire it cheaply. Count Two and Count Three concern breach of oral and written contracts. The Plaintiffs allege that the Defendants disregarded an oral assurance the Defendants gave them at the time SilkRoad Equity became an investor in InterAct, specifically that they would direct excess cash flow to certain loans that the Plaintiffs had personally guaranteed payment. The Plaintiffs also allege that the Defendants breached an obligation under the Stockholders Agreement to purchase their shares in SilkRoad Holding at "fair market value." In Count Five, the Plaintiffs allege that the Defendants' conduct in connection with their acquisition of InterAct violated the North Carolina Unfair Trade Practices Act. In Count Six, the Plaintiffs bring a claim for slander per se, alleging that Filipowski [*12] made defamatory statements to more than 200 InterAct employees regarding van de Groep's writing a check to himself from Company funds. Finally, the Plaintiffs seek an accounting in light of the alleged fiduciary duty violations of the Defendants.

Defendants Filipowski, Roszak, SilkRoad Equity, SilkRoad Holding, and InterAct collectively seek dismissal under Court of Chancery Rule 12(b)(6). First, they argue that the Plaintiffs' fiduciary duty claims under Count One and Count Four should be dismissed because they are derivative in nature and that the Plaintiffs lack standing to bring such claims. Second, they ask the Court to conclude that the contract claims under Count Two and Count Three should be dismissed because one alleges an oral agreement that is barred by an integration clause and the other alleges certain Defendants breached the Stockholders Agreement when they were not even parties to that agreement. Third, as to the claim under North Carolina trade practices law, the Defendants maintain that it is inconsistent with the purpose and scope of the pertinent statute and that, in any event, the Plaintiffs cannot establish any of its required elements. Fourth, in response to the [*13] slander per se claim, the Defendants attack the Plaintiffs' conclusory pleading and argue that, at minimum, they are entitled to a more definitive statement of the claim in order to properly respond. Finally, the Defendants argue that the claim for accounting should be dismissed because it is premised on invalid claims for breach of fiduciary duty.

**IV. ANALYSIS**

As noted, the Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6). A motion to dismiss will be granted if it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the Plaintiffs would not be entitled to relief. [10] This standard of review requires the Court to accept the well-pleaded facts alleged in the Complaint as true and to view those facts, and all reasonable inferences that may be drawn from them, in the light most favorable to the Plaintiffs. [11] It does not, however, compel acceptance of legal conclusions or every strained interpretation of fact offered by the Complaint. [12] Guided by this familiar standard, the Court moves to the issues raised by the motion.

> 10  See VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 610-11 (Del. 2003). [*14] It is not necessary to assess whether this "plaintiff-friendly" standard will continue as the proper formulation for motions to dismiss under Court of Chancery Rule 12(b)(6). See Bell Atl. Corp. v. Twombly, ___ U.S. ___ , 127 S. Ct. 1955, 1968-69, 167 L. Ed. 2d 929 (2007).
> 11  E.g., Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P., 829 A.2d 143, 148-49 (Del. Ch. 2003). The Court may also consider documents integral to the Complaint. Id. at 149. Accordingly, the Court at times makes reference to the Contribution and Stock Purchase Agreement and the Stockholders Agreement.
> 12  In re Gen. Motors (Hughes) S'holder Litig., 897 A.2d 162, 168 (Del. 2006).

A. *The Fiduciary Duty Claims Under Count One and Count Four*

Rhodes and van de Groep first assert claims for breach of fiduciary duty. The claims are related. They pertain to a handful of self-dealing transactions--e.g., padding InterAct's payroll with SilkRoad Equity employees, causing InterAct to acquire a SilkRoad Equity entity, and using InterAct funds for Filipowski and Roszak's personal expenses and massive severance packages--that were part of a larger effort to diminish Rhodes and van de Groep's interests in SilkRoad Holding to a level where the Defendants [*15] could acquire them at a discount. [13] The Defendants seek dismissal of these claims by arguing, first, that they are derivative claims and, second, that the Plaintiffs lost standing to assert the claims when they ceased to be shareholders of SilkRoad Holding.

> 13  Count One addresses several matters, including the acquisition of TrueSentry, a former SilkRoad Holding entity. Count Four is limited to

the TrueSentry acquisition. The purpose for a separate Count Four is not readily apparent. It is, however, sufficient for present purposes to note that (1) Count One may fairly be viewed as subsuming Count Four and (2) the two counts will be assessed here together.

Whether a fiduciary duty claim is direct or derivative generally requires that two questions be asked: "[w]ho suffered the alleged harm--the corporation or the suing stockholder individually--and who would receive the benefit of the recovery or other remedy?" [14] If the answer to both of these questions is "the corporation," then the claim is derivative. Conversely, to state a direct claim, "[t]he stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to [*16] the corporation." [15] The consequences of classification of a claim as either direct or derivative can be outcome determinative. For example, if a stockholder no longer owns her shares, whether because of merger or sale, she loses standing to pursue a derivative claim on behalf of the corporation. [16]

> 14 *Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1035 (Del. 2004).*
> 15 *Id. at 1039.*
> 16 *Lewis v. Anderson, 477 A.2d 1040, 1049 (Del. 1984).* There are limited exceptions. *See Kramer v. W. Pacific Indus., Inc., 546 A.2d 348, 354-55 (Del. 1988)* (noting that the two exceptions are "(i) if the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of the standing to bring a derivative action; or (ii) if the merger is in reality merely a reorganization which does not affect plaintiff's ownership in the business enterprise"); *Lewis, 477 A.2d at 1046 n.10.*

In this instance, the self-dealing allegedly committed by the Defendants harmed SilkRoad Holding--unnecessary and improvident dissipation of corporate assets--and the proper remedy would be to restore the ill-gotten gains to the corporation. Thus, the Plaintiffs have stated a derivative claim [*17] and, of course, they are no longer stockholders of InterAct. Moreover, any harm which the Plaintiffs can identify was suffered by the corporation; under any of their theories, SilkRoad Holding was also harmed by the challenged conduct.

That might be the end of the analysis if a claim can only be either direct or derivative. There are, however, circumstances which may form the basis for both direct claims and derivative claims. This is one of those instances, and, thus, the Plaintiffs' claims set forth in Count One and Count Four of the Amended Complaint survive. [17] Although the corporation may be harmed,

there are times when the consequences of that harm fall disproportionately upon minority stockholders. As set forth in *Gentile v. Rossette,* [18]

> There is, however, at least one transactional paradigm--a species of corporate overpayment claim--that Delaware case law recognizes as being both derivative and direct in character. A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser [*18] value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders. [19]

> 17 The Defendants have not argued otherwise that these counts fail to state a claim upon which relief can be granted; their contentions exclusively depend upon the Plaintiffs' loss of standing, as former stockholders, to assert derivative claims.
> 18 *906 A.2d 91 (Del. 2006).*
> 19 *Id. at 99-100* (citations omitted); *see also In re Tri-Star Pictures, Inc. Litig., 634 A.2d 319 (Del. 1993).*

The Plaintiffs' claims, of course, do not fit snuggly within this "transactional paradigm," but they do allege that SilkRoad Equity, as the controlling shareholder, sold assets it owned (or controlled) to the corporation for greater than fair value (and intentionally imposed other unnecessary burdens on the corporation) for the sole purpose of driving down the value of the corporation and driving out the Plaintiffs. As a result, Filipowski and Roszak (through SilkRoad Equity) became the sole owners of SilkRoad Holding when they acquired all of the remaining shares (as a consequence of [*19] contractual terms requiring that Rhodes and van de Groep sell their shares on termination of employment) that they did not previously hold. More particularly, Filipowski and Roszak caused a direct harm to the Plaintiffs by the "extraction" of economic value and residual voting power and a "redistribution" of the economic value and voting power to themselves as

controlling shareholders. [20] In addition, the Court's inquiry is not restricted to the abstract structuring of the transaction or course of conduct under scrutiny. Instead, the Court must focus on the "true substantive effect" of the challenged transaction. [21]

> 20   See Gentile, 906 A.2d at 100.
> 21   Gatz v. Ponsoldt, 925 A.2d 1265, 2007 Del. LEXIS 167, 2007 WL 1120338, at * 11 (Del. Apr. 16, 2007).

If the alleged facts supporting the claims are taken as true, they allow the Court to infer that the Defendants' actions had the "true substantive effect" of harming the Plaintiffs, as minority shareholders in SilkRoad Holding, in substantially different fashion from SilkRoad Equity (i.e., Filipowski and Roszak) as controlling shareholder. With the allegations made in Count One and Count Four--e.g., loading InterAct with SilkRoad Equity employees, using InterAct [*20] funds for SilkRoad Equity's other companies, causing SilkRoad Holding to acquire a SilkRoad Equity entity--it cannot be said, in the words of Gatz, that the Court should view these transactions as "confined to an equal dilution of the economic value . . . of each of the corporation's outstanding shares." Those alleged to have benefited directly from the Defendants' misdeeds are Filipowski and Roszak or entities controlled by them. Thus, SilkRoad Equity, as controlling shareholder, would not have suffered harm to the same extent and proportion as the Plaintiffs. Moreover, the Defendants' alleged breaches of fiduciary duty may readily be viewed as facilitating their efforts to drive out the Plaintiffs at a bargain price. Accordingly, the Court concludes that the fiduciary duty claims alleged in the Complaint can be brought as direct claims and that the Defendants' motion to dismiss Counts One and Four should be denied.

### B. The Breach of Contract Claims Under Count Two and Count Three

Two contract claims are offered in the Complaint. First, in Count Two, the Plaintiffs allege the Defendants breached an oral obligation to apply excess funds to loans for which the Plaintiffs had personally [*21] guaranteed. Second, in Count Three, the Plaintiffs cite a provision in the Stockholders Agreement as having been breached by a faulty valuation of SilkRoad Holding that was used in acquiring the Plaintiffs' shares.

### 1. The Stock Purchase Agreement's Integration Clause

The Complaint alleges, and the Court must accept as true, that certain oral commitments were made by Filipowski and Roszak at the time they (through SilkRoad Equity) became InterAct investors to direct excess cash flow to those loans that the Plaintiffs and

their spouses had personally guaranteed repayment. Instead, as alleged by the Complaint, once the Defendants gained control of InterAct following execution of the Contribution and Stock Purchase Agreement (the "Acquisition Agreement"), they caused funds to be used for other purposes. The Plaintiffs now claim that the Defendants breached their oral agreement.

Collectively, the Defendants move to dismiss the Plaintiffs' claim by reference to the Acquisition Agreement. More precisely, they point to Section 11.6, which provides:

> Complete Agreement. This Agreement, the related schedules, and the other documents delivered by the parties in connection with this Agreement, together [*22] with the Confidentiality Agreement, contain the complete agreement between the parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements and understandings between the parties to this Agreement.

They argue that this section precludes, as a matter of law, the oral assurances that Filipowski or Roszak may have made prior to the parties reducing their understanding to written form.

Section 11.6 operates plainly as an integration clause. [22] Notwithstanding its unambiguous nature and seemingly comprehensive scope, the Plaintiffs have two main protestations. Both are, however, without merit.

> 22   See Carrow v. Arnold, 2006 Del. Ch. LEXIS 191, 2006 WL 3289582, at *5 (Del. Ch. Oct. 31, 2006) (noting that "a presumption of integration" is created when a clause states that the written contract is intended to be the parties' final agreement). In determining if the Acquisition Agreement, through its integration clause, is "fully integrated," the Court would give particular attention to whether it is "carefully and formally drafted," if it "addresses the questions that would naturally arise out of the subject matter," and if it "expresses the final intentions of the parties." [*23] Hynansky v. Vietri, 2003 Del. Ch. LEXIS 89, 2003 WL 21976031, at *3 (Aug. 7, 2003) (citation omitted). Only the last two considerations appear to be implicated by the parties' briefing on the motion before the Court.

They first complain that the clause is only a partial integration clause and, therefore, it is appropriate for the Court to look outside the four corners of the Acquisition

Agreement for evidence of the Defendants' oral agreement. Specifically, they assert that the Acquisition Agreement fails to make critical reference to either the Bank of Asheville loan guaranteed by Rhodes or to a particular note given to Rhodes from InterAct, which was part of the consideration for SilkRoad Equity's acquisition. That assertion, however, is refuted by some notable references in the Acquisition Agreement. For example, Article XII defines "InterAct Debt" as including "all indebtedness for borrowed money," "guarantees," and "all amounts payable by InterAct." As to the note given to Rhodes by InterAct, that note is expressly referenced both at Section 1.3, which provides the note is in "full consideration for the Rhodes Sold Shares and in partial consideration for the covenants not to compete," and at Section 2.4(a), [*24] which provides that delivery of the note to Rhodes shall be made at closing. The Bank of Asheville loan appears not only to be included in Article XII's definition of "InterAct Debt," but is also referenced indirectly in Section 3.14(h) ("Each trust indenture, mortgage, promissory note, loan agreement, letter of credit, or other Contract for the borrowing of money . . . .") and more directly in Schedule 3.14 to the Acquisition Agreement.

The Plaintiffs also argue that the integration clause is unavailing for the Defendants because the contract of which it is part was, itself, induced by fraud and part of a bad faith scheme by the Defendants to depress the value of InterAct. Integration clauses do not, as a matter of law, bar claims of fraud and the presumption afforded by such clauses can also be rebutted upon a showing of bad faith. [23] That said, the problem with the Plaintiffs' attempt to invoke the "fraud" or "bad faith" exceptions to the integration clause at hand is that no allegations of fraudulent or bad faith conduct have been sufficiently alleged in Complaint. [24] In fact, the Complaint does not even state that they were defrauded by the Defendants. Even if it did, however, [*25] the Court cannot ignore the absence of allegations that the Plaintiffs specifically *relied*--reliance being an essential element for a fraud claim--on certain oral commitments of Filipowski and Roszak when deciding to consent to the Acquisition Agreement. That there were once oral commitments by the Defendants different from those commitments made and later reduced to writing is inapposite. As this Court recently observed, "[i]f the only showing required to invoke the fraud exception to the parol evidence rule were inconsistent prior oral statements, such oral statements would often (usually) be admitted, and the exception would swallow the rule." [25] Moreover, the Plaintiffs' "bad faith" argument--that the oral agreement should be spared from the sweep of the integration clause at Section 11.3 because of a "bad faith" scheme by the Defendants to acquire Rhodes and van de Groep's interest in InterAct after having driven down its value--is

unsupported by the Complaint, which actually states that Filipowski and Rhodes began their scheme *after* SilkRoad Equity became an investor in InterAct. [26]

> 23  *See e.g., Kronenberg v. Katz, 872 A.2d 568, 592-93 (Del. Ch. 2004).* Only explicit "anti-reliance" [*26] language--that is, a contractual commitment by a party that it has not relied upon statements outside of the contract's four corners in deciding to consent--would appear to have a claim preclusive effect. *See id.; see also Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co., 2002 Del. Ch. LEXIS 91, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002).* No such language in the Acquisition Agreement, however, can be found.
>
> 24  Court of Chancery Rule 9(b) demands, of course, that claims of fraud be pleaded with particularity.
>
> 25  *Carrow, 2006 Del. Ch. LEXIS 191, 2006 WL 3289582, at *8.* It has also been said that prior oral promises usually do not provide enough support to find exception to the parol evidence rule, but certain circumstances--such as a promisor's "sharp practice" of knowing that the promisee will not notice or understand the significance of a last minute change or the preclusive effect of an integration clause--may permit use of such an exception. *2006 Del. Ch. LEXIS 191, [WL] at *9.* Notably, however, no facts have been alleged in the Complaint to suggest that the Plaintiffs did not fully appreciate the effect that Section 11.6 had on the oral promise to pay down a specific loan out of excess funds.
>
> 26  *See* Am. Compl. P 30.

In short, nothing is alleged in [*27] the Complaint to suggest that the integration clause does not properly bar certain oral commitments the Defendants made prior to execution of the Acquisition Agreement.

2. Parties to the Stockholders Agreement and the Obligation to Pay Fair Market Value for Terminated Employees' Shares

Next, the Plaintiffs claim that the Defendants breached the repurchase option provision under the Stockholders Agreement to purchase their shares at fair market value. They complain that the valuation methods employed by Houlihan, SilkRoad Holding's advisor, failed to account for, among other things, the funds that Filipowski and Roszak directed from InterAct to SilkRoad Equity-based interests, as well as the numerous inaccuracies that prevented a proper and fair assessment of the value of their SilkRoad Holding shares. As read, the claim contained in Count Three of the Plaintiffs'

Complaint is against all of the named Defendants. That claim, however, can only properly stand against one party: SilkRoad Holding.

A primary flaw of the Plaintiffs' claim is that it names parties who were never signatories to the underlying agreement between the Plaintiffs and SilkRoad Holding and SilkRoad Equity, namely, Filipowski, [*28] Roszak, and InterAct. To permit this claim to proceed as against these parties would be to contravene that axiomatic expression found within our law: non-parties to a contract ordinarily have no obligations under it. [27] The Plaintiffs have agreed to dismiss Count Three as against Filipowski and Roszak. [28] They have also agreed to dismiss their claim against SilkRoad Equity, even though it was a party to the Stockholders Agreement. [29] They continue, however, to bring the claim against InterAct, but that claim cannot stand because, as already discussed, InterAct was never a party to the Stockholders Agreement.

> [27]  See *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172 (Del. 2002); *In re Delta Holdings, Inc.*, 2004 Del. Ch. LEXIS 104, 2004 WL 1752857, at *8 n.58 (Del. Ch. July 26, 2004); cf. *MetCap Sees. LLC v. Pearl Senior Care, Inc.*, 2007 Del. Ch. LEXIS 65, 2007 WL 1498989, at *7 (Del. Ch. May 16, 2007) ("Well-settled within precepts of contract law is recognition that non-parties to a contract ordinarily have no rights under it.").
> [28]  See Pls.' Ans. Br at 3 n.1.
> [29]  *Id.* The claim against SilkRoad Equity would, of course, fail on a different ground. Section 5.6 of the Stockholders Agreement provides "the Board shall [*29] reasonably determine in good faith the '*Fair Market Value*'" of the Plaintiffs' interests in SilkRoad Holding upon termination of their employment. References to "the Board" in Section 5.6 refer exclusively to SilkRoad Holding's Board of Directors. *See* Stockholders Agmt. at P 1.2 (defining "Board"). Thus, the obligation to repurchase Rhodes and van de Groep's stock was, at all times, that of SilkRoad Holding. As a matter of contract, SilkRoad Equity was neither slated to make a valuation of Rhodes and van de Groep's shares nor obligated to repurchase them.

Thus, the only Defendant which can properly be found to have been obligated under the Stockholders Agreement is SilkRoad Holding. SilkRoad Holding has declined, however, to join its co-Defendants in moving for dismissal. Accordingly, except as to SilkRoad Holding, the Court will grant the Defendants' motion to dismiss the breach of contract claim under Count Three.

## C. The *Claim Under North Carolina's Unfair and Deceptive Trade Practices Act*

The Court now turns to the Plaintiffs' claim under the North Carolina Unfair and Deceptive Trade Practices Act (the "UDTPA"), [30] which provides a private right of action for consumers aggrieved by [*30] certain business practices. [31] To state a claim under the UDTPA, the Plaintiffs must allege that (1) the Defendants committed an unfair or deceptive act or practice, (2) this act or practice was "in or affecting commerce," and (3) the act or practice has proximately caused their injuries. [32]

> [30]  *N.C. Gen. Stat. § 75-1.1 et seq.* (2001).
> [31]  *N.C. Gen. Stat. § 75-16* (providing a right of action); *see Winston Realty Co. v. G.H.G., Inc.*, 314 N.C. 90, 331 S.E.2d 677, 680 (N.C. 1985) (recognizing the legislative intent to provide "aggrieved consumers" with a new, private right of action beyond traditional common law claims).
> [32]  *Dalton v. Camp*, 353 N.C. 647, 548 S.E.2d 704, 711 (N.C. 2001).

The Plaintiffs invoke the UDTPA in the context of the Defendants' conduct leading up to the acquisition of InterAct. They allege that SilkRoad Equity (*i.e.*, Filipowski and Roszak) used its position as a senior creditor to pressure InterAct into a transaction with terms disproportionately benefiting SilkRoad Equity. [33] One of the more notable actions alleged to have been taken by SilkRoad Equity is its threat to file an involuntary bankruptcy petition against InterAct if it did not agree to a deal whereby SilkRoad Equity would acquire an [*31] equity stake in the Company.

> [33]  *See* Am. Compl. PP 23-27.

There is no real disagreement as to the UDTPA's cardinal purpose: it is to protect "the consuming public" from those acts done in violation of its general proscriptions. [34] Disagreement does arise, however, as to its scope. A threshold question that is raised by Defendants' motion to dismiss is whether the UDTPA's "in or affecting commerce" language covers Defendants' conduct in connection with its transaction with InterAct. In construing this language, North Carolina's highest court has observed that "while the statutory definition of commerce crosses expansive parameters, it is not intended to apply to all wrongs in a business setting." [35] In this vein, North Carolina has excluded from the UDTPA's scope those claims involving, among other things, securities transactions, [36] most employment-related matters, [37] professional services, [38] lending or "capital-raising" transactions, [39] and internal corporate governance issues. [40]

34  *Skinner v. E.F. Hutton & Co.*, 314 N.C. 267, 333 S.E.2d 236, 241 (N.C. 1985). The statute also has a more aspirational bent to foster "good faith and fair dealing between buyers and sellers." *Threatt v. Hiers*, 76 N.C. App. 521, 333 S.E.2d 772, 773 (N.C. App. Ct. 1985).

35  *Dalton*, 548 S.E.2d at 711.

36  *See* [*32] *Skinner*, 333 S.E.2d at 241 (holding that "securities transactions are beyond the scope of [the UDTPA]" because the statute is meant to protect the "consuming public" and such transactions are "already subject to pervasive and intricate regulation[s]").

37  *See, e.g., HAJMM Co. v. House Raeford Farm, Inc.* 328 N.C. 578, 403 S.E.2d 483, 492 (N.C. 1991).

38  *See* N.C. Gen. Stat. § 75-1.1(b).

39  *See, e.g., Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 554 S.E.2d 840, 848 (N.C. App. Ct. 2001); *Garlock v. Hilliard*, 2000 NCBC 11, 2000 WL 33914616, at *5 (N.C. Super. Aug. 22, 2000).

40  *See, e.g., Wilson v. Blue Ridge Elec. Membership Corp.*, 157 N.C. App. 355, 578 S.E.2d 692, 694 (N.C. App. Ct. 2003).

The Defendants argue that their alleged conduct falls outside of the UDTPA's reach because it relates precisely to those areas that North Carolina courts have declined to interpret as being the type of "regular, day-to-day activities" for which businesses "regularly engage[] in and for which [they are] organized." [41] In other words, they argue that the transaction with InterAct was extraordinary in nature and likened it to one involving securities or the transfer of capital. [42]

41  *HAJMM*, 403 S.E.2d at 493.

42  In *HAJMM*, the North Carolina Supreme Court reasoned that securities [*33] transactions were unlike the regular sale and purchase of consumer goods because such transactions are "extraordinary events . . . related to the creation, transfer, or retirement of capital" and, as such, are not viewed as traditional business activities under the UDTPA. *Id.*

To illustrate the extraordinary nature of SilkRoad's acquisition of InterAct equity, the Defendants point to the various instruments that were executed in connection with that transaction--*e.g.*, the Acquisition Agreement, the Stockholders Agreement, employment agreements for the Plaintiffs, stock certificates, and promissory notes.

In response, the Plaintiffs draw the Court's attention to a North Carolina lower court's decision involving the sale of a company. In *Walker v. Sloan,* it was held that a

complaint sufficiently stated a claim under the UDTPA when certain actions were taken by a group of directors to frustrate the sale of the business to a buyout group of plaintiff-employees. [43] Actions alleged to have been taken by the resistant director group included being uncooperative in due diligence requests, tempting certain plaintiff-employees to withdraw from the buyout group in exchange for "being taken care [*34] of," and terminating employees to bring about instability in efforts to secure outside funding. The Plaintiffs, here, see similarities with *Walker,* contending that, like the directors in *Walker,* the Defendants "took numerous improper actions to manipulate the sale process to suit their own interests." [44]

43  137 N.C. App. 387, 529 S.E.2d 236, 243 (N.C. App. Ct. 2000).

44  Pls.' Ans. Br. at 37. The factual similarities between *Walker* and here are not as strong as the Plaintiffs would have them. In *Walker,* the directors engaged in undeniably egregious acts. Here, the Complaint alleges little in terms of patently unfair or deceptive conduct. SilkRoad Equity may have placed pressure on Rhodes and van de Groep to consent to terms that they would not have otherwise agreed to in better financial straits, but the Complaint reveals that SilkRoad Equity was acting pursuant to the options it had available to it by contract. *See S. Atl. Ltd. P'ship of Ternn., LP v. Riese*, 284 F.3d 518, 536 (4th Cir. 2002) (noting that conduct carried out pursuant to contractual relations rarely violates the [UDTPA]").

Notwithstanding the Court's observation that *Walker* did nothing to elaborate upon how the alleged acts were deemed to [*35] fall within the UDTPA's "in or affecting commerce" requirement, the guidance from the North Carolina Supreme Court's seminal decision in *HAJMM Co. v. House Raeford Farm, Inc.*--that "in or affecting commerce" includes those "regular, day-to-day activities" aimed at consumers, but not those extraordinary events in the life of a business--remains firmly rooted in North Carolina law. [45] That teaching guides this Court to conclude that Defendants' alleged conduct in connection with the InterAct transaction was not the sort of ordinary conduct that would fall under the UDTPA. Filipowski and Roszak's acquisition of an 80% interest in InterAct was, not surprisingly, something that occurred outside of the ordinary course.

45  *See, e.g., Wilson*, 578 S.E.2d at 694; *Garlock*, 2000 NCBC 11, 2000 WL 33914616, at *5 (citing *HAJMM*).

Finally, it should be noted that the two groups of parties to the SilkRoad Equity-InterAct transaction in 2004 had the full benefit of counsel. Ultimately, the parties consented to the Acquisition Agreement. Rhodes and van de Groep may have "reluctantly agreed" to do so, [46] but the Complaint alleges no facts to suggest that they did not consent freely. That certain terms of the agreement [*36] were more favorable to one party at the expense of another, however, is not a matter for the Court to resolve in this context.

    46  Am. Comp. P 26.

In sum, the Court concludes that the alleged conduct here does not fall within the "in or affecting commerce" language of the UDTPA and that, even if it did, it does not constitute unfair or deceptive practice as a matter of law. Accordingly, the claim brought under this statute shall be denied.

### D. Slander Per Se

Rhodes and van de Groep also bring a claim for slander per se. [47] In particular, they allege that at "several meetings of Inter Act's more than 200 employees" Filipowski stated that van de Groep "had written a $ 50,000 check on behalf of InterAct to himself." [48] They maintain that this statement is false and that it has damaged van de Groep's business reputation. [49]

    47  Van de Groep previously sought voluntary dismissal of this claim pursuant to Court of Chancery Rule 41(a)(2). The Court, however, denied van de Groep's application because, first, the slander claim was initially, and voluntarily, filed in Delaware and, second, there was a risk of conflicting outcomes if a North Carolina court were resolve on van de Groep's slander claim [*37] when there was a corresponding counterclaim by InterAct (seeking recovery of $ 8,000 for allegedly improper distribution by van de Groep to himself) before this Court. *See Rhodes v. SilkRoad Equity, LLC, 2007 Del. Ch. LEXIS 20, 2007 WL 441940, at *1 (Del. Ch. Jan. 29, 2007).*

    48  Am. Compl. P 69.

    49  *Id.* at PP 69 ("The allegation that [v]an de Groep wrote himself a $ 50,000 check is completely unfounded and it has severely damaged [v]an de Groep's business reputation, especially in the public safety industry."), 103-04.

As an initial matter, there is a question as to whether this Court should view the Plaintiffs' claim under Delaware law or, as the Plaintiffs urge, under North Carolina or Georgia law. Besides noting that Filipowski's statements were made at "several meetings," there is no

indication from the Complaint where these meetings occurred. [50] That, perhaps, might portend the claim's general weakness. In any event, it is safe to conclude that these meetings did not occur in Delaware, as InterAct's offices are only in North Carolina and Georgia. With this in mind, the Court assesses whether Rhodes and van de Groep have sufficiently alleged facts which set forth a defamation claim under North Carolina or Georgia [*38] law. Under either formulation, however, the slander per se claim cannot stand.

    50  Likewise, there is no pleading as to when these statements were made by Filipowski or, besides the 200 InterAct employees, to whom.

Under North Carolina law, a claim for slander per se involves the injured party alleging that (1) another has spoken base or defamatory words tending "to prejudice him in his reputation, office, trade, business or means of livelihood or hold him up to disgrace, ridicule or contempt; (2) the statement was false; and (3) the statement was published or communicated to and understood by a third person." [51] The claim is put differently in Georgia, but it is substantially similar. [52] The laws of both states recognize that slander per se is a unique species of defamation. Unlike mere slander, or slander per quod, slander per se need not be accompanied by an allegation and proof of special damages. It is not surprising, then, that "[t]he policy of the law has much restricted the range of defamatory utterances which are actionable per se." [53]

    51  *West v. King's Dept. Store, Inc., 321 N.C. 698, 365 S.E.2d 621, 624 (N.C. 1988); see also Javurek v. Jumper, 2005 N.C. App. LEXIS 459, 2005 WL 465571, at *3* (noting the three main [*39] categories of slander per se: an accusation of a crime involving moral turpitude; an allegation impeaching one in his trade, business, or profession; and an imputation that one has a loathsome disease).

    52  In Georgia, slander per se includes [i]mputing to another a crime punishable by law," "[c]harging a person with having some contagious disorder," or "[m]aking charges against another in reference to his trade, office, or profession, calculated to injure him therein." *O.C.G.A. § 51-5-4 (a)(1)-(3).*

    53  *Donovan v. Fiumara, 114 N.C. App. 524, 442 S.E.2d 572, 576 (N.C. App. Ct. 1994)* (citing *Penner v. Elliott, 225 N.C. 33, 33 S.E.2d 124, 125 (1945)); accord Chong v. Reeba Constr. Co., Inc., 284 Ga. App. 830, 645 S.E.2d 47, 53 (Ga. App. Ct. 2007).*

To sustain a claim for slander per se, both North Carolina and Georgia law appear to share the view that there must be some showing that the defamatory words spoken were susceptible to but one meaning; importantly, this must be *without* the aid of explanatory circumstances or resort to extrinsic proof. [54] Put differently, the words must be "recognized as injurious on their face" and cannot be assisted by a judicial "hunt for a strained construction in order to hold the words as being defamatory as [*40] a matter of law." [55]

> 54 *See Renwick v. News & Observer Pub. Co., 310 N.C. 312, 312 S.E.2d 405, 409 (N.C. 1984)*; *Bellemead, LLC v. Stoker, 280 Ga. 635, 631 S.E.2d 693, 695-96 (Ga. 2006)* (holding that it is was inappropriate for a lower court to look to innuendo, or some wider explanatory context, to determine if certain words constituted slander per se).
>
> 55 *Bellemead, 631 S.E.2d at 695.*

The Plaintiffs' claim is that van de Groep wrote a check to himself from InterAct. That is all. No allegation has been made that van de Groep was unauthorized to write checks on behalf of InterAct; he was, after all, the Company's President. No allegation has been made that the intended distribution of InterAct funds was unlawful or for an improper purpose; that may have been the intended message, but claims for slander per se are claims based on statements that were said, not implied. [56] In short, Filipowski's comments could have been susceptible to a different interpretation. Without more, the broad brush allegations before the Court provide insufficient support to conclude, as a matter of law, that the statements were subject to only a defamatory understanding.

> 56 *Cf. Chong, 645 S.E.2d at 53* (concluding that slander per se could [*41] be found where a general contractor was called a "crook" in the context of a discussion about the contractor's business).

Another reason why the Plaintiffs' claim must fail is that it does not sufficiently allege facts that Filipowski's statement actually impeached van de Groep in the public safety industry. [57] That is, it is not enough to rely on those statements which "merely injure" a plaintiff's business, trade, or profession; rather, there must be a showing that certain statements both (1) touched upon the plaintiff's business, trade, or profession, and (2) were necessarily harmful in their *effect* on a plaintiff's business, trade, or profession. [58] Although the Plaintiffs have identified van de Groep as being in the public safety industry, [59] the allegation that he wrote InterAct checks to himself does not necessarily malign and

negatively effect his business, trade, or profession in the industry in such manner as to conclude that he was slandered per se and that special damages need not be alleged. [60] This is because, as explained earlier, there is no allegation that van de Groep improperly acquired funds from the Company or lacked the authority to even write checks on behalf [*42] of the Company.

> 57 *See Jolly v. Acad. Collection Serv., Inc., 400 F. Supp. 2d 851, 861 (M.D.N.C. 2005)* (concluding plaintiffs who generally claimed that certain defendants disrupted their business failed to "set out facts alleging that defendants made false statements *actually impeaching* them in their business" when they neither indicated the nature of their business or alleged that defendants stated they were somehow unfit to conduct such business) (emphasis added); *accord Bellemead, 631 S.E.2d at 695* (noting alleged statements must have been "especially injurious") (citation omitted).
>
> 58 *Donovan, 442 S.E.2d at 578* (citing *Badame v. Lampke, 242 N.C. 755, 89 S.E.2d 466, 468 (N.C. 1955)*).
>
> 59 *Cf. Jolly, 400 F. Supp. 2d at 861* (holding plaintiffs failed state a claim for slander per se where they never alleged the nature of defendants' business or trade).
>
> 60 *Cf. Badame v. Lampke, 242 N.C. 755, 89 S.E.2d 466 (N.C. 1955)* (ruling that a business rival's statement to one of plaintiff's customers that plaintiff had failed to make a required payment and engaged in "shady deals" was slander per se); *Broadway v. Cope, 208 N.C. 85, 179 S.E. 452 (N.C. 1935)* (ruling a butcher had been slandered per se by a competitor's statement that the butcher [*43] had slaughtered a rabid cow).

For these reasons, the Court concludes that the Plaintiffs have not stated a claim for slander per se and that the claim must be dismissed.

E. *Accounting*

Rhodes and van de Groep also seek an accounting. An accounting is not so much a cause of action as it is a form of relief. [61] Here, the demand for accounting is inherently dependent on the Court's decision on the fiduciary duty claims in Count One and Count Four. Because the Court views those claims as having been properly stated, it follows that dismissal of the Plaintiffs' request for an accounting is unwarranted.

> 61 *See Albert v. Alex. Brown Mgmt. Servs., Inc., 2005 Del. Ch. LEXIS 133, 2005 WL 2130607, at *11 (Del. Ch. Aug. 25, 2005)* ("An accounting is

2007 Del. Ch. LEXIS 96, *

an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result.").

## V. CONCLUSION

For the foregoing reasons, Count Two (breach of oral agreement) of the Amended Complaint, Count Three (breach of Stockholders Agreement), except as to SilkRoad Holding, Count Five (violation of the North Carolina's trade practices statute), and Count Six (slander per se) will be dismissed. Otherwise, [*44] Defendants' Motion to Dismiss will be denied.

An implementing order will be entered.

**H**Lewis v. Ward
Del.Ch.,2003.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Shirley LEWIS, Plaintiff,
v.
Milton H. WARD, Allen Born, Gerald J. Malys, Rockwell A. Schnabel, Vernon F. Taylor,
Jr., Russell L. Wood, Cyprus Amax Minerals Company, and Amax Gold, Inc., Defendants.
**No. Civ.A. 15255.**

Submitted Oct. 15, 2003.
Decided Oct. 29, 2003.

Joseph A. Rosenthal, and Norman M. Monhait, Rosenthal Monhait Gross & Goddess, P.A.,
Wilmington, Delaware; A. Arnold Gershon, A. Arnold Gershon, P.C., New York, New
York; Irving Bizar, Ballon Stoll Bader & Nadler, P.C., New York, New York, for
Plaintiff.
David C. McBride, and James P. Hughes, Jr., Young Conaway Stargatt & Taylor, LLP,
Wilmington, Delaware, for Defendants Milton H. Ward, Allen Born and Gerald L. Malys.
William M. Lafferty, Morris Nichols Arsht & Tunnell, Wilmington, Delaware, for
Defendants Vernon F. Taylor, Jr. and Russell L. Wood.
Joel E. Friedlander, Bouchard Margules & Friedlander, P.A., Wilmington, Delaware,
for Defendant Cyprus Amax Minerals Company.
Thomas P. Preston, Blank Rome, LLP, Wilmington, Delaware, for Defendant Amax Gold,
Inc.

MEMORANDUM OPINION

STRINE, Vice Chancellor.
**\*1** The plaintiff in this derivative action lost her stockholder status in an arm's-
length merger. Because she has failed to plead facts that support a reasonable
inference that the merger that caused her to lose her status as a stockholder was a
fraud perpetrated merely to deprive her of her ability to press her derivative
claims, she lacks standing under the teaching of *Lewis v. Anderson.*Therefore, the
court will grant the defendants' motion to dismiss her complaint.

I. *Background*

In this derivative action, the plaintiff alleges that in 1996 the then-majority
stockholder of Amax Gold, Inc. provided Amax Gold with financing on terms that were
unfair. The plaintiff was a stockholder of Amax Gold on October 8, 1996, when this
suit was filed.

On June 1, 1998, Amax Gold merged with a subsidiary of Kinross Gold Corporation
("Kinross") in a reverse triangular merger. The plaintiff in this action never
directly challenged the fairness of that arm's-length, third-party merger.[FN1]As a
result of the merger, Amax Gold [FN2] became a wholly owned subsidiary of Kinross, and
all of the shares of Amax Gold were converted into the right to receive shares of
Kinross. Thus, the plaintiff lost her shares in Amax Gold and became a Kinross
stockholder. Kinross was and remains an Ontario corporation.

> FN1. There was litigation filed by other stockholders of Amax Gold seeking,
> among other things, to enjoin consummation of the merger.*Ratzersdorfer v.
> Ward,* C.A. No. 16189 (Del. Ch. filed Feb. 13, 1998). That case was not
> actively litigated and was dismissed pursuant to a stipulation of dismissal.

FN2. Amax Gold was later renamed. I use its original name for the sake of clarity.

After the merger, the defendants in this derivative action - who include Amax Gold's directors at the time of the financing and its then-majority stockholder Cyprus Amax Minerals Company - moved to dismiss the complaint on the grounds that the plaintiff's loss of her Amax Gold stockholder status deprived her of the right to press the derivative action, under the teaching of *Lewis v. Anderson*[FN3] and its progeny.[FN4]

FN3.477 A.2d 1040 (Del.1984).

FN4.*E.g., Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 354-55 (Del.1988); In re First Interstate Bancorp Consol. S'holder Litig., 729 A.2d 851, 867-68 (Del. Ch.1998), aff'd sub nom.Bradley v. First Interstate Bancorp, 748 A.2d 913 (Del.2000)* (ORDER); *Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1244-45 (Del.1999); 8 Del. C. § 327.*

This court, through then-Vice Chancellor Jacobs, granted the defendants' motion to dismiss, finding that the merger divested the plaintiff of standing to pursue her claims and that she had not pled facts demonstrating the applicability of what I will refer to as the "fraud exception" to *Lewis v. Anderson*.[FN5]To wit, he rejected the plaintiff's argument that she had "pled facts that bring this case within the exception where the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive the plaintiff of derivative standing."[FN6]

FN5.*Lewis v. Ward*, 2000 WL 1336721, at *1 (Del. Ch. Aug. 28, 2000).

FN6.*Id.* (internal quotation marks and citations omitted).*See also Kramer, 546 A.2d at 354-55;Lewis v. Anderson, 477 A.2d at 1046 n. 10*.

Thus Vice Chancellor Jacobs held:

The difficulty with the plaintiff's position is that the complaint does not plead facts from which it could be reasonably inferred that the defendants perpetrated the merger *merely* to deprive the plaintiff of derivative standing. Because the plaintiff's brief suggests that the plaintiff may be able to plead such a claim, however, the defendants' motion to dismiss will be granted with leave to amend.[FN7]

FN7.*Lewis v. Ward*, 2000 WL 1336721, at *1 (emphasis added).

Vice Chancellor Jacobs's ruling is, of course, law of the case.[FN8]

FN8.*E.g., Frank G.W. v. Carol M.W., 457 A.2d 715, 718 (Del.1983)*.

On October 13, 2000, the plaintiff filed her amended complaint in response to Vice Chancellor Jacobs's ruling and attempted to plead facts invoking the fraud exception to *Lewis v. Anderson*.The defendants then moved to dismiss arguing that the plaintiff had again failed to plead facts supporting application of that exception. But the defendants did not file their opening brief until March 30, 2001. The plaintiff took an equally luxurious period to answer, filing its brief on March 26, 2002. The defendants then replied in late January of 2003.

**\*2** By that time, Amax Gold had moved its corporate home from Delaware to Nevada. When Vice Chancellor Jacobs joined the Supreme Court, this case was assigned to me and the defendants' motion to dismiss was scheduled for argument.

## II. *Legal Analysis*

The defendants' renewed motion to dismiss is based on a simple and direct argument: The plaintiff has failed to plead facts supporting a reasonable inference that the merger was a fraud designed merely to deprive her of derivative standing. As such, the complaint must be dismissed in accordance with Vice Chancellor Jacobs's prior ruling and *Lewis v. Anderson.*

In response, the plaintiff makes two arguments. First, she contends that her amended complaint does plead sufficient facts to invoke the fraud exception to *Lewis v. Anderson.*Second, she contends that regardless of whether that is the case, Nevada law and not Delaware law now governs her standing to pursue her suit because Nevada is now the home of Amax Gold. She asks me to conclude that Nevada would not follow *Lewis v. Anderson* but instead apply a more lenient approach that would permit a former stockholder in her position to continue a derivative suit.

I deal with these arguments in reverse order, starting with the choice-of-law question.

A.

The choice-of-law question the plaintiff poses could be an interesting one in the right case. The issue of whether a derivative plaintiff should be permitted to press a cause of action on behalf of a corporation is, in key respects, a policy matter about the allocation of authority between the corporation's board and its stockholders and other constituencies. In this case, the plaintiff argues that the merger that divested her of her Amax Gold shares did not end her interest in the affairs of Amax Gold. As a Kinross stockholder, she retains an important ongoing interest in the financial health of Amax Gold, because Amax Gold has become a wholly owned subsidiary of Kinross. Because Amax Gold has chosen to become a Nevada corporation, the plaintiff argues that Nevada law - and not that of Delaware - should determine whether she can advance a claim derivatively on behalf of that Nevada corporation. She argues that this prudential matter of public policy is one in which Delaware no longer has an interest.[FN9]

> [FN9.] The debate is an even deeper one than the parties' papers explore. Arguably, the key issue is whether the plaintiff can cause a double derivative suit to be brought in the interest of Kinross, an Ontario corporation. That is, it is arguably Ontario that has the greatest interest in determining whether the plaintiff can proceed with a case brought in the interest of a wholly owned subsidiary of an Ontario corporation. In this regard, the plaintiff's pleas about equity are far less convincing because in the *five* years since the merger she never attempted to assert a double derivative action on behalf of Kinross or to demand that Kinross cause Amax Gold to press her claims. Nor, 1 note, has she argued that Ontario law is relevant to the resolution of this motion.

In answer, the defendants argue that once the plaintiff lost "standing" under *Lewis v. Anderson,* she lost it forever and that it cannot be revived by Amax Gold's later reincorporation into Nevada. In support of this argument, the defendants argue that there is a need for certainty as to the law that applies to derivative actions or otherwise directors will not be able to assess their own exposure to liability and stockholders will not know to what standards of accountability they may hold their directors.

This is a nice debate that I need not and therefore do not enter.[FN10]Although the plaintiff argues that "there is no reason to believe that Nevada would adopt the reasoning of *Lewis v. Anderson,"* she concedes that she was unable to find a judicial

decision in Nevada taking a different approach than that Delaware decision.[FN9] Where there is no Nevada law on point, courts applying Nevada corporate law have traditionally looked to Delaware law for guidance.[FN10] Moreover, scholars have noted the extent to which Nevada has attempted to conform its corporate law to that of Delaware.[FN11] Therefore, I have every reason to anticipate that the Nevada Supreme Court would adopt the rule of *Lewis v. Anderson* as Nevada law, and no reliable basis to infer that it would take another approach. Thus, the governing principles that apply are identical whether Delaware law or Nevada law applies to the question of whether the plaintiff may proceed to press claims belonging to Amax Gold.

FN10. The question is a subtle one. For example, it seems to me obvious that Delaware law would apply to determine whether the defendants had committed any breach of duty against Amax Gold in connection with the financing that is challenged in the amended complaint. To find that the change in domicile of Amax Gold changed the law that applied to the merits would be a highly troubling conclusion, disruptive of the defendants' settled expectations. The proposition that the law of Kinross's or Amax Gold's home jurisdiction might govern whether a former Amax Gold stockholder could continue to press claims that belonged to Amax Gold before the merger when that stockholder continues to own Kinross stock is a less extreme one.

FN11. Pl.'s Opp'n Br. at 3. Through independent research, I discovered some authority suggesting that Nevada would in fact follow *Lewis v. Anderson.* Nevada law, like that of many states, generally requires derivative plaintiffs to maintain stockholder status throughout the litigation. *See* Nev. R. Civ. P. 23.1; *Keever v. Jewelry Mountain Mines, Inc.,* 688 P.2d 317, 317 (Nev.1984) ("Under the contemporaneous ownership requirements of NRCP 23.1, a representative plaintiff must have owned stock in the corporation at the time of the transaction of which he complains *and throughout the pendency of the suit.*" (emphasis added) (internal quotation marks and citations omitted)). Although there do not appear to be any Nevada cases directly addressing the precise issue before the court now, the Nevada Supreme Court has stated that former stockholders lack standing to pursue derivative claims. *See Cohen v. Mirage Resorts, Inc.,* 62 P.3d 720, 732 (Nev.2003). As support for this proposition, *Cohen* cited two Delaware Supreme Court decisions following the holding of *Lewis v. Anderson* that a derivative plaintiff who loses stockholder status as a result of a merger loses standing to maintain the action. *See id.* at 732 & nn. 70, 72 & 76 (Nev.2003) (citing *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243, 1244-45 (Del.1999) and *Kramer,* 546 A.2d at 351).

Indeed, one of the authorities cited by the plaintiff actually undermines her argument that Nevada might choose not to follow *Lewis v. Anderson.* The plaintiff notes that the American Law Institute has proposed a rule in which a derivative plaintiff could maintain suit following the loss of stockholder status if that loss

is the result of corporate action in which the holder did not acquiesce, and either (A) the derivative action was commenced prior to the corporate action terminating the holder's status, or (B) the court finds that the holder is better able to represent the interests of the shareholders than any other holder who has brought suit.

Principles of Corp. Governance § 7.02(a)(2) (2003). But, it is unlikely that Nevada would choose the ALI rule over *Lewis v. Anderson,* because the comment to § 7.02 explicitly states that it departs from the majority approach to the continuous-ownership rule. *See id.* § 702 cmt. a.

FN12. *See Cohen,* 62 P.3d at 726 n. 10 ("Because the Legislature relied upon the

Model Act [in the particular respect before the court] and the Model Act relies heavily on New York and Delaware case law, we look to the Model Act and the law of those states in interpreting the Nevada statutes."); *Hilton Hotels Corp. v. ITT Corp., 978 F.Supp. 1342, 1346 (D.Nev.1997)* ("Where, as here, there is no Nevada statutory or case law on point for an issue of corporate law, this Court finds persuasive authority in Delaware case law."); *Shoen v. AMERCO, 885 F.Supp. 1332, 1341 n. 20 (D.Nev.1994)* ("Where there is no Nevada precedent on point ... this court must predict how Nevada's supreme court would decide the question.... On questions of corporation law, the Delaware Supreme Court and the Delaware Courts of Chancery are persuasive authorities .").

FN13. *See* Jill E. Fisch, *The Peculiar Role Of The Delaware Courts in the Competition For Corporate Charters, 68 U. Cin. L.Rev. 1061, 1067 (2000)* ("In addition to adopting the Delaware statute, the Nevada legislature adopted Delaware case law. Moreover, courts construing Nevada law appear to follow Delaware precedent."(footnotes omitted)); Ehud Kamar, *A Regulatory Competition Theory of Indeterminacy in Corporate Law, 98 Colum. L.Rev.1908, 1911 (1998)* ("[I]n fact, Nevada adopted Delaware law wholesale...."); Jonathan R. Macey & Geoffrey P. Miller, *Toward an Interest-Group Theory of Delaware Corporate Law, 65 Tex. L.Rev. 469, 488 (1987)* ("In fact, Nevada [has] adopt[ed] both the Delaware statutory and common law as it applies to corporations.").

B.

**\*3** Having decided that *Lewis v. Anderson* governs, I now turn to the question of whether the plaintiff has pled facts invoking the fraud exception to the general rule that the loss of stockholder status in a merger divests a derivative plaintiff of standing. To be fair to the plaintiff, it is useful to set forth in full the relevant portions of her complaint:

The Subsequent Merger

26. On or about February 9, 1998, a merger was announced between the Company [Amax Gold] and Kinross. The form of the merger contemplated that the Company would become a subsidiary of Kinross, and the common stockholders of the Company would receive shares of Kinross stock in exchange for their shares of Company stock.

27. The merger proxy statement, at p. 26, describes the discussions as leading potentially to a merger of equals. At p. 33, the merger proxy statement discloses that Kinross's contribution to the combined entity ranged from 31.0% to 57.7% on the equity value measures. However, Kinross stockholders would own approximately 50% of the combined entity on an equity value basis.

28. At p. 38, it discloses that Kinross's total present value contribution would equal 45.5%. At p. 41, it discloses that the Company's contribution to the combined company ranged from 17% to 72% on equity measures and 57% to 134% on Enterprise measures. Under another analysis the Company's contribution was 45% to 53% to equity and 73% to 78% to Enterprise Value. The Company's stockholders would own approximately 50% of the equity and 67% of the Enterprise Value of the combined company.

29. The merger became effective on June 1, 1998.

30. The merger of the Company and Kinross was specifically structured and perpetrated in the form described in paragraph 26 merely to deprive the plaintiff and other common stockholders of standing to prosecute this action.

31. Moreover, there is no principled economic or equitable argument that plaintiff should lose standing here as a result of the merger between the Company and Kinross. Such loss of standing is inconsistent with basic economic principles as well as fundamental principles of equity and fairness.[FN14]

FN14. Am. Compl. ¶¶ 26-31.

Distilled to their essence, these allegations assert that because 1) on some measures Kinross can be said to have gotten the better of the economic bargain between itself and Amax Gold in the merger; and 2) the merger could have been structured as a "straight" merger with Amax Gold as the surviving corporation (or as a triangular merger with Amax Gold surviving as the public parent entity), then a reasonable inference exists that the merger was solely designed so as to deprive the plaintiff of her standing to press her derivative claims.[FN15]

FN15. The plaintiff also argues that there is "no equitable or economic reason to dismiss a valid derivative suit brought pre-merger in order to compel a post-merger double derivative suit."Pl.'s Opp'n Br. at 6. In a double derivative suit, a stockholder of a parent corporation seeks recovery on behalf of a cause of action belonging to a subsidiary corporation. See Sternberg v. O'Neil, 550 A.2d 1105 (Del.1988). Because the plaintiff might have been able to bring a post-merger double derivative suit (but did not attempt to do so), she contends, she should maintain standing to pursue the present suit.

But, the Delaware Supreme Court has already rejected this argument as inconsistent with Delaware law, and I am bound to its decisions. Nor am I free to ignore the law of the case as established by Vice Chancellor Jacobs's prior ruling. Although the Third Circuit accepted an argument similar to the plaintiff's in Blasband v. Rales, 971 F.2d 1034, 1040-46 (3d Cir.1992) ("[T]he Delaware Supreme Court sub silentio recognized an indirect financial interest as a basis for standing in ...Sternberg... [by] permit[ting] a plaintiff to pursue a double derivative suit."), both this court and the Supreme Court have rejected Blasband.See In re First Interstate Bancorp Consol. S'holder Litig., 729 A.2d 851, 868 & n. 18 (Del. Ch.1998)("Blasband is ... inconsistent with the clear holding of Lewis v. Anderson...."), aff'd sub nom.Bradley v. First Interstate Bancorp, 748 A.2d 913 (Del.2000) (ORDER); Ash v. McCall, 2000 WL 1370341, at *13 & n. 47 (Del. Ch. Sept. 15, 2000)("First Interstate clearly expressed the Delaware Courts' rejection of the Third Circuit's holding in Blasband v. Rales.... [Blasband] is not consistent with the Delaware Supreme Court's holding in Lewis v. Anderson and, for that reason, I am not free to follow it.").

As an initial matter, the parties clash over whether the sufficiency of the plaintiffs' pleading is governed by the notice pleading standard of Rule 12(b)(6) or the particularity standard of Rule 9(b). The defendants contend that the heightened standard of Rule 9(b) applies because the relevant Lewis v. Anderson exception involves an accusation of "fraud." By contrast, the plaintiff asserts that the Supreme Court did not intend by use of the term "fraud" to place such a heightened burden on derivative plaintiffs.

*4 In my view, the defendants have the better of this argument. The fraud exception to Lewis v. Anderson is just that - an exception that allows a plaintiff to show that a merger that was presented as having a legitimate business purpose was in fact entered into by one side of the deal solely for the purpose of immunizing corporate fiduciaries from liability in a pending derivative suit. In analogous contexts when a breach-of-fiduciary-duty claim is premised on an accusation of fraud, this court has examined the complaint against the particularized pleading standard of Rule

9(b). [FN16] Here, the plaintiff argues that an arm's-length merger of two public companies was not in fact consummated for the reasons contained in the merger proxy materials, but instead merely as a device to get rid of the plaintiff's derivative claims. That is, the plaintiff argues that the merger was a classic fraud perpetrated by the Amax Gold directors and Cyprus Amax.

> FN16. *See* *York Linings v. Roach,* 1999 WL 608850, at *2-3 (Del.Cb. July 28, 1999). *See* *also* *Dann v. Chrysler Corp.,* 174 A.2d 696, 700 (Del. Ch.1961) (holding that particularity requirement of Rule 9(b) applies to claims of "constructive" as well as "actual" fraud).

As important, the plaintiff here seeks to defeat what is in essence a motion under Rule 23.1. It is traditional for a plaintiff seeking to have demand excused to have to plead particularized facts.[FN17] There is no evident reason why a plaintiff should be able to proceed with mere notice pleading in attempting to invoke an exception to the general rule of *Lewis v. Anderson* that stockholders who lose stockholder status in a merger also lose derivative standing. This is especially the case when a plaintiff attempts to overcome *Lewis v. Anderson's* general rule by accusing the defendants of having committed fraud, by ginning up a pretextual merger solely to deprive the plaintiff of standing. For these reasons, I therefore find that the plaintiff has to have pled particularized facts invoking the fraud exception to *Lewis v. Anderson* in order to avoid dismissal.

> FN17. *Aronson v. Lewis,* 473 A.2d 805, 808 (Del.1984).

For reasons I now articulate, I further conclude that the plaintiff has not met that burden (or even the lesser burden that would apply under Rule 12). I begin my explanation with an obvious point. The mere fact that a merger was structured as a "triangular merger" provides no rational basis to infer that the merger was a fraud designed merely to deprive stockholders of the corporation that has lost its status as a public company of derivative standing. As the defendants point out, triangular mergers are common and have a myriad of legitimate justifications.[FN18] Similarly, there are numerous reasons for choosing one company rather than the other as the surviving public company, whether the transaction is structured as a straight or triangular merger.[FN19]

> FN18. In a triangular merger, the acquiror's stockholders generally do not have the right to vote on the merger, nor are they entitled to appraisal. *See, e.g.,* 1 R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations & Business Organizations § 9.7, at 9-10 (3d ed. Supp.2003). If a reverse triangular structure is used, the rights and obligations of the target are not transferred, assumed or affected. *See id.* § 9.8, at 9-11; James C. Freund, Anatomy of a Merger: Strategies and Techniques for Negotiating Corporate Acquisitions 79 (1975). Because of these and other advantages to using a triangular structure, it is the preferred method of acquisition for a wide range of transactions. *See* 1 Lou R. Kling & Eileen T. Nugent, Negotiated Acquisitions of Companies, Subsidiaries, and Divisions § 1.02[11], at 1-19 (2001); Freund, *supra,* at 107.

> FN19. The parties to a merger might allocate the roles of "purchaser" and "target" for a variety of reasons, such as avoiding a high stockholder vote requirement or appraisal rights for stockholders in one merging entity's jurisdiction of incorporation, dealing with hold-out stockholders or not violating a provision in a contract of one of the merging entities that prohibits it from being a party to a merger or asset transfer, or for tax considerations. *See* 1 Kling & Nugent, *supra* note 18, § 1.02[7], at 1-12. Even in a "merger of equals," a variety of factors influence the decision of which company remains as the publicly owned entity, such as the relative size of the

companies, which entity's shareholders will hold a greater percentage of the combined companies, which company's management will have the more senior positions in the combined company, or which company's directors will represent a majority of the board of the combined company. 1 *id.* § 1.02[8][a], at 1-14.

Nothing in the plaintiff's complaint reasonably supports the inference that Amax Gold structured the merger with Kinross the way it did solely to deprive the plaintiff of standing or that it was Amax Gold that sought this structure.[FN20] That is, no fact in the complaint buttresses the conclusory proposition that Amax Gold rather than Kinross would have been the surviving public company in the merger but was not solely because Amax Gold's controlling stockholder and directors wished to insulate themselves from liability in this derivative action. In focusing on Amax Gold, I take a pro-plaintiff point of view, which is to read *Lewis v. Anderson* as focusing the "fraud" inquiry on the board facing a derivative suit and whether it caused the company to merge with another party simply to avoid defending the derivative suit rather than for other valid business reasons.

FN20. *See Dell v. Grimm, 1979 WL 175247, at *2 (Del. Ch. July 17, 1979)* ("There is no hint in the record that the merger here was sought to be used to cover up the wrongful acts of management or to in any way circumvent what otherwise would appear to be a valid cause of action on behalf of the corporation and its shareholders.").

**\*5** But even taking that friendly point of view, the plaintiff's complaint falls far short of the mark. Its pleading of excerpted economic facts from the merger proxy statement suggests, at most, that Kinross's negotiators might have done a better job than Amax Gold's. Candidly, the complaint's recitation of the economic facts is so sketchy as to be unreliable even in that respect. The merger proxy statement that the complaint refers to and relies upon, and therefore incorporates, contains other facts that suggest that the merger exchange ratio was fair to Amax Gold. Indeed, it is noteworthy that a well-known investment bank gave a fairness opinion to that effect to a special committee of the Amax Gold board charged with protecting the minority stockholders. These facts accord with the reality that Kinross was an NYSE-traded company that had revenues of approximately $200 million annually in the two years preceding the merger and that had a stock trading price exceeding that of Amax Gold immediately before the merger.

More important, even if one assumes that Kinross made out somewhat better in the merger negotiations than Amax Gold, that assumption does not get the plaintiff very far in proving that the fraud exception to *Lewis v. Anderson* applies. Remember that Cyprus Amax owned over 58% of Amax Gold. For it to be rational for Cyprus Amax to have entered into the merger solely for the purpose of getting rid of this derivative action, Cyprus Amax would have had to conclude that the potential liability it faced in this action exceeded the loss it would suffer from the inadequate price it was receiving for its majority ownership of Amax Gold. At oral argument, the plaintiff's counsel was unable to identify with any precision the magnitude of his client's claims regarding the unfair financing that Cyprus Amax allegedly provided to Amax Gold. Most critically, nothing in the complaint supports a rational inference that Cyprus Amax would have entered into a merger divesting itself of 58% of Amax Gold solely to insulate itself and its affiliated directors from liability in this derivative action. Given the magnitude of the merger transaction, the involvement of an Amax Gold special committee, and a third-party merger partner like Kinross, the absence of well-pled facts suggesting that the liability Cyprus Amax and its affiliated directors faced was so substantial as to have motivated them to cause Amax Gold to enter into a pretextual merger with another publicly traded company at a sub-optimal price is fatal.

By its plain terms, the fraud exception to *Lewis v. Anderson* requires a showing that

the sole basis for Amax Gold's decision to enter the merger was to divest the plaintiff of derivative standing. This is the reading of *Lewis v. Anderson* that was adopted by Vice Chancellor Jacobs and is law of the case. I am bound to that interpretation. The plaintiff was given a second chance to make the required showing. Her cursory effort to do so rests on a conclusory allegation that is not supported by well-pled facts and that seems implausible in light of the nature of the merger and Cyprus Amax's strong interest in obtaining the right price for its equity interest in Amax Gold.

### III. *Conclusion*

**\*6** Because the plaintiff has failed to plead facts supporting the applicability of the fraud exception to *Lewis v. Anderson,* the defendants' motion to dismiss with prejudice is granted. IT IS SO ORDERED.

Del.Ch.,2003.
Lewis v. Ward
Not Reported in A.2d, 2003 WL 22461894 (Del.Ch.), 29 Del. J. Corp. L. 601

END OF DOCUMENT

▶Albert v. Alex. Brown Management Services, Inc.
Del.Ch.,2005.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Todd ALBERT, Joseph M. Bryan, Jr., Kevin Calderwood, Katherine D. Crothall, Scott W.
Frazier, FU Family Revocable Trust, Robert B. Goergen, Sr., Robert G. Goergen, Jr.,
Todd A. Goergen, Hasan 1995 Living Trust, Wai Yan Ho, Willis James Hindman, Johnson
Family Living Trust, Michael R. Kidder Revocable Trust, Mark and Ann Kington,
Jeffrey A. Koser, Marlenko Inc., Elaine McKay Family, LP, David Mixer, MRW Trust,
James Murray, Jim K. Omura 1996 Trust, Jennifer Owen and Michael J. Ross, Nicholas
Peay, Douglas G. Smith, Frederick G. Smith, Jane Vei-Chun Sun, Mark Wabschall, Karen
L. Walsh, Warmenhoven 1995 Children's Trust, Yan 1996 Revocable Trust, Barbara J.
Zale, and Charles A. Ziering, Plaintiffs,
v.
ALEX. BROWN MANAGEMENT SERVICES, INC.; Deutsche Bank Securities, Inc.; Deutsche
Bank, AG; Richard Hale; Gary Fearnow; Bruns Grayson; E. Robert Kent, Jr.; Truman T.
Semans; DC Investment Partners, LLC; Doctor Robert Cants, III; and Michael W.
Devlin, Defendants.
Elizabeth J. BAKER, Bender 1996 Revocable Trust, Dr. Steven J. Berlin, Estate of
Robert B. Blow, Luther C. Boliek, Stephen E. Coit, Sara Crowder, Gerald K. and
Teresa K. Fehr, FU Family Revocable Trust, Ralph Glasgal, Robert G. Goergen, Jr.1985
Trust, Todd A. Goergen 1985 Trust, Peter O. Hausmann, Willis James Hindman, William
F. Kaiser, Mark and Ann Kington, Timothy K. Krauskopf, William T. McConnell, Philip
R. McKee, David Mixer, MRW Trust, James Murray, Paul D. and Judith F. Newman, W.L.
Norton, Gregory Packer, Howard E. Rose, Ruben Family Limited Partnership, 5 S Trust,
Saladrigas Family Ltd. Partnership, Ricardo A. Salas, Jose M. Sanchez, Samuel
Siegel, Silverman 1996 Irrevocable Trust, Douglas G. Smith, Frederick G. Smith,
Ronald B. Stakland, Strauch Kulhanjain Family Trust, Bruce E. Toll, Alexander R. and
Marjorie L. Vaccaro, Yanover Family Ltd. Partnership, Michael Yokell, and Justin A.
Zivin, Plaintiffs,
v.
ALEX. BROWN MANAGEMENT SERVICES; Deutsche Bank Securities, Inc.; Deutsche Bank, AG;
Richard Hale; E. Robert Kent, Jr.; Truman T. Semans; DC Investment Partners, LLC;
Doctor Robert Crants, III, and Michael W. Devlin, Defendants.
No. Civ.A. 762-N, Civ.A. 763-N.

Submitted July 22, 2005.
Decided Aug. 26, 2005.

Jeffrey S. Goddess, Jessica Zeldin, Rosenthal, Monhait, Gross & Goddess, P.A.,
Wilmington, Delaware; Steven E. Fineman, Hector D. Geribon, Daniel P. Chiplock,
Lieff, Cabraser, Heimann & Bernstein, LLP, New York, New York, for the Plaintiffs.
Michael D. Goldman, Peter J. Walsh, Jr., Melony R. Anderson, Potter Anderson &
Corroon LLP, Wilmington, Delaware; Christopher P. Hall, Kevin Rover, John Vassos,
Marilyn B. Ampolsk, Morgan Lewis & Bockius, LLP, New York, New York, for the
Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities, Inc. and
Deutsche Bank A.G.
Daniel Griffith, Marshall Dennehey, Warner, Coleman & Goggin, Wilmington, Delaware,
for Defendants DC Investment Partners, LLC, Dr. Robert Crants, III, and Michael W.
Devlin.
Richard D. Allen, Thomas W. Briggs, Jr., Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware, for Defendants Richard Hale, Gary Fearnow, Bruns Grayson, E.
Robert Kent, Jr. and Truman T. Semans.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

*1 In a recent opinion in these two related cases on the defendants' motion to dismiss under Court of Chancery Rule 12(b)(6), the court addressed the defendants' statute of limitations argument and concluded that any claims arising before November 11, 2000, the date upon which the parties entered into an agreement tolling the statute of limitations, were barred.[FN1]Because it was unclear which, if any, claims for relief set out in the complaints arise after that date, the court requested additional submissions from the parties.

> FN1. The facts alleged in the complaints are recited in detail in the earlier opinion. *Albert v. Alex. Brown Mgmt. Servs.*, 2005 Del. Ch. LEXIS 100, at *43- 58, 2005 WL 1594085 (Del. Ch. June 29, 2005). Reference is made to that opinion for a complete recitation of the facts and for the definition of terms used herein. However, to avoid confusion, the court refers in this opinion to Alex. Brown Management Services, Inc. as "AB Management." Unless otherwise noted, the facts recited in this opinion are taken from the well-pleaded allegations of the complaints.

In this opinion, the court now addresses the issues raised in the additional submissions as well as the remaining issues raised by the defendants' motion to dismiss. Included among the latter are: (i) whether any surviving claims are derivative, rather than direct claims as to which demand was neither made nor excused; and (ii) whether the court can exercise personal jurisdiction over several defendants (the "DCIP Defendants") who served as agents, or employees of agents, of the partnerships.

II.

In the earlier opinion, the court noted that some of the factual allegations in the complaints occurred after November 11, 2000 and that, therefore, viable claims based on these factual allegations are not time-barred.[FN2]The Plaintiffs' Response Brief [FN3] identified five other factual allegations in the complaints (all involving allegedly material misrepresentations or non-disclosures) which, they contend, support viable claims for relief. These are: (i) the Managers' failure in the December 2000 semi- annual reports (dated on or about February 28, 2001) to inform the defendants that hedging was desirable, but the Funds could not afford to do so; (ii) the allegedly misleading statement in the December 31, 2000 report to the unitholders that the Managers remained "comfortable with the broad diversification achieved by the Fund[s'] portfolio of public securities and private investments ....;" (iii) the defendants' failure to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity," although these themes were the focus of the Management Committee meetings of October 3, 2000, March 23, 2001, and September 6, 2001; (iv) the defendants' failure to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds; and (v) the defendants' failure to inform the unitholders of the Funds violation of their credit arrangements with their lenders, including their eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan).

> FN2. The factual allegations specifically discussed in the earlier opinion are as follows: First, the Managers failed to provide financial statements and reports as they are required to under the Partnership Agreements and Delaware law. Second, the Managers wrongfully allowed certain withdrawals from the

Funds, thereby causing or exacerbating a liquidity crisis. Specifically, the Fund II Complaint alleges that three withdrawals from Fund II occurred after November 11, 2000. These allegedly occurred on January 17, 2001, October 25, 2001, and December 31, 2001 (the "Fund II 2001 Withdrawals"). Additionally, the Fund I Complaint alleges approximately $8.0 million in withdrawals occurred in December of 2000 from Fund I (the "Fund I December 2000 Withdrawals"). Third, the Managers failed to provide active and competent management of the Funds. *Alex. Brown, 2005 Del. Ch. LEXIS 100, at \*78-\*79, 2005 WL 1594085 (Del.Ch.).*

FN3. The Plaintiffs' Response Brief is titled "Plaintiffs' Brief In Response To The Court's Memorandum Opinion And Order Of June 29, 2005" and was filed on July 15, 2005.

All five of these factual allegations are found in the complaints. Furthermore, they allegedly occurred after November 11, 2000. Therefore, claims based on these allegations are timely. However, a threshold question is whether the information that the plaintiffs allege should have been disclosed, or was disclosed but was allegedly false and misleading, is material. If this information is not material as a matter of law, the allegations will not support claims that the Managers violated their disclosure duties.

**\*2** The determination of materiality is a mixed question of fact and law that generally cannot be resolved on the pleadings.[FN4]Therefore, the court cannot (and does not) make any final findings on the materiality of these alleged disclosure allegations. However, on a *Rule 12(b)(6)* motion, the court must determine whether, under the facts alleged in the complaints, these disclosure (or non-disclosure) allegations support a reasonable inference of materiality. If they do not, these factual allegations cannot support a claim for relief.

FN4.*O'Malley v. Boris, 742 A.2d 845, 850 (Del.1999)*

An omitted fact is material if "under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[FN5]

FN5.*Rosenblatt v. Getty Oil Co., 493 A.2d 929, 944 (Del.1983)* (quoting *TSC Indus. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)*).

The first alleged non-disclosure is that the Managers' failed in the December 2000 semi-annual reports to inform the unitholders that hedging was desirable, but the Funds could not afford to do so. This allegation of non-disclosure, viewed in the context of the allegations contained in the complaints, supports a reasonable inference that this information is material. According to the complaints, the defendants marketed the Funds as being actively managed by experienced, professional managers. Viewed in this context, a unitholder would likely find it important to know that the Managers could not manage the Funds in what they believed to be the Funds' best interests, because they were facing liquidity problems and could not afford to purchase collars.

The second alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity." As alleged in the complaints, the real cause of the Funds' losses was the lack of liquidity. The lack of liquidity allegedly prevented the Managers from properly hedging the

Funds as they (allegedly) thought was best for the Funds. Viewed in that context, a reasonable investor would likely find it important to know such information.

The third alleged non-disclosure is that the defendants failed to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds. Under the facts alleged, the court cannot reasonably infer that this information is material. The complaints allege that the unitholders understood from the very beginning that the Funds would have to borrow money. This is because the contributed securities were illiquid and the Funds needed cash to purchase collars. Given that fact, it is unlikely that a reasonable investor would find it important to know that the Funds were borrowing from one lender as opposed to multiple lenders. In fact, such information would likely only confuse an investor by giving him more information than is necessary to understand the Funds. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

**\*3** The fourth alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' violations of the credit arrangements with their lenders, including the eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan). This allegation supports a reasonable inference of materiality. As opposed to the information about a bank withdrawing from the credit syndicate, the fact that the Funds were in default on their loans directly speaks to the financial condition of the Funds. A reasonable investor would want to know this information.

Finally, the plaintiffs allege that the claim in the December 31, 2000 report that the Managers remained "comfortable with the broad diversification achieved by the Fund[s'] portfolio of public securities and private investments" was materially false and misleading. This allegation does *not* support a reasonable inference that this information is material. It is simply a statement of the Managers' opinion. Furthermore, there is no allegation in the complaints that this statement of opinion was not honestly held, i.e. false. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

The Non-Disclosure Allegations [FN6] relate to failures to disclose allegedly material information. There is not, of course, any general duty to disclose information. To bring a non-disclosure claim, a party must allege either a fiduciary duty or a contractual duty to disclose. The plaintiffs have attempted to allege both. Therefore, the court will address the Non-Disclosure Allegations in the context of the plaintiffs' claims for breach of fiduciary duty and breach of contract.

FN6. Collectively, the court refers to the three remaining factual allegations of non-disclosure as the "Non-Disclosure Allegations."

III.

The allegations set out in the two complaints are nearly identical and the complaints are both set out in eleven counts: breach of fiduciary duty (Count 1); aiding and abetting a breach of fiduciary duty (Count 2); common law fraud (Count 3); aiding and abetting common law fraud (Count 4); breach of contract against AB Management (with respect to Fund I) and breach of contract against DCIP (with respect to Fund II) (Count 5); breach of the covenant of good faith and fair dealing against AB Management (with respect to Fund I) and breach of the covenant of good faith and fair dealing against DCIP (with respect to Fund II) (Count 6); gross negligence (Count 7); unjust enrichment against all defendants (Count 8); conspiracy liability (Count 9); an accounting (Count 10); and agency liability against Deutsche Bank and DBSI (Count 11). The court first addresses each of the substantive claims (Counts 1, 3, 5-8, & 10). The court then considers the vicarious liability claims

(Counts 2, 4, 9, & 11).

A. *Breach Of Fiduciary Duty (Count 1)*

1. *Failure To Provide Financial Statements*

The complaints allege that the Managers failed to provide the unitholders with the 2001 audited financial statements until 2003, and failed to provide any investor reports or audited financial statements for 2002. The plaintiffs argue that this amounted to a breach of the Managers' fiduciary duties.

**\*4** There is not, of course, a general fiduciary duty to provide financial statements. Instead, under the Partnership Agreements, the Managers had a contractual duty to provide the unitholders with such reports.[FN7]The plaintiffs have not articulated why the violation of this contractual right amounted to a breach of fiduciary duty.[FN8]Thus, this factual allegation does not state a claim for breach of fiduciary duty.

>    FN7. Partnership Agreements § 11.2.

>    FN8. In the Plaintiffs' Response Brief, the plaintiffs argue that the Managers failed to make material disclosures, when they had a fiduciary obligation to do so. They further outline specific factual allegations, the Non-Disclosure Allegations, they contend are material and should have been disclosed. The Non-Disclosure Allegations are discussed below.

2. *Withdrawal Allegations*

The plaintiffs argue that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals. The plaintiffs contend that the defendants violated their fiduciary duties "by failing to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives,' and failed to ensure that the Managers were providing professional and active supervision, oversight and management of the Funds."[FN9]

>    FN9. Pls.'s Resp. Br. at 7.

From these factual allegations, the court cannot reasonably infer a breach of the fiduciary duty of loyalty. The complaints do not allege that the Managers benefited personally in any way by allowing the withdrawals. In fact, the amount of fees that the Managers received were based on the amount of money the Funds had under management. Therefore, if anything, the Managers had an incentive *not* to allow redemptions.

Likewise, the plaintiffs' allegations relating to the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not rise to the level of a breach of the duty of care. Director liability for breaching the duty of care "is predicated upon concepts of gross negligence."[FN10]A court faced with an allegation of lack of due care should look for evidence of whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives.[FN11]

>    FN10.*Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984); accord Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 66 (Del.1989).*

>    FN11.*Citron, 569 A.2d at 66*

Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one "which involves a devil-may-care attitude or indifference to duty amounting

to recklessness."[FN12]"In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[FN13]In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was "recklessly uninformed" or acted "outside the bounds of reason."[FN14]

> FN12. William T. Allen, Jack B. Jacobs and Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law,* 56 BUS. LAW. 1287, 1300 (2001); *accord Tomczak v. Morton Thiokol, Inc.,* 1990 Del. Ch. LEXIS 47, at *35, 1990 WL 42607 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds of reason." ') (citations omitted).

> FN13.*In re Walt Disney Co. Derivative Litig.,* 2005 Del. Ch. LEXIS 113, at *162, 2005 WL 2056651, 907 A.2d. 693, (Del. Ch. Aug. 9, 2005) (internal citations and quotations omitted).

> FN14.*Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.,* 1996 Del. Ch. LEXIS 116, at *42, 1996 WL 506906 (Del. Ch. Sept. 3, 1996) (citations omitted), *aff'd,*692 A.2d 411 (Del.1997) (TABLE); *see also Solash v. Telex Corp.,* 1988 Del. Ch. LEXIS 7, at *24-*25, 1988 WL 3587 (Del. Ch. Jan. 19, 1988) (stating that the standard for gross negligence is a high one, requiring proof of "reckless indifference" or "gross abuse of discretion") (citations omitted).

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals were actionably wrongful. Yet, the plaintiffs specifically allege in the complaints that the Partnership Agreements gave limited partners, in defined circumstances, the right to redeem. While the agreements also gave the Managers the power to delay or deny redemption requests "in [their] sole discretion,"[FN15] it is difficult to read that discretionary power as imposing a positive duty to exercise that power to prevent or delay a withdrawal in order "to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives.' ' Thus, while the redemptions may have exacerbated the Funds' liquidity crunch, this is not enough to say that the Managers' failure to delay or deny those redemptions can give rise to a duty of care claim.

> FN15. Fund I Compl. ¶ 82; Fund II Compl. ¶ 94.

**\*5** Therefore, the factual allegation that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals does not give rise to a claim for breach of fiduciary duty.

3. *Active And Competent Management And Disclosure Allegations*

First, the complaints allege that the Managers lacked the experience and expertise to manage the Funds. Second, the complaints allege that the Managers devoted inadequate time and attention to managing the Funds. The complaints also allege that the Managers failed to disclose material information, and made misleading disclosures.

The claim that the Managers lacked the experience and expertise to manage the Funds is completely without merit. The defendants disclosed the qualifications of the Funds' Management Committee in the Private Placement Memoranda (the "PPMs") that the defendants gave to all of the unitholders. The "Management" sections of the PPMs disclosed the names, titles, affiliations, ages, educations, and experience of the

Management Committee members, DCIP's principals, and DCIP's degree of experience with exchange funds.[FN16] The unitholders received this information before they ever made their investment in the Funds. They, therefore, implicitly agreed that the Managers were sufficiently qualified to manage the Funds.

   FN16. *See* Fund I PPM at 27-29; Fund II PPM at 29-31.

However, the plaintiffs' other claim, that the Managers devoted inadequate time and attention to managing the Funds and committed disclosure violations, is more substantial. The complaints allege that the Managers made false and misleading statements to the unitholders, and failed to disclose material information. While many of the alleged misstatements took place before November 11, 2000, some (specifically, the Non-Disclosure Allegations) took place after this date.

The complaints allege that the Managers met only sporadically, less than once a year since the inception of the Funds. During this time, the Funds were facing difficult challenges. The Managers originally set up the Funds with collars, attempting to limit the upside and downside potential of the Funds.[FN17] The appreciation of certain contributed securities (especially Yahoo!) was causing the Funds to blow through the collars. The Managers then made the decision to remove the collars on the Funds, a decision that had beneficial effects in the short-term, but over the long-term, when the defendants failed to reinstate the collars, resulted in sharp losses.

   FN17. "Collaring" is financial jargon for purchasing offsetting calls and puts on a security to limit upside and downside exposure. At the inception of the Funds, the Managers attempted to limit upside and downside exposure to roughly 10%. *Alex. Brown, 2005 Del. Ch. LEXIS 100, at *9, 2005 WL 1594085 (Del.Ch.)*.

Viewed in the light most favorable to the plaintiffs, these alleged facts do (just barely) raise a duty of care claim. Whether the Managers exercised the requisite amount of due care in managing the Funds is, of course, a fact sensitive inquiry. In certain circumstances, meeting once a year to manage an investment vehicle would be sufficient. This would be the case when the investment is relatively straight-forward, or where the complexity of the investment lies in its original design. In fact, a typical exchange fund could require less active management than other types of investments. These funds are often designed to avoid tax liability and to provide diversification, *not* to generate spectacular returns. Therefore, under normal circumstances, a properly hedged and diversified exchange fund might need less active management than, say, a typical mutual fund.

*6 The facts alleged in the complaints, however, paint a picture of the Funds being faced with exceptional challenges, first by the sharply rising value of the securities that made up the Funds, and second by the rapid fall in value of those same securities. The response of the Managers was, allegedly, almost nonexistent, meeting less than once a year.

Furthermore, the complaints allege that the Managers failed to disclose the challenges facing the Funds and the meager steps they were taking to meet those challenges. These alleged disclosure violations were potentially material because, had the plaintiffs known the truth, they could have asked for withdrawals, or brought suit before the value of the Funds plummeted.

It is quite possible that the Managers acted appropriately in both the amount of time they spent managing the Funds and the disclosures they made. However, the complaints paint a picture of the Managers taking almost *no* action over the course of several years to protect the unitholders' investments, while the value of the Funds first skyrocketed and later plummeted. Under the circumstances, the plaintiffs should at least be allowed discovery to find out if, as the complaints imply, the

Managers received millions of dollars in fees for doing almost nothing.

Therefore, for all of the above reasons, the court holds that the plaintiffs have plead sufficient facts to give rise to a duty of care claim.

B. *Breach Of Contract And The Implied Covenant Of Good Faith And Fair Dealing (Counts 5 & 6)*

In order to survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must demonstrate: (i) the existence of the contract, (ii) a breach of an obligation imposed by that contract, and (iii) resultant damages to the plaintiff.[FN18]

> FN18.*VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del.2003)*.

1. *Failure To Provide Financial Statements Allegations*

The complaints allege that the Managers had a contractual duty under the Partnership Agreements to provide semi-annual unaudited financial statements reporting on the financial condition of the Funds, and an annual audited report. The complaint further alleges that the Managers did not provide the unitholders with these reports for 2002 and did not provide the 2001 audited financial statements until 2003. Further, the court reasonably infers from the facts alleged in the complaints that the plaintiffs were harmed by either not being able to ask for a redemption, or not being able to sue for rescission or a like remedy. Therefore, the plaintiffs have satisfied the pleading requirements for a breach of contract claim and this claim cannot be dismissed.

2. *Withdrawal Allegations*

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals constituted a breach of contract. They argue that the withdrawals caused, or made worse, the Funds' liquidity crunch. However, the Partnership Agreements gave the unitholders the right to withdraw their investments after two years.[FN19]As alleged in the complaints, the unitholders' right to withdraw was limited by the power of the Managers to delay or deny redemptions "in [their] sole discretion."[FN20]

> FN19.*See* Partnership Agreements ¶¶ 6.3.

> FN20. Fund I Compl. ¶ 82, Fund II Compl. ¶ 94.

**\*7** This contractual provision did not create a duty for the Managers to individually assess the financial position of the Funds and the effect that such a withdrawal would have each time a unitholder requested a withdrawal. Instead, it placed a restriction on the unitholders' right to receive withdrawals. It gave the Managers the power to limit withdrawals, in their sole discretion. Therefore, the plaintiffs have not identified a contractual obligation that the Managers have violated and this claim must be dismissed.[FN21]

> FN21. In the Plaintiffs' Response Brief, the plaintiffs implicitly admit that the Managers had the authority to allow the withdrawals. Instead of arguing this point, the plaintiffs argue that the Managers had a contractual obligation to report the withdrawals.

3. *Active And Competent Management And Disclosure Allegations*

The plaintiffs allege that the defendants owed them a contractual duty to provide

active management and to disclose all material information. The complaints allege that the Managers made false and misleading statements to the unitholders, failed to disclose material information, and that the Managers met only sporadically, less than once a year since the inception of the Funds.

As stated above, the Managers are alleged to have owed the unitholders a contractual duty to provide regular financial reports. Of course, concomitant to the duty to provide information is the duty that such information not be false or misleading. In other words, the defendants had a contractual duty to provide the information in good faith. The complaints allege that the Managers failed to provide reports when they were contractually obligated to do so, and that, when they did provide the reports, they were false and misleading. Specifically, the plaintiffs argue that the Managers failed to disclose certain material information-the Non-Disclosure Allegations and the withdrawals.

These allegations, if proven, are sufficient to support a claim for breach of contract. Therefore, this claim survives the motion to dismiss.

C. *Fraud (Count 3)*

The plaintiffs' third claim is for fraud. Common law fraud in Delaware requires that: (1) the defendant made a false representation, usually one of fact; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance.[FN22] In addition to overt representations, where there is a fiduciary relationship, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.[FN23] Fraud claims are subject to the heightened pleading standards of Rule 9(b). This means that the pleading must identify the "time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby."[FN24]

> FN22. *Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del.1983).*

> FN23. *Id.*

> FN24. *York Linings v. Roach,* 1999 Del. Ch. LEXIS 160, at *25, 1999 WL 608850 (Del. Ch. July 28, 1999). (internal quotations and citations omitted).

The plaintiffs argue that the defendants committed fraud by failing to disclose material information which they had a contractual and fiduciary duty to disclose, specifically the Non-Disclosure Allegations. Obviously, this claim (resting principally on alleged omissions) is merely a rehash of Count 1's claim of breach of fiduciary duty and Count 5's claim for breach of contract. It does not independently support a claim for relief. Moreover, the plaintiffs fail to plead with particularity what the defendants obtained through their alleged fraud. The plaintiffs plead generally that the Managers received management fees based on the amount of money that the Funds had under management, thereby giving them an incentive to keep money in the Funds. But the plaintiffs' arguments on this score are inherently contradictory. While they argue that the defendants had an incentive to keep money in the Funds to earn great management fees, they also argue that the Managers wrongfully allowed withdrawals, thereby reducing the amount of money they had under management. Are the withdrawals also part of the alleged fraud?

**\*8** For the above reasons, the plaintiffs have failed to adequately state a claim for fraud. Therefore, Count 3 will be dismissed without prejudice to the claims asserted

in Count 1 or Count 5.

D. *Gross Negligence (Count 7)*

The plaintiffs' fourth claim is for gross negligence. Both of the Funds' Partnership Agreements contain an exculpatory provision, limiting the liability of the Managers for losses the unitholders incurred with respect to the Funds. Except for misrepresentation or breach of the Partnership Agreements, the General Partners of the Funds (AB Management for Fund I and DCIP for Fund II), and those who perform service on their behalf, are not liable to the unitholders, unless their conduct constituted "gross negligence or intentional misconduct."[FN25] As such, the unitholders are forced to argue that the Managers' alleged misconduct amounted to gross negligence.

> [FN25.](#) Partnership Agreements § 3.5.

First, as discussed above, the allegations of the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not state a claim for gross negligence. Second, also as stated above, claims for breach of the duty of care are predicated on concepts of gross negligence. The court has already found that the plaintiffs' claim for breach of the duty of care survive the motion to dismiss. Therefore, this claim survives as well.

E. *Unjust Enrichment (Count 8)*

The plaintiffs, in the alternative, plead both a claim for breach of contract and a claim for unjust enrichment. In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls.[FN26] It is undisputed that a written contract existed between the unitholders and the defendants. The Partnership Agreements for the Funds spelled out the relationship between the parties, and the plaintiffs specifically brought claims based on these contracts.

> [FN26.](#)*[Rossdeutscher v. Viacom, Inc.,](#)* [768 A.2d 8, 24 (Del.2001)](#) (applying New York law); *[ID Biomedical Corp. v. TM Tech., Inc.,](#)* [1995 WL 130743, at *15 (Del.Ch. Mar.16, 1995) (applying Delaware law)](#).

Notwithstanding the existence of these contractual relationships, the plaintiffs make the bald claim that the Managers were unjustly enriched at the unitholders expense. This is insufficient to state a claim for unjust enrichment, when the existence of a contractual relationship is not controverted. Thus, this claim must be dismissed.

F. *Agency Liability (Count 11)*

The plaintiffs also bring claims against Deustche Bank and DBSI (as controlling persons of AB Management) based on agency liability. A parent corporation can be held liable for the acts of its subsidiary under either of two theories of agency liability. The first is where "piercing the corporate veil" is appropriate. While many factors are considered in deciding whether to pierce the corporate veil, "the concept of complete domination by the parent is decisive."[FN27]

> [FN27.](#)*[Phoenix Canada Oil Co. v. Texaco, Inc.,](#)* [842 F.2d 1466, 1477 (3d Cir.1988)](#).

**\*9** Second, while one corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company, a corporation-completely independent of a second corporation-may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. Under this second theory, total domination or general alter ego criteria need not be proven.[FN28]

FN28. *Id.* (citing RESTATEMENT (SECOND) OF AGENCY § 14M, cmt. (a) (1958)).

With respect to DBSI, the plaintiffs argue that AB Management was dominated and controlled by DBSI. In essence, the plaintiffs ask the court to disregard AB Management's corporate form[FN29] and impose liability on DBSI. The complaints allege that: (i) DBSI and AB Management operate out of the same Maryland office; (ii) AB Management, although incorporated, has no functioning board of directors and no business other than the management of the Funds; (iii) AB Management is run by its Management Committee, which is comprised of employees and executives of DBSI; (iv) DBSI provided margin accounts for the Funds; and (v) DBSI served as the placement agent and custodian for the Funds' accounts.[FN30]

FN29. AB Management is a corporation, organized under the laws of Maryland.

FN30. Fund I Compl. ¶¶ 44, 45, 247, 250, 332, 334; Fund II Compl. ¶¶ 54, 179, 253-259.

"Persuading a Delaware Court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears."[FN31]Allegations (i), (iv) and (v) above, while consistent with an obviously close relationship between DBSI and its wholly owned subsidiary, do not alone or together support any inference that would lead this court to disregard the separate legal existence of AB Management; nor does the allegation that AB Management's business is run by DBSI employees. However, the well pleaded factual allegation that AB Management has "no functioning board of directors," when viewed most favorably to the plaintiffs in light of the other facts alleged, if proven, could provide a basis to conclude that the corporate form should be ignored. The corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent.[FN32]The complaints allege that AB Management does not have board meetings or follow other corporate formalities. Instead, employees of DBSI allegedly perform the activities that, in a properly functioning corporation, the board of directors would perform. If these facts are true and the other relationships are shown to exist, an adequate basis for piercing the corporate veil could be established. Therefore, this claim against DBSI cannot be dismissed.

FN31.*Mason v. Network of Wilmington, Inc.*, 2005 Del. Ch. LEXIS 99, at \*9, 2005 WL 1653954 (Del. Ch. July 1, 2005) (internal quotations omitted).

FN32.*Mabon, Nugent & Co. v. Texas Amer. Energy Corp.*, 1990 Del. Ch. LEXIS 46, at \*14-\*15, 1990 WL 44267 (Del. Ch. Apr. 12, 1990); *Phoenix Canada Oil*, 842 F.2d at 1477.

The complaints make additional allegations as to why AB Management is a mere agent of Deutsche Bank. These are: (i) Deutsche Bank purchased Alex. Brown, Inc. (the parent company of AB Management) thereby acquiring 100% ownership of AB Management; (ii) Deutsche Bank changed the name of the Funds the reflect the "Deutsche Bank" name; (iii) when the liquidity crisis became acute, the Management Committee decided that it needed to alert officials at Deutsche Bank; and (iv) in July of 2002, Deutsche Bank fired all the members of the Management Committee.[FN33]

FN33. Fund I Compl. ¶¶ 153, 163, 239-240; Fund II Compl. ¶¶ 179, 253-259.

**\*10** First, these factual allegations do not give rise a reasonable inference that Deutsche Bank dominated and controlled AB Management and the Management Committee. These factual allegations show little more than Deutsche Bank owned the parent company of AB Management and, indirectly, AB Management itself. Ownership alone is not sufficient proof of domination or control.[FN34] The complaints allege that Deutsche Bank bought AB Management in June of 1999 and changed its name a few months later. The complaints do not allege any action by Deutsche Bank to influence or control the management of the Funds until July of 2002, when it fired the majority of the Management Committee. From these bare factual allegations, the court simply cannot infer domination or control.

FN34. *Aronson, 473 A.2d at 815;see also In re W. Nat'l S'holders Litig., 2000 Del. Ch. LEXIS 82, 2000 WL 710192 (Del. Ch. May 22, 2000)* (holding that a 46% shareholder does not control or dominate the board due to stock ownership alone).

Second, these factual allegations do not give rise a reasonable inference that, in the managing and/or sale of the Funds, AB Management and the Management Committee were Deutsche Bank's agent. Under the rubric of agency liability, there are two main theories-actual authority and apparent authority. Because the plaintiffs do not describe which theory of liability they assert, the court addresses both.

Actual authority is that authority which a principal expressly or implicitly grants to an agent.[FN35] There is simply no allegation in the complaints that Deutsche Bank expressly gave either AB Management or the Management Committee the authority to bind it as its agent.

FN35. *Billops v. Magness Constr. Co., 391 A.2d 196, 197 (Del.1978)*.

Apparent authority is that authority which, though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing.[FN36] In order to hold a defendant liable under apparent authority, a plaintiff must show reliance on indicia of authority originated by principal, and such reliance must have been reasonable.[FN37] The plaintiffs have not alleged any facts showing that Deutsche Bank held out either AB Management or the Management Committee as its agent; nor have the plaintiffs alleged facts from which the court can reasonably infer reliance.

FN36. *Henderson v. Chantry, 2002 Del. Ch. LEXIS 14, at \*14, 2002 WL 244692 (Del. Ch. Feb. 5, 2002)*.

FN37. *Billops, 391 A.2d at 198*.

For the above reasons, the plaintiffs have failed to plead sufficient facts to support a claim for agency liability against Deutsche Bank and Count 11 against Deutsche Bank must be dismissed. However, the plaintiffs plead sufficient facts to support a claim for liability against DBSI. Therefore, Count 11 against DBSI will not be dismissed.

G. *Conspiracy, Aiding And Abetting Fraud, And Breach Of Fiduciary Duty (Count 2, 4, & 9)*

The plaintiffs allege that the defendants conspired to commit fraud and to commit a breach of fiduciary duty. The elements for civil conspiracy under Delaware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done

in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties.[FN38]While the plaintiffs caption their claim as aiding and abetting breach of fiduciary duty, the court treats it as a claim for civil conspiracy. Claims for civil conspiracy are sometimes called aiding and abetting.[FN39]However, the basis of such a claim, regardless of how it is captioned, is the idea that a third party who *knowingly* participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship.[FN40]

   FN38.*AeroGlobal Capital Mgmt., LLC v. Cirrus Indus.,* 871 A.2d 428, 437 n. 8 (Del.2005); *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149-50 (Del.1987).

   FN39.*See Benihana of Tokyo, Inc. v. Benihana, Inc.,* 2005 Del. Ch. LEXIS 19, at *26, 2005 WL 583828 (Del. Ch. Feb. 28, 2005).

   FN40.*Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del.Ch.1984), *aff'd,*575 A.2d 1131 (Del.1990).

**\*11** However captioned, civil conspiracy is vicarious liability.[FN41]It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty.[FN42]Therefore, it does not apply to the defendants which owe the unitholders a direct fiduciary duty. Instead, the plaintiffs attempt to hold Deustche Bank and DBSI responsible for the Managers' alleged breaches of fiduciary duty.

   FN41.*See, e.g., Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1238 (Del.Ch.2001) ("Civil conspiracy thus provides a mechanism to impute liability to those not a direct party to the underlying tort."), *rev'd on other grounds,*817 A.2d 149 (Del.2002).

   FN42.*Gilbert,* 490 A.2d at 1057.

The defendants argue that the plaintiffs have not adequately alleged that Deustche Bank and DBSI had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity."[FN43]While Rule 9(b) provides that "knowledge ... may be averred generally," where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it.[FN44]

   FN43.*Atlantis Plastics Corp. v. Sammons,* 558 A.2d 1062, 1066 (Del.Ch.1989) (citing Rule 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

   FN44.*IOTEX Communs., Inc. v. Defries,* 1998 Del. Ch. LEXIS 236, at *12-*13, 1998 WL 914265 (Del. Ch. Dec. 21, 1998).

Furthermore, Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal.[FN45] With respect to DBSI, the complaints allege repeatedly that its employees, acting within the scope of their employment, had knowledge of the underlying factual allegations. Specifically, the complaints allege that the Funds were run by the Management Committee, all the members of which were employees of DBSI.[FN46]This knowledge is thereby imputed to DBSI.

   FN45.*J.I. Kislak Mtg. Corp. v. William Matthews Bldr., Inc.,* 287 A.2d 686, 689

(Del.Super.1972), *aff'd,*303 A.2d 648 (Del.1972).

FN46. Fund I Compl. ¶¶ 45, 47-51, 247-251; Fund II Compl. ¶¶ 55, 57-61, 261-266.

With respect to Deutsche Bank, the plaintiffs allege that AB Management and the Management Committee are mere agents of Deutsche Bank. However, as discussed above, the factual allegations in the complaints are insufficient to infer that AB Management and the Management Committee are the agents of Deutsche Bank.

For the above reasons, the court holds that the plaintiffs have not adequately pleaded facts that, if proven, would support an inference that Deustche Bank had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. The plaintiffs have adequately pleaded that DBSI had knowledge of the alleged wrongful acts. Therefore, with respect to Deutsche Bank, Counts 2, 4, and 9 must be dismissed. With respect to DBSI, these counts will not be dismissed.

H. *Accounting (Count 10)*

The plaintiffs' tenth claim is for an accounting. An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result.[FN47] As it is a remedy, should the plaintiffs ultimately be successful on one or more of their claims, the court will address their arguments for granting an accounting.

FN47.*Jacobson v. Dryson Acceptance Corp.,* 2002 Del. Ch. LEXIS 4, at *12-*13, 2002 WL 31521109 (Del. Ch.2002).

V.

The defendants argue that several of the claims in the complaints are derivative and that, since the plaintiffs did not make demand upon the Funds, and demand was not excused, these claims should be dismissed pursuant to Rule 23.1.[FN48]

FN48. The claims that the defendants contend are derivative are as follows: breach of fiduciary duty (Count 1), aiding and abetting breach of fiduciary duty (Count 2), breach of contract (Count 5), breach of the covenant of good faith (Count 6), gross negligence (Count 7), unjust enrichment (Count 8), accounting (Count 10), and agency liability (Count 11). As the court has already dismissed the claim for unjust enrichment (Count 8) and agency liability as to Deutsche Bank (Count 11), and deferred granting the equitable remedy of an accounting (Count 10), it will not discuss those claims here.

**\*12** The demand requirement in the limited partnership context is codified in 6 Del. C. § 17-1001. That statute states:

A limited partner or an assignee of a partnership interest may bring an action in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

Likewise, the determination of whether a claim is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases.[FN49] Accordingly, throughout this decision, the court relies on corporate as well as partnership case law for its determination of this lawsuit's nature.

FN49.*Litman v. Prudential-Bache Prop., Inc.,* 611 A.2d 12, 15 (Del.Ch.1992).

The Delaware Supreme Court's recent decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* revised the standard for determining whether a claim is direct or derivative. Now, the determination "turn[s] solely on the following questions: (i) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (ii) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[FN50] "[U]nder *Tooley,* the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint."[FN51] "Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists."[FN52]

FN50. 845 A.2d 1031, 1033 (Del.2004).

FN51. *In re Syncor Int'l Corp. S'holders Litig.,* 857 A.2d 994, 997 (Del.Ch.2004).

FN52. *Dieterich v. Harrer,* 857 A.2d 1017, 1027 (Del.Ch.2004).

As they are factually distinct, the court deals with the claims separately. First, the court addresses the claims for breach of contract and the breach of fiduciary duty based on the Non-Disclosure Allegations. Second, the court addresses the claims for gross negligence and failing to provide active and competent management, and the fiduciary duty claims based thereon.

A. *Breach Of Contract And The Non-Disclosure Allegations*

The claims for breach of contract and the claims for breach of fiduciary duty based on the Non-Disclosure Allegations are direct. First, the unitholders, not the partnerships, suffered the alleged harm. In order to show a direct injury under *Tooley,* a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]."[FN53] The gravamen of these claims is that the Managers failed to disclose material information when they had a duty to disclose it and made other misleading or fraudulent statements, in violation of their contractual and fiduciary duties. Generally, non-disclosure claims are direct claims.[FN54] Moreover, the partnerships were not harmed by the alleged disclosure violations. Any harm was to the unitholders, who either lost their opportunity to request a withdrawal from the Funds from the Managers, or to bring suit to force the Managers to redeem their interests.

FN53. *Tooley,* 845 A.2d at 1039.

FN54. *See, e.g., Dieterich,* 857 A.2d at 1029 (characterizing non-disclosure claims as direct claims); *Abajian v. Kennedy,* 1992 Del. Ch. LEXIS 6, at *10, 1992 WL 8794 (Del. Ch. Jan. 17, 1992)* (same).

**\*13** Second, the unitholders would receive any recovery, not the Funds. Under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will receive the benefit of any remedy.[FN55] While the best remedy for a disclosure violation is to force the partnership to disclose the information, due to the passage of time since the alleged wrongdoing, that remedy would likely be inadequate. In order to compensate the unitholders for their alleged harm, the court may find it appropriate to grant monetary damages. Such damages would be awarded to the unitholders, and not the partnerships.

FN55. *Tooley,* 845 A.2d at 1033.

For all of the above reasons, the court concludes that the claims based on the Non-

Disclosure Allegations and the alleged breach of contract are direct claims and, thus, demand was not required.

B. *Gross Negligence And Failure To Provide Competent And Active Management*

The claims for gross negligence and failure to provide competent and active management are clearly derivative. First, as stated above, in order to show a direct injury under *Tooley,* a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]."[FN56] The gravamen of these claims is that the Managers devoted inadequate time and effort to the management of the Funds, thereby causing their large losses. Essentially, this a claim for mismanagement, a paradigmatic derivative claim.[FN57] The Funds suffered any injury that resulted from the Managers' alleged inattention. Any injury that the unitholders suffered is derivative of the injury to the Funds.

> FN56. *Tooley,* 845 A.2d at 1039.

> FN57. *See, e.g., Kramer v. W. Pac. Indus., Inc.,* 546 A.2d 348, 353 (Del.1988) ("A claim of mismanagement ... represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature.").

Second, the Funds, not the unitholders, would receive any recovery. Again, under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will benefit from the remedy.[FN58] If the court finds that the Managers violated their fiduciary duties by failing to devote adequate time and effort to managing the Funds, any recovery would go to the party harmed, namely the Funds. Thus, these claims are derivative claims.

> FN58. *Tooley,* 845 A.2d at 1033.

If a party brings derivative claims without first making demand, and demand is not excused, those claims must be dismissed.[FN59] In this case, the plaintiffs have not alleged that they made demand on the Fund, nor have they alleged why demand should be excused. Accordingly, the derivative claim must be dismissed. However, in the interest of justice, the court dismisses these claims with leave to replead.[FN60]

> FN59. *Haber v. Bell,* 465 A.2d 353, 357 (Del.Ch.1983).

> FN60. In a letter to the court, the plaintiffs stated that AB Management sent letters to all the unitholders of the Funds (the "Redemption Letters"), stating that the Managers would allow the unitholders to redeem their units and that the Managers are pursuing the dissolution of the Partnerships. The plaintiffs argue that the Redemption Letters bolster their contention that their claims are direct, not derivative. However, the complaints do not contain the information in the Redemption Letters and the Redemption Letters are not referenced in the complaints. Therefore, these documents are not properly before the court on a Rule 12(b)(6) motion.

## VI.

The DCIP Defendants argue that, with respect to the Fund I Complaint, this court lacks personal jurisdictions over them. With respect to the Fund II Complaint, they argue that this court lacks personal jurisdiction over Crants and Devlin.[FN61]

FN61. DCIP is the General Partner of Fund II. As such, there is no dispute that the court has personal jurisdiction over DCIP viz. Fund II. See *RJ Assocs. v. Health Payors' Org. Ltd. P'ship.*, 1999 Del. Ch. LEXIS 161, at \*12, 1999 WL 550350 (Del. Ch. July 16, 1999) (quoting 6 Del. C. § 17-109(a) and holding that, as a matter of law, by accepting the position of general partner, a corporation consents to be subjected to a Delaware court's jurisdiction if the limited partnership has chosen to incorporate under Delaware law).

In support of their Rule 12(b)(2) motion, the DCIP Defendants adduced affidavits of both Devlin and Crants. The plaintiffs have not adduced any affidavits rebutting the Devlin and Crants affidavits, nor have they asked to take discovery. Instead, they have decided to rely on the well-pleaded allegations in their complaint. Moreover, since they have not been rebutted, the court must take as true the facts contained in the Devlin and Crants affidavits. However, where the well-pleaded allegations in the complaints are not rebutted by affidavit, the court will, for the purposes of this Rule 12(b)(2) motion, assume the truthfulness of those allegations.[FN62]

FN62. See *Hart Holding Co. v. Drexel Burnham Lambert, Inc.*, 593 A.2d 535, 539 (Del.Ch.1991) (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2nd Cir.1981)) (stating that a trial court is vested with broad discretion in shaping the procedure by which a motion under Rule 12(b)(2) is resolved).

**\*14** According to the Devlin and Crants affidavits, DCIP is a Tennessee limited liability company, with its principal place of business in Nashville, Tennessee. Both Crants and Devlin are residents of Tennessee and perform the vast majority of their duties from their office in Nashville. Neither Crants nor Devlin recall ever traveling to Delaware. None of the DCIP Defendants solicit any business in Delaware or engage in any regular conduct with Delaware.

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant.[FN63] In determining whether it has personal jurisdiction over a nonresident defendant, the court will generally engage in a two-step analysis. First, was service of process on the nonresident authorized by statute? Second, does the exercise of jurisdiction, in the context presented, comport with due process?[FN64]

FN63. See *Plummer & Co. Realtors v. Crisafi*, 533 A.2d 1242, 1244 (Del.Super.1987); see also *Finkbiner v. Mullins*, 532 A.2d 609, 617 (Del.Super.1987) (stating that, on a Rule 12(b)(2) motion, "the burden is on the plaintiff to make a specific showing that this Court has jurisdiction under a long-arm statute.") (citing *Greenly v. Davis*, 486 A.2d 669 (Del.1984)).

FN64. *LaNuova D & B, S.P.A. v. Bowe Co.*, 513 A.2d 764, 768 (Del.1986).

A. *The Long-Arm Statute*

The plaintiffs argue that the court has personal jurisdiction over the DCIP Defendants under 10 Del. C. § 3104, the Delaware long-arm statute. Section 3104(c) provides, in relevant part: "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident ... who ... (1) Transacts any business or performs any character of work or service in the State ... [or] (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State...." Section 3104 has been broadly construed to confer

jurisdiction to the maximum extent possible under the due process clause.[FN65] Furthermore, when *in personam* jurisdiction is challenged on a motion to dismiss, the record is construed most strongly against the moving party.[FN66]

FN65. *Id*.

FN66. *RJ Assocs., 1999 Del. Ch. LEXIS 161, at \*13, 1999 WL 550350 (Del.Ch.)*.

The complaints lay out detailed allegations of the connections between the DCIP Defendants and the Funds. The Funds were established as Delaware limited partnerships and are governed by Delaware law. DCIP is the Sub-Advisor of Fund I and the General Partner and Sub-Advisor of Fund II. Crants and Devlin are the managing members and owners of DCIP. DCIP acts principally through Crants and Devlin. The PPMs touted the DCIP Defendants' experience and qualifications in order to sell units in the Funds.

The PPMs also state that DCIP is responsible for the day-to-day management of the Funds. DCIP, in the persons of Crants and Devlin, attended every meeting of the Management Committee (none of which took place in Delaware). Also, DCIP, which acted through Crants and Devlin, was primarily responsible for choosing the securities included in the Funds.

In *RJ Associates,* Justice (then-Vice Chancellor) Jacobs held that this court could exercise personal jurisdiction over a limited partner in a Delaware limited partnership under Section 3104(c)(1). Justice Jacobs held that the following three contacts, taken together, were sufficient to constitute "transacting business" under the Delaware long-arm statute: (i) the limited partner participated in the formation of the limited partnership, (ii) the limited partnership indirectly participated in the limited partnership's management by 'controlling' the general partner, and (iii) the limited partner caused the Partnership Agreement to be amended to alter the method of distributions to the partners.[FN67]

FN67. *RJ Assocs., 1999 Del. Ch. LEXIS 161, at \*18, 1999 WL 550350 (Del.Ch.)*.

**\*15** The operative facts of this case, as alleged in the complaints, are similar to those in *RJ Associates.*First, DCIP participated in the formation of the Funds. In fact, DCIP was primarily responsible for selecting the initial securities accepted by the Funds.[FN68]Second, DCIP not only participated in the management of the Funds, DCIP was primarily responsible for the management of the Funds. The PPMs state that "the Sub-Advisor will provide day-to-day management and administration of the Fund and investment advisory services, including, among other matters, the screening of contributed securities, advice regarding the selection of the illiquid Assets and hedging and borrowing strategies."[FN69]Finally, DCIP received millions of dollars in fees to manage the two Delaware entities.

FN68. *See* Fund I Compl. ¶ 71; Fund II Compl. ¶¶ 82, 241.

FN69. Fund I PPM at 3-4, Fund II PPM at 3.

With respect to Crants and Devlin, the complaints allege that they are the owners and managing partners of DCIP. The complaints further allege that DCIP only acts through Crants and Devlin. In essence, the complaints allege that it was Crants and Devlin who selected the securities for the Funds, and managed the Funds on a day-to-day basis.

The court finds that these contacts are sufficient to constitute "transacting business" under the long-arm statute.

B. *Due Process*

The focus of a minimum contacts inquiry is whether a nonresident defendant engaged in sufficient minimum contacts with the State of Delaware to require it to defend itself in the courts of the state consistent with the traditional notions of fair play and justice.[FN70] In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should reasonably anticipate being required to defend itself in Delaware's courts.[FN71] The minimum contacts which are necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created obligations between itself and the forum.[FN72] Consequently, the defendant's activities are shielded by the benefits and protection of the forum's laws and it is not unreasonable to require it to submit to the forum's jurisdiction.[FN73]

> FN70. *AeroGlobal, 871 A.2d at 440* (citing *Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)*).

> FN71. *Id.*

> FN72. *Sternberg v. O'Neil, 550 A.2d 1105, 1120 (Del.1988)*.

> FN73. *Id.; see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (U.S.1985)* (requiring "purposeful availment" of the benefits of the state's laws to satisfy the minimum contacts test).

In addition to the contacts outlined above that the complaints allege between DCIP Defendants and the Funds, the plaintiffs also allege that the DCIP Defendants enjoyed the benefits of Delaware law. They claim that the DCIP Defendants have received millions of dollars in fees for managing the Delaware partnerships and are entitled to claim limited liability under the terms of the Partnership Agreements, which established the Funds and limit the DCIP Defendants' liability to cases of gross negligence.[FN74]

> FN74. Partnership Agreements § 3.5.

In *RJ Associates,* Justice Jacobs found that the following contacts were sufficient to satisfy due process: (i) the limited partner took an active role in establishing the Delaware Partnership; (ii) the limited partner owned a 50% interest in the partnership's general partner, and appointed four of the general partner's seven board members; (iii) the limited partner received 49 .5% of the partnership's cash flow distributions; (iv) the limited partner allegedly controlled the partnership; (v) the limited partner allegedly caused the partnership agreement to be amended under Delaware law to change the agreed-upon cash flow distribution payments to the limited partners; and (vi) the limited partner agreed to a Delaware choice of law provision in the partnership agreement.[FN75]

> FN75. *RJ Assocs., 1999 Del. Ch. LEXIS 161, at *19-*20, 1999 WL 550350 (Del.Ch.)*.

**\*16** While not exactly the same, the contacts that DCIP has with Delaware are substantially similar to those in *RJ Associates.* DCIP took part in the formation of the Funds, two Delaware entities. DCIP managed the Funds on a day-to-day basis and received millions of dollars in fees for doing so. In addition, the Partnership Agreements which established the Funds limited the DCIP Defendants' liability to cases of gross negligence.[FN76] They have, thereby, benefited by expressly limiting their liability under Delaware law. Given all of these contacts, DCIP should have reasonably expected to be haled before the courts in Delaware.

FN76. Partnership Agreements § 3.5.

Crants and Devlin also should have reasonably expected to be haled before the courts of this state. As stated above, the complaints allege that DCIP could only act through Crants and Devlin. All the actions attributed to DCIP were really performed by them. Moreover, in the case of Fund II, Crants and Devlin are alleged to be the managing partners of the general partner of a Delaware limited partnership. In the case of Fund I, Crants and Devlin are alleged to have managed a Delaware limited partnership, despite the fact that DCIP is not that entity's general partner.

In *In re USACafes,* former Chancellor Allen found that the directors of a corporation that was the general partner of a Delaware limited partnership were subject to the jurisdiction of this state's courts, due to their positions with the general partner.[FN77] Chancellor Allen focused on the important state interest that Delaware has in regulating entities created under its laws, and how that interest could only be served by exercising jurisdiction over those who managed the Delaware entity.

FN77. 600 A.2d 43, 52 (Del.Ch.1991).

The relationship between the General Partner and the limited partners was created by the law of Delaware. The state empowered defendants to act, and this state is obliged to govern the exercise of that power insofar as the issues of corporate power and fiduciary obligation are concerned. These factors bear importantly on the fairness of exercising supervisory jurisdiction at this point in the relationship of the various parties. The wrongs here alleged are not tort or contract claims unconnected with the internal affairs or corporate governance issues that Delaware law is especially concerned with.[FN78]

FN78. *Id.*

Likewise, the wrongs alleged in this case go essentially to the management of a Delaware limited partnership. The DCIP Defendants voluntarily undertook to mange the Funds and received millions of dollars in compensation for doing so. Now, limited partners in the Delaware entity seek to hold them accountable for alleged wrongs they committed. It is both necessary and proper for the courts of this state to ensure that the managers of a Delaware entity are held responsible for their actions in managing the Delaware entity. When a person manages a Delaware entity, and receives substantial benefit from doing so, he should reasonably expect to be held responsible for his wrongful acts relating to the Delaware entity in Delaware.[FN79]

FN79. *See Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974, 975 (Del.Ch.2000) ("When nonresidents agree to serve as directors or managers of Delaware entities, it is only reasonable that they anticipate that ... they will be subject to personal jurisdiction in Delaware courts.").

**\*17** For the above reasons, the court concludes that it has personal jurisdiction over the DCIP Defendants in both cases. Therefore, the DCIP Defendants' motion to dismiss pursuant to Rule 12(b)(2) must be denied.

VII.

For the above reasons, the defendants' motion to dismiss is GRANTED in part and DENIED in part. The defendants are directed to submit a form of order, on notice, within 10 days.

Del.Ch.,2005.
Albert v. Alex. Brown Management Services, Inc.
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267

END OF DOCUMENT

▷Trenwick America Litigation Trust v. Billett
Del.Supr.,2007.
(The decision of the Court is referenced in the Atlantic Reporter in a 'Table of
Decisions Without Published Opinions.')
Supreme Court of Delaware.
TRENWICK AMERICA LITIGATION TRUST, Plaintiff Below, Appellant,
v.
James F. BILLETT, Jr., Stephen H. Binet, Anthony S. Brown, Richard E. Cole,
Robert M. Demichele, Neil Dunn, Paul Feldsher, Robert A. Giambo, Frank E.
Grzelecki, Alan L. Hunte, P. Anthony Jacobs, James E. Roberts, Joseph D.
Sargent, Frederick D. Watkins, and Stephen R. Wilcox, Defendants Below,
Appellees.
**No. 495, 2006.**

Submitted: June 27, 2007.
Decided: Aug. 14, 2007.

Court Below-Court of Chancery of the State of Delaware, in and for New Castle
County, C.A. No. 1571.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices,
constituting the Court en Banc.

**ORDER**

RANDY J. HOLLAND, Justice.
**\*1** This 14th day of August 2007, the Court, having considered this matter after
oral argument and on the briefs and supplemental memoranda filed by the parties,
has determined that the final judgment of the Court of Chancery should be
affirmed on the basis of and for the reasons assigned by the Court of Chancery
in its opinion dated August 10, 2006.[FN1]

> FN1.*Trenwick America Litig, Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168
> (Del. Ch.2006). Accord *North American Catholic Educational Programming*
> *Foundation, Inc. v. Gheewalla,* 2007 WL 1453705 (Del.Supr.2007).

NOW, THEREFORE, IT IS HEREBY ORDERED that the judgment of the Court of Chancery
be, and the same hereby is, AFFIRMED.

Del.Supr.,2007.
Trenwick America Litigation Trust v. Billett
931 A.2d 438, 2007 WL 2317768 (Del.Supr.)

END OF DOCUMENT

LEXSEE 2006 U.S. DIST. LEXIS 6863

**MARTIN & ASSOCIATES, P.L.L.C. Plaintiff, v. MATT MALOUF, Defendant.**

**Civil Action No. 03-1281 (GK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2006 U.S. Dist. LEXIS 6863*

**February 6, 2006, Decided
February 6, 2006, Filed**

**COUNSEL:** [*1] For MARTIN & ASSOCIATES, P.L.L.C., Plaintiff: Kenneth A. Martin, MARTIN & ASSOCIATES P.L.L.C., McLean, VA; Daniel Mark Press, Russell B. Adams, III, CHUNG & PRESS, McLean, VA.

For MATT MALOUF, Defendant: Joseph A. Molina, BALDWIN, MOLINA & ESCOTO, Washington, DC.

**JUDGES:** Gladys Kessler, United States District Judge.

**OPINION BY:** Gladys Kessler

**OPINION**

***MEMORANDUM OPINION***

Plaintiff, Martin & Associates, P.L.L.C. ("Martin & Associates") brings suit against Defendant Matt Malouf ("Malouf"), for breach of contract and fraudulent inducement, common law fraud, conversion, unjust enrichment, violations of Sections 10 (b) and 20(a) of the Securities Exchange Act of 1934 ("SEA"), *15 U.S.C. §§ 78j(b), 78t(a)*, and misappropriation of property. This matter is now before the Court on Defendant's Motion to Dismiss, [**# 23**]. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, Defendant's Motion is **denied**.

## I. BACKGROUND [1]

1   Unless otherwise noted, the facts cited herein are taken from Plaintiff's Complaint.

[*2] Plaintiff, Martin & Associates, is a Washington, D.C. law firm whose principal is Kenneth Martin ("Martin"). Defendant is Malouf, a United States citizen domiciled in Utah.

In this lawsuit, Plaintiff alleges that "Defendant Malouf solicited Plaintiff through Plaintiff's employee Jasen Adams ("Adams") to participate in a $ 3,000,000 investment he committed to make into a Utah based company, Talk2, Inc., d/b/a/ Spontaneous Technology ("Talk2")." Compl. P 8. Plaintiff claims that, in order to induce Plaintiff to transfer funds to Malouf as an investment in Talk2, Malouf falsely represented that Talk2 had major corporate financing, that Malouf had personally invested $ 3,000,000 into Talk2, and that the investment "would appreciate in value ten times over." *Id.* PP 9-10.

In reliance on these false representations, Plaintiff transferred to Malouf $ 190,000 in the form of a convertible loan via three separate wire transfers between June 15, 2000, and June 13, 2001. Plaintiff alleges that from June 15, 2000, through December 31, 2001, Malouf falsely reported to Plaintiff via the telephone, internet, and mails that Malouf had prepared the documentation for the convertible loan, was [*3] in the process of establishing a company, MM Tech Fund ("MMTF"), to facilitate the Talk2 investment, and often communicated with Talk2's management about major corporate financing that would lead to significant revenues.

Plaintiff claims that Malouf has refused to furnish documentation related to the convertible loan or the legal existence of MMTF, verify receipt of the funds Plaintiff transferred to him, or return any of Plaintiff's money. On June 13, 2003, Plaintiff filed a Complaint in this Court, seeking monetary damages for injuries caused by this business transaction. Plaintiff claims Malouf's actions resulted in breach of contract and fraudulent inducement, common law fraud, conversion, unjust enrichment, violations of the SEA, and misappropriation of property.

## II. STANDARD OF REVIEW

2006 U.S. Dist. LEXIS 6863, *

Defendant Malouf seeks to dismiss Plaintiff's Complaint for lack of personal jurisdiction and because Plaintiff is not the real party in interest in this lawsuit. *See Fed. R. Civ. P. 12 (b) (2), 17(a).*

"To prevail on a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima* [*4] *facie* showing of pertinent jurisdictional facts." *United States v. Phillip Morris, Inc., 116 F. Supp. 2d 116, 121 (D.D.C. 2000)* (citing *Edmond v. United States Postal Serv. Gen. Counsel, 292 U.S. App. D.C. 240, 949 F.2d 415, 424 (D.C. Cir. 1991)*; *Naartex Consulting Corp. v. Watt, 232 U.S. App. D.C. 293, 722 F.2d 779, 787 (D.C. Cir. 1983)).* "A plaintiff makes such a showing by alleging specific acts connecting the defendant with the forum. . . ." *Id. 116 F. Supp. 2d at 121* (citing *Naartex, 722 F.2d at 787*). In making its decision, the Court must resolve "factual discrepancies" in the record "in favor of the plaintiff." *Crane v. New York Zoological Soc., 282 U.S. App. D.C. 295, 894 F.2d 454, 456 (D.C. Cir. 1990)* (citing *Reuber v. United States, 242 U.S. App. D.C. 370, 750 F.2d 1039, 1052 (D.C. Cir. 1984)).*

## III. ANALYSIS

### A. Section 27 of the SEA Confers Personal Jurisdiction Over Defendant Malouf

Defendant argues that this Court lacks personal jurisdiction over him because he is a Utah resident whose business dealings that spawned this lawsuit are not "tied in any way to the District of Columbia. . . ." Def.'s Reply at 1. Essentially, Defendant's argument is that because [*5] "there is no basis to find this to be a securities action," this Court must apply a traditional minimum contacts analysis for personal jurisdiction under the District of Columbia long-arm statute, *D.C. Code § 13-423 (a) (1)-(4)* (1981). Def.'s Reply at 4. However, neither in its Motion nor in its Reply did Defendant provide any argument as to why the allegations in Counts V and VI of Plaintiff's Complaint fail to state a claim for violations of the SEA. This Court cannot dismiss those Counts based solely on Defendant's unsupported assertions that this is not a securities action. Accordingly, for purposes of this Motion, the Court will analyze this case as having been properly brought under the SEA.

Plaintiff argues that under the SEA, personal jurisdiction exists so long as the Defendant is a citizen of, and was properly served within, the United States. [2] *See* Pl.'s Opp'n at 7. In cases in which the defendant is sued under the SEA, the Court must (1) determine whether the statute authorized jurisdiction over the defendant and (2) whether its assertion of personal jurisdiction comports with the requirements of the Constitution. *See In re Baan Co. Sec. Litig., 245 F. Supp. 2d 117 (D.D.C. 2003).* [*6]

2   In the alternative, Plaintiff argues that it is entitled to "an opportunity for discovery on the jurisdictional issues." Pl.'s Opp'n at 11.

*Section 27 of the SEA* states, in relevant part:

Any suit or action to enforce any liability or duty created by this chapter or rules or regulations thereunder . . . may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

Service under this section, "in conjunction with *Rule 4(k)(2) of the Federal Rules of Civil Procedure* . . . is sufficient to confer personal jurisdiction." [3] *In re Baan Co., 245 F. Supp. 2d at 126.*

3   In *Poling v. Farrah, 131 F. Supp. 2d 191, 193 (D.D.C. 2001)*, Judge Friedman suggested that under *Section 27 of the SEA*, the Court must satisfy itself that venue is proper before concluding it has personal jurisdiction over the defendant. Because Defendant here does not argue that venue is improper, the Court need not address this issue.

[*7]   Second, the Constitution requires that a defendant have sufficient contacts with the judicial forum such "that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945))*. In SEA actions, the relevant judicial forum is the entire United States pursuant to the SEA's nationwide service-of-process provision. *See In re Baan Co., 245 F. Supp. 2d at 126 n.11* (citing *SEC v. Carrillo, 115 F.3d 1540, 1543-44 (11th Cir. 1997)*; *Trust Co. of La. v. N.N.P., Inc., 104 F.3d 1478, 1486-87 (5th Cir. 1997)*; *United Liberty Life Ins. Co. v. Ryan, 985 F.2d 1320, 1330 (6th Cir. 1993)).*

In this case, Plaintiff has made the requisite *prima facie* showing that the Court has personal jurisdiction over Malouf. Plaintiff alleges that Malouf's actions resulted in violations of the SEA. [4] Malouf was properly served within the United States, in accordance with *Section 27 of the SEA*. Accordingly, "the statute undoubtedly confers personal jurisdiction over" Malouf. *In re Baan Co., 245 F. Supp. 2d at 126 n.10* [*8] (citing *Poling, 131 F. Supp. 2d at 192-93*). The constitutional

requirement is also clearly satisfied. Malouf's citizenship, residency, and involvement in business transactions within the United States, which is the relevant judicial forum for establishing personal jurisdiction under the SEA, satisfy the constitutional requirement for personal jurisdiction. *See Poling, 131 F. Supp. 2d at 192.*

> 4    Supplemental personal jurisdiction exists for Plaintiff's non-SEA claims, because they arise out of the same transaction as the SEA claims. *See 28 U.S.C. § 1367 (a).*

**B. Martin & Associates Is the Real Party in Interest**

Defendant argues that "Martin & Associates is not a real party in interest in this action. As established, Kenneth Martin made a personal investment, yet sues in the name of his company." Def.'s Mot. at 11.

Under *Rule 17(a) of the Federal Rules of Civil Procedure*, "no action shall be dismissed on [*9] the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest." *Fed. R. Civ. P. 17 (a).* Plaintiff Martin & Associates previously submitted a sworn affidavit stating that it, not Martin personally, engaged in the business transaction with Malouf. Pl.'s Aff. in Support of Mot. for Default Judgment at P 2, [# 6], filed Oct. 20, 2003. Moreover, the affidavits attached to Defendant's Motion state that the funds transferred to Malouf came from Martin & Associates' bank account. Def.'s Mot., Ex. A (Aff. of M. Malouf) at P 18; Ex. B (Aff. of J. Adams) at P 13. This evidence is sufficient to withstand Defendant's Motion to Dismiss.

**IV. CONCLUSION**

Plaintiff has established that, in accordance with *Section 27 of the SEA* and the Constitution, this Court has personal jurisdiction over Malouf. Plaintiff has also presented sufficient evidence to withstand Defendant's argument that Martin & Associates is not the real party in interest. Accordingly, for the reasons [*10] stated above, Malouf's Motion to Dismiss, [# 23], is **denied.**

An Order will issue with this Memorandum Opinion.

February 6, 2006

Gladys Kessler

United States District Judge

***ORDER***

Plaintiff, Martin & Associates, P.L.L.C. ("Martin & Associates") brings suit against Defendants, Matt Malouf ("Malouf") and MM Tech Fund ("MMTF"), for breach of contract and fraudulent inducement, common law fraud, conversion, unjust enrichment, violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("SEA"), *15 U.S.C. §§ 78j(b), 78t(a)*, and misappropriation of property.

This matter is now before the Court on Defendant Malouf's Motion to Dismiss, [# 23]. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated in the Memorandum Opinion, it is hereby

**ORDERED** that Defendant's Motion to Dismiss, [# 23], is denied; and it is further

**ORDERED** that an Initial Scheduling Conference will be held in this case on **February 28, 2006 at 9:45 a.m.**

Febraury 6, 2006

Gladys Kessler

United    States    District    Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____ )
                                  )
In Re SUNRISE SENIOR LIVING, INC. )    **Civil Action No. 07-00143 (RBW)**
                                  )
_____ )
                                  )
This Document Relates to:         )
                                  )
ALL ACTIONS                       )
_____ )

## ORDER

Upon consideration of Defendant Bradley B. Rush's Motion to Dismiss the Amended

Consolidated Shareholder Derivative Complaint, and based upon the entire record herein, for the

reasons stated in Defendant Bradley B. Rush's Memorandum of Points and Authorities in

support of his Motion to Dismiss, it is hereby **ORDERED** that:

Defendant's Motion to Dismiss is **GRANTED;** and further that

Plaintiff's' Amended Consolidated Shareholder Derivative Complaint is **DISMISSED**

**WITH PREJUDICE** as to Defendant Rush.

**SO ORDERED.**

Entered this _____ day of _____, 2008.

_____
THE HONORABLE REGGIE B. WALTON
United States District Judge

**COPIES TO:**

George R. Murphy
Mark Hanna
Joni S. Jacobs
DAVIS, COWELL & BOWE, LLP
1701 K. Street NW, Suite 210
Washington, DC 20006

*Liaison Counsel for Plaintiffs*


Eric L. Zagar
Michael C. Wagner
J. Daniel Albert
SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
280 King of Prussia Road
Radnor, PA 19087

Brian J. Robbins
Felipe J. Arroyo
Ashley R. Palmer
ROBBINS UMEDA & FINK, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101

Maya Saxena
Joseph White
SAXENA WHITE, P.A.
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431

*Co-Lead Counsel for Plaintiffs*


George H. Mernick, III
N. Thomas Connally
Jon M. Talotta
HOGAN & HARTSON, LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004

*Counsel for Nominal Defendant Sunrise Senior Living, Inc.*

John C. Millian
Matthew R. Estabrook
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306

*Counsel for the Individual Defendants*


Philip A. Sechler
Scott K. Dasovich
WILLIAMS & CONNOLLY, LLP
725 12th Street, NW
Washington, DC 20005-5901

*Counsel for Defendant David G. Bradley*