## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| In Re SUNRISE SENIOR LIVING, INC. | **Civil Action No. 07-00143 (RBW)** |
| This Document Relates to: | |
| ALL ACTIONS | |

### DEFENDANT BRADLEY B. RUSH'S REPLY TO PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO THE INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

The plaintiffs in this case have filed a 217-paragraph Consolidated Complaint, a 365-paragraph Amended Consolidated Complaint ("Amended Complaint" or "Am. Compl."), and more than 50 pages of briefing in opposition to the individual defendants' motions to dismiss ("Opposition Memorandum" or "Opp. Mem.").  Despite these voluminous filings, however, the plaintiffs have failed to explain why Bradley B. Rush is a defendant to this lawsuit.

All of the plaintiffs' claims against Mr. Rush are based on two distinct and unrelated theories of fraud.  First, the plaintiffs allege that Mr. Rush and other defendants engaged in an options backdating scheme between 1997 and 2001.  See Am. Compl. ¶¶ 2, 7, 64-132.  Second, the plaintiffs allege that from 1997 to 2006, Mr. Rush and other defendants fraudulently manipulated Sunrise's accounting for various transactions and made public statements about Sunrise's financial condition that they knew to be materially false and misleading as a result of their participation in the accounting fraud.  See Am. Compl. ¶¶ 3, 5, 6, 243-55.

As explained in detail in Mr. Rush's Motion to Dismiss, neither of the plaintiffs' theories is sufficient to support any cause of action against Mr. Rush.  With respect to the alleged options

backdating, the Amended Complaint is facially deficient because the plaintiffs admit that Mr.
Rush was not even employed by Sunrise when the backdating allegedly occurred, compare Am.
Compl. ¶ 127 with Am. Compl. ¶ 32, and because the purported backdating all occurred outside
of the applicable limitations period.  With respect to the alleged accounting fraud, the plaintiffs
fail to state a claim against Mr. Rush because they have not alleged with any particularity that
Mr. Rush participated in the purported accounting manipulations, that he made any false
statements identified in the Amended Complaint, or that he ever acted with the intent to defraud.

Now, in their Opposition Memorandum, the plaintiffs attempt to disguise these critical
shortcomings in their two theories by blending the theories together, and by borrowing elements
from one theory in order to salvage the other.  For example, in an attempt to obscure the fact that
the alleged options backdating occurred outside of the limitations period and before Mr. Rush
was even employed by Sunrise, the plaintiffs state that the purported accounting fraud occurred
as recently as March 16, 2006.  See Opp. Mem. at 7.  But this allegation, even if true, cannot
salvage the allegations of options backdating, all of which are purported to have occurred no
later than 2001.  Similarly, the plaintiffs attempt to conceal their inability to plead facts raising a
strong inference of scienter as to the alleged accounting fraud by arguing that scienter may be
inferred where options backdating is alleged.  See Opp. Mem. at 21-22.  Once again, this is
simply an attempt by the plaintiffs to fill a hole in one of their theories by borrowing allegations
that relate solely to the other.

Finally, there is no basis for this Court to exercise personal jurisdiction over Mr. Rush.
Indeed, the plaintiffs continue to ignore the relevant legal test in this jurisdiction, precisely
because it confirms the insufficiency of their pleadings.  Accordingly, the plaintiffs' claims

against Mr. Rush should be dismissed with prejudice both for failure to state a claim and for lack of personal jurisdiction.

## ARGUMENT

Based on their allegations of options backdating and accounting fraud, the plaintiffs attempt to state five separate causes of action against Mr. Rush: (1) violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 (Count I), (2) breach of fiduciary duty related to stock option backdating (Count V), (3) breach of fiduciary duty related to improper accounting manipulations (Count VI), (4) breach of fiduciary duty related to insider selling and misappropriation of information (Count XI), and (5) for an accounting (Count IV).[1]  Because the plaintiffs' underlying allegations of options backdating and accounting fraud are insufficiently pled to support any cause of action against Mr. Rush, each of the plaintiffs' individual claims against Mr. Rush must be dismissed.  Moreover, the plaintiffs have failed to plead facts sufficient to make a prima facie showing that this Court has personal jurisdiction over Mr. Rush, and the Amended Complaint must be dismissed as to Mr. Rush for this reason as well.

## I.    THE PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR SECURITIES FRAUD AGAINST MR. RUSH UNDER SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 (COUNT I)

As explained in detail in Mr. Rush's opening brief, the plaintiffs have failed to satisfy the heightened pleading standards applicable to their securities fraud claim pursuant to Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "Reform Act"), which require the plaintiffs to plead with particularity that Mr. Rush himself: (1) made a false statement or used a manipulative or deceptive device; (2) with scienter; (3) in connection with

---

[1] The plaintiffs attempt to plead additional causes of action against the other defendants. See Am. Compl. at Counts II, III, VII, VIII, IX and X.  Because Mr. Rush is not implicated by these counts, they are not addressed by his Motion to Dismiss.

the purchase or sale of a security; (4) upon which the plaintiffs relied; and (5) which proximately

caused economic loss to the plaintiffs.  See Tellabs, Inc. v. Makor Issues & Rights Ltd., 127 S.

Ct. 2499, 2504-05 (2007); Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42; 125 S. Ct. 1627,

1629-32 (2005); Belizan v. Hershon, 495 F.3d 686, 691 (D.C. Cir. 2007); Kowal v. MCI

Commc'ns Corp., 16 F.3d 1271, 1276-78 (D.C. Cir. 1994); In re Fannie Mae Secs. Litig., 503 F.

Supp. 2d 25, 36-38 (D.D.C. 2007).  Now, in their Opposition Memorandum, the plaintiffs do not

even attempt to address the shortcomings identified in Mr. Rush's Motion to Dismiss—most

notably, that Mr. Rush was not employed at Sunrise at the time of the alleged backdating and that

plaintiffs have made no factual allegations sufficient to raise a strong inference that Mr. Rush

acted with scienter with respect to the alleged accounting fraud.  Instead, the plaintiffs mix-and-

match their backdating and accounting fraud theories in an attempt to confuse the issues and the

Court.

### A.    The Plaintiffs Have Failed to State a Securities Fraud Claim Against Mr. Rush Relating to Their Allegations of Options Backdating

The plaintiffs first allege that Mr. Rush committed securities fraud by participating in an

options backdating scheme between 1997 and 2001.  These allegations are insufficient to support

any cause of action against Mr. Rush because the plaintiffs concede that Mr. Rush was not even

employed at Sunrise until 2003, long after the last instance of backdating was alleged to have

occurred.  See Am. Compl. at ¶ 32.  The plaintiffs' backdating allegations are also insufficient to

state a claim against Mr. Rush because they are barred by the applicable statute of limitations.

1. **The Plaintiffs' Backdating Allegations are Insufficient to Support a Claim Against Mr. Rush Because the Plaintiffs Have Not Alleged that Mr. Rush was Employed by Sunrise at the Time of the Alleged Scheme**

Although it was one of the principal arguments in support of Mr. Rush's Motion to Dismiss, the plaintiffs' Opposition Memorandum does not even attempt to explain how Mr. Rush could have been involved in the alleged backdating scheme, which the plaintiffs claim ended in 2001, given that Mr. Rush was not even employed by Sunrise until 2003. To the contrary, the Opposition Memorandum supplies even more reasons why Mr. Rush could not possibly have been involved in the scheme, as the plaintiffs now admit that options backdating of the kind alleged in the Amended Complaint would have been <u>impossible</u> during the period of Mr. Rush's employment with Sunrise: <u>See</u> Opp. Mem. at 4. ("In 2002, with the passage of the Sarbanes-Oxley Act ("SOX"), the Individual Defendants were required to report all stock options grants within two days of the grant date by filing Forms 4 with the SEC, effectively ending the Individual Defendants' ability to backdate stock options by more than two days."). Obviously, if Mr. Rush was not employed at Sunrise until 2003, and the enactment of SOX in 2002 meant "the individual defendants could no longer grant or receive backdated stock options," Mr. Rush could not possibly have participated in an options backdating scheme that ended in 2001. The plaintiffs' backdating claim against Mr. Rush is thus fatally flawed.

Refusing to recognize that Mr. Rush is not a proper defendant here, the plaintiffs indiscriminately lump Mr. Rush together with the other individual defendants, many of whom <u>were</u> employed by Sunrise during the period of the alleged backdating, in the hopes that the Court will fail to notice this fatal defect in their claims against Mr. Rush. But this kind of non-particularized group pleading is insufficient to satisfy the plaintiffs' burden under Rule 9(b) and the Reform Act, which require the plaintiffs to plead each element of their securities fraud claim

against each defendant individually.  See, e.g., Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1018 (11th Cir. 2004); Southland Sec., Corp. v. Inspire Ins. Solutions, Inc., 365 F.3d 353, 365-66 (5th Cir. 2004); In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 17 (D.D.C. 2000).

        Not surprisingly, courts in backdating cases have consistently dismissed these kinds of unsupported, catch-all allegations against corporate officers and directors who were not employed at the defendant companies at the time the backdating is alleged to have occurred.  See In re Openwave Sys. Secs. Litig., 528 F. Supp. 2d 236, 251-52 (S.D.N.Y. 2007) (dismissing securities fraud claim against CEO and CFO whose tenures postdated the alleged options backdating scheme); Pedroli v. Bartek, No. 4:07-CV-43, 2008 U.S. Dist. LEXIS 26041, at *24-25 (E.D. Tex. March 31, 2008) (dismissing claims against corporate officers and directors and noting "many of the complained of backdated options occurred well before many of the directors…assumed their positions.").[2]  Moreover, the plaintiffs' backdating claims fail as to Mr. Rush because they have not alleged that Mr. Rush received any backdated stock options.  See In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 304-05 (S.D.N.Y. 2008) (plaintiff's scienter allegations against company CFO who did not receive backdated options fell "far short of the mark."); In re VeriSign, Inc., Derivative Litig., 531 F. Supp. 2d 1173, 1207 (N.D. Cal. 2007) (plaintiffs failed to plead scienter with respect to certain defendants because they failed to allege that those defendants had received backdated options).  As in the cited cases, the plaintiffs' allegations against Mr. Rush "fall short of the mark" for the simple reason that the plaintiffs have pled no facts indicating that Mr. Rush had any motive to participate in the alleged scheme, from which the plaintiffs concede he never benefited, and indeed admit that he was not even employed at Sunrise when the backdating allegedly occurred.

_____

[2] All unpublished opinions are attached as Exhibit A.

2.    **The Plaintiffs' Backdating Allegations are Insufficient to Support a Claim Against Mr. Rush Because the Allegations are Barred by the Statute of Limitations**

The plaintiffs' backdating allegations are also insufficient to support a claim against Mr. Rush because they are barred by the five-year statute of limitations applicable to securities fraud claims. 28 U.S.C. § 1658(b). As set forth more fully in Mr. Rush's Motion to Dismiss, the plaintiffs were required to bring their claim for securities fraud within two years of "the discovery of facts constituting the violation," but in no case later than five years after the violation. 28 U.S.C. § 1658(b). Given that the plaintiffs' backdating allegations are premised upon a "scheme" that ended in 2001, the plaintiffs were required to file their 10(b)(5) claim no later than December 31, 2006.

The plaintiffs attempt to sidestep this problem by importing allegations related to their distinct theory of accounting fraud, which the plaintiffs claim occurred up through 2006. See Opp. Mem. at 7-8. The plaintiffs thus improperly argue that all of the defendants' alleged misconduct, including that which occurred outside the five-year limitations period, may "piggyback" on the more recent accounting fraud allegations, thus satisfying the statute of limitations. Once again, however, the courts have rejected precisely this kind of bootstrapping, holding that when a securities action involves distinct factual assertions, some of which fall outside the limitations period, the untimely claims are barred. See In re Atmel Corp. Derivative Litig., No. C 06-4592 JF, 2007 U.S. Dist. LEXIS 54058, at *20-22 (N.D. Cal. July 16, 2007) (rejecting the use of subsequent timely false statements in a 10(b) action to preserve time-barred claims for options manipulation and stating that the plaintiffs "may not avoid the effect of the statute of limitations by combining allegations of recent financial statements and time-barred option back-dating"); In re Comverse Tech., Inc. Sec. Litig., 543 F. Supp. 2d 134, 155 (E.D.N.Y.

2008) ("[T]o the extent that [plaintiff's] claims are based directly on a backdated grant of options, the 5-year period begins to run on the date the options were granted."); In re Affiliated Computer Servs. Derivative Litig., 540 F. Supp. 2d 695, 701 (N.D. Tex. 2007) (dismissing plaintiffs' 10(b) claims based on backdated options grants and false statements in financial filings as time-barred and rejecting plaintiffs' argument that "the 'continuing wrong' theory applies to toll limitations and repose until the last alleged misrepresentation was made" and finding that "a claim under §10(b) that is based upon the backdating itself accrues on the date the option grant was made").  As these decisions make clear, the plaintiffs may not rely on a timely securities fraud claim as a means to bootstrap factually unrelated allegations of a time-barred options backdating scheme.

The plaintiffs' backdating allegations are thus insufficient to support a claim of securities fraud against Mr. Rush because any such claim is time-barred, and this defect may not be cured by reference to the factually unrelated allegations of accounting fraud.

B.    **The Plaintiffs Have Failed to State a Securities Fraud Claim Against Mr. Rush Relating to Their Allegations of False Statements and Accounting Manipulations**

The plaintiffs have also have failed to address the fatal insufficiencies in their claim that Mr. Rush committed securities fraud by engaging in accounting fraud and making public statements and financial filings with the SEC that he knew to be materially false and misleading as a result.  Specifically lacking from the plaintiffs' Amended Complaint is any particularized allegation (1) that Mr. Rush himself was responsible for any false statement, or (2) that Mr. Rush acted with the intent to defraud.

1. **The Plaintiffs' Accounting Fraud Allegations are Insufficient to Support a Claim Against Mr. Rush Because the Plaintiffs Fail to Attribute Any False Statements to Mr. Rush Himself**

First, the plaintiffs have failed to allege that Mr. Rush himself was responsible for the contents of any of the allegedly false statements identified in the Amended Complaint. As Mr. Rush argued in his Motion to Dismiss, nearly all of the statements specified in the Amended Complaint are attributed to large groups of defendants, sometimes but not always including Mr. Rush, with no attempt to identify who among the group was actually responsible for the contents of the statements. See Rush Mem. at 11 (citing Am. Compl. at ¶¶ 44, 45, 48, 50, 52-55, 140, 141,143-202, 221-23, 244, 254).[3] In response, the plaintiffs refer to paragraphs 2, 10, and 269 of their Amended Complaint, see Opp. Mem. at 25, n. 17, but the referenced paragraphs contain precisely the kind of blanket allegations against large groups of defendants that are insufficient to support a claim against Mr. Rush individually.[4] See In re Baan Co. Secs. Litig., 103 F. Supp. 2d 1, 17 (D.D.C. 2000) (holding that "group pleading" is insufficient under the Reform Act). Thus, even in the paragraphs that the plaintiffs cite as examples of particularized pleading, no individual defendant, let alone Mr. Rush specifically, is identified as having made the allegedly

---

[3] The plaintiffs do attribute one statement to Mr. Rush specifically, see Am. Compl. ¶ 107, but they do not allege this statement was false. To the contrary, the plaintiffs seem to be relying on Mr. Rush's statement to establish that Sunrise was on notice of potential errors in its accounting by late 2005.

[4] See Am. Compl. ¶ 2 ("[A] majority of Sunrise directors and top officers colluded to devise numerous mechanisms to manipulate the Company's financial statements . . . ."); id. ¶ 10 ("[T]e Defendants colluded with one another to…produce and disseminate to Sunrise shareholders and the market false financial statements and other Securities and Exchange Commission filings that improperly recorded and accounted for the Company's real estate joint ventures and backdated option grants and concealed the improper accounting of real estate joint ventures and backdating of stock options."); id. ¶ 269 ("[T]he Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme."). The plaintiffs also point to paragraphs 216-321, but these are simply the paragraphs constituting Count I, the claim for securities fraud, and throughout refer only to large groups of defendants rather than to any defendant individually.

false statements at issue.  The plaintiffs' broad, conclusory allegations against large groups of defendants are thus insufficient to state a claim against Mr. Rush specifically.  See id.

> **2.     The Plaintiffs' Accounting Fraud Allegations are Insufficient to Support a Claim Against Mr. Rush Because the Plaintiffs Fail to Plead Facts Sufficient to Give Rise to a Strong Inference of Scienter**

Although the Amended Complaint is liberally peppered with the necessary adverbs—"knowingly," "intentionally," "recklessly,"—the plaintiffs fail to allege any specific facts giving rise to a strong inference that Mr. Rush acted with fraudulent intent.  The plaintiffs' bald allegations of scienter are plainly insufficient to state a claim for securities fraud, see Burman v. Phoenix Worldwide Indus., Inc., 384 F. Supp. 2d 316, 334 (D.D.C. 2005) (Walton, J.) (characterizing plaintiffs' allegation that defendants acted "knowingly and with intent to deceive," as "nothing more than a conclusory allegation" insufficient to support a claim for securities fraud), and the plaintiffs' Opposition Memorandum fails to remedy this critical deficiency.

The plaintiffs first argue that Sunrise's GAAP violations support a strong inference of scienter against Mr. Rush.  See Opp. Mem. at 26.  But the cases, including those decided in this District, unanimously hold that allegations of GAAP violations, without more, are insufficient to raise a strong inference of scienter.  See In re Verisign, 531 F. Supp. 2d at 1207 ("[T]he mere fact that a corporation restates its financial statements does not give rise to a strong inference that any individual defendant acted with intent to defraud."); In re Fannie Mae, 503 F. Supp. 2d at 43 (dismissing claims against certain defendants for want of scienter when plaintiffs resorted to generic allegations that defendant corporation's accounting treatment violated GAAP and was restated); In re United States Office Prods. Sec. Litig., 326 F. Supp. 2d 68, 77 (D.D.C. 2004) ("a mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does

not establish scienter.") (citations and quotations omitted); <u>In re Cable & Wireless, PLC</u>, 321 F.

Supp. 2d 749, 772 (E.D. Va. 2004) ("Courts have held that GAAP violations, standing alone, are

insufficient to establish the strong inference of scienter as required by the PSLRA."); <u>In re</u>

<u>MicroStrategy, Inc. Secs. Litig.</u>, 115 F. Supp. 2d 620, 634-35 (E.D. Va. 2000) ("[T]he fact that a

restatement of financials occurred is not sufficient to raise a strong inference of scienter, for it is

settled that scienter requires more than a misapplication of accounting principles, and mere

allegations that statements made in one report should have been made in earlier reports do not

make out a claim of securities fraud."); <u>Pedroli</u>, 2008 U.S. Dist. LEXIS 26041, at *21-22

(dismissing Section 10(b) claim against director based on allegations that director caused or

allowed his company to file 10-Q's and Form 10-K's in violation of GAAP).  Clearly, the mere

fact that Sunrise has admitted that some of its historical financial statements were inconsistent

with GAAP does not give rise to a strong inference of scienter as to Mr. Rush.

     The plaintiffs also attempt to raise an inference of scienter by characterizing Mr. Rush's

one and only alleged sale of Sunrise stock as suspiciously timed.  <u>See</u> Opp. Mem. at 28.  But

once again, the plaintiffs have wholly failed to explain why it was suspicious for Mr. Rush to sell

stock in September 2005, just one month after he became Sunrise's CFO, <u>see</u> Am. Compl. at ¶

32, and more than eight months before Sunrise announced its accounting review and restatement,

<u>see</u> Am. Compl. at ¶¶ 221-27.  Instead, the plaintiffs simply string Mr. Rush's stock sale together

with sales by other Sunrise insiders (many of which occurred much later than Mr. Rush's sale

and much closer in time to the announcement of the restatement) in the hopes that the Court will

simply overlook the critical differences among the defendants' sales.  These allegations are

completely insufficient to support a strong inference of scienter as to Mr. Rush because there is

nothing whatsoever suspicious about the timing of Mr. Rush's one stock sale.  <u>See In re Baan</u>

Co., 103 F. Supp. at 19 (rejecting plaintiffs' argument that defendant directors' stock sales served as sufficient evidence of scienter because the plaintiffs had not provided any information regarding what percentage of stock each defendant sold or the sellers' history of stock sales).

Finally, the plaintiffs attempt to supplement their defective accounting fraud allegations by pointing to their distinct options backdating theory, arguing that scienter may be inferred where backdating is alleged.  See Am. Compl. at 21-22 (quoting Ryan v. Gifford, 918 A.2d 341, 355 n.35 (Del. Ch. 2007)).  Once again, this kind of bootstrapping cannot cure the plaintiffs' defective allegations of scienter with respect to the alleged accounting fraud—particularly as to Mr. Rush, whom the plaintiffs admit was not even employed by Sunrise when the alleged backdating occurred.

The plaintiffs' accounting fraud allegations are thus insufficient to support a claim for securities fraud against Mr. Rush because the plaintiffs have failed to plead with particularity that Mr. Rush made any false statements or that he acted with the required state of mind.

## II.   THE PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST MR. RUSH FOR BREACH OF FIDUCIARY DUTY RELATED TO IMPROPER STOCK OPTION BACKDATING OR SUNRISE'S ACCOUNTING MANIPULATIONS (COUNTS V AND VI)

In their Opposition Memorandum, the plaintiffs also ignore the high standard for pleading a breach of fiduciary duty stemming from the alleged options backdating scheme and improper accounting manipulations under Delaware law.

In Delaware, an officer is liable for breaching the duty of care only if the plaintiff can plead and prove that the officer acted with "gross negligence."  McMullin v. Beran, 765 A.2d 910, 921 (Del. 2000).  "Gross negligence" has been defined as "a devil-may-care attitude or indifference to duty amounting to recklessness."  Gelfman v. Weeden Investors, L.P., 859 A.2d 89, 114 (Del. Ch. 2004).  Where breach of fiduciary claims are based on alleged fraudulent

conduct, they must be pled with particularity, as dictated by Federal Rule of Civil Procedure 9(b).  See Lewis v. Ward, C.A. No. 15255, 2003 Del. Ch. LEXIS 111, at *14-16 (Del. Ch. Oct. 29, 2003).  Accordingly, to satisfy their burden under Rule 9(b), the plaintiffs must plead specific facts supporting an inference that Mr. Rush was recklessly indifferent to or acted with deliberate disregard for Sunrise's stockholders, or that he committed actions outside the bounds of reason. Rabkin v. Philip A. Hunt Chemical Corp., 547 A.2d 963, 970 (Del. Ch. 1986).

The Amended Complaint provides no such particularized allegations against Mr. Rush with respect to the options backdating scheme, and nothing in the Opposition Memorandum can excuse or explain this failure, since the plaintiffs admit that Mr. Rush was not even employed by Sunrise during the period of the alleged backdating.  Indeed, the plaintiffs argue in the Opposition Memorandum that a breach of duty is established "by showing a sustained or systematic failure to exercise oversight."  In re Oxford Health Plans, Inc. Sec. Litig., 192 F.R.D. 111, 117 (S.D.N.Y. 2000).  But by this standard, Mr. Rush clearly must be absolved of liability, since the plaintiffs admit that he was not even employed by Sunrise until more than a year after the last instance of allegedly fraudulent backdating, and thus could not possibly have exercised oversight over the options backdating.

The plaintiffs also fail to make any factual allegations supporting an inference that Mr. Rush acted with reckless indifference or deliberate disregard for Sunrise's shareholders with respect to the accounting fraud.  To the contrary, the plaintiffs' conclusory allegations of bad faith are simply implausible in light of the uncontested fact that Sunrise announced a review of its financial statements covering a time period that almost entirely pre-dated Mr. Rush's tenure as CFO within a year of Mr. Rush taking over as CFO—facts which strongly support an inference of diligence and good faith on Mr. Rush's part.  Faced with these inconvenient realities, the

plaintiffs have simply coupled the uncontested fact that there were errors in Sunrise's historical

financial statements with merely adverbial allegations of reckless and fraudulent intent—

allegations which fall far short of the specificity required to put Mr. Rush on notice of the actual

claims against him.  See Kowal, 16 F.3d at 1278.

## III.    THE PLAINTIFFS HAVE NOT STATED A CLAIM AGAINST MR. RUSH FOR INSIDER SELLING (COUNT XI)

The plaintiffs have also failed to allege a cognizable claim against Mr. Rush for insider

selling.  Indeed, the plaintiffs have failed even to allege a legal basis for their insider selling

claim, thus leaving Mr. Rush and the Court to guess at the basis for these claims.  The cases cited

in the plaintiffs' Opposition Memorandum, however, all concern state law claims for breach of

fiduciary duty resulting from insider trading.

To bring a claim for breach of fiduciary duty based on insider selling under Delaware

state law, the plaintiffs must allege:  "(1) the corporate fiduciary possessed material, nonpublic

company information; and (2) the corporate fiduciary used that information improperly by

making trades because she was motivated, in whole or in part, by the substance of that

information."  In re Oracle Corp. Derivative Litig., 867 A.2d 904, 934 (Del. Ch. 2004).  It is the

plaintiffs' burden to show that the elements of the insider selling claim have been met, and

Delaware courts closely analyze the plaintiff's allegations to determine if the requisite facts have

been alleged as to each defendant individually.  See In re Oracle, 867 A.2d at 943 (undertaking a

defendant-specific analysis of the material information possessed by each defendant at the time

of their alleged insider trades and finding they possessed no such information).

Here, the plaintiffs have failed to satisfy either prong of this test.  First, the plaintiffs have

failed to identify the specific material, non-public information that they contend was in Mr.

Rush's possession at the time he made his one and only stock sale in September of 2005.  Indeed,

the plaintiffs completely fail to allege any facts that would support an inference that Mr. Rush, who had been promoted to the position of CFO just one month before this sale, knew anything about the alleged options backdating (which the plaintiffs concede occurred entirely before Mr. Rush joined Sunrise in 2003) or the errors in Sunrise's historical financial statements (almost all of which pre-dated Mr. Rush's tenure as CFO). Nor have the plaintiffs alleged any specific facts suggesting that the timing of Mr. Rush's stock sales had anything to do with any alleged insider information he may have possessed or that he was motivated by the substance of that information. Consequently, the plaintiffs' insider selling claims must be dismissed.

## IV.    THE PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST MR. RUSH FOR AN ACCOUNTING (COUNT IV)

The plaintiffs have also failed to state a claim against Mr. Rush for an accounting. An accounting is not a cause of action; the plaintiffs may only recover for this equitable remedy if they prevail on their other causes of action. See Rhodes v. Silkroad Equity, LLC, No. 2133-VCN, 2007 Del. Ch. LEXIS 96, at *43 (Del. Ch. July 11, 2007). Furthermore, Mr. Rush would not be able to provide the relief that the plaintiffs seek even if the Court were to find that an accounting is warranted. An accounting requires the defendant to render "a detailed statement of the debits and credits between [the] parties arising out of a contract or a fiduciary relation" and is available only where a plaintiff claims that the defendant has "exclusive control" over the records necessary to make the accounting. See Bates v. Northwestern Human Servs., 466 F. Supp. 2d 69, 103-04 (D.D.C. 2006). Here, there is no allegation that Mr. Rush, whom the plaintiffs admit is no longer employed by Sunrise, see Am. Comp. ¶ 32, has possession at all, let alone "exclusive control," over any property belonging to the plaintiffs. The accounting claim must therefore be dismissed as to Mr. Rush.

**V.    THE PLAINTIFFS HAVE NOT ESTABLISHED THAT THIS COURT HAS PERSONAL JURISDICTION OVER MR. RUSH**

Although the plaintiffs acknowledge that they bear the burden of making a <u>prima facie</u> showing that personal jurisdiction exists, they fail to cite or apply the relevant legal test in this jurisdiction.  <u>See</u> Opp. Mem. at 11-15.  Instead, the plaintiffs argue that Mr. Rush was a control person of Sunrise, and that because Sunrise has continuous and systematic business contacts with the District of Columbia sufficient to establish personal jurisdiction over it, this Court also has jurisdiction over Mr. Rush.  This argument is incorrect as a matter of law and has been explicitly rejected by this Court.  <u>See</u> <u>Wiggins v. Equifax, Inc.</u>, 853 F. Supp. 500, 503 (D.D.C. 1994); <u>Quinto v. Legal Times</u>, 506 F. Supp. 554, 558 (D.D.C. 1981).  Indeed, the plaintiffs place principal reliance on the case of <u>San Mateo County Transit Dist. v. Dearman, Fitzgerald & Roberts, Inc.</u>, 979 F.2d 1356, 1358 (9th Cir. 1992), a decision which this Court has expressly rejected.  <u>See</u> <u>In re Baan Co. Secs. Litig.</u>, 245 F. Supp. 2d 117, 129 (D.D.C. 2003) (holding that "the broad understanding of control person liability adopted by the Securities Act cannot on its own support personal jurisdiction" and explicitly stating that it "disagrees with the Ninth Circuit's holding in <u>San Mateo</u> that the standard for personal jurisdiction is identical to the standard for control person liability.")  In this jurisdiction, the plaintiffs are required to make specific jurisdictional allegations as to each defendant and "cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant." <u>Burman v. Phoenix Worldwide Indus.</u>, 437 F. Supp. 2d 142, 147 (D.D.C. 2006) (Walton, J.).

According to the prior decisions of this Court, this Court may exercise personal jurisdiction over Mr. Rush with respect to the plaintiffs' securities fraud claim only if venue is proper in this district.  <u>See</u> <u>Poling v. Farrah</u>, 131 F. Supp. 2d 191, 192-93 (D.D.C. 2001); <u>Martin</u>

& Assocs. v. Malouf, No. 03-1281, 2006 U.S. Dist. LEXIS 6863, at *6 n. 3 (D.D.C. Feb. 6, 2006). Pursuant to the venue provisions of Section 27 of the Exchange Act, venue is proper only in a judicial district where an "act or transaction constituting the violation occurred" or in a judicial district where the defendant "is found or is an inhabitant or transacts business." 15 U.S.C. § 78aa. The plaintiffs choose to ignore this legal test in their Opposition Memorandum, no doubt because their Amended Complaint is completely lacking in any facts to support the propriety of venue in this district. In the absence of any such individualized allegations, this Court must dismiss the plaintiffs' securities fraud claim for lack of venue and personal jurisdiction over Mr. Rush. The plaintiffs' state law claims against Mr. Rush thus must also be dismissed for lack of pendant personal jurisdiction. See Rush Mem. at 27.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in support of Mr. Rush's Motion to Dismiss, Mr. Rush's Motion should be granted and the plaintiffs' Amended Complaint should be dismissed with prejudice.

Respectfully Submitted,

/s/ James E. Sherry
John M. Dowd (DC Bar 003525)
Jeffrey M. King (DC Bar 461644)
James E. Sherry (DC Bar 500797)

AKIN GUMP STRAUSS HAUER & FELD, LLP
Robert S. Strauss Building
1333 New Hampshire Ave. NW
Washington, DC 20036
202.887.4000

*Counsel For Defendant Bradley B. Rush*

**CERTIFICATE OF SERVICE**

I hereby certify that DEFENDANT BRADLEY B. RUSH'S REPLY TO PLAINTIFFS'

OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO THE INDIVIDUAL

DEFENDANTS' MOTIONS TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

was served this 16th day of June 2008, in accordance with the Court's CM/ECF Guidelines. In

addition, the forgoing was served this 15th day of August 2008, via first-class mail, postage

prepaid, on:

George R. Murphy
Mark Hanna
Joni S. Jacobs
DAVIS, COWELL & BOWE, LLP
1701 K. Street NW, Suite 210
Washington, DC 20006

Eric L. Zagar
Michael C. Wagner
J. Daniel Albert
SCHIFFRIN BARROWAY TOPAZ & KESSLER LLP
280 King of Prussia Road
Radnor, PA 19087

Brian J. Robbins
Felipe J. Arroyo
Ashley R. Palmer
ROBBINS, UMEDA, & FINK, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101

Maya Saxena
Joseph White
SAXENA WHITE, P.A.
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431

*Co-Lead Counsel for Plaintiffs*

George H. Mernick, III
N. Thomas Connally
Jon M. Talotta

HOGAN & HARTSON, LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004

*Counsel for Nominal Defendant Sunrise Senior Living, Inc.*

John C. Millian
Matthew R. Estabrook
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306

*Counsel for the Individual Defendants*

Philip A. Sechler
Scott K. Dasovich
WILLIAMS & CONNOLLY, LLP
725 12th Street, NW
Washington, DC 20005-5901

*Counsel for Defendant David G. Bradley*

                         /s/ James E Sherry _____

# Exhibit A

2008 U.S. Dist. LEXIS 26041, *; Fed. Sec. L. Rep. (CCH) P94,629

LEXSEE 2008 U.S. DIST. LEXIS 26041

**PETER A. PEDROLI, derivatively on Behalf of MICROTUNE, INC., Plaintiff, v. DOUGLAS J. BARTEK, et al., Defendants, - and - MICROTUNE, INC., a Delaware corporation, Nominal Defendant.**

**Case No. 4:07-CV-43**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS, SHERMAN DIVISION**

*2008 U.S. Dist. LEXIS 26041; Fed. Sec. L. Rep. (CCH) P94,629*

**March 31, 2008, Decided**
**March 31, 2008, Filed**

**COUNSEL:** [*1] For Peter A Pedroli, derivatively on behalf of Microtune Inc, Plaintiff: Mitchell A Toups, LEAD ATTORNEY, Weller Green Toups & Terrell LLP, Beaumont, TX; James E Miller, Karen M Leser, Shepherd Finkelman Miller & Shah - Chester, Chester, CT; Nathan C Zipperian, Shepherd Finkelman Miller & Shah, Media, PA.

For Justin M Chapman, James A Fontaine, Robert S Kirk, Barry Koch, Jeffrey A Kupp, Phillip D Peterson, Albert H Taddiken, Walter S Ciciora, James H Clardy, Steven Craddock, Anthony J LeVecchio, Bernard T Marren, William P Tai, A Travis White, John P Norsworthy, Jack D Furst, Eric Lindberg, Lawrence D Stuart, Jr, Philippe von Stauffenberg, Defendants: David R Woodcock, Jr, Vinson & Elkins - Austin, Austin, TX; Karen Lee Hirschman, Vinson & Elkins, Dallas, TX.

For Douglas J Bartek, Defendant: Nicholas Even, LEAD ATTORNEY, Barrett Reid Howell, Haynes and Boone - Dallas, Dallas, TX; David R Woodcock, Jr, Vinson & Elkins - Austin, Austin, TX.

For Martin Englmeier, Harvey B Cash, Kenneth G Langone, Defendants: David R Woodcock, Jr, Vinson & Elkins - Austin, Austin, TX.

For Rob-Roy J Graham, Defendant: David R Woodcock, Jr, Vinson & Elkins - Austin, Austin, TX; Jim L Flegle, Wilson E Wray, Jr, [*2] Loewinsohn Flegle Deary LLP - Dallas, Dallas, TX.

For William L Housley, Defendant: David R Woodcock, Jr, Vinson & Elkins - Austin, Austin, TX; Paul Richard Bessette, Akin Gump Strauss Hauer & Feld - Austin, Austin, TX.

For Nancy A Richardson, Defendant: David R Woodcock, Jr, Vinson & Elkins - Austin, Austin, TX; Jason L Krajcer, Orrick Herrington & Sutcliffe LLP - Los Angeles, Los Angeles, CA; Susan D Resley, Orrick Herrington & Sutcliffe - Menlo Park, Menlo Park, CA.

For Everett Rogers, also known as Buddy Rogers, Defendant: Bruce William Collins, LEAD ATTORNEY, Christopher Shawn Cleveland, Sharon Julie Shumway, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX; David R Woodcock, Jr, Vinson & Elkins - Austin, Austin, TX.

For Microtune Inc, Defendant: Timothy W Mountz, LEAD ATTORNEY, Baker Botts - Dallas, Dallas, TX; Clyde Moody Siebman, Siebman Reynolds Burg & Phillips LLP, Sherman, TX; David R Woodcock, Jr, Vinson & Elkins - Austin, Austin, TX; Mary L Scott, Baker Botts - Dallas, Dallas, TX.

**JUDGES:** RICHARD A. SCHELL, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** RICHARD A. SCHELL

**OPINION**

**MEMORANDUM OPINION AND ORDER**

The following motions are pending before the court:

1. Defendant Everett Roger's motion to dismiss [*3] Plaintiff's complaint and supporting brief (docket entry # 40);

2. Defendant William L. Housley's motion to dismiss shareholder derivative

2008 U.S. Dist. LEXIS 26041, *; Fed. Sec. L. Rep. (CCH) P94,629

complaint and joinder in the motion to dismiss of certain directors and officers (docket entry # 43);

3. Defendant Rob-Roy J. Graham's motion to dismiss and brief in support thereof (docket entry # 44);

4. Motion to dismiss verified shareholder derivative complaint as against Defendant Nancy A. Richardson (docket entry # 47);

5. Microtune's motion to dismiss shareholder derivative complaint (docket entry # 49);

6. Motion to dismiss of certain directors and officers (docket entry # 50);

7. Motion to dismiss verified shareholder derivative complaint by Defendant Douglas J. Bartek (docket entry # 62); and

8. Defendant Martin Englmeier's motion to dismiss shareholder derivative complaint and joinder in certain directors and officers' motion to dismiss and reply in support of the motion to dismiss (docket entry # 96).

Peter Pedroli filed this derivative suit against twenty-seven current and former officers and directors of Microtune over the alleged former practice by corporate insiders of backdating stock options. The complaint alleges that these practices [*4] date back to 1999. Pedroli contends that certain Microtune insiders changed their respective stock option grant dates to take advantage of lower exercise prices than those that were available on the actual dates specified for the stock options. Pedroli claims that this practice violated Microtune's two stock option plans which restricted the exercise of stock options under the plans to the fair market price of the option on the date of the grant. Pedroli alleges that in 2006, Microtune disclosed that an internal investigation revealed the practices for which he now brings suit. Pedroli claims this practice has severely impacted Microtune's bottom line.

As expected, defendants have filed a number of motions to dismiss for failure to state a claim upon which relief may be granted. *Fed. R. Civ. P. 12(b)(6)*. There are no challenges to this court's jurisdiction or venue. Pedroli brings a number of pendent state claims in his complaint. For federal jurisdiction, he alleges violations of Section 304 of the Sarbanes-Oxley Act of 2002 ("SOX") against

Fontaine, Richardson, Graham and Kupp in Count I. *15 U.S.C. § 7243 (2006)*. All director defendants are sued for violation of Section 14(a) of the [*5] Securities Exchange Act of 1934 ("Exchange Act") in Count II. *15 U.S.C. § 78n (2006)*. All defendants are sued for violation of § 10(b) of the Exchange Act, *15 U.S.C. § 78j (2006)*, and Rule 10(b)(5), *17 C.F.R. § 240.10b-5 (2007)*, promulgated thereunder.

Dismissal under *Rule 12(b)(6)* is appropriate when the plaintiff has failed to allege "enough facts to state a claim to relief that is plausible on its face" and fails to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,    U.S.    , 127 S.Ct. 1955, 1965, 1974, 167 L.Ed.2d 929 (2007)*.

### SARBANES-OXLEY ACT OF 2002

Pedroli asserts that the Sarbanes-Oxley Act of 2002 creates a private cause of action and has sued Fontaine, Richardson, Graham and Kupp for disgorgement. He argues that one court has implicitly recognized a cause of action under *§304*, citing *In re AFC Enters. Inc. Derivative Litig., 224 F.R.D. 515, 521 (N.D.Ga. 2004)*, ignoring the predominant holdings across the country that the Act does not create a private cause of action under *§ 304* as well as other sections of the Act. *See Wuliger v. Sewell, 363 F. Supp. 2d 940, 950-51 (N.D. Ohio 2005)* ("This provision states that it is not meant to create any [*6] new private cause of action, but only to govern already existing private causes of action under federal securities laws. S.Rep. No. 107-146 at *12 (2002). Moreover, the additional views of several committee members commented on the existence of private rights of action: We agree that Section 4 of this bill is not intended to create a new private right of action or to broaden any existing private right of action. *Id.* at *29."; *Mehlenbacher ex. rel. Asconi Corp. v. Jitaru, 2005 U.S. Dist. LEXIS 42007, 2005 WL 4585859 (M.D. Fla. 2005)* (after conducting an exhaustive analysis of *Cort v. Ash, 422 U.S. 66, 95 S. Ct. 2080, 45 L. Ed. 2d 26 (1975)*, the court found no "clear evidence" that Congress intended to create a private cause of action); *In re BISYS Group Inc. Derivative Action, 396 F.Supp.2d 463 (S.D.N.Y. 2005)*; *Neer v. Pelino, 389 F.Supp.2d 648 (E.D. Pa. 2005)*; *Kogan v. Robinson, 432 F.Supp.2d 1075 (S.D. Cal. 2006)*; *In re Digimarc Corp., 2006 U.S. Dist. LEXIS 56134, 2006 WL 2345497 (D. Or. 2006)*; *In re Whitehall Jewellers, Inc., 2006 U.S. Dist. LEXIS 16635, 2006 WL 468012 (N.D. Ill. 2006)*; *In re Intelligroup Securities Litigation, 468 F.Supp.2d 670 (D. N.J. 2006)*.

As Pedroli points out, the Fifth Circuit has not decided whether the Act creates a private cause of action. However, the court notes that the [*7] Fifth Circuit applies the *Cort* factors in analyzing whether a private

Case 1:07-cv-00227-RBW    Document 53-2    Filed 08/15/2008    Page 4 of 46

Page 4

2008 U.S. Dist. LEXIS 26041, *; Fed. Sec. L. Rep. (CCH) P94,629

cause of action is provided in an Act. The Fifth Circuit has also declined to create a private cause of action when Congress has not manifested its intent that one should exist. *See Wright v. Allstate Ins. Co., 500 F.3d 390, 250 Fed. Appx. 1 (5th Cir. 2007)*. Pedroli has advanced no theory or argument as to why the Fifth Circuit would depart from its position that Congress, in drafting legislation, must clearly manifest its intent to create a private cause of action. The court declines to address the issue in any more detail and believes that the cases cited conclusively mandate a dismissal of Count I against the four Defendants named in that count for violations of the Sarbanes-Oxley Act.

## SECTION 14(a)

Pedroli also sues the various director defendants for violations of *Section 14(a)* of the Exchange Act. Pedroli alleges that Microtune's proxy statements of March 13, 2002, March 26, 2004 and April 27, 2005 contain false and misleading statements. The proxies failed to disclose that Microtune's executives were engaging in improper backdating and that the Board was approving those options as backdated. Pedroli claims that the proxies also [*8] falsely portrayed the compensation presented and did not take into account the backdated options.

*Rule 14a-9* provides that "[n]o solicitation subject to this regulation shall be made by means of any proxy statement ... which, at the time ... it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." An omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *General Elec. Co. v. Cathcart, 980 F.2d 927, 932 (3d Cir.1992)*, quoting *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)*. SOX does not extend limitations or repose for § 14(a) claims. *In re ExxonMobil Corp. Securities Litigation, 500 F.3d 189 (3d Cir. Nov. 20, 2007)*. Therefore, any claims involving the 2002 Proxy statement are barred by the three year period of repose.

To be liable in the first place, a director would have had to have held a position as director when the proxy was issued. The following individuals were not directors at the time any proxies were issued and, therefore, could not be liable for [*9] a 14(a) violation: Bernard Marren, Douglas Bartek (although a director in 2002, any action is barred by repose), Martin Englmeier, John P. Norsworthy, Harvey B. Cash (according to Pedroli's complaint, Cash was not a director at the time of the March 2004 proxy), Jack K. Furst, Kenneth Langone, Eric Lindberg, Lawrence D. Stuart, Jr., and Philippe von Stauffenberg. Therefore, as to the above-named

directors, Pedroli's 14(a) claim is dismissed with prejudice.

As to the remaining directors, to establish a claim under *section 14(a)* of the Exchange Act, Pedroli need only allege that some part of a proxy statement "contain[s] any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not misleading ..." *15 U.S.C. § 78n*. To state a claim under *section 14(a)*, a plaintiff must allege that: "(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an [*10] essential link in the accomplishment of the transaction." *Bond Opp'ty Fund v. Unilab Corp., 2003 U.S. Dist. LEXIS 7838, 2003 WL 21058251, *3* (internal quotation marks and citation omitted). "Omission of information from a proxy statement will violate [*Section 14(a)* and *Rule 14a-9*] if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Resnik v. Swartz, 303 F.3d 147, 151 (2nd Cir. 2002)*. An omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Poughkeepsie Sav. Bank v. Morash, 1989 U.S. Dist. LEXIS 3952, 1989 WL 40008, *3 (S.D.N.Y. 1989)*, citing *TSC Indus. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)*. Where, as here, a plaintiff's allegations "sound in fraud," *Federal Rule of Civil Procedure 9(b)* requires the plaintiff to state the circumstances constituting the fraud with particularity. *See Fed.R.Civ.P. 9(b)*; *Rombach v. Chang, 355 F.3d 164, 171 (2nd Cir.2004)*; *see also In re Exxon Mobil Corp. Sec. Litig., 500 F.3d 189, 197 (3rd Cir.2007)*, citing *Rombach*, reiterating [*11] that *Rule 9(b)* pleading requirements apply to section 14(a) claims that sound in fraud; *In re JP Morgan Chase Sec. Litig., 363 F.Supp.2d 595, 636 (S.D.N.Y.2005)*; *In re U.S. Office Prods. Sec. Litig., 326 F.Supp.2d 68, 80-81 (D.D.C.2004)*. Pedroli merely states that because of their positions and access to meetings and documents and other employees, the remaining directors should be held liable. The court believes that Pedroli has not pled sufficient, specific facts to hold these remaining directors liable. The complaint is nothing more than an example of group pleadings disfavored in this Circuit. *See Fin. Acquisition Partners LP v. Blackwell, 440 F.3d 278, 287 (5th Cir. 2006)*.

## SECTION 10(b) AND RULE 10(b)(5) CLAIMS

2008 U.S. Dist. LEXIS 26041, *; Fed. Sec. L. Rep. (CCH) P94,629

All defendants have been sued in Count III for 10(b)(5) claims. Defendants are alleged to have disseminated or approved financial statements that did not disclose Microtune's backdating practices. The defendants are also alleged to have recklessly disregarded the fact that Microtune's financial statements contained misrepresentations. As such, Count III charges that the defendants employed devices, schemes and artifices to defraud, made untrue statements or omitted material [*12] facts and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Microtune. Pedroli charges that Microtune would not have repurchased shares at the price paid if it was aware its stock price was artificially and falsely inflated by the defendants' misleading statements.

All the defendants, whether characterized as director defendants, officer defendants or insider selling defendants, are accused of the same general conduct, to wit: that they "knew, consciously disregarded, [were] reckless and grossly negligent in not knowing or should have known, that Microtune insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to (him or her) in connection therewith."

To state a claim under § 10(b) and Rule 10b-5, "a plaintiff must allege, in connection with the purchase or sale of securities: '(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the [*13] plaintiffs'] injury.'" *ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 348 (5th Cir.2002)*. Under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), if a plaintiff alleges that a defendant "made an untrue statement of a material fact" or "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading," then "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Pub. L. No. 104-67, § 101(b), 109 Stat. 737, 747 (codified at *15 U.S.C. § 78u-4(b)(1) (2006))*. *Federal Rule of Civil Procedure 9(b)* requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Fifth Circuit has provided this summary test:

[A] plaintiff pleading a false or misleading statement or omission as the basis for a *section 10(b)* and *Rule 10b-5* [*14] securities fraud claim must, to avoid dismissal pursuant to *Rule 9(b)* and *15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(3)(A)*:

(1) specify ... each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent. *ABC Arbitrage, 291 F.3d at 350*.

Under the PSLRA, a complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., 497 F.3d 546, 551 (5th Cir.2007)*. "Importantly, the Supreme Court recently stated that '[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.'" *Id.*, citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2510, 168 L. Ed. 2d 179 (2007)*. [*15] A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, 127 S.Ct. at 2510*; *In re Affiliated Computer Services Derivative Litigation, 2007 U.S. Dist. LEXIS 92401, 2007 WL 4440920 (N.D. Tex. 2007)*.

However, scienter must rest on something more than the defendants' positions with the company. *Abrams v. Baker Hughes, Inc., 292 F.3d 424, 432 (5th Cir. 2002)*. Pedroli also attempts to connect some of the defendants' insider trading with a showing of scienter. Again, this alone is not enough to infer scienter. *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., 497 F.3d 546, 552-53 (5th Cir. 2007)* (to establish scienter, insider trading must be in suspicious amounts, at suspicious

Case 1:07-cv-00227-RBW    Document 53-2    Filed 08/15/2008    Page 6 of 46

Page 6

2008 U.S. Dist. LEXIS 26041, *; Fed. Sec. L. Rep. (CCH) P94,629

times, and out of line with prior trading practices). As to the defendants' culpability in signing forms 10Q and 10K, Pedroli must show something more than a mere signing to establish liability. *Mortensen v. AmeriCredit Corp., 123 F.Supp.2d 1018, 1027 (N.D. Tex. 2007).* Corporate officers are not liable for acts solely because they are officers, even where their day-to-day involvement [*16] in the corporation is pleaded. *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc., 365 F.3d 353, 363-64 (5th Cir. 2004).*

A claim under *§ 10(b)* that is based upon backdating accrues on the date the option grant was made. *In re Ditech Networks, Inc. Derivative Litig., 2007 U.S. Dist. LEXIS 51524, 2007 WL 2070300, *7 (N.D. Cal. July 16, 2007).* Congress extended the statutes of limitation and repose to two and five years, respectively, in SOX. *28 U.S.C. § 1658(b).* The statutes of limitation and repose in SOX apply to cases filed after SOX's enactment date -- July 30, 2002 -- if the claims were not time-barred as of that date under the prior law. *Margolies v. Deason, 464 F.3d 547 (5th Cir. 2006).*

To state a claim under *§ 10(b)* and *Rule 10(b)(5)* for insider trading, Pedroli must plead that a defendant (1) used material, nonpublic information, (2) knew or recklessly disregarded that the information was material and nonpublic, and (3) traded contemporaneously with the plaintiff. *In re Sec. Litig. BMC Software, Inc., 183 F. Supp. 2d 860, 916 (S.D. Tex. 2001).* In addition, scienter is an independent element of a *Rule 10(b)(5)* violation for insider trading. *Dirks v. SEC, 463 U.S. 646, 664 n.23, 103 S. Ct. 3255, 77 L. Ed. 2d 911 (1983).* As to allegations that [*17] some of the officers and directors engaged in insider trading, there can be no basis for liability if such sales were properly disclosed. *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 367-69 (5th Cir.2004).* Pedroli's complaint is, in essence, a scatter-gun approach to pleading liability. The court finds that the only way to deal with this approach is to discuss each defendant's liability separately.

**BARTEK** -- Bartek was Microtune's CEO, chairman of the board and a director from May 1996 to June 2003, and president briefly before his departure. The complaint alleges that he received at least 75,000 options that were dated at or very close to the lowest stock price for the month in which they were granted. Plaintiff alleges on information and belief that Bartek backdated these options. The complaint also alleges that he sold 778,726 of his personally held shares while in possession of material, non-public information concerning the undisclosed practice of backdating stock option grants. The complaint makes the same general allegations as to Bartek as it does to all other officers and directors. The court agrees with Bartek that the

allegations do not satisfy [*18] the heightened pleading requirements of the PSLRA. The complaint fails to plead with particularity any false statements attributed to Bartek. Further, the complaint inappropriately relies on group pleading. The complaint fails to demonstrate with particularity the requisite scienter as to Bartek. An incorrect Sarbanes-Oxley certification, without more, does not by itself create a strong presumption of scienter. *In re Intelligroup Sec. Litig., 468 F.Supp.2d 670, 707 (D. N.J. 2006).* As to the stock sales, only insider trading in suspicious amounts or at suspicious times is probative of scienter. Plaintiff makes no allegations that these sales are out of line with prior trading practices. Further, even unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the relevant period. *Abrams v. Baker Hughes, Inc., 292 F.3d 424 (5th Cir. 2002).* As Bartek points out, the shares were sold over an 18 month period. The court also finds that the complaint fails to properly plead loss causation. In fact, there is no pleading that the stock price declined after the revelations of the stock option backdating. [*19] *See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).* Something beyond the mere possibility of loss causation must be alleged, lest Pedroli with a "largely groundless claim" be allowed to "take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Id. at 347* (citations omitted). As to Counts I-III, Plaintiff's complaint against Bartek fails to state a claim upon which relief may be granted. The claims against Bartek under SOX and *Section 14(a)* are dismissed with prejudice. The claim against Bartek under *Rule 10b-5* is dismissed without prejudice.

**ENGLMEIER** -- Pedroli alleges that Englmeier was a director of Microtune and vice-chairman of the Board until August 2001. The complaint also alleges that he sold 640,126 shares of stock while in possession of material, non-public information concerning the practice of backdating stock options. There are the usual allegations that because of his position on the Board, he knew or should have known of the backdating scheme. Englmeier also asserts that the 10(b) claim is time-barred because the facts complained about occurred more than five years before suit was [*20] filed. Pedroli does not dispute this. All claims as to Englmeier are dismissed with prejudice.

**NORSWORTHY** -- Norsworthy was a director from May 1996 to September 2001. For the reasons noted as to Englmeier, all counts as to Norsworthy are dismissed with prejudice.

**FURST** -- Furst was a director from 2001 to 2002. For the reasons noted as to Englmeier, all counts as to Furst are dismissed with prejudice.

Case 1:07-cv-00227-RBW    Document 53-2    Filed 08/15/2008    Page 7 of 46

Page 7

2008 U.S. Dist. LEXIS 26041, *; Fed. Sec. L. Rep. (CCH) P94,629

**LANGONE** -- Langone was a director from November 1996 to at least October 2000. For the reasons noted as to Englmeier, all counts as to Langone are dismissed with prejudice.

**LINDBERG** -- Lindberg was a director from August 2001 to April 2002. For the reasons noted as to Englmeier, all counts as to Lindberg are dismissed with prejudice.

**STUART** -- Stuart was a director from January 2000 to August 2001. For the reasons noted as to Englmeier, all counts as to Stuart are dismissed with prejudice.

**VON STAUFFENBERG** -- Von Stauffenberg was a director from January 2000 to August 2001. For the reasons noted as to Englmeier, all counts as to von Stauffenberg are dismissed with prejudice.

**PETERSON** -- Peterson has been Microtune's general counsel since April 2004. Any claims as to Peterson before April 2004 [*21] are dismissed with prejudice. Since April 2004, Pedroli alleges that by virtue of his position, Peterson knew or should have known of the practice. Pedroli's generalized allegations are not sufficient. All claims as to Peterson, not otherwise barred, are dismissed without prejudice.

**CICIORA** -- Ciciora has been a director since 1996. Pedroli alleges that as a result of his position, he knew or should have known of the backdating practices. Since 2002, he has signed various 10K and 10Q forms. However, there is nothing to demonstrate when and to what extent he had knowledge of the backdating practices. The court finds that the pleadings as to Ciciora do not meet the heightened pleading standards and should be dismissed without prejudice.

**MARREN** -- Marren has been a director since August 2005. The only allegations as to him are those cast in the boilerplate allegations as to all directors. The complaint notes that he signed one Form 10K in March 2006. The complaint is silent as to any other participation or omission by Marren. Marren is thrown into the mix of allegations that state from 1999 to the filing of the complaint, he and others caused or allowed Microtune to file 10Q's and Form [*22] 10K's that misrepresented the company's finances in violation of GAAP, and caused compensation expenses to be understated and net earnings overstated. The court finds that the 10b-5 claim against Marren does not meet the heightened pleading standards and should be dismissed without prejudice.

**CLARDY** -- Clardy has been a director since 1996 and a member of the compensation committee since 2004. He was also a member of the audit committee. He is alleged to have known about the practice of backdating

stock options by virtue of his positions within the company. He has also signed various 10K and 10Q forms over the years. No particular motive is attributed to Clardy. Furthermore, as to Clardy, and for that matter all defendants, the Fifth Circuit requires a plaintiff to establish loss causation in order to trigger the fraud-on-the-market presumption. *See Greenberg v. Crossroads Systems, Inc., 364 F.3d 657 (5th Cir. 2004)*. Without a pleading alleging a decline in price, the court finds that there is no loss causation. Since Plaintiff has not pled loss causation, there can be no 10(b) claim. Pedroli's damages are stated in paragraph 94 of the complaint. Nowhere does he affirmatively state [*23] that the omission and subsequent revelation of the backdating practice caused a decline in Microtune's stock. Pedroli must plead that the decline in price is due to the revelation of stock option backdating. *See Greenberg, 364 F.3d at 665*. Pedroli merely alleges that because of these practices, the company's stock price was artificially inflated and Microtune would have to pay more money to buy the stock back. The Supreme Court has ruled that this is insufficient to meet the loss causation test. *See Dura Pharmaceuticals, Inc., supra.* Pedroli submits that he has met the *Dura* test, noting two drops in stock price, one occurring over a week period. Pedroli invites the court to take judicial notice of matters of public record. Pedroli notes that Microtune's stock closed at $ 4.93 on November 1, 2006, and fell to $ 4.60 on November 9, 2006. Yet, Pedroli fails to mention that the day after the announcement, the stock actually rose to $ 5.02. On November 10, 2006, the stock had gone up to $ 4.81 from the low noted above. In the other example Pedroli gives, he notes that Microtune's stock price fell from a close of $ 5.82 on September 19, 2006 to $ 5.70 on September 20, 2006. However, on the [*24] 19th, the stock opened at $ 5.97 and fell 15 cents to close at $ 5.82. The day the audit committee released its findings, the stock opened at $ 5.75 but fell only 5 cents to $ 5.70. Since Pedroli has not properly pled loss causation as required, the court need not address the arguments advanced by defendants that the one day drop in price was de minimis. As Pedroli states, this is all a matter of public record and such being the case, his failure to plead loss causation indicates to the court that any drop must have been insignificant to the Plaintiff or he would have surely pled it knowing full well the standard required in this Circuit. All counts as to Clardy should be dismissed without prejudice.

**CRADDOCK** -- Craddock is alleged to have been a Microtune director since April 2002 and to have signed 10K's. Again, by virtue of his position and access to corporate records, Pedroli alleges that he should have known of the backdating practices. For the multiple reasons stated above, all counts against Craddock should be dismissed without prejudice.

Case 1:07-cv-00227-RBW    Document 53-2    Filed 08/15/2008    Page 8 of 46

Page 8

2008 U.S. Dist. LEXIS 26041, *; Fed. Sec. L. Rep. (CCH) P94,629

**WHITE** -- White has been a director since 2004 and also signed 10K's. For the reasons stated above, all counts as to White should be dismissed [*25] without prejudice. The court also notes that many of the complained of backdated options occurred well before many of the directors, such as White, assumed their positions.

**CASH** -- Cash was a director from 1996 until 2004. He also signed 10K's. For the reasons stated above, any claims occurring more than five years before the filing of the complaint are barred by repose and should be dismissed with prejudice. As to the claims occurring within the five year period, Pedroli fails to plead with specificity and also fails to sufficiently plead loss causation. Those claims should be dismissed without prejudice.

**LE VECCHIO** -- LeVecchio has been a director since 2003 and a member of the audit committee since August 2003. All of the challenged options, except for Koch, occurred before he was a director. The mere fact that LeVecchio was on the audit committee is not enough to find scienter as to Koch's alleged backdated options. There is no allegation concerning what duties the audit committee was charged with, whether it coordinated outside audits, whether it oversaw various aspects of Microtune's financial accounting or what internal controls it enforced. Allegations of membership on an audit [*26] committee may, in certain circumstances, provide a basis for liability under the group pleading doctrine. *In re Alstom SA, 406 F.Supp.2d 433, 449 (S.D.N.Y. 2005); but see Wojtunik v. Kealy, 394 F.Supp.2d 1149 (D.Ariz. 2005)* (audit committee membership is insufficient to make an outside director liable under the group pleading doctrine); *In re Sunbeam Sec. Litig., 89 F.Supp.2d 1326,1341 (S.D. Fla. 1999).*

Here, there is no mention of how the audit committee learned of Microtune's alleged improper accounting, who presented it with the information, when or how the committee members' response, or lack thereof, rendered them active participants in Microtune's wrongdoing. *See generally Jones ex. rel. CSX Auto Corp. v. Jenkins, 503 F.Supp.2d 1325 (D.Ariz. 2007).* Mere membership on a committee, without more, will not suffice to withstand a 12(b)(6) challenge.

**GRAHAM** -- Graham was Microtune's Secretary from March 2004 to May 2005. He was also chief development officer and vice-president from November 2004 to May 2005 and CFO from August 2003 to November 2004. He also certified certain filings. Graham's position alone does not render him liable. *See Abrams, supra.* His position does not excuse Pedroli's [*27] obligation to plead scienter with particularity. *In re Sec. Litig. BMC Software, Inc., 183 F. Supp. 2d 860, 887*

*(S.D. Tex. 2001).* The mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter. *Goldstein v. MCI WorldCom, 340 F.3d 238, 253 (5th Cir. 2003).* Here, the allegations against Graham center on his position and what he must have known. There is no specific pleading as to what he actually knew or withheld. Having considered all the facts and circumstances, the complaint fails to raise a strong inference of scienter. Simple negligence, without more, does not rise to a 10(b)(5) violation. Except for the SOX claim, which is dismissed with prejudice, the remaining counts as to Graham are dismissed without prejudice.

**KIRK** -- Kirk has been a vice-president since March 2003. There are no allegations he received backdated options. He never signed a financial certification. In fact, his position is one of sales. There is nothing that Pedroli has said or could say to hold this individual liable under any theory. All claims are dismissed with prejudice.

**KUPP** -- Kupp has been a vice-president, CFO and secretary since May 2005. He has also [*28] signed SOX certifications and filings. As discussed above, a mere certification as to SOX or signing a 10K, without more, does not equate to a finding of scienter. Except for the SOX claim, which was dismissed with prejudice, the remaining counts as to Kupp are dismissed without prejudice.

**TADDIKEN** -- Taddiken has been Microtune's chief operating officer since 2003 and held other positions before that date. Of the approximately 700,000 options he received, Pedroli alleges that 24,000 are believed to have been backdated. This occurred in 2001 and any clam as to this transaction is barred. He alleges a significant number of shares sold as an insider but there is no allegation as to when the shares were sold, that they were contemporaneous to that of the Plaintiff or that they were not properly disclosed. Again, there is nothing but boilerplate pleadings to support Pedroli's claim. Taddiken signed and certified a 10Q in 2003, but there are no allegations that support a finding of scienter. All claims as to Taddiken are dismissed without prejudice.

The remaining defendants are primarily sued as officers. Fontaine has been president and CEO since August 2003 and served as president before [*29] that. From November 2000 to February 2002, he is alleged to have sold 390,600 of his personally held shares. There is no allegation that he received backdated stock options. He has also signed SOX certifications and signed filings.

Chapman has been vice-president of accounting since 2004 and held other positions prior to that time. He is alleged to have received 14,600 backdated options in 2003 and sold 4,266 of his shares on November 22, 2004. The nearest other sale by an "insider" is alleged to

Case 1:07-cv-00227-RBW    Document 53-2    Filed 08/15/2008    Page 9 of 46

Page 9

2008 U.S. Dist. LEXIS 26041, *; Fed. Sec. L. Rep. (CCH) P94,629

have occurred more than three years before. Chapman signed two SOX certifications.

Housley was president from December 2001 to April 2003. The complaint alleges that he resigned over previous accounting irregularities. The complaint alleges that Housley received 36,000 options that are alleged to have been backdated in 2001. He also sold 32,000 shares of his stock over a 16 month period ending in 2002. Pedroli identifies no filings or certifications made by Housley. Because Pedroli has pled no specific facts as to Housley nor indicated how his sales of stock were irregular or suspicious, all claims as to Housley should be dismissed with prejudice. The last "egregious" backdating practice noted [*30] in the complaint which came during Housley's watch was 2001. Therefore, Pedroli has failed to state a claim against Housley.

Richardson served as general counsel from April 2001 to August 2003 and took on the responsibility of CFO in July 2002. She signed four Forms 10Q and one Form 10K. Pedroli claims Richardson received 36,000 improperly backdated stock options in 2001, but never states when they were actually made or who allegedly approved them. The complaint alleges that she sold shares over a three year period, even after she left the company. The best that can be said about the allegations against Richardson, and for that matter the other defendants, is that the allegations are wholly conclusory and non-specific. Even an incorrect SOX certification does not, by itself, create a strong inference of scienter. *See, e.g., In re Hypercom Corp. Sec. Litig., 2006 U.S. Dist. LEXIS 45482, 2006 WL 1836181, * 11 (D. Ariz. 2006).* As to insider trading, there has been no demonstration that Richardson's trading was in suspicious amounts or at suspicious times. *See Abrams, 292 F.3d at 435.* Except for the SOX claim, which is dismissed with prejudice, the remaining claims as to Richardson are dismissed without prejudice.

Rogers [*31] was a vice-president and CFO until 2002. He is alleged to have taken 12,000 backdated options in 2001 and sold approximately 135,000 shares over an 18 month period. He also signed a Form 10K and 10Q within the repose period. For the multiple reasons already stated, the court finds that the complaint as to Rogers should be dismissed without prejudice.

In the end analysis, all directors and officers are alleged to have either engaged in the same conduct, signed false certifications, or sold stock. Such generalized pleadings only leaves the court with the impression that Pedroli failed to adhere to his burden to plead facts with particularity.

**IS DEMAND FUTILE?**

*Fed.R.Civ.P. 23.1* requires Pedroli to allege, with particularity, the efforts, if any, made to obtain the desired action from the directors and the reasons for his failure to obtain such action or for not making the demand. The obligation to make a demand is governed by Delaware law. *See generally Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991).* Pedroli claims that demand is futile. The reason for this is that Pedroli claims the demand would be a futile, wasteful and useless act. First, he says that the entire Board is [*32] liable for backdating by insiders. He claims that the Board should have properly informed itself of the circumstances surrounding the options. This statement only reinforces the directors' claims that Pedroli has failed to plead scienter. He says that many of the directors could be liable for breach of fiduciary duty because they either served on the board, compensation committee or audit committee. Moreover, he claims that some of the directors sold stock as insiders during their tenures on the board. He also notes the Board has a history of stonewalling derivative suits. He cites one example.

The various director defendants point out that an independent investigation revealed that no member of the current Board engaged in any wrongful conduct. The director defendants allege that approval of options was delegated to the compensation committee. Two of those members did not join the committee until after the practice had stopped (Marren and Clardy). There are also no allegations that any current director (Ciciora, Clardy, Craddock, Fontaine, LeVecchio, Marren, Tai, White or Schueppert) received backdated options. Under Delaware law, membership on an audit committee does not alone render [*33] directors personally liable and, therefore, too interested to consider a shareholder's demand. *Guttman v. Huang, 823 A.2d 492 (Del. Ch. 2003).* Likewise, conclusory allegations regarding the directors as a group are insufficient to demonstrate demand futility. Courts applying Delaware law have held that allegations that directors merely participated in wrongful conduct are insufficient. *See, e.g., In re Silicon Graphics Inc. Securities Litigation, 183 F.3d 970, 990 (9th Cir. 1999).* Similarly, allegations that directors "must have known" about and "failed to prevent and correct the improper financials" are insufficient. *See Rattner v. Bidzos, 2003 Del. Ch. LEXIS 103, 2003 WL 22284323, *10 n. 53 (Del.Ch. Sept. 30, 2003); see also Ferre v. McGrath, 2007 U.S. Dist. LEXIS 29490, 2007 WL 1180650, *6 (S.D.N.Y. 2007)* (holding that "[a]llegations of knowledge explained solely by the directors' service as directors, without more, are insufficient as a matter of law -- even where, as here, the plaintiff alleges that the matters in suit relate to the corporation's 'core' business.") (citing *Rattner, 2003 Del. Ch. LEXIS 103, 2003 WL 22284323 at *13).* Similarly,

2008 U.S. Dist. LEXIS 26041, *; Fed. Sec. L. Rep. (CCH) P94,629

"[a] plaintiff may not 'bootstrap allegations of futility' by pleading merely that 'the directors participated in [*34] the challenged transaction or that they would be reluctant to sue themselves.'" *In re Sagent Tech., 278 F.Supp.2d 1079, 1089 (N.D. Cal.2003)*, citing *Blasband v. Rales, 971 F.2d 1034, 1049 (3d Cir.1992)* (citing Delaware law); *Jones ex. rel. CSX Auto Corp., 503 F.Supp.2d at 1333*.

The only allegation as to Craddock, LeVecchio, White and Tai in regard to the audit committee is that they face substantial liability. LeVecchio became a member of the audit committee in August 2003 and Craddock in January 2004. Except for Koch, all the complained of insider option practices predated their committee membership. The same holds true for White. The court does not believe that Pedroli has shown futility as to the members of the audit committee.

Ciciora and Clardy are members of the compensation committee. It was their responsibility to review and approve grants of stock options. Pedroli claims that they cannot be disinterested. He also says they face substantial liability. Clardy did not become a member of the committee until 2004. There is no particularized allegation that either the audit committee or compensation committee knew that options were backdated.

As to the alleged insider trading by Fontaine [*35] and Tai, Pedroli must plead and explain what inside knowledge the defendants traded upon or how he or she gleaned such information. Pedroli must allege with detail that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material, non-public information. *In re Coca-Cola Enters., 478 F. Supp. 2d 1369, 1379-1380 (N.D. Ga. 2007)*. Here, Pedroli merely lumps all sales together. The same could be said as to Pedroli's allegations as to the remaining directors. Those allegations are boilerplate and do not sufficiently satisfy the court that Pedroli should be excused from his obligation in a derivative suit against a Delaware corporation to make demand prior to filing suit. For this reason alone, the complaint should be dismissed.

## STATE LAW CLAIMS

*Section 1367 of Title 28 of the United States Code* permits federal courts to exercise supplemental jurisdiction over pendent state claims. Whether to exercise such jurisdiction after dismissing the underlying federal claims is a matter left to the sound discretion of the court. *See United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)*; [*36] *Heaton v. Monogram Credit Card Bank, 231 F.3d 994, 997 (5th Cir. 2000)*. When the court dismisses the federal claims at a preliminary stage of litigation, judicial economy argues against the exercise of pendent or supplemental jurisdiction over state claims. *See LaPorte Constr. Co. v. Bayshore Nat'l Bank, 805 F.2d 1254, 1257 (5th Cir.1986)*. The court declines to exercise supplemental jurisdiction and the remaining state law claims are also dismissed without prejudice.

The court finds that all claims against the defendants for violating SOX are dismissed with prejudice to the refiling of the same. Section 14(a) claims against the following directors are dismissed with prejudice: Marren, Bartek, Englmeier, Norsworthy, Cash, Furst, Langone, Lindberg, Stuart, and Von Stauffenberg. All other section 14(a) claims are dismissed without prejudice. As to the 10(b)(5) claims, the Plaintiff's claims against the following defendants are dismissed with prejudice to the refiling of the same: Englmeier, Norsworthy, Furst, Langone, Lindberg, Stuart, Von Stauffenberg, and Housley. The claims against all other defendants are dismissed without prejudice.

As to those defendants dismissed without prejudice, [*37] the Plaintiff is granted leave to file an amended complaint in line with the reasoning noted herein, if the Plaintiff can do so in good faith and in compliance with *Rule 11*. Any amended complaint must be filed within 60 days of this order.

IT IS SO ORDERED.

**SIGNED this the 31st day of March, 2008.**

/s/ Richard A. Schell

RICHARD A. SCHELL

UNITED STATES DISTRICT JUDGE

2007 U.S. Dist. LEXIS 54058, *; Fed. Sec. L. Rep. (CCH) P94,425

LEXSEE 2007 U.S. DIST. LEXIS 54058



Positive
As of: Aug 15, 2008

### IN RE ATMEL CORPORATION DERIVATIVE LITIGATION

### Case Number C 06-4592 JF (HRL)

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

*2007 U.S. Dist. LEXIS 54058; Fed. Sec. L. Rep. (CCH) P94,425*

### July 16, 2007, Decided
### July 16, 2007, Filed

**NOTICE:**   NOT FOR CITATION

**COUNSEL:**  [*1] For James Juengling, Derivatively on Behalf of Nominal Defendant Atmel Corporation, Plaintiff: Alan R Plutzik, LEAD ATTORNEY, Kathryn Anne Schofield, Bramson, Plutzik, Mahler & Birkhaeuser, LLP, Walnut Creek, CA; Alan Roth Plutzik, Lawrence Timothy Fisher, Schiffrin Barroway Topaz & Kessler LLP, Walnut Creek, CA; Betsy Carol Manifold, Wolf Haldenstein Adler Freeman & Herz, San Diego, CA; Emanuel Shachmurove, Schiffrin Barroway Topaz & Kessler, Radnor, PA; Eric L. Zagar, Schiffrin Barroway Topaz & Kessler LLP, Radnor, PA; Marisa C. Livesay, Rachele R. Rickert, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA; Tara Puhua Kao, Radnor, PA.

For Anthony Noble, Plaintiff: Betsy Carol Manifold, Wolf Haldenstein Adler Freeman & Herz, San Diego, CA; Emanuel Shachmurove, Schiffrin Barroway Topaz & Kessler, Radnor, PA; Eric L. Zagar, Schiffrin Barroway Topaz & Kessler LLP, Radnor, PA; Marisa C. Livesay, Rachele R. Rickert, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA; Tara Puhua Kao, Radnor, PA.

For George Perlegos, Gust Perlegos, Defendants: Jessica Koren Nall, John L. Cooper, Farella Braun & Martel LLP, San Francisco, CA.

For Tsung-Ching Wu, Kris Chellam, Jack Peckham, Donald  [*2] Colvin, B. Jeffrey Katz, Francis Barton, T. Peter Thomas, Chaiho Kim, David Sugushita, Pierre Fougere, Steven Laub, Graham Turner, Norman T. Hall,

Bernard Pruniaux, Steven Schumann, Defendants: Brian Lawrence Levine, Palo Alto, CA; Darryl Paul Rains, Morrison & Foerster LLP, Palo Alto, CA; Todd L. Burlingame, Morrison & Foerster LLP, Walnut Creek, CA.

For Mikes N. Sisois, Defendant: James Lawrence Pagano, Law Offices of James L. Pagano, San Jose, CA.

For Atmel Corporation, Defendant: Todd L. Burlingame, LEAD ATTORNEY, Morrison & Foerster LLP, Walnut Creek, CA; Darryl Paul Rains, Morrison & Foerster LLP, Palo Alto, CA.

For Mikes N. Sisois, Defendant: James Lawrence Pagano, Law Offices of James L. Pagano, San Jose, CA.

For Kenneth Kelley, Movant: Betsy Carol Manifold, Wolf Haldenstein Adler Freeman & Herz, San Diego, CA; Kathryn Anne Schofield, Bramson, Plutzik, Mahler & Birkhaeuser, LLP, Walnut Creek, CA; Marisa C. Livesay, Rachele R. Rickert, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA.

**JUDGES:**  JEREMY FOGEL, United States District Judge.

**OPINION BY:** JEREMY FOGEL

**OPINION**

    ORDER [1]  (1) GRANTING WITH LEAVE TO AMEND MOTIONS TO DISMISS FOR FAILURE TO

Case 1:07-cv-00227-RBW    Document 53-2    Filed 08/15/2008    Page 12 of 46

Page 12

2007 U.S. Dist. LEXIS 54058, *; Fed. Sec. L. Rep. (CCH) P94,425

STATE A CLAIM; (2) DEFERRING MOTION TO DISMISS FOR FAILURE TO [*3] MAKE DEMAND

> 1    This disposition is not designated for publication and may not be cited.

[re: docket nos. 52, 53, 54, 58]

## I. BACKGROUND

### 1. Procedural Background

On July 27, 2006, Plaintiff James Juengling filed a shareholder derivative complaint against a number of the directors and officers of nominal defendant Atmel Corporation ("Atmel" or "the Company"), which designs, develops, manufactures and sells a wide variety of integrated circuit products, including microcontrollers, advanced logic, mixed-signal, non-volatile memory, and radio frequency components. The complaint alleged improper backdating of stock options and asserted three claims: (1) breach of fiduciary duty; (2) violation of *Section 10(b) of the Securities Exchange Act* and *Rule 10b-5* promulgated thereunder; and (3) restitution/unjust enrichment. On October 4, 2006, the Court consolidated the Juengling action with two other derivative actions [2] and appointed a leadership structure for the consolidated action ("the Consolidated Plaintiffs").

> 2    The plaintiff in *Noble v. Perlegos, et al.,* Case No. C 06-4973 JF brought claims for: (1) violation of *Section 14(a) of the Exchange Act;* (2) breach of fiduciary duty; (3) gross mismanagement;    [*4] (4) waste of corporate assets; and (5) unjust enrichment and breach of the duty of loyalty.
>
> The plaintiff in *Kelley v. Perlegos, et al.,* Case No. C 06-4680 JF brought claims for: (1) breach of fiduciary duty; (2) violation of *Section 10(b) of the Securities Exchange Act* and *Rule 10b-5* promulgated thereunder; and (3) restitution/unjust enrichment.

On November 3, 2006, the instant consolidated complaint ("the Complaint") was filed. The Complaint names eighteen individual defendants ("the Individual Defendants") who served as officers or directors of Atmel. The Complaint separates those eighteen defendants into two categories: the "Option Recipient Defendants" (Gust Perlegos, Tsung-Ching Wu ("Wu"), Kris Chellam ("Chellam"), Jack Peckham ("Peckham"),

Donald Colvin ("Colvin"), Mike Sisois ("Sisois"), B. Jeffrey Katz ("Katz"), Francis Barton ("Barton"), Graham Turner ("Turner"), Bernard Pruniaux ("Pruniaux"), and Steven Schumann ("Schumann")) and the "Director Defendants" (George Perlegos, T. Peter Thomas ("Thomas"), Chaiho Kim ("Kim"), Pierre Fougere ("Fougere"), Norman Hall ("Hall"), David Sugishita ("Sugishita"), and Steven Laub ("Laub")). It asserts eleven claims: (1) violation of *§ 10(b)* [*5] and *Rule 10b-5 of the Securities Exchange Act;* [3] (2) violation of *§ 14(a) of the Securities Exchange Act;* (3) violation of *§ 20(a) of the Securities Exchange Act* (against Chellam, Barton, Wu and the Director Defendants); (4) accounting; (5) breach of fiduciary duty and/or aiding and abetting; (6) unjust enrichment (against the Option Recipient Defendants); (7) rescission (against the Option Recipient Defendants); (8) constructive fraud; (9) corporate waste; (10) breach of contract (against the Option Recipient Defendants); and (11) violation of *California Corporation Code § 25402* (against the Individual Defendants, with the exception of Barton, Fougere, Kim, Laub and Sugishita). No demand has been made upon Atmel's Board of Directors ("the Board"). The Consolidated Plaintiffs allege that such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. Complaint P 153.

> 3    Those claims without notation as to specific defendants are asserted against all the Individual Defendants.

On January 29, 2007, three motions to dismiss were filed. Fifteen of the Individual Defendants moved [*6] to dismiss for failure to state a claim upon which relief may be granted ("the Barton Motion"). Defendants Gust Perlegos and George Perlegos also moved to dismiss, joining the Barton Motion with limited exceptions. Atmel moved to dismiss for failure to make demand. On January 30, 2007, defendant Sisois moved to dismiss, joining the Barton Motion with limited exceptions. The Consolidated Plaintiffs have filed an omnibus opposition to the four motions to dismiss. The Court heard oral argument on April 27, 2007.

### 2. Factual Allegations

The Complaint alleges that the Individual Defendants had the following relationships with Atmel:

| Defendant | Role with Atmel |
| --- | --- |
| George | President, CEO, [4] & director from Atmel's inception in 1984 |

2007 U.S. Dist. LEXIS 54058, *; Fed. Sec. L. Rep. (CCH) P94,425

| Defendant | Role with Atmel |
|---|---|
| Perlegos | to August 2006. |
| | |
| Gust Perlegos | Executive VP Office of the President, 2001 to August 2006. |
| | Director, January 1985 to August 2006. |
| | Executive VP & GM, January 1996 to 2001. |
| | VP, GM, January 1985 to January 1996. |
| | |
| Wu | Executive VP, Office of the President since 2001. |
| | Director since 1985. |
| | Executive VP & GM, January 1996 to 2001. |
| | VP, Technology, January 1986 to January 1996. |
| | |
| Thomas | Director since December 1987. |
| | Member of the Compensation Committee & the Audit Committee |
| | since at least 1996. |
| | |
| Hall | Director from August 1992 until in or about 2005. Member of |
| | the Compensation Committee from 1997 to 2004, & member of the |
| | Audit Committee from 1997 to 2003. |
| | |
| Fougere | Director, member of the Audit Committee, & member of the |
| | Compensation Committee since February 2001. |
| | |
| Kim | Director & member of the Audit Committee since September |
| | 2002. Member of the Compensation Committee from September |
| | 2002 through 2003. |
| | |
| Sugishita | Director, Chairman of Audit Committee, & Chairman of |
| | Corporate Governance & Nominating Committee, February 2004 to |
| | present. |
| | |
| Laub | Director since February 10, 2006. |
| | Appointed President & CEO in August 2006. |
| | |
| Chellam | Chief Financial Officer & VP, Finance & Administration, |
| | September 1991 to July 1998. |
| | |
| Peckham | GM, ASIC Operations, January 1992 to 1998. |
| | VP, Sales, January 1986 to January 1992. |
| | Director of Sales, June 1985 to January 1986. |
| | |
| Colvin | Chief Financial Officer, & VP, Finance, March 1998 to January |
| | 2003. Chief Financial Officer, Atmel Rousset S.A. 1995 to |
| | 1998. |
| | |
| Sisois | VP, Planning & Information Systems, 1986 to August 2006. |
| | Director of Information Systems, February 1985 to 1986. |
| | |
| Katz | VP, Marketing, November 1998 to about 2005. |
| | |
| Barton | Executive VP & Chief Financial Officer, May 2003 to July |

2007 U.S. Dist. LEXIS 54058, *; Fed. Sec. L. Rep. (CCH) P94,425

| Defendant | Role with Atmel |
| --- | --- |
| | 2005. |
| Turner | VP and GM, Microcontroller Segment since October 2001. Joined |
| | the Company in 1989. |
| Pruniaux | VP and GM, ASIC Segment since November 2001. |
| | CEO of Atmel Rousset S.A., May 1995 to November 2001. |
| Schumann | VP and GM, Non-Volatile Memory Segment since January 2002. |
| | Joined the Company in 1985. |

Complaint [*7] PP 22-76.

4   CEO refers to Chief Executive Officer, VP refers to Vice President, and GM refers to General Manager.

As summarized below, the Complaint alleges that the Option Recipient Defendants received twenty-one backdated option grants on eleven dates.

| Recipient | Purported Grant Date | Shares | Share Price |
| --- | --- | --- | --- |
| Turner | February 4, 1994 | 160,000* [5] | $ 2.29 |
| Schumann | February 22, 1994 | 192,000* | $ 3.8516 |
| Gust Perlegos | April 11, 1997 | 40,000 | $ 6.0938 |
| Wu | April 11, 1997 | 40,000 | $ 6.0938 |
| Chellam | April 11, 1997 | 40,000 | $ 6.0938 |
| Peckham | April 11, 1997 | 40,000 | $ 6.0938 |
| Turner | October 9, 1998 | 100,000* | $ 1.9844 |
| Pruniaux | October 9, 1998 | 200,000* | $ 1.9844 |
| Schumann | October 9, 1998 | 192,000* | $ 1.9844 |
| Colvin | February 12, 1999 | 20,000 | $ 3.6719 |
| Sisois | June 11, 1999 | 40,000 | $ 5.9063 |
| Colvin | July 16, 1999 | 40,000 | $ 7.8281 |
| Katz | July 16, 1999 | 10,000 | $ 7.8281 |
| Turner | July 16, 1999 | 40,000* | $ 7.8281 |
| Colvin | November 17, 2000 | 40,000 | $ 12.125 |

2007 U.S. Dist. LEXIS 54058, *; Fed. Sec. L. Rep. (CCH) P94,425

| Recipient | Purported Grant Date | Shares | Share Price |
|---|---|---|---|
| Colvin | September 17, 2001 | 100,000 | $ 7.12 |
| Gust Perlegos | November 14, 2002 | 50,000 | $ 2.11 |
| Wu | November 14, 2002 | 100,000 | $ 2.11 |
| Colvin | November 14, 2002 | 50,000 | $ 2.11 |
| Sisois | November 14, 2002 | 40,000 | $ 2.11 |
| Barton | April 30, 2003 | 500,000 | $ 1.81 |

Complaint PP 24-62, 103.

5   An asterisk indicates that the option grant was "At least" the number stated here.

The Complaint alleges the following: The Company's [*8] stock option plans require that the exercise price of an option be no less than the fair market value on the date of the grant. Complaint P 91. However, in "a striking pattern that could not have been the result of chance," all the grants listed above purportedly were granted at some of the lowest prices of the year in which they fell. Complaint P 109. The purported grant dates were not the actual grant dates. Complaint P 110. "Rather, at the behest of the Option Recipient Defendants, the Director Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Atmel stock was lower than the market price on the actual grant dates." Id. "From 1994 to 2003, the Compensation Committee granted . . . backdated Atmel stock options to the Option Recipient Defendants . . . ." Complaint P 103. After the Sarbanes-Oxley Act became effective, the Compensation Committee granted backdated options to Gust Perlegos, Wu, Colvin, Sisois, and Barton. Complaint PP 114-15. "From 1998 to 2003, the Company, with the knowledge, approval and participation of each of the Individual Defendants, for the purpose and with the effect of concealing [*9] the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Option Recipient Defendants . . . ." Complaint P 126.

The Complaint alleges the following with respect to Atmel's announced discovery of backdating: On July 25, 2006, Atmel issued a press release announcing that the Audit Committee was reviewing the Company's practices relating to its stock options grants with the assistance of independent legal counsel and independent accountants.

Complaint P 96. The Company failed to file a timely Form 10-Q for the quarter ending June 30, 2006. Complaint P 97. On August 15, 2006, the Company announced that it had received a request for information from the SEC relating to its past stock option grants. Id. On August 17, 2006, Atmel issued a press release announcing that its investigation was ongoing and that it was still unable to provide financial information for the quarter ending June 30, 2006. Complaint P 98. On October 30, 2006, the Company issued a press release reporting the Audit Committee's preliminary conclusion that "the actual measurement dates for certain stock options [*10] differed from the recorded measurement dates for such stock options." Complaint P 99. The release stated that the Company's prior financial statements could not be relied upon. Id. As of the filing of the Complaint, the Company had yet to issue its Form 10-Q for the quarter ending June 30, 2006, and faced possible delisting by NASDAQ. Complaint P 101.

The Complaint also alleges the following: On August 6, 2006, Laub, Fougere, Thomas, Kim, and Sugishita elected Sugishita as Chairman and canceled the stockholders' meeting George Perlegos had called for the day before, which had sought their removal. Complaint P 92. The Board then fired George and Gust Perlegos, as well as two other executives, citing misuse of corporate travel funds. Id. On August 25, 2006, George Perlegos submitted a letter of resignation to the Board. Complaint P 95. On August 28, 2006, the Company announced that it had received a notice from NASDAQ that it was not in compliance with the director independence listing requirement, but that it had come back into compliance with the requirement after the resignation of George Perlegos. Id.

## II. LEGAL STANDARD

### 1. Motion to Dismiss

Case 1:07-cv-00227-RBW    Document 53-2    Filed 08/15/2008    Page 16 of 46

Page 16

2007 U.S. Dist. LEXIS 54058, *; Fed. Sec. L. Rep. (CCH) P94,425

For purposes of a motion to dismiss, the plaintiff's [*11] allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969)*. Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections, 66 F.3d 245, 248 (9th Cir. 1995)*. When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp, 90 F.3d 386, 393 (9th Cir. 1996)*. On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *North Star Int'l v. Arizona Corp. Comm'n, 720 F.2d 578, 581 (9th Cir. 1983)*; *MGIC Indemnity Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986)*; *Beliveau v. Caras, 873 F.Supp. 1393, 1395 (C.D. Cal. 1995)*. However, under the "incorporation by reference" doctrine, the Court also may consider documents that are referenced extensively in the complaint and are accepted by all parties as authentic, even though the documents are not physically attached to the complaint. *In re Silicon Graphics, Inc. Securities Litigation, 183 F.3d 970 (9th Cir. 1999)*.

**2. Demand Requirement**

A derivative [*12] complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." *Fed. R. Civ. P. 23.1*. The existence and satisfaction of a demand requirement is a substantive issue governed by state law. *See Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 96-97, 111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991)*. [6] When the challenged decision is that of the board in place at the time of the filing of the complaint, failure to make demand may be excused if a plaintiff can raise a reason to doubt that a majority of the board is disinterested or independent or that the challenged acts were the product of the board's valid exercise of business judgment. *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)*; *see also Ryan v. Gifford, 918 A.2d 341, 352 (Del. Ch. 2007)* (discussing *Aronson*). However, "[w]here there is no conscious decision by the corporate board of directors to act or refrain from acting, the business judgment rule has no application." *Rales v. Blasband, 634 A.2d 927, 933 (Del. 1993)*; [*13] *see also Ryan, 918 A.2d at 352* (discussing *Rales*). In such a situation, demand may be excused only if a plaintiff "can create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id. at 353* (citing *Rales, 634 A.2d at 933-34*).

6 The parties agree that Delaware law applies to the instant action because Ditech is incorporated in Delaware.

**III. DISCUSSION**

**1. The Barton Motion to Dismiss for Failure to State a Claim**

a. Claim One: Violation of *Section 10(b)* and *Rule 10b-5*

i. Sufficiency of the Allegations

The Consolidated Plaintiffs allege securities fraud in violation of *Section 10(b) of the Securities Exchange Act* and *Rule 10b-5* promulgated thereunder. *Section 10(b)* makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

*15 U.S.C. § 78j(b)*. [*14] *Rule 10b-5* makes it unlawful for any person to use interstate commerce

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b-5*. In cases involving publicly-traded securities and purchases or sales in public securities markets, the elements of an action under *Section 10(b)* and *Rule 10b-5* are: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura*

2007 U.S. Dist. LEXIS 54058, *; Fed. Sec. L. Rep. (CCH) P94,425

*Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).

The Consolidated Plaintiffs must meet two heightened pleading standards. *Fed. R. Civ. P. 9(b)* requires that "the circumstances constituting fraud . . . be stated with particularity." The Ninth Circuit has explained that a "plaintiff must include [*15] statements regarding the time, place, and nature of the alleged fraudulent activities, and that mere conclusory allegations of fraud are insufficient." *In re GlenFed, Inc. Securities Litigation, 42 F.3d 1541, 1548 (9th Cir. 1994).* A plaintiff asserting fraud "must set forth an explanation as to why the statement or omission complained of was false or misleading." *Id.* (internal quotation marks omitted); *see also Yourish v. California Amplifier, 191 F.3d 983, 992-93 (9th Cir. 1999).* The Private Securities Litigation Reform Act ("PSLRA") raises the pleading standard further:

> (1)  Misleading  statements  and omissions
>
> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all  [*16] facts on which that belief is formed.
>
> (2) Required state of mind
>
> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*15 U.S.C. § 78u-4(b)(1)-(2).*

The Consolidated Plaintiffs allege the following with respect to the *Section 10(b)* claim:

> 159. Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.
>
> 160. The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and/or directors in the Company,  [*17] each of the Individual Defendants was able to and did control the conduct complained of herein.
>
> 161. The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and/or directors of the Company and were therefore directly responsible for the fraud alleged herein.
>
> 162. The Company relied upon the Individual Defendants' fraud in granting the Option Recipient Defendants options to purchase shares of the Company's common stock, as alleged herein.
>
> 163. As a direct and proximate result of the Individual Defendants' fraud, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, the costs associated with the Company's internal investigation, the loss of funds paid to the Company upon the exercise of stock options, costs and expenses incurred in connection with the Company's restatement of historical  [*18] financial results, and costs and expenses incurred in connection with the SEC investigation of the Company.

Case 1:07-cv-00227-RBW    Document 53-2    Filed 08/15/2008    Page 18 of 46

Page 18

2007 U.S. Dist. LEXIS 54058, *; Fed. Sec. L. Rep. (CCH) P94,425

Complaint PP 159-163.

These allegations do not satisfy the specificity requirement of *Rule 9(b)* or of the PSLRA. They neither identify what roles each defendant played in the alleged back-dating scheme nor allege facts giving rise to a strong inference of scienter on the part of each defendant. In light of the public statement by Atmel, it appears almost certain that some of the options at issue here were backdated. However, that apparent fact does not permit the Consolidated Plaintiffs to name any number of individual defendants without providing adequate detail regarding their role and knowledge of the alleged backdating. [7] This is not a case in which requiring further detailed allegations of the roles played by individual defendants would lead to an unreasonably cumbersome complaint. *See In re Washington Public Power Supply System Securities Litigation, 623 F.Supp. 1466, 1472 (W.D.Wash. 1985)*. Accordingly, this claim will be dismissed with leave to amend to the extent that it is not time-barred.

────────────────

7  Nor are the Consolidated Plaintiffs relieved of the requirement that they allege [*19] facts raising an inference that a particular option grant was backdated. While the Court need not decide the sufficiency of such allegations in the instant complaint, it notes that other courts within this district have considered the presence or absence of a pattern of backdating, primarily in the context of the demand futility requirement. *See e.g. In re Zoran Corp. Deriv. Litig., 511 F. Supp. 2d 986, 2007 U.S. Dist. LEXIS 43402, 2007 WL 1650948 (N.D.Cal. June 5, 2007)*; *In re Openwave Systems Inc. Deriv. Litig., 503 F. Supp. 2d 1341, 2007 U.S. Dist. LEXIS 36517, 2007 WL 1456039 (N.D.Cal., May 17, 2007)*; *In re CNET Networks, Inc. Deriv. Litig., 483 F.Supp.2d 947 (N.D.Cal. 2007)*; *In re Linear Tech. Corp. Deriv. Litig., 2006 U.S. Dist. LEXIS 90986, 2006 WL 3533024 (N.D.Cal. Dec. 7, 2006)*. This Court also has provided a non-exclusive list of facts that, if alleged, would strengthen allegations that a grant was backdated. *See* Order Re Motions to Dismiss 11-12, *In re Ditech Derivative Litigation*, Case No. C 06-5157 JF (listing the following factors: "the degree to which the options were granted at the discretion of the compensation committee or the board, versus at fixed, preestablished times; the actual grant dates of the options and the appropriate price of the options; the date that the options were exercised; [*20] whether required performance goals were met before the options were granted;

the presence or absence of other major corporate events, such as an acquisition, at the time of the grants; and the results of any requests by Plaintiff for information.").

ii. Statute of Limitations

[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in *section 3(a)(47)* of the Securities Exchange Act of 1934 (*15 U.S.C. § 78c(a)(47)*), may be brought not later than the earlier of --

(1) 2 years after the discovery of the facts constituting the violation; or

(2) 5 years after such violation.

*28 U.S.C. § 1658(b)*; *see e.g. In re Heritage Bond Litig., 289 F.Supp.2d 1132, 1147-48 (C.D.Cal. 2003)*. This statute of limitations is not subject to equitable tolling. *Durning v. Citibank, Int'l, 990 F.2d 1133, 1136-37 (9th Cir. 1993)*.

The parties agree that the five-year period of repose [8] applies to the first claim for violations of *Section 10(b)* and *Rule 10b-5 of the Securities and Exchange Act*. The Consolidated Plaintiffs argue that their claims fall within the five-year period of repose. While [*21] only a limited number of the alleged stock grant dates fall within this period, the Consolidated Plaintiffs do allege a series of false financial statements within the five-year period and argue that the period of repose begins no earlier than the latest such financial statement, which was filed on March 15, 2003. This argument raises the question as to whether such subsequent false financial statements preserve claims for options manipulation that occurred outside the five-year period of repose. The Court concludes that in light of the statute's focus on the "violation," the Court must consider the statute of limitations in terms of the specific violations alleged. To the extent that the claim is based upon the backdating itself, the period of repose starts on the date that the option grant was made. *See Durning, 990 F.2d at 1136* (noting that the federal rule is that a cause of action accrues at the completion of the sale of the instrument); *Falkowski v. Imation Corp., 309 F.3d 1123, 1130 (9th Cir. 2002)* (describing the grant of an option as "a

Case 1:07-cv-00227-RBW     Document 53-2     Filed 08/15/2008     Page 19 of 46

Page 19

2007 U.S. Dist. LEXIS 54058, *; Fed. Sec. L. Rep. (CCH) P94,425

purchase or sale" under the Securities Litigation Uniform Standards Act). The Consolidated Plaintiffs may be able to state a claim under *Section 10(b)* [*22] and *Rule 10b-5* for dissemination of fraudulent financial statements, but such statements must fall within the five-year period of repose. [9] The Consolidated Plaintiffs may not avoid the effect of the statute of limitations by combining allegations of recent financial statements and time-barred option back-dating. Because the first claim, as currently pled, depends upon such a combination, it will be dismissed. The Court will grant leave to amend so that the Consolidated Plaintiffs may allege independent wrongful acts that occurred on or after July 27, 2001.

8    "A statute of repose is a fixed, statutory cutoff date, usually independent of any variable, such as claimant's awareness of a violation." *Munoz v. Ashcroft, 339 F.3d 950, 957 (9th Cir. 2003)* (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991)*).

9    The Court is skeptical of a continuing wrong theory that would create liability under *Section 10(b)* upon the issuance of a financial statement that merely fails to correct a prior false statement. Such a theory appears to approximate the effects of the fraudulent concealment doctrine in relation to equitable tolling, a doctrine that does not apply [*23] in the *Section 10(b)* context.

b. Claim Two: Violation of *Section 14(a)*

*Rule 14a-9* provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

*17 C.F.R. § 240.14a-9(a)*. To state a claim under *Rule 14a-9* and *Section 14(a)*, a plaintiff must allege a false or misleading statement or omission of material fact; that the misstatement or omission was made with the

requisite level of culpability; and that it was an essential link in the accomplishment of the transaction. *Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th Cir. 2000)*.

The Individual Defendants argue that the *Section 14(a)* claim is time-barred because it must be [*24] filed within one year after discovery of the facts constituting the violation, and in no event more than three years following publication of the proxy statement. Barton Motion 23. The Consolidated Plaintiffs argue that *Section 14(a)* claims fall within the two-year/five-year scheme that applies to a *Section 10(b)* claim. *See* Opposition 18. The Court concludes that the one-year/three-year scheme applies to the *Section 14(a)* claim because such a claim does not sound in fraud. *See In re Exxon Mobil Corp. Sec. Litig., 387 F.Supp.2d 407, 424 (D.N.J. 2005); In re Global Crossing, Ltd. Sec. Litig., 313 F.Supp.2d 189, 196-97 (S.D.N.Y. 2003); In re Zoran Corp. Derivative Litig., 2007 U.S. Dist. LEXIS 43402, 2007 WL 1650948 *24*.* As currently pled, the *Section 14(a)* claim alleges false statements made more than three years prior to the filing of this action. Accordingly, the claim will be dismissed with leave to amend. Any amended claim must allege wrongful acts that occurred on or after July 27, 2003 and not later than one year after discovery of the violation.

In light of the foregoing discussion, the Court need not reach the challenges to the sufficiency of the allegations. However, assuming without deciding that the PSLRA [*25] also applies to *Section 14(a)* claims, *see e.g. In re Textainer Partnership Securities Litig.,* 2005 WL 3801596 (N.D.Cal. March 8, 2005), *In re McKesson HBOC, Inc. Secs. Litig., 126 F. Supp. 2d 1248, 1267 (N.D.Cal. 2000).,* greater specificity likely would strengthen this claim considerably. [10]

10    This Court has held in another action that the PSLRA has foreclosed the application of the "group published pleading" doctrine, which provides that when false or misleading information is conveyed in group published statements, it is reasonable to presume that the statements are the result of the collective actions of the company's officers. *In re Nextcard, Inc. Sec. Litig., 2006 U.S. Dist. LEXIS 16156, 2006 WL 708663 *2-3 (N.D.Cal. March 20, 2006)*. This holding likely will be relevant to the sufficiency of an amended claim under *Section 14(a)*.

c. Claim Three: Violation of *Section 20(a)*

*Section 20(a)* provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person [*26] acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*15 U.S.C. § 78t(a).* "To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." *Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir. 1996).* As discussed above, the Consolidated Plaintiffs have failed to state a claim for a primary violation of the securities laws. However, it is possible that they may be able to do so in an amended pleading. Accordingly, the *Section 20(a)* claim will be dismissed with leave to amend. [11]

> 11    The parties agree that the statute of limitations analysis for claim three is the same as for claim one. *See also In re Heritage Bond Litigation, 289 F.Supp.2d at 1148.* Accordingly, amendment of claim three should comply with the limitations articulated in the Court's analysis of claim one.

d. Claims Four to Eleven: The State Law Claims

i. Claims Under Delaware Law (Claims Four to Eleven)

(1) Statute of Limitations

The parties agree that a three-year statute of limitations applies to each claim under [*27] Delaware law. *See 10 Del. C. § 8106 (2006).* The Consolidated Plaintiffs contend that the statute was tolled in the instant case "based upon the doctrines of inherently unknowable injuries and fraudulent concealment." Opposition 20. "Fraudulent concealment requires an affirmative act of concealment by a defendant-an actual artifice that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry." *Ryan, 918 A.2d 341, 360, 2007 WL 1018208 *13* (quotation marks omitted). "Inaccurate public representations as to whether directors are in compliance with shareholder-approved stock option plans constitute fraudulent concealment of wrongdoing sufficient to toll the statute of limitations."

*Id.* Because the Consolidated Plaintiffs allege such inaccurate public representations, *see* Complaint P 126, the three-year statute of limitations is tolled as to the Delaware state law claims.

(2) Claim Five: Breach of Fiduciary Duty

The Consolidated Plaintiffs allege the following:

> 179. As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other [*28] Company insiders at the expense of the Company.

> 180. As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

> 181. In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

> 182. The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to and did, unduly benefit the Option Recipient Defendants at the expense of the Company.

Complaint PP179-82.

The Individual Defendants argue that their actions are protected by the business judgment rule. However, where a defendant acts in bad faith and commits a breach of loyalty, the business judgment rule does not apply. *See Ryan, 918 A.2d 341, 2007 WL 1018208 *11.* The Individual Defendants also argue that the fiduciary duty claim is not stated with sufficient [*29] particularity. This argument is well taken, as the Complaint does not put the Individual Defendants, and particularly the non-officer defendants, on notice as to how they are alleged to have violated their fiduciary duties. *See York Linings v. Roach, 1999 Del. Ch. LEXIS 160, 1999 WL 608850 *2 (Del. Ch. July 28, 1999)* (unpublished). The Consolidated Plaintiffs refer to detailed allegations

Case 1:07-cv-00227-RBW    Document 53-2    Filed 08/15/2008    Page 21 of 46

Page 21

2007 U.S. Dist. LEXIS 54058, *; Fed. Sec. L. Rep. (CCH) P94,425

elsewhere in the Complaint, but, as discussed above, necessary detail is largely absent. Accordingly, this claim will be dismissed with leave to amend.

### (3) Claim Six: Unjust Enrichment

The Individual Defendants move to dismiss the unjust enrichment claim on a number of bases. The Consolidated Plaintiffs respond by citing to *Ryan, 918 A.2d 341, 2007 WL 1018208 *14*, in which the Delaware Chancery indicated that an unjust enrichment claim may be viable in the context of options backdating. The Court need not resolve the legal challenges to this claim, as amendment of the complaint is required on other bases. The Court notes that more detailed allegations of options backdating will strengthen any claim that the recipients of such options were unjustly enriched.

### (4) Claims Four and Seven: Remedies Pled as Claims

The Individual Defendants move to [*30] dismiss the claims for accounting and rescission on the basis that accounting and rescission are remedies, not separate claims for relief. The Consolidated Plaintiffs effectively concede as much, but argue that it is inconsequential whether accounting and rescission are pled as remedies or claims for relief. Opposition 48. The Court concludes that the Consolidated Plaintiffs should include accounting and rescission as remedies sought in any amended complaint.

### (5) Claims Eight and Nine: Constructive Fraud and Corporate Waste

The Individual Defendants argue that constructive fraud and corporate waste are merely types of breaches of fiduciary duty, not separate torts. Barton Motion 17 n.10. The Consolidated Plaintiffs do not respond to this specific argument, which is well taken as to the constructive fraud claim. The Court will dismiss that claim, which should be restated in any amended complaint as a "straightforward fiduciary duty claim[]." *See Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211, 1236 (Del. Ch. 2001)* ("[Plaintiff] should amend the complaint to transform its derivative constructive fraud counts into straightforward breach of fiduciary duty counts.").

The corporate [*31] waste claim also will be dismissed. "To support a claim [for corporate waste], a shareholder must demonstrate that the transaction in question either served no purpose or was so completely bereft of consideration that the transfer is in effect a gift." *Lewis v. Vogelstein, Del. Ch., 699 A.2d 327, 336 (1997)*. A plaintiff must allege facts that, if true, establish that the defendant directors "authorize[d] an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has

received adequate consideration." *Glazer v. Zapata Corp., Del. Ch., 658 A.2d 176, 183 (1993)*. The Consolidated Plaintiffs have not alleged such facts here; instead, they have alleged a grant of equity-compensation. As the Individual Defendants assert, these grants may well have been in consideration for the recipients remaining in Atmel's employ. Accordingly, the claim will be dismissed with leave to amend.

### (6) Claim Ten: Breach of Contract

The Individual Defendants move to dismiss the breach of contract claim on the grounds that it is not pled with sufficient particularity, that no employment agreements existed between Atmel and the "option recipient defendants," [*32] that the Consolidated Plaintiffs have not alleged any act of breach, and that the directors ratified any breach. The Consolidated Plaintiffs respond briefly that "[t]he terms of the Atmel stock option plans were blatantly violated when the Director Defendants approved backdated stock option grants." Opposition 47. However, the Consolidated Plaintiffs have not alleged which, if any, of the defendants entered into a binding contract that incorporates the terms of an option plan. Accordingly, this claim will be dismissed with leave to amend.

### ii. Claim Eleven: Insider Trading Under California Law

#### (1) Statute of Limitations

A *Section 25402* claim must be brought "before the expiration of five years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire." *Cal. Corp. Code § 25506(b)*. While the Consolidated Plaintiffs argue that this period should be equitably tolled, the Court concludes that the five-year period since the violation is a strict limit that may not be tolled. *See SEC v. Seaboard Corp., 677 F.2d 1301, 1308 (9th Cir. 1982)* (concluding that the [*33] four-year bar under an earlier version of the statute was a strict limit). The insider trading allegations refer to sales as early as 1997. Accordingly, portions of the claim are barred as currently pled. Any amended claim should allege violations that occurred on or after July 27, 2001 and discovery of which occurred on or after July 27, 2004.

#### (2) Sufficiency of the Allegations

*Cal. Corp. Code § 25402* provides that

[i]t is unlawful for an issuer or any person who is an officer, director or controlling person of an issuer or any other person whose relationship to the issuer gives him access, directly or

Case 1:07-cv-00227-RBW    Document 53-2    Filed 08/15/2008    Page 22 of 46

Page 22

2007 U.S. Dist. LEXIS 54058, *; Fed. Sec. L. Rep. (CCH) P94,425

indirectly, to material information about the issuer not generally available to the public, to purchase or sell any security of the issuer in this state at a time when he knows material information about the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available, unless he has reason to believe that the person selling to or buying from him is also in possession of the information.

A claim under *Section 25402* must be pled with particularity [*34] under *Rule 9(b)*. *In re RasterOps Corp. Sec. Litig., 1993 U.S. Dist. LEXIS 14266, 1993 WL 476651 *5 (N.D.Cal. Sep. 10, 1993)*.

The Consolidated Plaintiffs allege the following:

202. At the time that the Insider Selling Defendants sold their Atmel common stock as set forth herein at PP 135-49, by reason of their high executive and/or directorial positions with Atmel, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of Atmel's option backdating, improper accounting, and false financial statements.

203. At the time of such sales, that information was not generally available to the public of the securities markets. Had such information been generally available, it would have significantly reduced the market price of Atmel shares at the time.

204. The Insider Selling Defendants had actual knowledge of material, adverse non-public information and thus sold their Atmel common stock in California in violation of *California Corporations Code § 25402*.

Complaint PP 202-04. The Court concludes that like the other claims, the insider trading claim is not pled with sufficient particularity and should be dismissed [*35] with leave to amend. An amended claim should allege facts specific to each of the Individual Defendants.

e. Motions to Dismiss Joining in the Barton Motion

The Court has reviewed the two additional motions to dismiss that join in the Barton Motion. The Court concludes that the dismissal of the claims on the basis of the arguments made in the Barton Motion renders it unnecessary to address the separate arguments asserted in the Sisois and Perlegos motions.

## 2. The Atmel Motion to Dismiss for Failure to Make Demand

The Delaware Court of Chancery [12] recently explained:

[I]n an effort to balance the interest of preventing strike suits motivated by the hope of creating settlement leverage through the prospect of expensive and time-consuming litigation discovery [with the interest of encouraging] suits reflecting a reasonable apprehension of actionable director malfeasance that the sitting board cannot be expected to objectively pursue on the corporation's behalf, Delaware law recognizes two instances where a plaintiff is excused from making demand. Failure to make demand may be excused if a plaintiff can raise a reason to doubt that: (1) a majority of the board is disinterested or independent [*36] or (2) the challenged acts were the product of the board's valid exercise of business judgment.

The analysis differs, however, where the challenged decision is not a decision of the board in place at the time the complaint is filed. In *Rales v. Blasband[, 634 A.2d 927 (Del. 1993)]*, the Supreme Court of Delaware held that [w]here there is no conscious decision by the corporate board of directors to act or refrain from acting, the business judgment rule has no application. Stated differently, the absence of board action . . . makes it impossible to perform the essential inquiry contemplated by *Aronson [v. Lewis, 473 A.2d 805, 812 (Del. 1984)]*.

Accordingly, where the challenged transaction was not a decision of the board upon which plaintiff must seek demand, plaintiff must create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and

2007 U.S. Dist. LEXIS 54058, *; Fed. Sec. L. Rep. (CCH) P94,425

disinterested business judgment in responding to a demand.

. . . .

Where at least one half or more of the board in place at the time the complaint was filed approved the underlying challenged transactions, which approval may be imputed to the entire board for purposes of proving [*37] demand futility, the *Aronson* test applies.

*Ryan v. Gifford, 918 A.2d 341, 352-53(Del. Ch. 2007)* (citations and quotation marks omitted).

12  The parties agree that Delaware law governs the instant dispute. Because California courts follow Delaware law in demand futility cases, this is true even if California law applies due to Atmel's asserted prior incorporation in California. *See Oakland Raiders v. National Football League, 93 Cal.App.4th 572, 586 n.5, 113 Cal. Rptr. 2d 255 (2001)* ("The parties agree that we may properly rely on corporate law developed in the State of Delaware given that it is identical to California corporate law for all practical purposes.").

The parties dispute whether the Court should consider the eight-member Board that was in place at the time that the initial complaint was filed [13] or the six-member Board that was in place at the time that the Complaint was filed. [14]

[W]hen an amended derivative complaint is filed, the existence of a new independent board of directors is relevant to a *Rule 23.1* demand inquiry only as to derivative claims in the amended complaint that are not already validly in litigation. Three circumstances must exist to excuse a plaintiff from making demand under *Rule 23.1* [*38] when a complaint is amended after a new board of directors is in place: first, the original complaint was well pleaded as a derivative action; second, the original complaint satisfied the legal test for demand excusal; and third, the act or transaction complained of in the amendment is essentially the same as the act or transaction challenged in the original complaint.

*Braddock v. Zimmerman, 906 A.2d 776, 786 (Del. 2006); see also Harris v. Carter, 582 A.2d 222, 228 (Del. Ch. 1990)* ("Demand futility is assessed as of the time that the original complaint was filed, not as of the filing of an amended complaint containing further factual allegations in support of the same claims."). However, Delaware courts have not explained whether the three circumstances for excuse of a new demand requirement apply to a *consolidated* complaint.

13  George & Gust Perlegos, Wu, Fougere, Thomas, Kim, Laub, and Sugishita.
14  The original eight-person Board, less George and Gust Perlegos.

In light of the dismissal for failure to state a claim, the Court concludes that it is premature to resolve this question, or the subsequent questions as to whether *Aronson* or *Rales* applies, and what result the appropriate test [*39] dictates. Accordingly, the motion to dismiss for failure to make demand will be deferred.

## IV. ORDER

Good cause therefor appearing, IT IS HEREBY ORDERED that the motions to dismiss for failure to state a claim are GRANTED with leave to amend and that the motion to dismiss for failure to make demand is DEFERRED.

DATED: July 16, 2007.

JEREMY FOGEL

United States District Judge

2003 Del. Ch. LEXIS 111, *

LEXSEE 2003 DEL. CH. LEXIS 111



Analysis
As of: Aug 15, 2008

**SHIRLEY LEWIS, Plaintiff, v. MILTON H. WARD, ALLEN BORN, GERALD J. MALYS, ROCKWELL A. SCHNABEL, VERNON F. TAYLOR, JR., RUSSELL L. WOOD, CYPRUS AMAX MINERALS COMPANY, and AMAX GOLD, INC., Defendants.**

**C.A. No. 15255**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2003 Del. Ch. LEXIS 111*

**October 15, 2003, Submitted
October 29, 2003, Decided**

**SUBSEQUENT HISTORY:** Subsequent appeal at *Lewis v. Ward, 2004 Del. LEXIS 289 (Del., June 16, 2004)*

**PRIOR HISTORY:** *Lewis v. Ward, 2000 Del. Ch. LEXIS 126 (Del. Ch., Aug. 28, 2000)*

**DISPOSITION:**    [*1] Defendants' motion to dismiss with prejudice granted.

**COUNSEL:** Joseph A. Rosenthal, Esquire and Norman M. Monhait, Esquire, ROSENTHAL MONHAIT GROSS & GODDESS, P.A., Wilmington, Delaware; A. Arnold Gershon, Esquire, A. ARNOLD GERSHON, P.C., New York, New York; Irving Bizar, Esquire, BALLON STOLL BADER & NADLER, P.C., New York, New York, Attorneys for Plaintiff.

David C. McBride, Esquire and James P. Hughes, Jr., Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, Attorneys for Defendants Milton H. Ward, Allen Born and Gerald L. Malys.

William M. Lafferty, Esquire, MORRIS NICHOLS ARSHT & TUNNELL, Wilmington, Delaware, Attorney for Defendants Vernon F. Taylor, Jr. and Russell L. Wood.

Joel E. Friedlander, Esquire, BOUCHARD MARGULES & FRIEDLANDER, P.A., Wilmington, Delaware,

Attorney for Defendant Cyprus Amax Minerals Company.

Thomas P. Preston, Esquire, BLANK ROME, LLP, Wilmington, Delaware, Attorney for Defendant Amax Gold, Inc.

**JUDGES:** STRINE, Vice Chancellor.

**OPINION BY:** STRINE

**OPINION**

MEMORANDUM OPINION

**STRINE, Vice Chancellor**

The plaintiff in this derivative action lost her stockholder status in an arm's-length merger. Because she has failed to plead [*2] facts that support a reasonable inference that the merger that caused her to lose her status as a stockholder was a fraud perpetrated merely to deprive her of her ability to press her derivative claims, she lacks standing under the teaching of *Lewis v. Anderson.* Therefore, the court will grant the defendants' motion to dismiss her complaint.

I. Background

In this derivative action, the plaintiff alleges that in 1996 the then-majority stockholder of Amax Gold, Inc. provided Amax Gold with financing on terms that were

unfair. The plaintiff was a stockholder of Amax Gold on October 8, 1996, when this suit was filed.

On June 1, 1998, Amax Gold merged with a subsidiary of Kinross Gold Corporation ("Kinross") in a reverse triangular merger. The plaintiff in this action never directly challenged the fairness of that arm's-length, third-party merger. [1] As a result of the merger, Amax Gold [2] became a wholly owned subsidiary of Kinross, and all of the shares of Amax Gold were converted into the right to receive shares of Kinross. Thus, the plaintiff lost her shares in Amax Gold and became a Kinross stockholder. Kinross was and remains an Ontario corporation.

> 1   There was litigation filed by other stockholders of Amax Gold seeking, among other things, to enjoin consummation of the merger. *Ratzersdorfer v. Ward*, C.A. No. 16189 (Del. Ch. filed Feb. 13, 1998). That case was not actively litigated and was dismissed pursuant to a stipulation of dismissal.

[*3]

> 2   Amax Gold was later renamed. I use its original name for the sake of clarity.

After the merger, the defendants in this derivative action -- who include Amax Gold's directors at the time of the financing and its then-majority stockholder Cyprus Amax Minerals Company -- moved to dismiss the complaint on the grounds that the plaintiff's loss of her Amax Gold stockholder status deprived her of the right to press the derivative action, under the teaching of *Lewis v. Anderson* [3] and its progeny. [4]

> 3   *477 A.2d 1040 (Del. 1984).*
> 4   *E.g., Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 354-55 (Del. 1988); In re First Interstate Bancorp Consol. S'holder Litig., 729 A.2d 851, 867-68 (Del. Ch. 1998), aff'd sub nom. Bradley v. First Interstate Bancorp, 748 A.2d 913 (Del. 2000)* (ORDER); *Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1244-45 (Del. 1999); 8 Del. C. § 327.*

[*4]   This court, through then-Vice Chancellor Jacobs, granted the defendants' motion to dismiss, finding that the merger divested the plaintiff of standing to pursue her claims and that she had not pled facts demonstrating the applicability of what I will refer to as the "fraud exception" to *Lewis v. Anderson*. [5] To wit, he rejected the plaintiff's argument that she had "pled facts that bring this case within the exception where the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive the plaintiff of derivative standing." [6]

> 5   *Lewis v. Ward, 2000 Del. Ch. LEXIS 126, 2000 WL 1336721, at *1 (Del. Ch. Aug. 28, 2000).*
> 6   *Id.* (internal quotation marks and citations omitted). *See also Kramer, 546 A.2d at 354-55; Lewis v. Anderson, 477 A.2d at 1046 n.10.*

Thus Vice Chancellor Jacobs held:

> The difficulty with the plaintiff's position is that the complaint does not plead facts from which it could be reasonably inferred that the defendants perpetrated [*5] the merger *merely* to deprive the plaintiff of derivative standing. Because the plaintiff's brief suggests that the plaintiff may be able to plead such a claim, however, the defendants' motion to dismiss will be granted with leave to amend. [7]

Vice Chancellor Jacobs's ruling is, of course, law of the case. [8]

> 7   *Lewis v. Ward, 2000 Del. Ch. LEXIS 126, 2000 WL 1336721 at *1* (emphasis added).
> 8   *E.g., Frank G.W. v. Carol M.W., 457 A.2d 715, 718 (Del. 1983).*

On October 13, 2000, the plaintiff filed her amended complaint in response to Vice Chancellor Jacobs's ruling and attempted to plead facts invoking the fraud exception to *Lewis v. Anderson*. The defendants then moved to dismiss arguing that the plaintiff had again failed to plead facts supporting application of that exception. But the defendants did not file their opening brief until March 30, 2001. The plaintiff took an equally luxurious period to answer, filing its brief on March 26, 2002. The defendants then replied in late January [*6] of 2003.

By that time, Amax Gold had moved its corporate home from Delaware to Nevada. When Vice Chancellor Jacobs joined the Supreme Court, this case was assigned to me and the defendants' motion to dismiss was scheduled for argument.

## II. Legal Analysis

The defendants' renewed motion to dismiss is based on a simple and direct argument: The plaintiff has failed to plead facts supporting a reasonable inference that the merger was a fraud designed merely to deprive her of derivative standing. As such, the complaint must be dismissed in accordance with Vice Chancellor Jacobs's prior ruling and *Lewis v. Anderson*.

In response, the plaintiff makes two arguments. First, she contends that her amended complaint does plead sufficient facts to invoke the fraud exception to *Lewis v. Anderson.* Second, she contends that regardless of whether that is the case, Nevada law and not Delaware law now governs her standing to pursue her suit because Nevada is now the home of Amax Gold. She asks me to conclude that Nevada would not follow *Lewis v. Anderson* but instead apply a more lenient approach that would permit a former stockholder in her position to continue a derivative suit.

[*7] I deal with these arguments in reverse order, starting with the choice-of-law question.

A.

The choice-of-law question the plaintiff poses could be an interesting one in the right case. The issue of whether a derivative plaintiff should be permitted to press a cause of action on behalf of a corporation is, in key respects, a policy matter about the allocation of authority between the corporation's board and its stockholders and other constituencies. In this case, the plaintiff argues that the merger that divested her of her Amax Gold shares did not end her interest in the affairs of Amax Gold. As a Kinross stockholder, she retains an important ongoing interest in the financial health of Amax Gold, because Amax Gold has become a wholly owned subsidiary of Kinross. Because Amax Gold has chosen to become a Nevada corporation, the plaintiff argues that Nevada law -- and not that of Delaware -- should determine whether she can advance a claim derivatively on behalf of that Nevada corporation. She argues that this prudential matter of public policy is one in which Delaware no longer has an interest. [9]

> 9  The debate is an even deeper one than the parties' papers explore. Arguably, the key issue is whether the plaintiff can cause a double derivative suit to be brought in the interest of Kinross, an Ontario corporation. That is, it is arguably Ontario that has the greatest interest in determining whether the plaintiff can proceed with a case brought in the interest of a wholly owned subsidiary of an Ontario corporation. In this regard, the plaintiff's pleas about equity are far less convincing because in the *five* years since the merger she never attempted to assert a double derivative action on behalf of Kinross or to demand that Kinross cause Amax Gold to press her claims. Nor, I note, has she argued that Ontario law is relevant to the resolution of this motion.

[*8] In answer, the defendants argue that once the plaintiff lost "standing" under *Lewis v. Anderson,* she lost

it forever and that it cannot be revived by Amax Gold's later reincorporation into Nevada. In support of this argument, the defendants argue that there is a need for certainty as to the law that applies to derivative actions or otherwise directors will not be able to assess their own exposure to liability and stockholders will not know to what standards of accountability they may hold their directors.

This is a nice debate that I need not and therefore do not enter. [10] Although the plaintiff argues that "there is no reason to believe that Nevada would adopt the reasoning of *Lewis v. Anderson,*" she concedes that she was unable to find a judicial decision in Nevada taking a different approach than that Delaware decision. [11] Where there is no Nevada law on point, courts applying Nevada corporate law have traditionally looked to Delaware law for guidance. [12] Moreover, scholars have noted the extent to which Nevada has attempted to conform its corporate law to that of Delaware. [13] Therefore, I have every reason to anticipate that the Nevada Supreme Court would adopt the [*9] rule of *Lewis v. Anderson* as Nevada law, and no reliable basis to infer that it would take another approach. Thus, the governing principles that apply are identical whether Delaware law or Nevada law applies to the question of whether the plaintiff may proceed to press claims belonging to Amax Gold.

> 10  The question is a subtle one. For example, it seems to me obvious that Delaware law would apply to determine whether the defendants had committed any breach of duty against Amax Gold in connection with the financing that is challenged in the amended complaint. To find that the change in domicile of Amax Gold changed the law that applied to the merits would be a highly troubling conclusion, disruptive of the defendants' settled expectations. The proposition that the law of Kinross's or Amax Gold's home jurisdiction might govern whether a former Amax Gold stockholder could continue to press claims that belonged to Amax Gold before the merger when that stockholder continues to own Kinross stock is a less extreme one.
>
> 11  Pl.'s Opp'n Br. at 3. Through independent research, I discovered some authority suggesting that Nevada would in fact follow *Lewis v. Anderson.* Nevada law, like that of many states, generally requires derivative plaintiffs to maintain stockholder status throughout the litigation. *See* Nev. R. Civ. P. 23.1; *Keever v. Jewelry Mountain Mines, Inc., 100 Nev. 576, 688 P.2d 317, 317 (Nev. 1984)* ("Under the contemporaneous ownership requirements of NRCP 23.1, a representative plaintiff must have owned stock in the corporation at the time of the

transaction of which he complains *and throughout the pendency of the suit."* (emphasis added) (internal quotation marks and citations omitted)). Although there do not appear to be any Nevada cases directly addressing the precise issue before the court now, the Nevada Supreme Court has stated that former stockholders lack standing to pursue derivative claims. *See Cohen v. Mirage Resorts, Inc., 62 P.3d 720, 732 (Nev. 2003).* As support for this proposition, *Cohen* cited two Delaware Supreme Court decisions following the holding of *Lewis v. Anderson* that a derivative plaintiff who loses stockholder status as a result of a merger loses standing to maintain the action. *See id. at 732* & nn. 70, 72 & 76 (Nev. 2003) (citing *Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1244-45 (Del. 1999)* and *Kramer, 546 A.2d at 351*).

Indeed, one of the authorities cited by the plaintiff actually undermines her argument that Nevada might choose not to follow *Lewis v. Anderson.* The plaintiff notes that the American Law Institute has proposed a rule in which a derivative plaintiff could maintain suit following the loss of stockholder status if that loss

> is the result of corporate action in which the holder did not acquiesce, and either (A) the derivative action was commenced prior to the corporate action terminating the holder's status, or (B) the court finds that the holder is better able to represent the interests of the shareholders than any other holder who has brought suit.

Principles of Corp. Governance § 7.02(a)(2) (2003). But, it is unlikely that Nevada would choose the ALI rule over *Lewis v. Anderson,* because the comment to § 7.02 explicitly states that it departs from the majority approach to the continuous-ownership rule. *See id.* § 702 cmt. a.

[*10]

12 *See Cohen, 62 P.3d at 726 n.10* ("Because the Legislature relied upon the Model Act [in the particular respect before the court] and the Model Act relies heavily on New York and Delaware case law, we look to the Model Act and the law of those states in interpreting the Nevada statutes."); *Hilton Hotels Corp. v. ITT Corp., 978 F. Supp. 1342, 1346 (D. Nev. 1997)* ("Where, as here, there is no Nevada statutory or case law on

point for an issue of corporate law, this Court finds persuasive authority in Delaware case law."); *Shoen v. AMERCO, 885 F. Supp. 1332, 1341 n.20 (D. Nev. 1994)* ("Where there is no Nevada precedent on point . . . this court must predict how Nevada's supreme court would decide the question. . . . On questions of corporation law, the Delaware Supreme Court and the Delaware Courts of Chancery are persuasive authorities.").

13 *See* Jill E. Fisch, *The Peculiar Role Of The Delaware Courts in the Competition For Corporate Charters, 68 U. Cin. L. Rev. 1061, 1067 (2000)* ("In addition to adopting the Delaware statute, the Nevada legislature adopted Delaware case law. Moreover, courts construing Nevada law appear to follow Delaware precedent." (footnotes omitted)); Ehud Kamar, *A Regulatory Competition Theory of Indeterminacy in Corporate Law, 98 Colum. L. Rev. 1908, 1911 (1998)* ("In fact, Nevada adopted Delaware law wholesale . . . ."); Jonathan R. Macey & Geoffrey P. Miller, *Toward an Interest-Group Theory of Delaware Corporate Law, 65 Tex. L. Rev. 469, 488 (1987)* ("In fact, Nevada [has] adopted both the Delaware statutory and common law as it applies to corporations.").

[*11] B.

Having decided that *Lewis v. Anderson* governs, I now turn to the question of whether the plaintiff has pled facts invoking the fraud exception to the general rule that the loss of stockholder status in a merger divests a derivative plaintiff of standing. To be fair to the plaintiff, it is useful to set forth in full the relevant portions of her complaint:

The Subsequent Merger

26. On or about February 9, 1998, a merger was announced between the Company [Amax Gold] and Kinross. The form of the merger contemplated that the Company would become a subsidiary of Kinross, and the common stockholders of the Company would receive shares of Kinross stock in exchange for their shares of Company stock.

27. The merger proxy statement, at p. 26, describes the discussions as leading potentially to a merger of equals. At p. 33, the merger proxy statement discloses that Kinross's contribution to the combined entity ranged from 31.0% to 57.7% on the equity value measures. However, Kinross

stockholders would own approximately 50% of the combined entity on an equity value basis.

28. At p. 38, it discloses that Kinross's total present value contribution would equal 45.5%. At p. 41, it [*12] discloses that the Company's contribution to the combined company ranged from 17% to 72% on equity measures and 57% to 134% on Enterprise measures. Under another analysis the Company's contribution was 45% to 53% to equity and 73% to 78% to Enterprise Value. The Company's stockholders would own approximately 50% of the equity and 67% of the Enterprise Value of the combined company.

29. The merger became effective on June 1, 1998.

30. The merger of the Company and Kinross was specifically structured and perpetrated in the form described in paragraph 26 merely to deprive the plaintiff and other common stockholders of standing to prosecute this action.

31. Moreover, there is no principled economic or equitable argument that plaintiff should lose standing here as a result of the merger between the Company and Kinross. Such loss of standing is inconsistent with basic economic principles as well as fundamental principles of equity and fairness. [14]

14   Am. Compl. PP26-31.

Distilled to their essence, these allegations [*13] assert that because 1) on some measures Kinross can be said to have gotten the better of the economic bargain between itself and Amax Gold in the merger; and 2) the merger could have been structured as a "straight" merger with Amax Gold as the surviving corporation (or as a triangular merger with Amax Gold surviving as the public parent entity), then a reasonable inference exists that the merger was solely designed so as to deprive the plaintiff of her standing to press her derivative claims. [15]

15   The plaintiff also argues that there is "no equitable or economic reason to dismiss a valid derivative suit brought pre-merger in order to

compel a post-merger double derivative suit." Pl.'s Opp'n Br. at 6. In a double derivative suit, a stockholder of a parent corporation seeks recovery on behalf of a cause of action belonging to a subsidiary corporation. *See Sternberg v. O'Neil, 550 A.2d 1105 (Del. 1988).* Because the plaintiff might have been able to bring a post-merger double derivative suit (but did not attempt to do so), she contends, she should maintain standing to pursue the present suit.

But, the Delaware Supreme Court has already rejected this argument as inconsistent with Delaware law, and I am bound to its decisions. Nor am I free to ignore the law of the case as established by Vice Chancellor Jacobs's prior ruling. Although the Third Circuit accepted an argument similar to the plaintiff's in *Blasband v. Rales, 971 F.2d 1034, 1040-46 (3d Cir. 1992)* ("The Delaware Supreme Court *sub silentio* recognized an indirect financial interest as a basis for standing in . . . *Sternberg* . . . [by] permitting a plaintiff to pursue a double derivative suit."), both this court and the Supreme Court have rejected *Blasband. See In re First Interstate Bancorp Consol. S'holder Litig., 729 A.2d 851, 868* & n.18 (Del. Ch. 1998) ("*Blasband* is . . . inconsistent with the clear holding of *Lewis v. Anderson . . . ."), aff'd sub nom. Bradley v. First Interstate Bancorp, 748 A.2d 913 (Del. 2000)* (ORDER); *Ash v. McCall,* 2000 WL 1370341, at *13 & n.47 (Del. Ch. Sept. 15, 2000) ("*First Interstate* clearly expressed the Delaware Courts' rejection of the Third Circuit's holding in *Blasband v. Rales . . . . [Blasband]* is not consistent with the Delaware Supreme Court's holding in *Lewis v. Anderson* and, for that reason, I am not free to follow it.").

[*14]   As an initial matter, the parties clash over whether the sufficiency of the plaintiffs' pleading is governed by the notice pleading standard of Rule 12(b)(6) or the particularity standard of Rule 9(b). The defendants contend that the heightened standard of Rule 9(b) applies because the relevant *Lewis v. Anderson* exception involves an accusation of "fraud." By contrast, the plaintiff asserts that the Supreme Court did not intend by use of the term "fraud" to place such a heightened burden on derivative plaintiffs.

In my view, the defendants have the better of this argument. The fraud exception to *Lewis v. Anderson* is just that -- an exception that allows a plaintiff to show that a merger that was presented as having a legitimate business purpose was in fact entered into by one side of the deal solely for the purpose of immunizing corporate fiduciaries from liability in a pending derivative suit. In

analogous contexts when a breach-of-fiduciary-duty claim is premised on an accusation of fraud, this court has examined the complaint against the particularized pleading standard of Rule 9(b). [16] Here, the plaintiff argues that an arm's-length merger of two public companies was [*15] not in fact consummated for the reasons contained in the merger proxy materials, but instead merely as a device to get rid of the plaintiff's derivative claims. That is, the plaintiff argues that the merger was a classic fraud perpetrated by the Amax Gold directors and Cyprus Amax.

> [16]   *See York Linings v. Roach, 1999 Del. Ch. LEXIS 160, 1999 WL 608850 at *2-3 (Del. Ch. July 28, 1999). See also Dann v. Chrysler Corp., 40 Del. Ch. 103, 174 A.2d 696, 700 (Del. Ch. 1961)* (holding that particularity requirement of Rule 9(b) applies to claims of "constructive" as well as "actual" fraud).

As important, the plaintiff here seeks to defeat what is in essence a motion under Rule 23.1. It is traditional for a plaintiff seeking to have demand excused to have to plead particularized facts. [17] There is no evident reason why a plaintiff should be able to proceed with mere notice pleading in attempting to invoke an exception to the general rule of *Lewis v. Anderson* that stockholders who lose stockholder status [*16] in a merger also lose derivative standing. This is especially the case when a plaintiff attempts to overcome *Lewis v. Anderson's* general rule by accusing the defendants of having committed fraud, by ginning up a pretextual merger solely to deprive the plaintiff of standing. For these reasons, I therefore find that the plaintiff has to have pled particularized facts invoking the fraud exception to *Lewis v. Anderson* in order to avoid dismissal.

> [17]   *Aronson v. Lewis, 473 A.2d 805, 808 (Del. 1984).*

For reasons I now articulate, I further conclude that the plaintiff has not met that burden (or even the lesser burden that would apply under Rule 12). I begin my explanation with an obvious point. The mere fact that a merger was structured as a "triangular merger" provides no rational basis to infer that the merger was a fraud designed merely to deprive stockholders of the corporation that has lost its status as a public company of derivative standing. As the defendants point out, triangular mergers [*17] are common and have a myriad of legitimate justifications. [18] Similarly, there are numerous reasons for choosing one company rather than the other as the surviving public company, whether the transaction is structured as a straight or triangular merger. [19]

[18]   In a triangular merger, the acquiror's stockholders generally do not have the right to vote on the merger, nor are they entitled to appraisal. *See, e.g.,* 1 R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations & Business Organizations § 9.7, at 9-10 (3d ed. Supp. 2003). If a reverse triangular structure is used, the rights and obligations of the target are not transferred, assumed or affected. *See id.* § 9.8, at 9-11; James C. Freund, Anatomy of a Merger: Strategies and Techniques for Negotiating Corporate Acquisitions 79 (1975). Because of these and other advantages to using a triangular structure, it is the preferred method of acquisition for a wide range of transactions. *See* 1 Lou R. Kling & Eileen T. Nugent, Negotiated Acquisitions of Companies, Subsidiaries, and Divisions § 1.02[11], at 1-19 (2001); Freund, *supra,* at 107.

[*18]

19   The parties to a merger might allocate the roles of "purchaser" and "target" for a variety of reasons, such as avoiding a high stockholder vote requirement or appraisal rights for stockholders in one merging entity's jurisdiction of incorporation, dealing with hold-out stockholders or not violating a provision in a contract of one of the merging entities that prohibits it from being a party to a merger or asset transfer, or for tax considerations. *See* 1 Kling & Nugent, *supra* note 18, § 1.02[7], at 1-12. Even in a "merger of equals," a variety of factors influence the decision of which company remains as the publicly owned entity, such as the relative size of the companies, which entity's shareholders will hold a greater percentage of the combined companies, which company's management will have the more senior positions in the combined company, or which company's directors will represent a majority of the board of the combined company. 1 *id.* § 1.02[8][a], at 1-14.

Nothing in the plaintiff's complaint reasonably supports the inference that Amax Gold structured the merger [*19] with Kinross the way it did solely to deprive the plaintiff of standing or that it was Amax Gold that sought this structure. [20] That is, no fact in the complaint buttresses the conclusory proposition that Amax Gold rather than Kinross would have been the surviving public company in the merger but was not solely because Amax Gold's controlling stockholder and directors wished to insulate themselves from liability in this derivative action. In focusing on Amax Gold, I take a pro-plaintiff point of view, which is to read *Lewis v. Anderson* as focusing the "fraud" inquiry on the board facing a derivative suit and whether it caused the

2003 Del. Ch. LEXIS 111, *

company to merge with another party simply to avoid defending the derivative suit rather than for other valid business reasons.

> 20    *See Dell v. Grimm, 1979 Del. Ch. LEXIS 467, 1979 WL 175247 at *2 (Del. Ch. July 17, 1979)* ("There is no hint in the record that the merger here was sought to be used to cover up the wrongful acts of management or to in any way circumvent what otherwise would appear to be a valid cause of action on behalf of the corporation and its shareholders.").

[*20]  But even taking that friendly point of view, the plaintiff's complaint falls far short of the mark. Its pleading of excerpted economic facts from the merger proxy statement suggests, at most, that Kinross's negotiators might have done a better job than Amax Gold's. Candidly, the complaint's recitation of the economic facts is so sketchy as to be unreliable even in that respect. The merger proxy statement that the complaint refers to and relies upon, and therefore incorporates, contains other facts that suggest that the merger exchange ratio was fair to Amax Gold. Indeed, it is noteworthy that a well-known investment bank gave a fairness opinion to that effect to a special committee of the Amax Gold board charged with protecting the minority stockholders. These facts accord with the reality that Kinross was an NYSE-traded company that had revenues of approximately $ 200 million annually in the two years preceding the merger and that had a stock trading price exceeding that of Amax Gold immediately before the merger.

More important, even if one assumes that Kinross made out somewhat better in the merger negotiations than Amax Gold, that assumption does not get the plaintiff very far [*21]  in proving that the fraud exception to *Lewis v. Anderson* applies. Remember that Cyprus Amax owned over 58% of Amax Gold. For it to be rational for Cyprus Amax to have entered into the merger solely for the purpose of getting rid of this derivative action, Cyprus Amax would have had to conclude that the potential liability it faced in this action exceeded the loss it would suffer from the inadequate price it was receiving for its majority ownership of Amax Gold. At oral argument, the plaintiff's counsel was unable to identify with any precision the magnitude of his client's claims regarding the unfair financing that Cyprus Amax allegedly provided to Amax Gold. Most critically, nothing in the complaint supports a rational inference that Cyprus Amax would have entered into a merger divesting itself of 58% of Amax Gold solely to insulate itself and its affiliated directors from liability in this derivative action. Given the magnitude of the merger transaction, the involvement of an Amax Gold special committee, and a third-party merger partner like Kinross, the absence of well-pled facts suggesting that the liability Cyprus Amax and its affiliated directors faced was so substantial [*22]  as to have motivated them to cause Amax Gold to enter into a pretextual merger with another publicly traded company at a sub-optimal price is fatal.

By its plain terms, the fraud exception to *Lewis v. Anderson* requires a showing that the sole basis for Amax Gold's decision to enter the merger was to divest the plaintiff of derivative standing. This is the reading of *Lewis v. Anderson* that was adopted by Vice Chancellor Jacobs and is law of the case. I am bound to that interpretation. The plaintiff was given a second chance to make the required showing. Her cursory effort to do so rests on a conclusory allegation that is not supported by well-pled facts and that seems implausible in light of the nature of the merger and Cyprus Amax's strong interest in obtaining the right price for its equity interest in Amax Gold.

III. Conclusion

Because the plaintiff has failed to plead facts supporting the applicability of the fraud exception to *Lewis v. Anderson,* the defendants' motion to dismiss with prejudice is granted. IT IS SO ORDERED.

LEXSEE 2007 DEL. CH. LEXIS 96



Analysis
As of: Aug 15, 2008

**WILLIAM A. RHODES, III, and WIJNANT VAN DE GROEP, individually and derivatively, Plaintiffs, v. SILKROAD EQUITY, LLC, ANDREW J. FILIPOWSKI, MATTHEW G. ROSZAK, SILKROAD INTERACT HOLDING COMPANY and COLOSSUS, INCORPORATED d/b/a INTERACT PUBLIC SAFETY SYSTEMS, Defendants.**

**C.A. No. 2133-VCN**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2007 Del. Ch. LEXIS 96*

**April 5, 2007, Submitted**
**July 11, 2007, Decided**

**NOTICE:**

THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**PRIOR HISTORY:** *Rhodes v. SilkRoad Equity, LLC, 2007 Del. Ch. LEXIS 20 (Del. Ch., Jan. 29, 2007)*

**COUNSEL:** [*1] Alan J. Stone, Esquire, Mark S. Hurd, Esquire, and Kevin M. Coen, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, Attorneys for Plaintiffs.

Christian Douglas Wright, Esquire and D. Fon Muttamara-Walker, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Harvey J. Barnett, Esquire and Mitchell H. Macknin, Esquire of Sperling & Slater, P.C., Chicago, Illinois, Attorneys for Defendants.

**JUDGES:** NOBLE, Vice Chancellor

**OPINION BY:** NOBLE

**OPINION**

**MEMORANDUM OPINION**

NOBLE, Vice Chancellor

**I. INTRODUCTION**

An investment entity engaged in conduct that caused a software development firm's change in control and, eventually, a complete transfer of ownership to the investment entity. The software development firm's two original--and, at one time, only--shareholders complain that when the investment entity became the firm's senior creditor, it pursued a course of conduct to pressure the firm to agree to give the investment entity an 80% stake in the firm in exchange for, among other things, the restructuring of certain loan obligations. The firm reluctantly consented to such a deal. Accordingly, the firm and its two sole shareholders entered into an acquisition agreement with the investment [*2] entity. As structured, the firm was owned entirely by a holding company, with 80% of the interests in that holding company held by the investment entity and 20% held collectively by the firm's two original shareholders. The parties also entered into a stockholders agreement. That agreement provided the holding company and the investment entity with a repurchase option right should the original shareholders be removed as directors of the holding company.

In this action, the firm's two original shareholders allege that, soon after the execution of these agreements, the investment entity--and the two principals behind the investment entity--initiated a scheme to depress the value of the firm so as to later acquire it at a bargain. The alleged acts in furtherance of this scheme include loading employees of the investment entity onto the firm's payroll and causing the firm to pay the many personal expenses of the investment entity's two principals. The

investment entity would later demand that the firm's two original shareholders agree to a deal in which they would give the investment entity $ 3 of preferred shares in the holding company for every $ 1 that the firm had borrowed. The original [*3] shareholders balked and eventually brought suit in this forum. The investment entity later caused the termination of the two original shareholders from their positions at the firm and exercised the option to purchase their shares. Shortly thereafter, in meetings with firm employees, one of the investment entity's principals stated that one of the firm's original shareholders had written a firm check to himself, perhaps intimating that it had been done improperly.

The two original shareholders in the software development firm bring suit against the holding company, the investment entity and its principals and, as nominal defendants, the software development firm. They allege causes of action based on breach of fiduciary duty, breach of contract, breach of a North Carolina consumer protection statute, and slander per se, and also seek an accounting. Before the Court is a motion to dismiss.

## II. BACKGROUND

[1]

> 1   The Background is drawn from the Amended Verified Complaint (the "Complaint").

Plaintiffs William A. Rhodes, III ("Rhodes") and Wijnant van de Groep ("van de Groep"), a son-in-law of Rhodes, are former directors, officers, and shareholders of Colossus, Incorporated, which did business [*4] as InterAct Public Safety Systems ("InterAct" or "the Company"), a North Carolina software development corporation now solely owned by Defendant SilkRoad InterAct Holding Company ("SilkRoad Holding"). [2] Founded in 1975, InterAct manufactures, sells, and supports a range of public safety and homeland security products for use in "911," police, fire, and other public safety dispatch centers. For more than twenty years, the Company introduced an array of successful products. InterAct's fortunes became even brighter in 1999 when it teamed up with BellSouth, a chief competitor at the time, to distribute integrated workstation equipment. The move paid off handsomely. InterAct's revenue soared from roughly $ 7 million in 1999 to $ 30 million in 2003.

> 2   SilkRoad Holding is a Delaware corporation now wholly owned by Defendant SilkRoad Equity, a Delaware limited liability company.

To finance the shift in product mix and the new manufacturing demands that came with it, InterAct sought extra working capital and obtained a traditional

bank loan of $ 5.2 million. In 2003, however, InterAct's lender was acquired and its new lender, Capital Bank, became impatient. It demanded two things: repayment in [*5] full by InterAct and personal guarantees by Rhodes, van de Groep, and their spouses. As pressure mounted on InterAct to pay off the loan, Rhodes and van de Groep looked for outside equity investors. The equity firm they selected required InterAct to take on a "seasoned CEO" as one of the conditions of its investment. But when the equity firm's pick pulled out at the last minute, so did the equity firm. Rhodes and van de Groep would eventually come to deal with two individuals: Defendants Andrew J. Filipowski ("Filipowski") and Matthew G. Roszak ("Roszak"). The Plaintiffs' control over InterAct--as its only shareholders and directors--would soon change.

Filipowski learned of InterAct's predicament from a senior partner at the equity firm that had originally planned to invest in InterAct. Shortly thereafter, and without notifying either Rhodes or van de Groep, Filipowski, acting through his company, SilkRoad Equity, LLC ("SilkRoad Equity"), [3] bought the InterAct loan with its personal guarantees from Capital Bank. [4] For InterAct, the practical significance of this transaction was that SilkRoad Equity had become its primary creditor. According to the Complaint, Filipowski and Roszak (i.e., [*6] SilkRoad Equity) used this development to their advantage, pressuring Rhodes and van de Group to agree to transactions by which InterAct would eventually become a wholly-owned subsidiary of SilkRoad Holding.

> 3   Filipowski and Roszak own majority and minority equity interests, respectively, in SilkRoad Equity, although their exact allocation is not alleged.
> 4   SilkRoad Equity purchased the loan for $ 4.2 million, at a million dollar discount from the balance owed.

In October 2004, SilkRoad Equity acquired 80% of the equity in InterAct--with Rhodes and van de Groep retaining 12% and 8%, respectively--in exchange for a senior note not to exceed $ 10 million. [5] In December of that year, the parties also entered into a stockholders agreement (the "Stockholders Agreement"). Under the agreement, InterAct's board would have seven members: Rhodes, van de Groep, and five designees of SilkRoad Equity. Rhodes and van de Groep's seats, however, were conditioned on their employment with InterAct. [6] The agreement also provided SilkRoad Holding and SilkRoad Equity with options to purchase Rhodes and van de Groep's shares for "fair market value" if they were to be removed as directors. [7]

5  The note included  [*7] the $ 5.2 million face value of the loan that SilkRoad Equity had acquired.

6  On December 20, 2004, at the time the Stockholders Agreement was executed, Rhodes and van de Groep also entered into employment agreements with InterAct whereby Rhodes would serve as Executive Vice Chairman and van de Group as President. Filipowski became InterAct's new Executive Chairman and Chief Executive Officer, and Roszak became the Chief Financial Officer.

7  Under the Stockholders Agreement, "fair market value" was to be determined by SilkRoad Holding's board. If the director refused to tender his shares, they would be deemed transferred under the agreement.

Rhodes and van de Groep bring this suit against the SilkRoad-related entities, InterAct, and both Filipowski and Roszak. [8] They allege that almost immediately after SilkRoad Equity gained a majority stake (80%) in InterAct, Filipowski and Roszak embarked upon a scheme to depress the value of the Company in order to purchase Rhodes and van de Groep's remaining shares at a significant discount.

8  Although the Plaintiffs make clear in their briefing that they are not seeking to assert derivative claims, their caption title in this action states that they  [*8] are bringing suit both "individually and derivatively."

By way of example, they point out that Filipowski and Rhodes added more than a dozen SilkRoad Equity employees to InterAct's payroll within the first few months of 2005. Contributing little or no economic benefit to InterAct, these employees cost the Company more than $ 5 million in salaries and other expenses. The Plaintiffs also cite SilkRoad Holding's acquisition of TrueSentry, an entity owned by SilkRoad Equity, as evidence of the Defendants' self-dealing, not least of all because numerous TrueSentry employees were shifted to InterAct's payroll.

A common theme running through the Complaint is that Filipowski and Roszak excluded the Plaintiffs from key decisions concerning the Company, while at the same time running the Company from afar and only occasionally descending upon Asheville, North Carolina, the Company's principal place of business. The Plaintiffs allege that they were denied a say in critical decisions involving InterAct, such as the Company's development of a "next generation product" with other SilkRoad Equity portfolio companies and its taking on of new debt obligations, among other reasons, to pay down certain [*9] InterAct's loans from SilkRoad Equity and finance management fees to SilkRoad Equity. They allege that Filipowski and Roszak denied them access to Inter Act's accounting system and to information on licenses held by the Company. Furthermore, the Plaintiffs allege that Filipowski and Roszak caused InterAct not only to pay themselves exorbitant consulting fees and extremely generous severance packages but also to cover an expanding array of personal travel and entertainment expenses.

By February 2006, SilkRoad Equity had requested that Rhodes and van de Groep agree to a deal whereby $ 3 of preferred InterAct shares would be issued to SilkRoad Equity for every dollar that had been borrowed by InterAct. Filipowski and Roszak were not coy as to how much they wanted Rhodes and van de Groep to agree to the terms. They would exert pressure on the Plaintiffs by refusing to pay quarterly interest and principal repayment on one of InterAct's more onerous loans, a loan through the Bank of Asheville guaranteed personally by Rhodes; refusing to pay InterAct's federal payroll taxes; and withholding funds earmarked for employees' 401(k) accounts. Rhodes and van de Groep were given until May 5, 2006,  [*10] to agree to the deal. On that day, however, they chose instead to bring an action before this Court. Three days later, they were fired. [9]

9  Rhodes and van de Groep's status as directors was also apparently terminated on May 12, 2006, although they maintain that they never received "prompt" notice of such removal as required by *Section 228* of the Delaware General Corporation Law.

Following the terminations, the Defendants exercised their option under the Stockholders Agreement to buy the Plaintiffs' shares. The Plaintiffs received $ 1,516 million, which they consider inadequate and a product of a flawed valuation effort by Houlihan, Lokey, Howard & Zukin ("Houlihan"), SilkRoad Holding's financial advisor. They also allege that Filipowski explained during meetings with more than 200 InterAct employees that van de Groep, acting through InterAct, had written a $ 50,000 check to himself.

## III. CONTENTIONS

Rhodes and van de Groep's seven-count Complaint alleges direct causes of action for breach of fiduciary duty, breach of contract, violation of North Carolina trade practices law, slander per se, and conduct by Filipowski and Roszak meriting an accounting of InterAct.

In Count One and Count Four,  [*11] the Plaintiffs allege that the Defendants breached their fiduciary duties

by engaging in self-dealing transactions (*e.g.*, loading SilkRoad Equity employees onto InterAct's payroll, using InterAct funds for personal expenses of Filipowski and Rhodes, causing SilkRoad Holding to acquire TrueSentry) designed to cripple InterAct, depress the Plaintiffs' stake in the Company, and enable the Defendants to acquire it cheaply. Count Two and Count Three concern breach of oral and written contracts. The Plaintiffs allege that the Defendants disregarded an oral assurance the Defendants gave them at the time SilkRoad Equity became an investor in InterAct, specifically that they would direct excess cash flow to certain loans that the Plaintiffs had personally guaranteed payment. The Plaintiffs also allege that the Defendants breached an obligation under the Stockholders Agreement to purchase their shares in SilkRoad Holding at "fair market value." In Count Five, the Plaintiffs allege that the Defendants' conduct in connection with their acquisition of InterAct violated the North Carolina Unfair Trade Practices Act. In Count Six, the Plaintiffs bring a claim for slander per se, alleging that Filipowski  [*12] made defamatory statements to more than 200 InterAct employees regarding van de Groep's writing a check to himself from Company funds. Finally, the Plaintiffs seek an accounting in light of the alleged fiduciary duty violations of the Defendants.

Defendants Filipowski, Roszak, SilkRoad Equity, SilkRoad Holding, and InterAct collectively seek dismissal under Court of Chancery Rule 12(b)(6). First, they argue that the Plaintiffs' fiduciary duty claims under Count One and Count Four should be dismissed because they are derivative in nature and that the Plaintiffs lack standing to bring such claims. Second, they ask the Court to conclude that the contract claims under Count Two and Count Three should be dismissed because one alleges an oral agreement that is barred by an integration clause and the other alleges certain Defendants breached the Stockholders Agreement when they were not even parties to that agreement. Third, as to the claim under North Carolina trade practices law, the Defendants maintain that it is inconsistent with the purpose and scope of the pertinent statute and that, in any event, the Plaintiffs cannot establish any of its required elements. Fourth, in response to the  [*13] slander per se claim, the Defendants attack the Plaintiffs' conclusory pleading and argue that, at minimum, they are entitled to a more definitive statement of the claim in order to properly respond. Finally, the Defendants argue that the claim for accounting should be dismissed because it is premised on invalid claims for breach of fiduciary duty.

## IV. ANALYSIS

As noted, the Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6). A motion to dismiss will be granted if it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the Plaintiffs would not be entitled to relief. [10] This standard of review requires the Court to accept the well-pleaded facts alleged in the Complaint as true and to view those facts, and all reasonable inferences that may be drawn from them, in the light most favorable to the Plaintiffs. [11] It does not, however, compel acceptance of legal conclusions or every strained interpretation of fact offered by the Complaint. [12] Guided by this familiar standard, the Court moves to the issues raised by the motion.

10   *See VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 610-11 (Del. 2003).*  [*14] It is not necessary to assess whether this "plaintiff-friendly" standard will continue as the proper formulation for motions to dismiss under Court of Chancery Rule 12(b)(6). *See Bell All. Corp. v. Twombly, ___ U.S. ___ , 127 S. Ct. 1955, 1968-69, 167 L. Ed. 2d 929 (2007).*

11   *E.g., Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P., 829 A.2d 143, 148-49 (Del. Ch. 2003).* The Court may also consider documents integral to the Complaint. *Id.* at 149. Accordingly, the Court at times makes reference to the Contribution and Stock Purchase Agreement and the Stockholders Agreement.

12   *In re Gen. Motors (Hughes) S'holder Litig., 897 A.2d 162, 168 (Del. 2006).*

A. *The Fiduciary Duty Claims Under Count One and Count Four*

Rhodes and van de Groep first assert claims for breach of fiduciary duty. The claims are related. They pertain to a handful of self-dealing transactions--*e.g.*, padding InterAct's payroll with SilkRoad Equity employees, causing InterAct to acquire a SilkRoad Equity entity, and using InterAct funds for Filipowski and Roszak's personal expenses and massive severance packages--that were part of a larger effort to diminish Rhodes and van de Groep's interests in SilkRoad Holding to a level where the Defendants  [*15] could acquire them at a discount. [13] The Defendants seek dismissal of these claims by arguing, first, that they are derivative claims and, second, that the Plaintiffs lost standing to assert the claims when they ceased to be shareholders of SilkRoad Holding.

13   Count One addresses several matters, including the acquisition of TrueSentry, a former SilkRoad Holding entity. Count Four is limited to the TrueSentry acquisition. The purpose for a separate Count Four is not readily apparent. It is,

however, sufficient for present purposes to note that (1) Count One may fairly be viewed as subsuming Count Four and (2) the two counts will be assessed here together.

Whether a fiduciary duty claim is direct or derivative generally requires that two questions be asked: "[w]ho suffered the alleged harm--the corporation or the suing stockholder individually--and who would receive the benefit of the recovery or other remedy?" [14] If the answer to both of these questions is "the corporation," then the claim is derivative. Conversely, to state a direct claim, "[t]he stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to [*16] the corporation." [15] The consequences of classification of a claim as either direct or derivative can be outcome determinative. For example, if a stockholder no longer owns her shares, whether because of merger or sale, she loses standing to pursue a derivative claim on behalf of the corporation. [16]

> 14  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1035 (Del. 2004).
>
> 15  *Id. at 1039.*
>
> 16  *Lewis v. Anderson,* 477 A.2d 1040, 1049 (Del. 1984). There are limited exceptions. *See Kramer v. W. Pacific Indus., Inc.,* 546 A.2d 348, 354-55 (Del. 1988) (noting that the two exceptions are "(i) if the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of the standing to bring a derivative action; or (ii) if the merger is in reality merely a reorganization which does not affect plaintiff's ownership in the business enterprise"); *Lewis,* 477 A.2d at 1046 n.10.

In this instance, the self-dealing allegedly committed by the Defendants harmed SilkRoad Holding--unnecessary and improvident dissipation of corporate assets--and the proper remedy would be to restore the ill-gotten gains to the corporation. Thus, the Plaintiffs have stated a derivative claim [*17] and, of course, they are no longer stockholders of InterAct. Moreover, any harm which the Plaintiffs can identify was suffered by the corporation; under any of their theories, SilkRoad Holding was also harmed by the challenged conduct.

That might be the end of the analysis if a claim can only be either direct or derivative. There are, however, circumstances which may form the basis for both direct claims and derivative claims. This is one of those instances, and, thus, the Plaintiffs' claims set forth in Count One and Count Four of the Amended Complaint survive. [17] Although the corporation may be harmed, there are times when the consequences of that harm fall

disproportionately upon minority stockholders. As set forth in *Gentile v. Rossette,* [18]

> There is, however, at least one transactional paradigm--a species of corporate overpayment claim--that Delaware case law recognizes as being both derivative and direct in character. A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser [*18] value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders. [19]

> 17  The Defendants have not argued otherwise that these counts fail to state a claim upon which relief can be granted; their contentions exclusively depend upon the Plaintiffs' loss of standing, as former stockholders, to assert derivative claims.
>
> 18  *906 A.2d 91 (Del. 2006).*
>
> 19  *Id. at 99-100* (citations omitted); *see also In re Tri-Star Pictures, Inc. Litig.,* 634 A.2d 319 (Del. 1993).

The Plaintiffs' claims, of course, do not fit snuggly within this "transactional paradigm," but they do allege that SilkRoad Equity, as the controlling shareholder, sold assets it owned (or controlled) to the corporation for greater than fair value (and intentionally imposed other unnecessary burdens on the corporation) for the sole purpose of driving down the value of the corporation and driving out the Plaintiffs. As a result, Filipowski and Roszak (through SilkRoad Equity) became the sole owners of SilkRoad Holding when they acquired all of the remaining shares (as a consequence of [*19] contractual terms requiring that Rhodes and van de Groep sell their shares on termination of employment) that they did not previously hold. More particularly, Filipowski and Roszak caused a direct harm to the Plaintiffs by the "extraction" of economic value and residual voting power and a "redistribution" of the economic value and voting power to themselves as controlling shareholders. [20]  In addition, the Court's

inquiry is not restricted to the abstract structuring of the transaction or course of conduct under scrutiny. Instead, the Court must focus on the "true substantive effect" of the challenged transaction. [21]

> 20   *See Gentile,* 906 A.2d at 100.
> 21   *Gatz v. Ponsoldt,* 925 A.2d 1265, 2007 Del. LEXIS 167, 2007 WL 1120338, at * 11 (Del. Apr. 16, 2007).

If the alleged facts supporting the claims are taken as true, they allow the Court to infer that the Defendants' actions had the "true substantive effect" of harming the Plaintiffs, as minority shareholders in SilkRoad Holding, in substantially different fashion from SilkRoad Equity (*i.e.,* Filipowski and Roszak), as controlling shareholder. With the allegations made in Count One and Count Four--*e.g.,* loading InterAct with SilkRoad Equity employees, using InterAct [*20] funds for SilkRoad Equity's other companies, causing SilkRoad Holding to acquire a SilkRoad Equity entity--it cannot be said, in the words of *Gatz,* that the Court should view these transactions as "confined to an equal dilution of the economic value . . . of each of the corporation's outstanding shares." Those alleged to have benefited directly from the Defendants' misdeeds are Filipowski and Roszak or entities controlled by them. Thus, SilkRoad Equity, as controlling shareholder, would not have suffered harm to the same extent and proportion as the Plaintiffs. Moreover, the Defendants' alleged breaches of fiduciary duty may readily be viewed as facilitating their efforts to drive out the Plaintiffs at a bargain price. Accordingly, the Court concludes that the fiduciary duty claims alleged in the Complaint can be brought as direct claims and that the Defendants' motion to dismiss Counts One and Four should be denied.

### B. *The Breach of Contract Claims Under Count Two and Count Three*

Two contract claims are offered in the Complaint. First, in Count Two, the Plaintiffs allege the Defendants breached an oral obligation to apply excess funds to loans for which the Plaintiffs had personally [*21] guaranteed. Second, in Count Three, the Plaintiffs cite a provision in the Stockholders Agreement as having been breached by a faulty valuation of SilkRoad Holding that was used in acquiring the Plaintiffs' shares.

### 1. The Stock Purchase Agreement's Integration Clause

The Complaint alleges, and the Court must accept as true, that certain oral commitments were made by Filipowski and Roszak at the time they (through SilkRoad Equity) became InterAct investors to direct excess cash flow to those loans that the Plaintiffs and their spouses had personally guaranteed repayment.

Instead, as alleged by the Complaint, once the Defendants gained control of InterAct following execution of the Contribution and Stock Purchase Agreement (the "Acquisition Agreement"), they caused funds to be used for other purposes. The Plaintiffs now claim that the Defendants breached their oral agreement.

Collectively, the Defendants move to dismiss the Plaintiffs' claim by reference to the Acquisition Agreement. More precisely, they point to Section 11.6, which provides:

> Complete Agreement. This Agreement, the related schedules, and the other documents delivered by the parties in connection with this Agreement, together [*22] with the Confidentiality Agreement, contain the complete agreement between the parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements and understandings between the parties to this Agreement.

They argue that this section precludes, as a matter of law, the oral assurances that Filipowski or Roszak may have made prior to the parties reducing their understanding to written form.

Section 11.6 operates plainly as an integration clause. [22] Notwithstanding its unambiguous nature and seemingly comprehensive scope, the Plaintiffs have two main protestations. Both are, however, without merit.

> 22   *See Carrow v. Arnold,* 2006 Del. Ch. LEXIS 191, 2006 WL 3289582, at *5 (Del. Ch. Oct. 31, 2006) (noting that "a presumption of integration" is created when a clause states that the written contract is intended to be the parties' final agreement). In determining if the Acquisition Agreement, through its integration clause, is "fully integrated," the Court would give particular attention to whether it is "carefully and formally drafted," if it "addresses the questions that would naturally arise out of the subject matter," and if it "expresses the final intentions of the parties." [*23] *Hynansky v. Vietri,* 2003 Del. Ch. LEXIS 89, 2003 WL 21976031, at *3 (Aug. 7, 2003) (citation omitted). Only the last two considerations appear to be implicated by the parties' briefing on the motion before the Court.

They first complain that the clause is only a partial integration clause and, therefore, it is appropriate for the Court to look outside the four corners of the Acquisition Agreement for evidence of the Defendants' oral

agreement. Specifically, they assert that the Acquisition Agreement fails to make critical reference to either the Bank of Asheville loan guaranteed by Rhodes or to a particular note given to Rhodes from InterAct, which was part of the consideration for SilkRoad Equity's acquisition. That assertion, however, is refuted by some notable references in the Acquisition Agreement. For example, Article XII defines "InterAct Debt" as including "all indebtedness for borrowed money," "guarantees," and "all amounts payable by InterAct." As to the note given to Rhodes by InterAct, that note is expressly referenced both at Section 1.3, which provides the note is in "full consideration for the Rhodes Sold Shares and in partial consideration for the covenants not to compete," and at Section 2.4(a), [*24] which provides that delivery of the note to Rhodes shall be made at closing. The Bank of Asheville loan appears not only to be included in Article XII's definition of "InterAct Debt," but is also referenced indirectly in Section 3.14(h) ("Each trust indenture, mortgage, promissory note, loan agreement, letter of credit, or other Contract for the borrowing of money . . . .") and more directly in Schedule 3.14 to the Acquisition Agreement.

The Plaintiffs also argue that the integration clause is unavailing for the Defendants because the contract of which it is part was, itself, induced by fraud and part of a bad faith scheme by the Defendants to depress the value of InterAct. Integration clauses do not, as a matter of law, bar claims of fraud and the presumption afforded by such clauses can also be rebutted upon a showing of bad faith. [23] That said, the problem with the Plaintiffs' attempt to invoke the "fraud" or "bad faith" exceptions to the integration clause at hand is that no allegations of fraudulent or bad faith conduct have been sufficiently alleged in Complaint. [24] In fact, the Complaint does not even state that they were defrauded by the Defendants. Even if it did, however, [*25] the Court cannot ignore the absence of allegations that the Plaintiffs specifically *relied*--reliance being an essential element for a fraud claim--on certain oral commitments of Filipowski and Roszak when deciding to consent to the Acquisition Agreement. That there were once oral commitments by the Defendants different from those commitments made and later reduced to writing is inapposite. As this Court recently observed, "[i]f the only showing required to invoke the fraud exception to the parol evidence rule were inconsistent prior oral statements, such oral statements would often (usually) be admitted, and the exception would swallow the rule." [25] Moreover, the Plaintiffs' "bad faith" argument--that the oral agreement should be argued from the sweep of the integration clause at Section 11.3 because of a "bad faith" scheme by the Defendants to acquire Rhodes and van de Groep's interest in InterAct after having driven down its value--is unsupported by the Complaint, which actually states that

Filipowski and Rhodes began their scheme *after* SilkRoad Equity became an investor in InterAct. [26]

23  *See e.g., Kronenberg v. Katz, 872 A.2d 568, 592-93 (Del. Ch. 2004).* Only explicit "anti-reliance" [*26] language--that is, a contractual commitment by a party that it has not relied upon statements outside of the contract's four corners in deciding to consent--would appear to have a claim preclusive effect. *See id.; see also Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co., 2002 Del. Ch. LEXIS 91, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002).* No such language in the Acquisition Agreement, however, can be found.

24  Court of Chancery Rule 9(b) demands, of course, that claims of fraud be pleaded with particularity.

25  *Carrow, 2006 Del. Ch. LEXIS 191, 2006 WL 3289582, at *8.* It has also been said that prior oral promises usually do not provide enough support to find exception to the parol evidence rule, but certain circumstances--such as a promisor's "sharp practice" of knowing that the promisee will not notice or understand the significance of a last minute change or the preclusive effect of an integration clause--may permit use of such an exception. *2006 Del. Ch. LEXIS 191, [WL] at *9.* Notably, however, no facts have been alleged in the Complaint to suggest that the Plaintiffs did not fully appreciate the effect that Section 11.6 had on the oral promise to pay down a specific loan out of excess funds.

26  *See* Am. Compl. P 30.

In short, nothing is alleged in [*27] the Complaint to suggest that the integration clause does not properly bar certain oral commitments the Defendants made prior to execution of the Acquisition Agreement.

2. Parties to the Stockholders Agreement and the Obligation to Pay Fair Market Value for Terminated Employees' Shares

Next, the Plaintiffs claim that the Defendants breached the repurchase option provision under the Stockholders Agreement to purchase their shares at fair market value. They complain that the valuation methods employed by Houlihan, SilkRoad Holding's advisor, failed to account for, among other things, the funds that Filipowski and Roszak directed from InterAct to SilkRoad Equity-based interests, as well as the numerous inaccuracies that prevented a proper and fair assessment of the value of their SilkRoad Holding shares. As read, the claim contained in Count Three of the Plaintiffs' Complaint is against all of the named Defendants. That

claim, however, can only properly stand against one party: SilkRoad Holding.

A primary flaw of the Plaintiffs' claim is that it names parties who were never signatories to the underlying agreement between the Plaintiffs and SilkRoad Holding and SilkRoad Equity, namely, Filipowski, [*28] Roszak, and InterAct. To permit this claim to proceed as against these parties would be to contravene that axiomatic expression found within our law: non-parties to a contract ordinarily have no obligations under it. [27] The Plaintiffs have agreed to dismiss Count Three as against Filipowski and Roszak. [28] They have also agreed to dismiss their claim against SilkRoad Equity, even though it was a party to the Stockholders Agreement. [29] They continue, however, to bring the claim against InterAct, but that claim cannot stand because, as already discussed, InterAct was never a party to the Stockholders Agreement.

> [27]    *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 817 A.2d 160, 172 (Del. 2002); In re Delta Holdings, Inc., 2004 Del. Ch. LEXIS 104, 2004 WL 1752857, at \*8 n.58 (Del. Ch. July 26, 2004); cf. MetCap Sees. LLC v. Pearl Senior Care, Inc., 2007 Del. Ch. LEXIS 65, 2007 WL 1498989, at \*7 (Del. Ch. May 16, 2007)* ("Well-settled within precepts of contract law is recognition that non-parties to a contract ordinarily have no rights under it.").
>
> [28]    *See* Pls.' Ans. Br at 3 n.1.
>
> [29]    *Id.* The claim against SilkRoad Equity would, of course, fail on a different ground. Section 5.6 of the Stockholders Agreement provides "the Board shall   [*29] reasonably determine in good faith the '*Fair Market Value*'" of the Plaintiffs' interests in SilkRoad Holding upon termination of their employment. References to "the Board" in Section 5.6 refer exclusively to SilkRoad Holding's Board of Directors. *See* Stockholders Agmt. at P 1.2 (defining "Board"). Thus, the obligation to repurchase Rhodes and van de Groep's stock was, at all times, that of SilkRoad Holding. As a matter of contract, SilkRoad Equity was neither slated to make a valuation of Rhodes and van de Groep's shares nor obligated to repurchase them.

Thus, the only Defendant which can properly be found to have been obligated under the Stockholders Agreement is SilkRoad Holding. SilkRoad Holding has declined, however, to join its co-Defendants in moving for dismissal. Accordingly, except as to SilkRoad Holding, the Court will grant the Defendants' motion to dismiss the breach of contract claim under Count Three.

## C. The *Claim Under North Carolina's Unfair and Deceptive Trade Practices Act*

The Court now turns to the Plaintiffs' claim under the North Carolina Unfair and Deceptive Trade Practices Act (the "UDTPA"), [30] which provides a private right of action for consumers aggrieved by   [*30] certain business practices. [31] To state a claim under the UDTPA, the Plaintiffs must allege that (1) the Defendants committed an unfair or deceptive act or practice, (2) this act or practice was "in or affecting commerce," and (3) the act or practice has proximately caused their injuries. [32]

> [30]    *N.C. Gen. Stat. § 75-1.1 et seq.* (2001).
>
> [31]    *N.C. Gen. Stat. § 75-16* (providing a private right of action); *see Winston Realty Co. v. G.H.G., Inc., 314 N.C. 90, 331 S.E.2d 677, 680 (N.C. 1985)* (recognizing the legislative intent to provide "aggrieved consumers" with a new, private right of action beyond traditional common law claims).
>
> [32]    *Dalton v. Camp, 353 N.C. 647, 548 S.E.2d 704, 711 (N.C. 2001).*

The Plaintiffs invoke the UDTPA in the context of the Defendants' conduct leading up to the acquisition of InterAct. They allege that SilkRoad Equity (*i.e.,* Filipowski and Roszak) used its position as a senior creditor to pressure InterAct into a transaction with terms disproportionately benefiting SilkRoad Equity. [33] One of the more notable actions alleged to have been taken by SilkRoad Equity is its threat to file an involuntary bankruptcy petition against InterAct if it did not agree to a deal whereby SilkRoad Equity would acquire an  [*31] equity stake in the Company.

> [33]    *See* Am. Compl. PP 23-27.

There is no real disagreement as to the UDTPA's cardinal purpose: it is to protect "the consuming public" from those acts done in violation of its general proscriptions. [34] Disagreement does arise, however, as to its scope. A threshold question that is raised by Defendants' motion to dismiss is whether the UDTPA's "in or affecting commerce" language covers Defendants' conduct in connection with its transaction with InterAct. In construing this language, North Carolina's highest court has observed that "while the statutory definition of commerce crosses expansive parameters, it is not intended to apply to all wrongs in a business setting." [35] In this vein, North Carolina has excluded from the UDTPA's scope those claims involving, among other things, securities transactions, [36] most employment-related matters, [37] professional services, [38] lending or "capital-raising" transactions, [39] and internal corporate governance issues. [40]

34  *Skinner v. E.F. Hutton & Co.,* 314 N.C. 267, 333 S.E.2d 236, 241 (N.C. 1985).* The statute also has a more aspirational bent to foster "good faith and fair dealing between buyers and sellers." *Threatt v. Hiers,* 76 N.C. App. 521, 333 S.E.2d 772, 773 (N.C. App. Ct. 1985).

35  *Dalton,* 548 S.E.2d at 711.

36  *See* [*32] *Skinner,* 333 S.E.2d at 241 (holding that "securities transactions are beyond the scope of [the UDTPA]" because the statute is meant to protect the "consuming public" and such transactions are "already subject to pervasive and intricate regulation[s]").

37  *See, e.g., HAJMM Co. v. House Raeford Farm, Inc.* 328 N.C. 578, 403 S.E.2d 483, 492 (N.C. 1991).

38  *See* N.C. Gen. Stat. § 75-1.1(b).

39  *See, e.g., Oberlin Capital, L.P. v. Slavin,* 147 N.C. App. 52, 554 S.E.2d 840, 848 (N.C. App. Ct. 2001); *Garlock v. Hilliard,* 2000 NCBC 11, 2000 WL 33914616, at *5 (N.C. Super. Aug. 22, 2000).

40  *See, e.g., Wilson v. Blue Ridge Elec. Membership Corp.,* 157 N.C. App. 355, 578 S.E.2d 692, 694 (N.C. App. Ct. 2003).

The Defendants argue that their alleged conduct falls outside of the UDTPA's reach because it relates precisely to those areas that North Carolina courts have declined to interpret as being the type of "regular, day-to-day activities" for which businesses "regularly engage[] in and for which [they are] organized." [41] In other words, they argue that the transaction with InterAct was extraordinary in nature and liken it to one involving securities or the transfer of capital. [42]

41  *HAJMM,* 403 S.E.2d at 493.

42  In *HAJMM,* the North Carolina Supreme Court reasoned that securities [*33] transactions were unlike the regular sale and purchase of consumer goods because such transactions are "extraordinary events . . . related to the creation, transfer, or retirement of capital" and, as such, are not viewed as traditional business activities under the UDTPA. *Id.*

To illustrate the extraordinary nature of SilkRoad's acquisition of InterAct equity, the Defendants point to the various instruments that were executed in connection with that transaction--*e.g.,* the Acquisition Agreement, the Stockholders Agreement, employment agreements for the Plaintiffs, stock certificates, and promissory notes.

In response, the Plaintiffs draw the Court's attention to a North Carolina lower court's decision involving the sale of a company. In *Walker v. Sloan,* it was held that a

complaint sufficiently stated a claim under the UDTPA when certain actions were taken by a group of directors to frustrate the sale of the business to a buyout group of plaintiff-employees. [43] Actions alleged to have been taken by the resistant director group included being uncooperative in due diligence requests, tempting certain plaintiff-employees to withdraw from the buyout group in exchange for "being taken care [*34] of," and terminating employees to bring about instability in efforts to secure outside funding. The Plaintiffs, here, see similarities with *Walker,* contending that, like the directors in *Walker,* the Defendants "took numerous improper actions to manipulate the sale process to suit their own interests." [44]

43  137 N.C. App. 387, 529 S.E.2d 236, 243 (N.C. App. Ct. 2000).

44  Pls.' Ans. Br. at 37. The factual similarities between *Walker* and here are not as strong as the Plaintiffs would have them. In *Walker,* the directors engaged in undeniably egregious acts. Here, the Complaint alleges little in terms of patently unfair or deceptive conduct. SilkRoad Equity may have placed pressure on Rhodes and van de Groep to consent to terms that they would not have otherwise agreed to in better financial straits, but the Complaint reveals that SilkRoad Equity was acting pursuant to the options it had available to it by contract. *See S. Atl. Ltd. P'ship of Ternn., LP v. Riese,* 284 F.3d 518, 536 (4th Cir. 2002) (noting that conduct carried out pursuant to contractual relations rarely violates the [UDTPA]").

Notwithstanding the Court's observation that *Walker* did nothing to elaborate upon how the alleged acts were deemed to [*35] fall within the UDTPA's "in or affecting commerce" requirement, the guidance from the North Carolina Supreme Court's seminal decision in *HAJMM Co. v. House Raeford Farm, Inc.*--that "in or affecting commerce" includes those "regular, day-to-day activities" aimed at consumers, but not those extraordinary events in the life of a business--remains firmly rooted in North Carolina law. [45] That teaching guides this Court to conclude that Defendants' alleged conduct in connection with the InterAct transaction was not the sort of ordinary conduct that would fall under the UDTPA. Filipowski and Roszak's acquisition of an 80% interest in InterAct was, not surprisingly, something that occurred outside of the ordinary course.

45  *See, e.g., Wilson,* 578 S.E.2d at 694; *Garlock,* 2000 NCBC 11, 2000 WL 33914616, at *5 (citing *HAJMM*).

Finally, it should be noted that the two groups of parties to the SilkRoad Equity-InterAct transaction in 2004 had the full benefit of counsel. Ultimately, the parties consented to the Acquisition Agreement. Rhodes and van de Groep may have "reluctantly agreed" to do so, [46] but the Complaint alleges no facts to suggest that they did not consent freely. That certain terms of the agreement [*36] were more favorable to one party at the expense of another, however, is not a matter for the Court to resolve in this context.

46    Am. Comp. P 26.

In sum, the Court concludes that the alleged conduct here does not fall within the "in or affecting commerce" language of the UDTPA and that, even if it did, it does not constitute unfair or deceptive practice as a matter of law. Accordingly, the claim brought under this statute shall be denied.

D. *Slander Per Se*

Rhodes and van de Groep also bring a claim for slander per se. [47] In particular, they allege that at "several meetings of Inter Act's more than 200 employees" Filipowski stated that van de Groep "had written a $ 50,000 check on behalf of InterAct to himself." [48] They maintain that this statement is false and that it has damaged van de Groep's business reputation. [49]

47    Van de Groep previously sought voluntary dismissal of this claim pursuant to Court of Chancery Rule 41(a)(2). The Court, however, denied van de Groep's application because, first, the slander claim was initially, and voluntarily, filed in Delaware and, second, there was a risk of conflicting outcomes if a North Carolina court were resolve on van de Groep's slander claim [*37] when there was a corresponding counterclaim by InterAct (seeking recovery of $ 8,000 for allegedly improper distribution by van de Groep to himself) before this Court. *See Rhodes v. SilkRoad Equity, LLC, 2007 Del. Ch. LEXIS 20, 2007 WL 441940, at *1 (Del. Ch. Jan. 29, 2007).*

48    Am. Compl. P 69.

49    *Id.* at PP 69 ("The allegation that [v]an de Groep wrote himself a $ 50,000 check is completely unfounded and it has severely damaged [v]an de Groep's business reputation, especially in the public safety industry."), 103-04.

As an initial matter, there is a question as to whether this Court should view the Plaintiffs' claim under Delaware law or, as the Plaintiffs urge, under North Carolina or Georgia law. Besides noting that Filipowski's statements were made at "several meetings," there is no

indication from the Complaint where these meetings occurred. [50] That, perhaps, might portend the claim's general weakness. In any event, it is safe to conclude that these meetings did not occur in Delaware, as InterAct's offices are only in North Carolina and Georgia. With this in mind, the Court assesses whether Rhodes and van de Groep have sufficiently alleged facts which set forth a defamation claim under North Carolina or Georgia [*38] law. Under either formulation, however, the slander per se claim cannot stand.

50    Likewise, there is no pleading as to when these statements were made by Filipowski or, besides the 200 InterAct employees, to whom.

Under North Carolina law, a claim for slander per se involves the injured party alleging that (1) another has spoken base or defamatory words tending "to prejudice him in his reputation, office, trade, business or means of livelihood or hold him up to disgrace, ridicule or contempt; (2) the statement was false; and (3) the statement was published or communicated to and understood by a third person." [51] The claim is put differently in Georgia, but it is substantially similar. [52] The laws of both states recognize that slander per se is a unique species of defamation. Unlike mere slander, or slander per quod, slander per se need not be accompanied by an allegation and proof of special damages. It is not surprising, then, that "[t]he policy of the law has much restricted the range of defamatory utterances which are actionable per se." [53]

51    *West v. King's Dept. Store, Inc., 321 N.C. 698, 365 S.E.2d 621, 624 (N.C. 1988); see also Javurek v. Jumper, 2005 N.C. App. LEXIS 459, 2005 WL 465571, at *3* (noting the three main [*39] categories of slander per se: an accusation of a crime involving moral turpitude; an allegation impeaching one in his trade, business, or profession; and an imputation that one has a loathsome disease).

52    In Georgia, slander per se includes [i]mputing to another a crime punishable by law," "[c]harging a person with having some contagious disorder," or "[m]aking charges against another in reference to his trade, office, or profession, calculated to injure him therein." *O.C.G.A. § 51-5-4 (a)(1)-(3).*

53    *Donovan v. Fiumara, 114 N.C. App. 524, 442 S.E.2d 572, 576 (N.C. App. Ct. 1994)* (citing *Penner v. Elliott, 225 N.C. 33, 33 S.E.2d 124, 125 (1945)); accord Chong v. Reeba Constr. Co., Inc., 284 Ga. App. 830, 645 S.E.2d 47, 53 (Ga. App. Ct. 2007).*

To sustain a claim for slander per se, both North Carolina and Georgia law appear to share the view that there must be some showing that the defamatory words spoken were susceptible to but one meaning; importantly, this must be *without* the aid of explanatory circumstances or resort to extrinsic proof. [54] Put differently, the words must be "recognized as injurious on their face" and cannot be assisted by a judicial "hunt for a strained construction in order to hold the words as being defamatory as [*40] a matter of law." [55]

> 54  *See Renwick v. News & Observer Pub. Co., 310 N.C. 312, 312 S.E.2d 405, 409 (N.C. 1984)*; *Bellemead, LLC v. Stoker, 280 Ga. 635, 631 S.E.2d 693, 695-96 (Ga. 2006)* (holding that it is was inappropriate for a lower court to look to innuendo, or some wider explanatory context, to determine if certain words constituted slander per se).
>
> 55  *Bellemead, 631 S.E.2d at 695.*

The Plaintiffs' claim is that van de Groep wrote a check to himself from InterAct. That is all. No allegation has been made that van de Groep was unauthorized to write checks on behalf of InterAct; he was, after all, the Company's President. No allegation has been made that the intended distribution of InterAct funds was unlawful or for an improper purpose; that may have been the intended message, but claims for slander per se are claims based on statements that were said, not implied. [56] In short, Filipowski's comments could have been susceptible to a different interpretation. Without more, the broad brush allegations before the Court provide insufficient support to conclude, as a matter of law, that the statements were subject to only a defamatory understanding.

> 56  *Cf. Chong, 645 S.E.2d at 53* (concluding that slander per se could [*41] be found where a general contractor was called a "crook" in the context of a discussion about the contractor's business).

Another reason why the Plaintiffs' claim must fail is that it does not sufficiently allege facts that Filipowski's statement actually impeached van de Groep in the public safety industry. [57] That is, it is not enough to rely on those statements which "merely injure" a plaintiff's business, trade, or profession; rather, there must be a showing that certain statements both (1) touched upon the plaintiff's business, trade, or profession, and (2) were necessarily harmful in their *effect* on a plaintiff's business, trade, or profession. [58] Although the Plaintiffs have identified van de Groep as being in the public safety industry, [59] the allegation that he wrote InterAct checks to himself does not necessarily malign and negatively effect his business, trade, or profession in the industry in such manner as to conclude that he was slandered per se and that special damages need not be alleged. [60] This is because, as explained earlier, there is no allegation that van de Groep improperly acquired funds from the Company or lacked the authority to even write checks on behalf [*42] of the Company.

> 57  *See Jolly v. Acad. Collection Serv., Inc., 400 F. Supp. 2d 851, 861 (M.D.N.C. 2005)* (concluding plaintiffs who generally claimed that certain defendants disrupted their business failed to "set out facts alleging that defendants made false statements *actually impeaching* them in their business" when they neither indicated the nature of their business or alleged that defendants stated they were somehow unfit to conduct such business) (emphasis added); *accord Bellemead, 631 S.E.2d at 695* (noting alleged statements must have been "especially injurious") (citation omitted).
>
> 58  *Donovan, 442 S.E.2d at 578* (citing *Badame v. Lampke, 242 N.C. 755, 89 S.E.2d 466, 468 (N.C. 1955)*).
>
> 59  *Cf. Jolly, 400 F. Supp. 2d at 861* (holding plaintiffs failed state a claim for slander per se where they never alleged the nature of defendants' business or trade).
>
> 60  *Cf. Badame v. Lampke, 242 N.C. 755, 89 S.E.2d 466 (N.C. 1955)* (ruling that a business rival's statement to one of plaintiff's customers that plaintiff had failed to make a required payment and engaged in "shady deals" was slander per se); *Broadway v. Cope, 208 N.C. 85, 179 S.E. 452 (N.C. 1935)* (ruling a butcher had been slandered per se by a competitor's statement that the butcher [*43] had slaughtered a rabid cow).

For these reasons, the Court concludes that the Plaintiffs have not stated a claim for slander per se and that the claim must be dismissed.

### E. *Accounting*

Rhodes and van de Groep also seek an accounting. An accounting is not so much a cause of action as it is a form of relief. [61] Here, the demand for accounting is inherently dependent on the Court's decision on the fiduciary duty claims in Count One and Count Four. Because the Court views those claims as having been properly stated, it follows that dismissal of the Plaintiffs' request for an accounting is unwarranted.

> 61  *See Albert v. Alex. Brown Mgmt. Servs., Inc., 2005 Del. Ch. LEXIS 133, 2005 WL 2130607, at *11 (Del. Ch. Aug. 25, 2005)* ("An accounting is

2007 Del. Ch. LEXIS 96, *

an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result.").

## V. CONCLUSION

For the foregoing reasons, Count Two (breach of oral agreement) of the Amended Complaint, Count Three (breach of Stockholders Agreement), except as to SilkRoad Holding, Count Five (violation of the North Carolina's trade practices statute), and Count Six (slander per se) will be dismissed. Otherwise, [*44] Defendants' Motion to Dismiss will be denied.

An implementing order will be entered.

LEXSEE 2006 U.S. DIST. LEXIS 6863

**MARTIN & ASSOCIATES, P.L.L.C. Plaintiff, v. MATT MALOUF, Defendant.**

**Civil Action No. 03-1281 (GK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2006 U.S. Dist. LEXIS 6863*

**February 6, 2006, Decided**
**February 6, 2006, Filed**

**COUNSEL:** [*1] For MARTIN & ASSOCIATES, P.L.L.C., Plaintiff: Kenneth A. Martin, MARTIN & ASSOCIATES P.L.L.C., McLean, VA; Daniel Mark Press, Russell B. Adams, III, CHUNG & PRESS, McLean, VA.

For MATT MALOUF, Defendant: Joseph A. Molina, BALDWIN, MOLINA & ESCOTO, Washington, DC.

**JUDGES:** Gladys Kessler, United States District Judge.

**OPINION BY:** Gladys Kessler

**OPINION**

***MEMORANDUM OPINION***

Plaintiff, Martin & Associates, P.L.L.C. ("Martin & Associates") brings suit against Defendant Matt Malouf ("Malouf"), for breach of contract and fraudulent inducement, common law fraud, conversion, unjust enrichment, violations of Sections 10 (b) and 20(a) of the Securities Exchange Act of 1934 ("SEA"), *15 U.S.C. §§ 78j(b), 78t(a)*, and misappropriation of property. This matter is now before the Court on Defendant's Motion to Dismiss, [# 23]. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, Defendant's Motion is **denied**.

**I. BACKGROUND** [1]

    1 Unless otherwise noted, the facts cited herein are taken from Plaintiff's Complaint.

[*2] Plaintiff, Martin & Associates, is a Washington, D.C. law firm whose principal is Kenneth Martin ("Martin"). Defendant is Malouf, a United States citizen domiciled in Utah.

In this lawsuit, Plaintiff alleges that "Defendant Malouf solicited Plaintiff through Plaintiff's employee Jasen Adams ("Adams") to participate in a $ 3,000,000 investment he committed to make into a Utah based company, Talk2, Inc., d/b/a/ Spontaneous Technology ("Talk2")." Compl. P 8. Plaintiff claims that, in order to induce Plaintiff to transfer funds to Malouf as an investment in Talk2, Malouf falsely represented that Talk2 had major corporate financing, that Malouf had personally invested $ 3,000,000 into Talk2, and that the investment "would appreciate in value ten times over." *Id.* PP 9-10.

In reliance on these false representations, Plaintiff transferred to Malouf $ 190,000 in the form of a convertible loan via three separate wire transfers between June 15, 2000, and June 13, 2001. Plaintiff alleges that from June 15, 2000, through December 31, 2001, Malouf falsely reported to Plaintiff via the telephone, internet, and mails that Malouf had prepared the documentation for the convertible loan, was [*3] in the process of establishing a company, MM Tech Fund ("MMTF"), to facilitate the Talk2 investment, and often communicated with Talk2's management about major corporate financing that would lead to significant revenues.

Plaintiff claims that Malouf has refused to furnish documentation related to the convertible loan or the legal existence of MMTF, verify receipt of the funds Plaintiff transferred to him, or return any of Plaintiff's money. On June 13, 2003, Plaintiff filed a Complaint in this Court, seeking monetary damages for injuries caused by this business transaction. Plaintiff claims Malouf's actions resulted in breach of contract and fraudulent inducement, common law fraud, conversion, unjust enrichment, violations of the SEA, and misappropriation of property.

**II. STANDARD OF REVIEW**

Defendant Malouf seeks to dismiss Plaintiff's Complaint for lack of personal jurisdiction and because Plaintiff is not the real party in interest in this lawsuit. *See Fed. R. Civ. P. 12 (b) (2), 17(a).*

"To prevail on a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima* [*4] *facie* showing of pertinent jurisdictional facts." *United States v. Phillip Morris, Inc.*, 116 F. Supp. 2d 116, 121 (D.D.C. 2000) (citing *Edmond v. United States Postal Serv. Gen. Counsel*, 292 U.S. App. D.C. 240, 949 F.2d 415, 424 (D.C. Cir. 1991); *Naartex Consulting Corp. v. Watt*, 232 U.S. App. D.C. 293, 722 F.2d 779, 787 (D.C. Cir. 1983)). "A plaintiff makes such a showing by alleging specific acts connecting the defendant with the forum. . . ." *Id.* 116 F. Supp. 2d at 121 (citing *Naartex, 722 F.2d at 787*). In making its decision, the Court must resolve "factual discrepancies" in the record "in favor of the plaintiff." *Crane v. New York Zoological Soc.*, 282 U.S. App. D.C. 295, 894 F.2d 454, 456 (D.C. Cir. 1990) (citing *Reuber v. United States*, 242 U.S. App. D.C. 370, 750 F.2d 1039, 1052 (D.C. Cir. 1984)).

### III. ANALYSIS

### A. Section 27 of the SEA Confers Personal Jurisdiction Over Defendant Malouf

Defendant argues that this Court lacks personal jurisdiction over him because he is a Utah resident whose business dealings that spawned this lawsuit are not "tied in any way to the District of Columbia. . . ." Def.'s Reply at 1. Essentially, Defendant's argument is that because [*5] "there is no basis to find this to be a securities action," this Court must apply a traditional minimum contacts analysis for personal jurisdiction under the District of Columbia long-arm statute, *D.C. Code § 13-423 (a) (1)-(4)* (1981). Def.'s Reply at 4. However, neither in its Motion nor in its Reply did Defendant provide any argument as to why the allegations in Counts V and VI of Plaintiff's Complaint fail to state a claim for violations of the SEA. This Court cannot dismiss those Counts based solely on Defendant's unsupported assertions that this is not a securities action. Accordingly, for purposes of this Motion, the Court will analyze this case as having been properly brought under the SEA.

Plaintiff argues that under the SEA, personal jurisdiction exists so long as the Defendant is a citizen of, and was properly served within, the United States. [2] *See* Pl.'s Opp'n at 7. In cases in which the defendant is sued under the SEA, the Court must (1) determine whether the statute authorized jurisdiction over the defendant and (2) whether its assertion of personal jurisdiction comports with the requirements of the Constitution. *See In re Baan Co. Sec. Litig.*, 245 F. Supp. 2d 117 (D.D.C. 2003). [*6]

> 2   In the alternative, Plaintiff argues that it is entitled to "an opportunity for discovery on the jurisdictional issues." Pl.'s Opp'n at 11.

*Section 27 of the SEA* states, in relevant part:

> Any suit or action to enforce any liability or duty created by this chapter or rules or regulations thereunder . . . may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

Service under this section, "in conjunction with *Rule 4(k)(2) of the Federal Rules of Civil Procedure* . . . is sufficient to confer personal jurisdiction." [3] *In re Baan Co.*, 245 F. Supp. 2d at 126.

> 3   In *Poling v. Farrah*, 131 F. Supp. 2d 191, 193 (D.D.C. 2001), Judge Friedman suggested that under *Section 27 of the SEA*, the Court must satisfy itself that venue is proper before concluding it has personal jurisdiction over the defendant. Because Defendant here does not argue that venue is improper, the Court need not address this issue.

[*7]   Second, the Constitution requires that a defendant have sufficient contacts with the judicial forum such "that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)). In SEA actions, the relevant judicial forum is the entire United States pursuant to the SEA's nationwide service-of-process provision. *See In re Baan Co.*, 245 F. Supp. 2d at 126 n.11 (citing *SEC v. Carrillo*, 115 F.3d 1540, 1543-44 (11th Cir. 1997); *Trust Co. of La. v. N.N.P., Inc.*, 104 F.3d 1478, 1486-87 (5th Cir. 1997); *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1330 (6th Cir. 1993)).

In this case, Plaintiff has made the requisite *prima facie* showing that the Court has personal jurisdiction over Malouf. Plaintiff alleges that Malouf's actions resulted in violations of the SEA. [4] Malouf was properly served within the United States, in accordance with *Section 27 of the SEA*. Accordingly, "the statute undoubtedly confers personal jurisdiction over" Malouf. *In re Baan Co.*, 245 F. Supp. 2d at 126 n.10 [*8] (citing *Poling, 131 F. Supp. 2d at 192-93*). The constitutional requirement is also clearly satisfied. Malouf's citizenship, residency, and involvement in business transactions within the United States, which is the relevant judicial forum for establishing personal jurisdiction under the

2006 U.S. Dist. LEXIS 6863, *

SEA, satisfy the constitutional requirement for personal jurisdiction. *See Poling, 131 F. Supp. 2d at 192.*

    4  Supplemental personal jurisdiction exists for Plaintiff's non-SEA claims, because they arise out of the same transaction as the SEA claims. *See 28 U.S.C. § 1367 (a).*

## B. Martin & Associates Is the Real Party in Interest

Defendant argues that "Martin & Associates is not a real party in interest in this action. As established, Kenneth Martin made a personal investment, yet sues in the name of his company." Def.'s Mot. at 11.

Under *Rule 17(a) of the Federal Rules of Civil Procedure*, "no action shall be dismissed on [*9] the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest." *Fed. R. Civ. P. 17 (a).* Plaintiff Martin & Associates previously submitted a sworn affidavit stating that it, not Martin personally, engaged in the business transaction with Malouf. Pl.'s Aff. in Support of Mot. for Default Judgment at P 2, [# 6], filed Oct. 20, 2003. Moreover, the affidavits attached to Defendant's Motion state that the funds transferred to Malouf came from Martin & Associates' bank account. Def.'s Mot., Ex. A (Aff. of M. Malouf) at P 18; Ex. B (Aff. of J. Adams) at P 13. This evidence is sufficient to withstand Defendant's Motion to Dismiss.

## IV. CONCLUSION

Plaintiff has established that, in accordance with *Section 27 of the SEA* and the Constitution, this Court has personal jurisdiction over Malouf. Plaintiff has also presented sufficient evidence to withstand Defendant's argument that Martin & Associates is not the real party in interest. Accordingly, for the reasons [*10] stated above, Malouf's Motion to Dismiss, [# 23], is **denied.**

An Order will issue with this Memorandum Opinion.

February 6, 2006

Gladys Kessler

United States District Judge

## *ORDER*

Plaintiff, Martin & Associates, P.L.L.C. ("Martin & Associates") brings suit against Defendants, Matt Malouf ("Malouf") and MM Tech Fund ("MMTF"), for breach of contract and fraudulent inducement, common law fraud, conversion, unjust enrichment, violations of

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("SEA"), *15 U.S.C. §§ 78j(b), 78t(a),* and misappropriation of property.

This matter is now before the Court on Defendant Malouf's Motion to Dismiss, [# 23]. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated in the Memorandum Opinion, it is hereby

**ORDERED** that Defendant's Motion to Dismiss, [# 23], is denied; and it is further

**ORDERED** that an Initial Scheduling Conference will be held in this case on **February 28, 2006 at 9:45 a.m.**

Febraury 6, 2006

Gladys Kessler

United       States       District       Judge

2006 U.S. Dist. LEXIS 6863, *