# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

In Re SUNRISE SENIOR LIVING, INC.   )   **Civil Action No. 07-00143**
Derivative Litigation   )
_____)

This Document Relates To:   )

ALL ACTIONS   )
_____)

### NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT

Plaintiffs, by and through their undersigned counsel, respectfully request that the Court take notice of the attached opinions in the stock option backdating cases entitled *In re Maxim Integrated Products, Inc. Derivative Litigation*, No. C-06-0344-JW, slip op. (N.D. Cal. Aug. 27, 2008) (attached hereto as Exhibit A) and *In re Cirrus Logic, Inc.*, No. A-07-CA-212-SS, slip op. (W.D. Tex. Aug. 28, 2008) (attached hereto as Exhibit B) as supplemental authority in further support of Plaintiffs' Memorandum of Law in Opposition to Nominal Defendant Sunrise Senior Living Inc.'s Motion to Dismiss or, in the Alternative, Stay Plaintiffs' Amended Consolidated Complaint and Plaintiffs' Omnibus Memorandum of Law in Opposition to the Individual Defendants' Motions to Dismiss Plaintiffs' Amended Consolidated Complaint ("Plaintiffs' Opposition Briefs"). The decisions in *Maxim and Cirrus* were issued after the filing of Plaintiffs' Opposition Briefs and directly address arguments proffered by Defendants in their Motions to Dismiss. Accordingly, Plaintiffs respectfully request that the Court take notice of the *Maxim and Cirrus* decisions in considering Defendants' Motions to Dismiss.

Dated:  September 3, 2008     **MURPHY ANDERSON, PLLC**


         __/s/ Mark Hanna_____
         George R. Murphy (DC Bar 75200)
         Mark Hanna (DC Bar 471960)
         Joni S. Jacobs (DC Bar 493846)
         1701 K Street NW, Suite 210
         Washington, DC 20006
         Telephone:   (202) 223-2620
         Facsimile:   (202) 223-8651

         *Liaison Counsel*

         **SCHIFFRIN BARROWAY**
         **TOPAZ & KESSLER, LLP**
         Lee D. Rudy
         Eric L. Zagar
         Michael C. Wagner
         J. Daniel Albert
         280 King of Prussia Road
         Radnor, PA  19087
         Telephone:  (610)667-7706
         Facsimile:   (610)667-7056

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| In Re SUNRISE SENIOR LIVING, INC.    ) | **Civil Action No. 07-00143** |
| Derivative Litigation    ) | |
| _____) | |
| ) | |
| This Document Relates To:    ) | |
| ) | |
| ALL ACTIONS    ) | |
| _____) | |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies, under penalty of perjury, that the foregoing was

served on counsel for Defendants via ECF this September 3, 2008, and that no Defendant

needs to be served by mail.

_____/s/ Mark Hanna_____
Mark Hanna

# EXHIBIT A

1

2

3

4

5

6

7          IN THE UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9          SAN JOSE DIVISION

10                                              NO. C 06-03344 JW

11   In re Maxim Integrated Products, Inc.,      **ORDER GRANTING IN PART AND**
     Derivative Litigation                       **DENYING IN PART DEFENDANTS'**
12                                               **MOTIONS TO DISMISS; DENYING**
                                                 **PLAINTIFF'S MOTION TO STAY**
13                                               **DISCOVERY**
     _____/
14

15                        **I.  INTRODUCTION**

16          This is a shareholders' derivative action brought on behalf of Nominal Defendant Maxim

17   Integrated Products, Inc. ("Maxim" or the "Company") against current and former officers and

18   directors of the Company (collectively, "Individual Defendants")[1] for, *inter alia*, alleged violations

19   of §§ 10(b), 14(a), and 20(a) of the Securities Exchange Act.  Plaintiffs[2] allege that the Individual

20   Defendants engaged in a scheme to manipulate stock option grant dates so as to maximize profits to

21   themselves at the expense of the Company.

22

23   _____

24          [1]  The Individual Defendants are John F. Gifford, Frederick G. Beck, Carl W. Jasper, Tunc
     Doluca, Pirooz Parvarandeh, Richard C. Hood, Vijaykumar Ullal, Nasrollah Navid, Kenneth
25   Huening, Viktor Zekeriya, Rob B. Georges, Charles G. Rigg, Christopher J. Neil, Edwin Medlin,
     Michael J. Byrd, James R. Bergman, A.R. Frank Wazzan, B. Kipling Hagopian, Alan Hale, Ziya G.
26   Boyacigiller, Parviz Ghaffaripour, William Levin, Robert Scheer, Laszlo Gal, Eric Karros, Sharon
     Smith-Lenox, M.D. Sampels, David M. Timm, Matthew J. Murphy, and Jennifer Gilbert.
27
            [2]  The Lead Plaintiffs are the City of Pontiac Policemen and Firemen's Retirement System,
28   Eugene Horkay, Jr., and Elias Corey.

United States District Court
For the Northern District of California

1    Presently before the Court are Motions to Dismiss by various Defendants and a Motion to

2    Stay Discovery in related state court actions by Plaintiffs. The Court conducted a hearing on

3    February 1, 2008. Based on the papers submitted to date and oral argument, the Court GRANTS in

4    part and DENIES in part Defendants' Motions to Dismiss and DENIES Plaintiffs' Motion to Stay

5    Discovery.

6                                    **II.  BACKGROUND**

7    A.    **Factual Allegations**

8        In a Second Amended Complaint filed on August 31, 2007, Plaintiffs allege as follows:

9           From 1994 through 2006, Defendants backdated stock option grants to coincide with

10    historically and relatively low closing prices of Maxim's common stock. (Corrected Second

11    Amended Verified Consolidated Shareholder Derivative Complaint ¶ 12, hereafter, "SAC,"

12    Docket Item No. 132.) Defendants did not properly account for the compensation expenses

13    associated with these options grants. (<u>Id.</u> ¶ 4.) Defendants issued false and misleading

14    financial statements which misrepresented the true state of Maxim's financial performance.

15    (<u>Id.</u> ¶ 6.)

16           Defendants' illegal and fraudulent options backdating practices were revealed on

17    May 22, 2006, when Merril Lynch published a report concerning the option grants at several

18    semi-conductor companies, including Maxim. (<u>Id.</u> ¶ 171.) The Merrill Lynch report showed

19    that the option grants suspiciously coincided with historical or relative lows in the

20    Company's stock, a result that would not be expected if options grants were not backdated.

21    (SAC, Ex. B, Docket Item No. 137.)

22           After the report was released, the SEC and the United States Attorney for the

23    Northern District of California launched investigations into Maxim's stock option granting

24    practices. (SAC ¶¶ 172-173.) Additionally, Maxim appointed a special committee to

25    conduct an internal investigation into the Company's stock option granting practices. (<u>Id.</u> ¶

26    174.) As a result of the investigation, Maxim did not file its annual or quarterly reports in

27

28                                        2

1  2006. (Id. ¶¶ 174-175.) In January 2007, Maxim announced the results of its investigation.

2  (Id. ¶ 180.) The Special Committee found that grants to officers were properly granted, but

3  that grants to directors and other employees were not properly accounted for. (Id.) Maxim

4  announced that it would restate its results for 2000 through 2006, but that it had not

5  determined by how much. (Id.) On August 30, 2007, Maxim announced that it had not yet

6  determined the amount of its restatement and that it would not file its annual report for 2007.

7  (Id.)

8  On the basis of the allegations outlined above, Plaintiffs allege ten causes of action:

| Cause of Action | Defendants |
| --- | --- |
| (1) Fraud in violation of § 10(b) and Rule 10b-5 of the Securities Exchange Act | Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan |
| (2) Issuance of false proxy statements in violation of § 14(a) of the Securities Exchange Act | Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan |
| (3) Control person liability under § 20(a) of the Securities Exchange Act | Bergman, Byrd, Gifford, Hagopian, Jasper, Karros, Sampels, and Wazzan |
| (4) Accounting | All Defendants |
| (5) Breach of Fiduciary Duty and/or Aiding and Abetting | All Defendants |
| (6) Unjust Enrichment | All Defendants |
| (7) Rescission | All Defendants |
| (8) Insider Selling and Misappropriation | Beck, Bergman, Boyacigiller, Byrd, Doluca, Georges, Ghaffaripour, Gifford, Gilbert, Hagopian, Hale, Hood, Huening, Jasper, Levin, Neil, Parvarandeh, Rigg, Sampels, Scheer, Ullal, Wazzan, and Zekeriya |
| (9) Insider trading in violation of California Corporations Code §§ 25402 and 25502.5 | Beck, Bergman, Boyacigiller, Byrd, Doluca, Georges, Ghaffaripour, Gifford, Gilbert, Hagopian, Hale, Hood, Huening, Jasper, Levin, Neil, Parvarandeh, Rigg, Sampels, Scheer, Ullal, Wazzan, and Zekeriya |
| (10) Breach of Fiduciary Duty in connection with insider trading | Beck, Bergman, Boyacigiller, Byrd, Doluca, Georges, Ghaffaripour, Gifford, Gilbert, Hagopian, Hale, Hood, Huening, Jasper, Levin, Neil, Parvarandeh, Rigg, Sampels, Scheer, Ullal, Wazzan, and Zekeriya |

United States District Court
For the Northern District of California

3

**United States District Court**
For the Northern District of California

**B.**     <u>Stock Option Granting, Dating and Pricing</u>

A stock option granted to an employee of a corporation allows the employee to purchase at some future date a specified number of shares of corporate stock at a specified price, called the "exercise price." If the exercise price is the same as the market price of the stock on the date the option is granted, the option is said to be "at-the-money." Under Generally Accepted Accounting Principles ("GAAP"), a company that grants an option "at-the-money" is not required to record the grants as compensation expenses. On the other hand, if the exercise price of the option is less than the market price of the stock on the date the option is granted, the options is said to be "in-the-money." Under GAAP, the company must record a compensation expense for the "in-the-money" option grant, equal to the difference between the exercise price and the market price of the stock on the date the option is granted. Walter L. Lukken and James A. Overdahl, Financial Product Fundamentals: A Guide for Lawyers § 18:2 (5th ed. 2004).

**C.**     <u>Stock Option Backdating</u>

"Stock option backdating" is a phrase that describes a practice in which the record of the option grant deviates from the actual grant date. A stock option is said to have been "backdated" if it was actually granted on one date, but the option itself is dated and is "recorded" on the books of the company as granted on an earlier date. Backdating a stock option is not necessarily improper. Backdating may be improper, however, if the practice misleads shareholders. For example, if the grant date of a stock option to an employee is backdated to a date when the market price was lower than the market price on the actual grant date, the option would be "in-the-money." If the company does not record and report a compensation expense as required by GAAP, any subsequently issued financial statement would be misleading. <u>See</u> 6 Bromberg & Lowenfels on Securities Fraud § 17:1 (2d ed. 2007).

**D.**     <u>Procedural History</u>

On May 22, 2006, Robert J. Mckinney filed a shareholder derivative action in the Northern District. (<u>See</u> Docket Item No. 1.) On June 1, 2006, the Court related <u>Horkay v. Beck, et al.</u>, C 06-

4

1    03395 RMW to Mckinney's action. (See Docket Item No. 22.) On June 14, 2006, by stipulation of

2    the parties, the Court consolidated the actions. (See Docket Item No. 23.) On August 21, 2006, the

3    Court related City of Pontiac Policemen and Firemen's Retirement System v. Gifford, et al., C 06-

4    03754 JF, and Corey v. Gifford, et al., C 06-03755 RMW to the consolidated action. (See Docket

5    Item No. 43.) On October 25, 2006, the Court consolidated the various actions and appointed

6    Pontiac Retirement System and Eugene Horkay Lead Plaintiffs. (See Docket Item No. 51.)

7          On December 13, 2006, Plaintiffs filed a Consolidated Verified Shareholder Derivative

8    Complaint. (See Docket Item No. 53.) On March 5, 2007, Plaintiffs filed an Amended

9    Consolidated Verified Shareholder Derivative Complaint. (See Docket Item No. 76.) On July 25,

10   2007, the Court dismissed the Amended Complaint with leave to amend. (See Docket Item No.

11   128.) On August 31, 2007, Plaintiffs filed a Second Amended Complaint.

12         Presently before the Court are the following motions:

13   (1)   Maxim's Motion to Dismiss Plaintiffs' Second Amended Complaint, (hereafter,
           "Maxim's Motion," Docket Item No. 144);
14

15   (2)   Defendant John F. Gifford's Motion to Dismiss the Second Amended Complaint,
           (hereafter, "Gifford's Motion," Docket Item No. 146);

16   (3)   Defendant Carl W. Jasper's Motion to Dismiss Plaintiffs' Second Amended
           Complaint, (hereafter, "Jasper's Motion," Docket Item No. 149);
17

18   (4)   Certain Individual Defendants' Motion to Dismiss Plaintiffs' Second Amended
           Complaint, (hereafter, "Individual Defendants' Motion," Docket Item No. 151); and

19   (5)   Plaintiffs' Motion for a Partial Stay of Discovery in Related State Court Proceedings,
           (hereafter, "Plaintiffs' Motion," Docket Item No. 166).
20

21                                    **III.  STANDARDS**

22   A.    **General 12(b)(6)**

23         Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against

24   a defendant for failure to state a claim upon which relief can be granted against that defendant.

25   Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient

26   facts alleged under a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699

27   (9th Cir. 1990); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-534 (9th Cir. 1984).

28                                            5

United States District Court

For the Northern District of California

1  For purposes of evaluating a motion to dismiss, the court "must presume all factual allegations of the

2  complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v.

3  City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). Any existing ambiguities must be resolved

4  in favor of the pleading. Walling v. Beverly Enters., 476 F.2d 393, 396 (9th Cir. 1973).

5  　　　　　However, mere conclusions couched in factual allegations are not sufficient to state a cause

6  of action. Papasan v. Allain, 478 U.S. 265, 286 (1986); see also McGlinchy v. Shell Chem. Co., 845

7  F.2d 802, 810 (9th Cir. 1988). The complaint must plead "enough facts to state a claim for relief

8  that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. __ , 127 S. Ct. 1955, 1974

9  (2007). Courts may dismiss a case without leave to amend if the plaintiff is unable to cure the defect

10  by amendment. Lopez v. Smith, 203 F.3d 1122, 1129 (9th Cir. 2000).

11  **B.    Requirements for Claims Under the Exchange Act**

12  　　　　　Claims brought under Section 10(b) of the Exchange Act and Rule 10b-5 or Section 14(a) of

13  the Exchange Act and Rule 14a-9 must meet the particularity requirements of Federal Rule of Civil

14  Procedure 9(b) which requires that "[i]n all averments of fraud or mistake, the circumstances

15  constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b); see also In re

16  Daou Sys., Inc. Sec. Litig., 411 F.3d 1006, 1014 (9th Cir. 2005); Desaigoudar v. Meyercord, 223

17  F.3d 1020, 1022 (9th Cir. 2000).

18  　　　　　Moreover, these claims must also meet the stringent pleading standards of the Private

19  Securities Litigation Reform Act ("PSLRA") of 1995. The PSLRA amends the Exchange Act to

20  require that a private securities fraud litigation complaint "plead with particularity both falsity and

21  scienter." In re Daou, 411 F.3d at 1014. Specifically, a complaint alleging securities fraud must

22  "specify each statement alleged to have been misleading, the reason or reasons why the statement is

23  misleading, and if an allegation regarding the statement or omission is made on information and

24  belief, the complaint shall state with particularity all facts on which that belief is formed." 15

25  U.S.C. § 78u-4(b)(1); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1085 (9th Cir. 2002). The

26

27

28                                                            6

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1   plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant

2   acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); In re Daou Sys., 411 F.3d at 1014.

3                                    **IV.  DISCUSSION**

4   **A.    Maxim's Motion to Dismiss**

5            Maxim moves to dismiss on the ground that Plaintiffs failed to make a demand on Maxim's

6   Board prior to bringing suit.  (Maxim's Motion at 2.)

7            Pursuant to the Federal Rules of Civil Procedure 23.1 and the corresponding Delaware

8   Chancery Court Rule 23.1, a plaintiff in a shareholders' derivative action must either allege that a

9   pre-suit demand was made upon the company's board of directors to pursue the corporate claim, or

10  allege that a majority of the directors are incapable of making an impartial decision regarding such a

11  claim.  Rales v. Blasband, 634 A.2d 927, 932 (Del. 1993); In re Silicon Graphics Inc. Sec. Litig.,

12  183 F.3d 970, 989 (9th Cir. 1999).

13           The latter method, pursued in this case, requires a plaintiff create a reasonable doubt that:

14  "(1) the directors are disinterested and independent; and (2) the challenged transaction was

15  otherwise the product of a valid exercise of business judgment."  Id. at 930; Aronson v. Lewis, 473

16  A.2d 805, 814 (Del. 1984).  The two prong Aronson test is disjunctive.  "If a derivative plaintiff can

17  demonstrate a reasonable doubt as to the first or second prong of the Aronson test, then he has

18  demonstrated that demand would have been futile."  Seminaris v. Landa, 662 A.2d 1350, 1354 (Del.

19  Ch. 1995).  To satisfy the first prong of the Aronson test, a plaintiff may create a reasonable doubt as

20  to a director's disinterest by alleging particularized facts that the director has a financial interest in

21  the challenged transaction or that the director faces a "substantial likelihood of liability" resulting

22  from it.  Aronson, 473 A.2d at 814; Rales, 634 A.2d at 936.  Alternatively, a plaintiff may create a

23  reasonable doubt as to a director's independence by alleging particularized facts that suggest the

24  director is beholden to an interested director such that his or her "discretion would be sterilized."

25  Aronson, 473 A.2d at 814; Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845

26  A.2d 1040, 1050 (Del. 2004).  To satisfy the second prong of the Aronson test, a plaintiff must show

27

28                                            7

United States District Court
For the Northern District of California

1   that the challenged transaction was not the product of a good faith exercise of the director's business

2   judgment. <u>Aronson</u>, 473 A.2d at 814.

3       However, a court does not analyze demand futility under <u>Aronson</u> when the board did not

4   approve the challenged transaction. For instance, when the board delegates its authority to approve

5   the challenged transaction to a committee under Delaware law, and the committee is comprised of

6   less than a majority of the board, the futility of a pre-lawsuit demand is analyzed under <u>Rales</u>. <u>See,</u>

7   <u>e.g.,</u> <u>Conrad v. Blank</u>, 2007 WL 2593540 at *14 (Del. Ch. 2007). The <u>Rales</u> test excuses demand if

8   the plaintiff creates a reasonable doubt that a majority of the board, at the time the complaint is filed,

9   can exercise "its independent and disinterested business judgment in responding to the demand."

10   <u>Rales</u>, 634 A.2d at 933. Similar to the <u>Aronson</u> test, a director is not considered disinterested if the

11   director "will receive a personal financial benefit from a challenged transaction that is not equally

12   shared by the stockholders." <u>Rales</u>, 634 A.2d at 936. The requisite doubt may also be shown by

13   alleging particularized facts that individual directors will be exposed to a substantial likelihood of

14   liability as a result of the derivative claim. <u>Id.</u>

15       The reasonable doubt requirement forms a "sufficiently flexible and workable" standard,

16   allowing the stockholder to obtain "'the keys to the courthouse' in an appropriate case where the

17   claim is not based on mere suspicions or stated solely in conclusory terms." <u>Beam</u>, 845 A.2d at

18   1050.

19       In this case, the Maxim Board consisted of six directors when the original Complaint was

20   filed: Defendants Gifford, Byrd, Bergman, Wazzan and Hagopian, and non-Defendant Peter de

21   Roeth. (SAC ¶ 227.) After the Complaint was filed, Gifford and Byrd were replaced by Doluca.

22   (<u>Id.</u> ¶ 19.) Thus, the Maxim Board consisted of five directors at the time the Second Amended

23   Complaint was filed.[3] Those Directors were Defendants Doluca, Bergman, Wazzan, and Hagopian

24

25   _____

26      [3] Demand futility is assessed at the time the complaint is filed. <u>Braddock v. Zimmerman</u>, 906 A.2d 776 (Del. 2006). However, if a complaint is dismissed with leave to amend, demand

27   futility must be assessed with regard to the Board in place when the amended complaint is filed. <u>Id.</u>

28                                 8

1  and non-Defendant Peter de Roeth.[4]  However, the majority of the new board was also on the old

2  board.  Three of the directors comprised the Compensation Committee that approved the challenged

3  grants: Bergman, Wazzan, and Hagopian.  (SAC ¶ 55.)  The actions of the Compensation Committee

4  are imputed to the entire Board since the committee consisted of a majority of the Board.

5  See Conrad, 2007 WL 2593540 at *14.  Thus, the Aronson test is appropriate.

6         **1.**      **Stock Options Backdating**

7        Since it affects the demand futility analysis in this case, the Court examines whether

8  Plaintiffs have adequately pleaded occurrences of stock options backdating.  Plaintiffs allege as

9  follows:

10          Beginning in 1994, and continuing through the end of 2006, Defendants received
        stock options, which were backdated so as to be priced below the market price of the
11      underlying stock.  Stock option grants were backdated as follows: four times to or within
        three days of the lowest closing price of a given year; eight times to or within three days of
12      the lowest closing price of a given quarter; and thirteen times to or within three days of the
        lowest closing price of the month.  (SAC ¶ 2.)  In total, at least forty-four of the fifty-seven
13      (more than 77%) option grants totaling more than 19.5 million stock options to Defendants
        between 1994 and 2006, inclusive, were deliberately backdated.  (Id. ¶ 3.)  This scheme was
14      in direct violation of the clear and unambiguous terms and conditions of Maxim's
        shareholder-approved stock option plans by granting stock options with exercise prices that
15      were not equal to the fair market value of Maxim's stock on the date of the grant, or the day
        immediately preceding the date of the grant.  (Id.)
16

17  These allegations state that the price of Maxim's stock on the recorded grant dates was lower than

18  the price on the date that the stock was actually granted.  The Second Amended Complaint goes on

19  to outline the exact dates of each grant and provides charts showing how the grant date provided

20  statistically improbable gains.  (Id. ¶¶ 66-151.)  The Delaware Court of Chancery has approved of

21  the use of a statistical methodology to support an allegation that stock options have been backdated.

22  Ryan, 918 A.2d at 354-55.  Accordingly, the Court finds that these allegations, along with the

23  allegations in the Second Amended Complaint that describe backdating with lesser specificity, are

24  sufficient to allege backdating for purposes of showing demand futility.

25  _____

26      [4] (SAC ¶¶ 19, 227; Maxim's Motion at 4; Maxim Integrated Products, Inc.'s Reply in
    Support of Its Motion to Dismiss Plaintiffs' Second Amended Verified Consolidated Shareholder
27  Derivative Complaint, Docket Item No. 159.)

28                               9

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

2.     **Receipt of Allegedly Backdated Options**

In dispute is whether Plaintiffs' allegations that the Maxim Board's received backdated stock options meet the <u>Aronson</u> test.

The Delaware Court of Chancery has considered whether the receipt of backdated stock creates reasonable doubt as to the disinterestedness of a director.  See <u>Conrad</u>, 2007 WL 2593540. The court found that directors who have received backdated options "have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue their current holdings or cause them to disgorge improperly obtained profits.  This creates an unacceptable conflict that restricts them from evaluating the litigation independently." <u>Id.</u> at *18. Courts in the Northern District of California applying Delaware law have also found that a director would be interested if he or she received backdated stock options.  <u>In re Zoran</u>, 511 F. Supp. 2d 986, 1003  (N.D. Cal. 2007); <u>In re CNET Networks, Inc.</u>, 483 F. Supp. 2d 947, 958 (N.D. Cal. 2007).

Therefore, the Court considers whether a majority of the Maxim Board received backdated stock options.  Plaintiffs allege the following:

> Doluca received approximately 2,230,000 backdated options.  (SAC ¶¶ 70, 88, 90, 93, 95, 99, 106, 120, 126, 135.)  Bergman received 80,000 backdated options representing $14 million in illegal proceeds.  (<u>Id.</u> ¶ 236.)  Wazzan received 56,000 backdated options representing $12 million in illegal proceeds.  (<u>Id.</u> ¶ 239.)  Hagopian received 137,000 backdated options representing $8.6 million in illegal proceeds.  (<u>Id.</u> ¶ 242.)  As members of the Compensation Committee, Bergman, Wazzan, and Hagopian knowingly and deliberately participated in and approved the improper backdating of stock options.  (<u>Id.</u> ¶¶ 234, 237, 240.)  The Board of Directors admitted that such option grants were not properly accounted for.  (<u>Id.</u> ¶ 180.)

Since Plaintiffs have alleged that three of the directors sitting on the Board received backdated options, it is sufficient to create reasonable doubt as to the disinterestedness of these directors under <u>Conrad</u>.  Further, because these directors constitute a majority of the board, the Court finds that Plaintiffs have sufficient pleaded demand futility under the first prong of <u>Aronson</u>.

With respect to the second prong of <u>Aronson</u>, the Court finds that these allegations are also sufficient to plead demand futility.  Generally, under the business judgment rule, directors are presumed to act in the best interests of their company.  See <u>Ryan v. Gifford</u>, 918 A.2d 341, 355-56

10

1  (Del. Ch. 2007).  However, in a parallel state court derivative action, a Delaware court has held that

2  the Individual Defendants in this case were not entitled to that presumption.  Id.  The court held that

3  the Individual Defendants' act of backdating options " . . . cannot meet the test of business

4  judgment."  Id.

5      Accordingly, the Court finds that a demand on the Maxim Board was excused.  Thus,

6  Maxim's motion to dismiss on this ground is DENIED.

7  **B.    Individual Motions**

8      Individual Defendants move to dismiss the Second Amended Complaint on the ground that

9  Plaintiffs have failed to state a claim.  (Gifford's Motion at 1; Jasper's Motion at 1; Individual

10 Defendants' Motion at 1.)  The Court consider the adequacy of the Second Amended Complaint

11 with respect to each cause of action.

12      **1.    First Cause of Action: Fraud in Violation of § 10(b) and Rule 10b-5 of the Securities Exchange Act, Against Defendants Bergman, Byrd, Gifford,**

13      **Hagopian, Karros, Sampels, and Wazzan**

14     To plead a violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b-5,

15 17 C.F.R. § 240.10b-5, a plaintiff must allege that (1) defendants made a material misrepresentation

16 or omission; (2) the misrepresentation was in connection with the purchase or sale of a security; (3)

17 the misrepresentation caused plaintiff's loss; (4) plaintiff relied on the misrepresentation or omission;

18 (5) defendants acted with scienter; and (6) plaintiff suffered damages.  Dura Pharm., Inc. v. Broudo,

19 544 U.S. 336, 341-42 (2005).  Each of these elements must be pleaded as to each defendant.  Id.

20      **a.    Scienter**

21     Primarily in dispute with respect to Plaintiffs' § 10(b) claim is whether it should be

22 dismissed because Plaintiffs have failed to adequately plead scienter.

23     The Supreme Court has defined "scienter" as a "mental state embracing intent to deceive,

24 manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 n.12 (1976).  In the

25 Ninth Circuit, recklessness (as a form of intentional conduct) has long sufficed to establish scienter

26 for § 10(b) purposes.  Nelson v. Serwold, 576 F.2d 1332, 1337 (9th Cir. 1978).

27

28             11

**United States District Court**
For the Northern District of California

1    Congress enacted the PSLRA to "deter opportunistic private plaintiffs from filing abusive

2    securities fraud claims, in part, by raising the pleading standards for private securities fraud

3    plaintiffs." In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 973 (9th Cir. 1999). Post-PSLRA,

4    a plaintiff must allege with particularity facts giving rise to a strong inference that the defendant

5    acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2). At minimum, a plaintiff must plead

6    particular facts giving rise to a strong inference of deliberate recklessness. In re Silicon Graphics,

7    183 F.3d at 979. In determining whether a plaintiff has adequately pleaded scienter, a court must

8    consider whether the totality of the plaintiff's allegations, although individually lacking, gives rise to

9    the "strong inference" required by the PSLRA. Nursing Home Pension Fund, Local 144 v. Oracle

10   Corp., 380 F.3d 1226, 1230 (9th Cir. 2004).

11   Congress did not further define the "strong inference" requirement. The Supreme Court has

12   recently clarified the requirement. To determine whether a plaintiff has alleged facts giving rise to a

13   "strong inference" of scienter, a court must consider both (1) plausible nonculpable explanations for

14   the defendant's conduct; and (2) inferences favoring the plaintiffs. Tellabs, Inc. v. Makor Issues &

15   Rights, Ltd., 551 U.S. ___, 127 S. Ct. 2499, 2510 (2007). Evidence of scienter must be more than

16   merely "reasonable" or "permissible" – it must be "cogent" and "at least as compelling as any

17   opposing inference one could draw from the facts alleged." Id. This is because "[a]n inference of

18   fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the

19   defendant's conduct." Id.

20   In the options backdating context, allegations that a defendant holds a high executive

21   position, without more, do not support a strong inference of scienter. See In re Ditech Networks,

22   Inc. Derivative Litigation, 2007 WL 2070300 *6 (N.D. Cal. 2007); In re Zoran, 511 F. Supp. 2d at

23   1013. On the other hand, allegations that the defendant signed false financial documents, approved

24   options grants, oversaw the options granting process, or was intimately involved in deciding when

25   and to whom options would be granted may support a strong inference of scienter. Id.

26

27

28                                               12

United States District Court

For the Northern District of California

1    The Court considers the adequacy of Plaintiffs' scienter allegations against each Defendant

2    in turn.

3                       **i.     Allegations Against Defendant Gifford**

4    Against Defendant Gifford, the Complaint alleges as follows:

5        Gifford co-founded Maxim in 1983 and served as President, CEO, and Chairman of
     the Board from 1983 until 2006. (Id. ¶ 15.) As a director, Gifford approved and received
6    some of the backdated stock options at issue in this case. (SAC ¶ 34.) Gifford falsely
     represented that Maxim's options were granted at fair market value on the date of the grant.
7    (Id. ¶ 34.) Gifford assisted in the preparation of Maxim's false annual reports from 1994
     through 2006 and prepared, reviewed and approved the false proxy statements that were
8    distributed from 1994-2006. (Id. ¶¶ 34, 156, 165-167, 169.) Gifford signed false financial
     statements from 1994-2006 which materially misstated Maxim's compensation expenses and
9    net income. (Id. ¶¶ 34, 161.) Gifford signed certifications, as required under the Sarbanes
     Oxley Act, stating that Maxim's SEC filings "fairly present[], in all material respects, the
10   financial condition and results of operations of the Company at the dates and for the periods
     indicated." (Id. ¶ 164.)
11       Gifford received 10,502,233 options representing more than $229 million in illegal
     proceeds. (Id. ¶ 228.) Many of the options Gifford received were granted when Maxim's
12   stock was at a historical or relative low. (Id. ¶¶ 2, 67.) On May 26, 2006, the financial firm
     Merrill Lynch published an analysis of the timing of stock option grants at various
13   semiconductor companies, including Maxim. (Id. ¶ 66.) The Merrill Lynch report noted that
     the stock option grants at Maxim were remarkably well timed to yield significantly better
14   returns than the company's overall annual return. (Id.)

15   Defendant Gifford's position as Chairman and CEO gives rise to an inference that he was

16   involved in backdating activity because he was in control of the Company during the time in which

17   backdating took place. However, Defendant Gifford's position standing alone does not give rise to a

18   strong inference of scienter. This is because, in the absence of facts suggesting Defendant Gifford

19   knew or was reckless in not knowing that backdating was taking place at the Company, the opposing

20   inference, that he was unaware of the backdating, is equally strong.

21       To bolster the inference of scienter, Plaintiffs further allege that Defendant Gifford himself

22   participated in preparing, reviewing, approving, and signing false financial reports and proxy

23   statements. Considered in light of the allegations that significant number of grants which were made

24   at historical and relative low points in Maxim's stock, these allegations do give rise to a strong

25   inference that Defendant Gifford was at least reckless in not knowing that the options were

26   backdated. This inference is at least as strong as any opposing inferences. Accordingly, the Court

27

28                                              13

1    finds that the Complaint adequately pleads scienter against Defendant Gifford with respect to

2    Plaintiffs' § 10(b) claim.

ii.    **Allegations Against Defendants Bergman, Wazzan, and Hagopian**

3

4    Against Defendants Bergman, Wazzan, and Hagopian, the Complaint alleges as follows:

5    Bergman, Wazzan, and Hagopian served on the compensation committee.  (SAC ¶
     68.)  As members of the compensation committee, they had sole authority to determine the
6    recipient, quantity, and date of the backdated options.  (Id. ¶¶ 68-151.)  They intentionally
     altered the grant dates to maximize returns while fraudulently accounting for the expenses.
7    (Id.)

8    Defendants Bergman, Wazzan, and Hagopian's membership on the compensation committee

9    put them in a position to directly oversee the option granting practices of the Company.  Allegations

10   regarding their positions, in combination with the Company's admission that option grants were not

11   properly dated, strongly suggests that they were at least reckless in not knowing about the

12   backdating.  Accordingly, the Court finds that the Complaint adequately pleads scienter against

13   Defendants Bergman, Wazzan, and Hagopian.

iii.    **Allegations Against Defendants Byrd, Karros, and Sampels**

14

15   Against Defendants Byrd, Karros, and Sampels, the Complaint alleges that as directors of

16   Maxim, they approved backdated options and prepared false financial and proxy statements.  (SAC

17   ¶¶ 34, 156.)  However, these allegations are broad and non-specific.  Since these allegations are

18   general and lack specificity, they do not give rise to a strong inference that Defendants Byrd, Karros,

19   or Sampels knew the options were backdated when they approved them or knew that the financial

20   statements were false when they signed them.  Accordingly, the Court finds that the Complaint does

21   not adequately plead scienter against Defendants Byrd, Karros, and Sampels.

b.    **Material Misrepresentation**

22

23   In dispute is whether Plaintiffs' § 10(b) claim should be dismissed because Plaintiffs have

24   failed to adequately plead a material misrepresentation or omission.

25   "[S]ubstantial participation or intricate involvement in the preparation of fraudulent

26   statements is grounds for primary liability even though that participation might not lead to the actor's

27

28                                                    14

1    actual making of the statements." Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 n.5 (9th Cir.

2    2000). A director who signs a financial disclosure may be held liable for any misrepresentations in

3    the disclosure. Id.

4         In this case, the Complaint alleges that the financial reports and proxy statements issued

5    during the relevant time period contained misrepresentations or omissions because they incorrectly

6    representation that the Company was not engaged in backdating and that it had not incurred

7    expenses from its options granting practices. (SAC ¶ 6, 174.) These representations were later

8    shown to be false when the Company announced that it would restate its financials. (SAC ¶ 180.)

9    The misrepresentations were material because any restatement would cause a substantial charge to

10   the Company resulting from its option granting practices. Since the Individual Defendants signed

11   the financial reports and proxy statements at issue, they may be held liable under § 10(b) for any

12   misrepresentations in them. Accordingly, the Court finds that the Complaint adequately pleads that

13   Defendants Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan made material

14   misrepresentations.

15             **c.    Reliance and Transaction Causation**

16        In dispute is whether Plaintiffs' § 10(b) claim should be dismissed because Plaintiffs have

17   failed to adequately plead reliance.

18        To plead a derivative § 10(b) claim, reliance must be pleaded on behalf of the company, not

19   on behalf of the plaintiff stockholders. In re Zoran, 511 F. Supp. 2d at 1011. Reliance is often

20   equated with transaction causation. Dura, 544 U.S. at 341, 342. Transaction causation requires an

21   allegation that but for the deceptive act, the injured would not have entered into the securities

22   transaction. Binder v. Gillespie, 184 F.3d 1059, 1065-66 (9th Cir. 1999). In the context of a

23   derivative stock options backdating case, it is sufficient to allege the company provided the shares in

24   exchange for the artificially low prices set by defendant directors. In re Zoran, 511 F. Supp. 2d at

25   1012.

26

27

28                                        15

United States District Court
For the Northern District of California

1      Plaintiffs allege transaction causation as follows:

2      Bergman, Hagopian, and Wazzan violated the terms of the Stock Plans, APB 25 and Section
3      162(m) and exceeded the Maxim shareholders' grant of express authority to grant Maxim
     stock options at specific exercise prices by backdating grants of stock options to make it
     appear as though the grants were made on dates when the market price of Maxim stock was
4      lower than the market price on the actual grant dates. (SAC ¶¶ 63, 151.) Bergman,
     Hagopian, and Wazzan did this with the knowledge and approval of the other members of the
5      Board, including Gifford, Sampels, Byrd, and Karros. (Id. ¶ 63.) In this way, Defendants
     profited immediately upon the award of the options without doing anything to improve the
6      Company's business or financial condition. (Id. ¶ 5.)

7 These allegations essentially state that, but for Defendants Bergman, Hagopian, and Wazzan's

8 actions to "make it appear" that grants were properly made (when in fact the grants were made on

9 days when the market price of the stock granted was lower than the market price on the day the

10 stock was actually granted), the Company would not have made the grants in question. These

11 actions caused the Company to incur a compensation expense without the expense being disclosed

12 to the Company, which allowed Defendants to profit without improving the Company's financial

13 condition. In fact, the Company later incurred a charge as a result of the undisclosed backdating.

14 The allegations include Defendants Gifford, Sampels, Byrd, and Karros as being complicit in

15 Defendants Bergman, Hagopian, and Wazzan's actions. Accordingly, the Court finds that the

16 Complaint adequately pleads transaction causation as to Defendants Bergman, Byrd, Gifford,

17 Hagopian, Karros, Sampels, and Wazzan.

18           **d.    Loss Causation**

19      The parties also dispute whether Plaintiffs' § 10(b) claim should be dismissed because

20 Plaintiffs have failed to adequately plead loss causation.

21      To plead loss causation, a plaintiff must allege a causal connection between a defendant's

22 material misrepresentation and the loss. 15 U.S.C. § 78u-4(b)(4); Dura, 544 U.S. at 341; Lentell v.

23 Merrill Lynch & Co., 396 F.3d 161, 173 (2nd Cir. 2005). The plaintiff "must allege . . . that the

24 *subject* of the fraudulent statement or omission was the cause of the actual loss." Lentell, 396 F.3d

25 at 173 (quoting Suez Equity Investors, L.P. v. Toronto Dominion Bank, 250 F.3d 87, 95 (2nd Cir.

26 2001) (emphasis in original)).

27

28                 16

*United States District Court*
For the Northern District of California

1    While it appears that a plaintiff's allegations of loss causation need only meet the pleading

2  requirements of Rule 8(a)(2), the allegations must still provide the defendant fair notice of the

3  grounds upon which the plaintiff's claim rests.  <u>Dura</u>, 544 U.S. at 347.

4    With respect to the issue of loss causation, Plaintiffs allege as follows:

5      As a direct and proximate result of Defendants Bergman, Byrd, Gifford, Hagopian, Karros,
       Sampels, and Wazzan's breaches of fiduciary duties, the Company has sustained millions of
6      dollars in damages, including, but not limited to, the additional compensation expenses and
       tax liabilities the Company will be required to incur, the loss of funds paid to the Company
7      upon the exercise of stock options resulting from the difference between the fair market
       value of the stock option on the true date of grant and the price that was actually paid as a
8      result of the backdated stock option grant, and costs and expenses incurred in connection
       with the Company's internal investigation and restatement of historical financial statements
9      and the SEC investigation of the Company.  (SAC ¶¶ 220, 252, 272.)

10  These allegations directly state that the backdating of stocks by Defendants Bergman, Byrd, Gifford,

11  Hagopian, Karros, Sampels, and Wazzan caused the Company to suffer losses in the form of the

12  receipt of less money when the stocks are exercised, costs of the Company's internal investigation,

13  and tax liabilities and expenses resulting from a restatement.  These allegations provide fair notice of

14  Plaintiffs' theory to Defendants and sufficient to allege loss causation under Rule 8.  Accordingly,

15  the Court finds that the Complaint adequately pleads loss causation as to Defendants Bergman,

16  Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan.

17    In sum, the Court GRANTS in part and DENIES in part Defendants' motions to dismiss

18  Plaintiffs' § 10(b) claim.  The Court DENIES Gifford's motion, DENIES the Individual Defendants'

19  motion as to Defendants Bergman, Wazzan, and Hagopian, and GRANTS the Individual

20  Defendants' motion as to Defendants Byrd, Karros, and Sampels on the issue of scienter.

21    **2.    Second Cause of Action: Issuance of False Proxy Statements in Violation of §
          14(a) of the Securities Exchange Act, Against Defendants Bergman, Byrd,**
22        **Gifford, Hagopian, Karros, Sampels, and Wazzan**

23    Section 14(a) of the Securities Exchange Act makes it unlawful to solicit shareholder

24  approval by use of a proxy statement that does not comply with the rules and regulations of the

25  Securities Exchange Commission.  15 U.S.C. § 78n.  Regulation 14a-9 prohibits proxy statements

26

27

28                                                17

1  that are false or misleading with regard to any material facts at the time they are issued and in light

2  of the circumstances under which they are made.  17 C.F.R. § 240.14a-9.

3         To state a claim under § 14(a), a plaintiff must allege that a material misrepresentation or

4  omission in a proxy statement was made with the requisite state of mind; and that the proxy

5  statement was the transactional cause of harm of which plaintiff complains.  See Mills v. Electric

6  Auto-Lite Co., 396 U.S. 375, 384 (1970).  "An omitted fact or misrepresentation in a proxy

7  statement is material when there is a substantial likelihood that a reasonable shareholder would

8  consider it important in deciding how to vote."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438,

9  449 (1976).  The required state of mind for a § 14(a) violation is that of negligence.  See In re Zoran,

10  511 F. Supp. 2d at 1015.  A plaintiff must also allege that the statement "was an essential link in the

11  accomplishment of the proposed transaction."  Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th

12  Cir. 2000).  To the extent the § 14(a) claim sounds in fraud, it must be pleaded with particularity in

13  accordance with the PSLRA.  Id.

14         Plaintiffs' § 14(a) claim depends on many of the same representations which were at issue in

15  their § 10(b) claim.  The Court has found that Plaintiffs have adequately alleged that these

16  representations were false, and caused the Company to incur a loss.  While the Court has also found

17  these alleged misrepresentations were material for purposes of Plaintiffs' § 10(b) claim, it remains to

18  be determined whether they were material in the context of a § 14(a) claim.

19         In addition to the alleged misrepresentations stated in Plaintiffs' § 10(b) claim, the

20  Complaint alleges that Defendant Gifford, Bergman, Wazzan, Hagopian, Byrd, Sampels, and Karros

21  issued proxy statements requesting votes for their election as directors and for approval of various

22  Stock Plans.  (SAC ¶¶ 167, 169.)  These proxy statements are allegedly false and misleading because

23  they did not disclose the true compensation Defendants had received or that Defendants were not

24  complying with previous stock plans.  (Id.)

25         With respect to whether the misrepresentations or omissions in the proxy statements affected

26  the outcome of the vote, the Complaint alleges as follows:

27

28                                                    18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The proxy statements concerned the election of directors and the approval of stock plans. (SAC ¶ 166.) Had the shareholders known that the directors were illegally diverting company assets to themselves by backdating options, the shareholders would not have voted for them or approved the stock option plans. (Id. ¶ 257.) The backdating caused harm to the company in the form of additional, unreported compensation expenses and altered tax liability. (Id. ¶ 4.)

As directors, Defendants Byrd, Karros, Sampels, Gifford, Bergman, Wazzan, and Hagopian had a duty to exercise reasonable care in ensuring that Maxim complied with state and federal laws. Taking Plaintiffs allegations as true, namely, that the directors issued false and misleading proxy statements, then they would have breached their duty of care.

The Court finds Plaintiffs have sufficiently alleged that the misrepresentations in the proxy statements caused the shareholders to grant proxies they would not have otherwise. Thus, as alleged, Defendants were at least negligent in preparing the proxy statements and that this negligence was an essential link in accomplishing further backdating transactions which harmed the Company. Accordingly, the Court DENIES Defendants' motions to dismiss the § 14(a) claims.

3.      **Third Cause of Action: Control Person Liability Under § 20(a) of the Securities Exchange Act, Against Defendants Bergman, Byrd, Gifford, Hagopian, Jasper, Karros, Sampels, and Wazzan**

Under § 20(a) of the Exchange Act, any person who controls a person liable for violating § 10(b) is jointly and severally liable for the violation. 15 U.S.C. § 78t(a). In the Ninth Circuit, to state a claim for control person liability, a plaintiff must allege that: "(1) the defendant had the power to influence or control the primary violator and (2) the defendant actively used this influence or control so as to be a 'culpable participant' in the primary violation." Knollenberg v. Harmonic, Inc., 152 Fed. Appx. 674, 685 (9th Cir. 2005); see also Howard v. Everex Sys., 228 F.3d 1057, 1065 (9th Cir. 2000). A plaintiff must allege more than the defendant's position and committee membership. In re GlenFed Securities Litig., 60 F.3d 591, 593 (9th Cir. 1995). "A director is not automatically liable as a controlling person. There must be some showing of actual participation in the corporation's operation or some influence before the consequences of control may be imposed." Burgess v. Premier Corp., 727 F.2d 826, 832 (9th Cir. 1984).

19

1    In a direct action, a control person claim may be stated by alleging that the corporation was a

2    primary violator and that the directors or officers controlled the corporation.  Howard, 228 F.3d at

3    1065.  Unlike a direct action, a derivative action is brought on behalf of the corporation, which

4    means that the corporation cannot be a primary violator for control person purposes.  In re Verisign

5    Inc., Deriv. Litig., 2007 WL 2705221 *37 (N.D. Cal. 2007).

6    In this case, the Complaint alleges that Defendants Bergman, Byrd, Gifford, Hagopian,

7    Jasper, Karros, Sampels, and Wazzan exercised their power and influence "to cause the Company to

8    engage in the illegal conduct and practices complained of herein."  (Id. ¶ 260.)  Since this is a

9    derivative action, the company cannot be the primary violator.  The Court finds that the Complaint

10    fails to identify the primary violator over whom these Defendants exercised control  Accordingly,

11    the Court GRANTS Defendants' motions to dismiss Plaintiffs' § 20(a) claim.

12    **4.    Fourth Cause of Action: Accounting, Against All Defendants**

13    An accounting is an equitable remedy which allows the court to determine the extent of a

14    misallocation of expenses and the damages resulting therefrom when there is fiduciary relationship

15    between the parties.  See Carlson v. Hallinan, 925 A.2d 506, 538 n.211-12 (Del. Ch. 2006).  Since

16    officers and directors are fiduciaries of a corporation, the duties they owe with respect to the

17    exercise of their legal power over corporate property supervene their legal rights.  McMahon v. New

18    Castle Associates, 532 A.2d 601, 604 -605 (Del. Ch. 1987).  Therefore, they may be required to

19    account for their stewardship over corporate property.  Id.

20    Here, the Complaint alleges that Defendants Bergman, Byrd, Gifford, Hagopian, Karros,

21    Sampels, and Wazzan, as Directors, Jasper and Hale, as Chief Financial Officers at various times,

22    and Smith-Lenox, as Principal Accounting Officer, were in positions of control over the Company's

23    property, in particular, its stock.  Since the officers and directors are fiduciaries of the Company,

24    they may be held to account for their stewardship of such assets.

25    The remaining Defendants, however, are not alleged to have had any operational control over

26    the Company's stock or any duty to manage or oversee the granting of options.  The allegations

27

28                                    20

1    against these Defendants is that they served in various executive positions, received backdated

2    options, and sold their shares.  Thus, these allegations do not support a finding that Defendants had

3    any fiduciary duties related to the alleged wrongdoing.  Further, there is no allegation that Maxim's

4    accounts are so complex that Plaintiffs' other legal claims against these Defendants would be

5    inadequate.

6           Accordingly, the Court GRANTS in part and DENIES in part Defendants' motions to

7    dismiss the accounting claim.  The Court DENIES Defendants Gifford and Jasper's motions to

8    dismiss, DENIES the Individual Defendants' motion to dismiss with respect to Bergmen, Byrd,

9    Hagopian, Karros, Sampels, Wazzan, Hale, and Smith-Lenox, and GRANTS the Individual

10   Defendants' motion to dismiss with respect to all other Defendants.

11   **5.      Fifth Cause of Action: Breach of Fiduciary Duty and/or Aiding and Abetting,
               Against All Defendants**

12          Under Delaware law, "[i]t is well established that the directors of a Delaware corporation

13   have a fiduciary relationship with the corporation they serve and its stockholders.  Arnold v. Society

14   for Sav. Bancorp, Inc., 678 A.2d 533, 539 (Del. Supr. 1996).  Allegations that a fiduciary of a

15   corporation acted intentionally, in bad faith, or for personal gain in dealing with the corporation are

16   sufficient to plead breach of a fiduciary duty.  Ryan, 918 A.2d at 357.  A valid claim for aiding and

17   abetting a breach of fiduciary duty requires: "(1) the existence of a fiduciary relationship, (2) the

18   fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a

19   breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the

20   non-fiduciary."  Jackson Nat. Life Ins. Co. v. Kennedy, 741 A.2d 377, 386 (Del. Ch. 1999).  Under

21   the business judgment rule, the plaintiff must show that the fiduciary "act[ed] in a manner that

22   cannot be attributed to a rational business purpose or reach[ed] [a] decision by a grossly negligent

23   process that include[d] the failure to consider all material facts reasonably available."  See Brehm v.

24   Eisner, 746 A.2d 244, 264 n. 66 (Del. 2000).  Intentional violation of a shareholder approved stock

25   option plan along with fraudulent disclosures regarding purported compliance with that plan are

26

27

28                                                   21

1    sufficient to allege bad faith in breach of the fiduciary duty of loyalty and to rebut the business

2    judgment rule. <u>Ryan</u>, 918 A.2d at 357-58.

3         Here, as directors, Defendants Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and

4    Wazzan had fiduciary duties to ensure the Company's stock options were properly granted and

5    accounted for.  The Complaint alleges that these duties were breached by granting backdated options

6    in contravention of the language of the plans under which the grants were made and failing to record

7    the additional compensation expenses.  (SAC ¶¶ 2, 3, 58, 62.)  Defendants Jasper and Hale, who

8    each served as Chief Financial Officer, are Defendants that allegedly knowingly participated in this

9    breach.  (<u>Id.</u> ¶¶ 16, 20, 164.)  Thus, the Court finds that the Complaint adequately alleges breach of

10   fiduciary duty or aiding and abetting breach of fiduciary duty as to Defendants Bergman, Byrd,

11   Gifford, Hagopian, Karros, Sampels, Wazzan, Jasper and Hale.

12        With respect to all other Defendants, however, the only allegations as to their breach of

13   fiduciary duty are that they received backdated stock options.  At oral argument, counsel for

14   Plaintiffs contended that these Defendants should have known the options were backdated because

15   they received the grants after the purported grant date.  However, the Complaint does not contain

16   such allegations.  Further, even if Plaintiffs' proposition is true, Plaintiffs have not identified any

17   action taken by the grant recipients that would constitute knowing participation in the breach.  Thus,

18   the Court finds that the Complaint does not adequately allege aiding and abetting against these

19   Defendants.

20        Accordingly, the Court GRANTS in part and DENIES in part Defendants' motions to

21   dismiss the breach of fiduciary duty and aiding and abetting claim.  The Court DENIES Defendants

22   Gifford and Jasper's motions to dismiss, DENIES the Individual Defendants' motion to dismiss as to

23   Defendants Bergman, Byrd, Hagopian, Karros, Sampels, Wazzan, and Hale, and GRANTS the

24   Individual Defendants' motion to dismiss as to the other Defendants.

25

26

27

28                                              22

United States District Court
For the Northern District of California

1    **6.    Sixth Cause of Action: Unjust Enrichment, Against All Defendants**

2          Under Delaware law, "unjust enrichment is the unjust retention of a benefit to the loss of

3    another, or the retention of money or property of another against the fundamental principles of

4    justice or equity and good conscience." <u>Ryan</u>, 918 A.2d at 361.  "A defendant may be liable even

5    when the defendant retaining the benefit is not a wrongdoer and even though he may have received

6    it honestly in the first instance."  <u>Id.</u>  The elements of unjust enrichment are: (1) an enrichment, (2)

7    an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of

8    justification and (5) the absence of a remedy provided by law.  <u>Jackson Nat'l. Life Ins. Co.</u>, 741

9    A.2d at 393.

10         The Complaint alleges that each Defendant received backdated "in-the-money" options.

11   (SAC ¶¶ 2, 68-151.)  The Company suffered an impoverishment by granting these backdated options

12   because such options grants were not properly accounted for as a compensation expense.

13   Defendants receiving the backdated options were enriched because they received an option to buy

14   stock at a price lower than its market value on the date of the grant.  The Court finds these

15   allegations are sufficient to state a claim for unjust enrichment at the pleading stage.  Accordingly,

16   the Court DENIES Defendants' motions to dismiss the unjust enrichment claim.

17         **7.    Seventh Cause of Action: Rescission, against all Defendants**

18         Under Delaware law, rescission is a remedy that restores a plaintiff to his original condition

19   by awarding money or other property of which he had been deprived or annulling and setting aside

20   an agreement or document that affects his rights and liabilities.  <u>Alejandro and Reinholz v. Hornung</u>,

21   1992 WL 200608 (Del. Ch. 1992).  Fraud is an adequate grounds on which to plead a claim for

22   rescission.  <u>Kern v. NCD Indus., Inc.</u>, 316 A.2d 576, 582 (Del. Ct. Ch. 1973).

23         Plaintiffs allege that the options granted to Defendants were the result of fraud, deceit, and

24   abuse of control and that they are invalid because they were not issued in accordance with the terms

25   of the stock plans.  (SAC ¶¶ 68-151, 277.)  The stock option plans at issue only authorized the grant

26   of options if the exercise price of the stock is equal to its fair market value on the date of the grant.

27

28                                        23

United States District Court

For the Northern District of California

1    If the options received by Defendants were backdated in such a way as to make them "in-the-

2    money," then they were not granted in accordance with the plan.  Since rescission of such grants

3    may be warranted, the Court finds that Plaintiffs have adequately pleaded their claim for recision as

4    against all Defendants.  Accordingly, the Court DENIES Defendants' motions to dismiss the

5    rescission claim.

6    **8.    Eighth, Ninth, and Tenth Causes of Action: Insider Trading and Breach of
         Fiduciary Duty in Connection with Insider Trading, Against Defendants Beck,**

7    **Bergman, Boyacigiller, Byrd, Doluca, Georges, Ghaffaripour, Gifford, Gilbert,
         Hagopian, Hale, Hood, Huening, Jasper, Levin, Neil, Parvarandeh, Rigg,**

8    **Sampels, Scheer, Ullal, Wazzan, and Zekeriya**

9    California law provides:[5]

10   It is unlawful for an issuer or any person who is an officer, director or controlling person of
         an issuer  . . . to purchase or sell any security of the issuer in this state at a time when he

11   knows material information about the issuer gained from such relationship which would
         significantly affect the market price of that security and which is not generally available to

12   the public, and which he knows is not intended to be so available, unless he has reason to
         believe that the person selling to or buying from him is also in possession of the information.

13   Cal. Corp. Code § 25402.  A plaintiff may bring a California insider trading claim against

14   individuals who traded on insider information in California even if the corporation is incorporated in

15   Delaware.  See In re Verisign, 2007 WL 2705221 at *45.  Since insider trading is a claim that

16   sounds in fraud, it must be pleaded with particularity.  Id.; Fed. R. Civ. P. 9(b).

17       The Complaint alleges that Defendants Beck, Bergman, Boyacigiller, Byrd, Doluca,

18   Georges, Ghaffaripour, Gifford, Gilbert, Hagopian, Hale, Hood, Huening, Jasper, Levin, Neil,

19   Parvarandeh, Rigg, Sampels, Scheer, Ullal, Wazzan, and Zekeriya participated in the options

20   backdating, and therefore knew that Maxim was not properly accounting for the expenses associated

21   with the option grants.  (SAC ¶ 228.)  Consequently, they knew the Company's net income was

22   overstated.  (SAC ¶¶ 280, 291.)  The Complaint further alleges that these Defendants exercised their

23

24

25

---

26   [5] California, rather than Delaware law, governs insider trading "within the state."  Cal. Corp.
     Code § 25402.

27

28                                                24

1  backdated options and then sold those shares at the market price of Maxim stock based, at least in

2  part, on this knowledge.  (Id. ¶¶ 188-191.)

3      As noted above, the Complaint alleges fact which support a strong inference that Defendants

4  Gifford, Bergman, Byrd, Hagopian, Hale, Jasper, and Wazzan conducted themselves with the intent

5  to deceive, manipulate, or defraud.  The sum of these allegations is sufficient to state claims for

6  insider trading against Defendants Gifford, Bergman, Byrd, Hagopian, Hale, Jasper, and Wazzan.

7  However, as also noted above, the Complaint does not allege facts that support a reasonable

8  inference that the remaining Defendants knew about the alleged backdating.  Since these Defendants

9  could not have made improper trades on knowledge that they did not have, the Court finds that

10  Plaintiffs have failed to sufficiently plead insider trading claims against them.

11      Accordingly, the Court GRANTS in part and DENIES in part Defendants' motions to

12  dismiss the insider trading claims.  The Court DENIES Defendants Gifford and Jasper's motions to

13  dismiss, DENIES the Individual Defendants' motion to dismiss as to Defendants Bergman, Byrd,

14  Hale, Hagopian, and Wazzan, and GRANTS the Individual Defendants' motion to dismiss as to the

15  remaining Defendants.

16  **C.    Statutes of Limitations**

17      In dispute is whether Plaintiffs' claims are time barred.

18      If the expiration of the applicable statute of limitations is apparent from the face of the

19  complaint, the defendant may raise a statute of limitations defense in a Rule 12(b)(6) motion to

20  dismiss.  Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir. 1980).  This is true even though

21  expiration of the limitations period is an affirmative defense because Federal Rule of Civil

22  Procedure Rule 9(f) "makes averments of time and place material for the purposes of testing the

23  sufficiency of a complaint."  Suckow Borax Mines Consol. v. Borax Consol., 185 F.2d 196, 204 (9th

24  Cir. 1950).

25

26

27

28                                    25

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1    **1.    Violation of § 10(b) of the Exchange Act**

2    Under the Sarbanes-Oxley Act of 2002, the statute of limitations for a claim brought under §

3    10(b) is two years from the discovery of facts constituting the violation but no more than five years

4    from the date of the violation. 28 U.S.C. 1658(b)(1)(2).[6] The two-year statute of limitations is not

5    subject to equitable tolling. See Durning v. Citibank, Int'l, 990 F.2d 1133, 1136-37 (9th Cir. 1993).

6    The five-year outer limitations period in a § 10(b) claim serves as a statute of repose[7] in lieu of

7    equitable tolling. See Lampf, 501 U.S. at 363 (construing the former statute, which imposed a one

8    and three-year limitation).

9    In a § 10(b) claim proceeding under a theory that a loss is linked to the making of a false

10    representation, a plaintiff must show reliance on either: (1) an untrue statement of material fact; or

11    (2) a material omission by one who had a duty to disclose. See 17 C.F.R. § 240.10b-5(b). Such a

12    violation is considered to have occurred on the date that the false representation was made, not the

13    date of the conduct which gave rise the representation. See Lampf, 501 U.S. at 364; In re Prudential

14    Ins. Co. of Am. Sales Practices Litig., 975 F. Supp. 584, 605 (D.N.J. 1996).

15    Since this is a derivative action, the two-year statute of limitations period begins to run on

16    one of the following two dates: (1) the date the corporation had actual notice that the representation

17    was false; or (2) the date the corporation, with some form of reasonable diligence, would have been

18    placed on inquiry notice. See Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940,

19    951 (9th Cir. 2005). However, the five-year statute of limitations period begins to run on the date of

20    the false representation. See Lampf, 501 U.S. at 364; In re Prudential, 975 F. Supp. at 605. Each

21    false representation may constitute a separate violation of § 10(b); the five-year period begins to run

22    with respect to each violation when it occurs. In re Zoran, 511 F. Supp. 2d at 1014. There can be no

23

24    ───────────

25    [6]  In 2002, Congress passed the Sarbanes-Oxley Act extending the statute of limitations for §
10(b) actions. Pub.L. No. 107-204, 116 Stat. 745 (2002), codified in part at 28 U.S.C. § 1658(b).

26    [7]  "A statute of repose is a fixed, statutory cutoff date, usually independent of any variable,
such as claimant's awareness of a violation." Munoz v. Ashcroft, 339 F.3d 950, 957 (9th Cir. 2003)

27    (citing Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363 (1991)).

28                                        26

United States District Court

For the Northern District of California

1  recovery for reliance on representations made prior to the five-year statute of limitations period

2  under a theory of continuing wrong.  Id.

3        This case involves allegedly secret backdating practices, which the Company could not have

4  discovered from its directors and officers, since they were the ones that concealed the wrongdoing.

5  Therefore, the two-year statute of limitations period did not start to run until these practices were

6  allegedly revealed.[8]  On May 22, 2006, Merrill Lynch published an analysis of the timing of stock

7  option grants, and noted the abnormal returns on Maxim stock option grants.  (SAC ¶ 66.)  The

8  Mckinney action against Juniper was filed on May 22, 2006, which was the same day that Merrill

9  Lynch published its analysis.  (See Docket Item No. 1.)  Accordingly, the Court finds that the two-

10 year statute of limitations does not bar any part of Plaintiffs' § 10(b) claim.  However, since the five-

11 year statute of limitations period began on May 22, 2001, the Court finds that Plaintiffs' § 10(b)

12 claim may not be based on any allegedly false statements made prior to that date.

13        2.        Violation of § 14(a) of the Exchange Act

14        Section 14(a) creates a cause of action for injury arising from the filing of a fraudulent proxy

15 statement.  15 U.S.C. § 78n(a).  For § 14(a) claims, the statute of limitations is one year from the

16 discovery of facts constituting the violation but no more than three years from the date of the

17 violation.  See Lampf, 501 U.S. at 363; Ceres Partners v. GEL Associates, 918 F.2d 349, 362-63 (2d

18 Cir. 1990).  The extended limitations period under Sarbanes-Oxley does not apply to § 14(a) claims

19 because, unlike § 10(b) claims, § 14(a) claims do not require scienter or a showing of fraudulent

20 intent.  See In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 196-97 (S.D.N.Y. 2003).

21        For similar reasons to those set forth with respect to Plaintiffs' § 10(b) claims, the Court

22 finds that the three-year statute of limitations bars Plaintiffs' § 14(a) claims to the extent they are

23 based on false proxy statements filed with the SEC before May 22, 2003.

24

25

26 _____

27    [8]  See In re Zoran, 511 F. Supp. 2d at 1014 (finding that secret backdating inside a company cannot be reasonably detected, so the two-year statute of limitations does not apply).

28                                                    27

United States District Court
For the Northern District of California

### 3. Accounting, Breach of Fiduciary Duty and Aiding and Abetting, Unjust Enrichment, and Rescission

Under Delaware law, a three year statute of limitations applies to claims for accounting, breach of fiduciary duty, unjust enrichment, and rescission.[9] However, the limitations period may be tolled when: (1) concealment of fraud prevents discovery of the injury, <u>Mastellone v. Argo Oil Corp.</u>, 82 A.2d 379, 383 (Del. 1951); (2) "the facts of the underlying claim [are] so hidden that a reasonable plaintiff could not timely discover them," <u>Forsythe</u>, 2007 WL 2982247 at *14; or (3) "corporate officers or directors are charged with having personally profited from a breach of fiduciary duty involving fraudulent self-dealing." <u>Strougo v. Carroll</u>, 1991 WL 9978 at *3 (Del. Ch. 1991).

Plaintiffs allege that Defendants concealed their wrongful conduct through false financial statements. (SAC ¶ 156.) Plaintiffs further allege that the wrongful acts were discovered when Merril Lynch published its report on May 22, 2006. (SAC ¶ 171.) Although the data on which Merril Lynch based its analysis were publicly available prior to May 2006, the Company would not be expected to conduct such analysis without some indication of wrongdoing. Thus, the limitations period was tolled until the publication of the report. Since the Complaint was filed on the same day the report was released, these claims are timely.

### 4. Insider Trading Under Cal. Corp. Code § 25402

Insider trading claims under Cal. Corp. Code § 25402 are actionable under § 25502. Section 25502 is governed by § 25506, which states that claims must be brought within "five years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire."

---

[9] 10 Del. C. § 8106; <u>Artesian Water Co. v. Lynch</u>, 283 A.2d 690, 692 (Del. Ch. 1971) (accounting); <u>Forsythe v. ESC Fund Management Co. (U.S.), Inc.</u>, 2007 WL 2982247, 14 (Del. Ch. 2007) (breach of fiduciary duty); <u>Merck & Co., Inc. v. SmithKline Beecham Pharmaceuticals Co.</u>, 1999 WL 669354, 42 (Del. Ch. 1999) (unjust enrichment); <u>Krahmer v. Christie's Inc.</u>, 911 A.2d 399, *407 (Del. Ch. 2006) (rescission).

28

1    As with Plaintiffs' § 10(b) claim, the two-year limitations period has not run because the

2   case was filed on the same day as the publication of the Merril Lynch report.  However, also as with

3   Plaintiffs' § 10(b) claim, the five-year repose period began on May 22, 2001.  Accordingly, the

4   Court finds that Plaintiffs' insider trading claims may not be based on any allegedly false statements

5   made prior to that date.

6   **D.     Plaintiffs' Motion**

7        Plaintiffs move the Court to issue an order staying discovery in <u>Ryan v. Gifford</u>, currently

8   pending in Delaware Chancery Court, and <u>In re Maxim Integrated Prods., Inc., Derivative Litig.</u>,

9   currently pending in Michigan Chancery Court.  Plaintiffs contend that discovery in those actions

10  will allow Defendants access to information they cannot obtain in this action because of the

11  discovery stay currently in place.  (Plaintiffs' Motion at 1.)

12       The Securities Litigation Uniform Standards Act of 1998 allows a district court to "stay

13  discovery proceedings in any private action in a State court, as necessary in aid of its jurisdiction, or

14  to protect or effectuate its judgments, in an action subject to a stay of discovery pursuant to this

15  paragraph."  15 U.S.C. § 78u-4(b)(3)(D).  The application of the stay authorized by SLUSA is

16  appropriate when necessary to prevent unfairness or undue burden on defendants from multiple

17  actions.  <u>See</u> <u>In re Cardinal Health, Inc. Secs. Litig.</u>, 365 F. Supp. 2d 866, 872-73 (S.D. Ohio 2005).

18       Plaintiffs seek a stay to prevent Defendants from learning about the details of their

19  ownership of Maxim stock.  Such discovery is highly relevant to Plaintiffs' standing to pursue this

20  case and thus, the Court is not persuaded that it would unduly prejudice Plaintiffs.  More

21  importantly, the Court's findings above will lift the PSLRA discovery stay on this case, making the

22  issue of discovery in other cases less relevant, because equivalent discovery could be taken here.

23  Accordingly, the Court DENIES Plaintiffs' motion for stay.

24  //

29

1

**V.  CONCLUSION**

2    The Court orders as follows:

3    (1)    Nominal Defendant Maxim's motion to dismiss is DENIED;

4    (2)    Defendants Gifford, Jasper, and Individual Defendants' motions to dismiss are

5         GRANTED in part and DENIED in part;

6         (a)    With respect to Plaintiffs' § 10(b) cause of action, the Court, DENIES

7             Defendant Gifford's motion, DENIES the Individual Defendants' motion as to

8             Defendants Bergman, Wazzan, and Hagopian, and GRANTS the Individual

9             Defendants' motion as to Byrd, Karros, and Sampels;

10         (b)    With respect to Plaintiffs' § 14(a) cause of action, the Court DENIES

11             Defendants' motions;

12         (c)    With respect to Plaintiffs' § 20(a) cause of action, the Court GRANTS

13             Defendants' motions;

14         (d)    With respect to Plaintiffs' Accounting cause of action, the Court DENIES

15             Defendant Gifford's motion, DENIES Defendant Jasper's motion, DENIES

16             the Individual Defendants' motion as to Defendants Bergmen, Byrd,

17             Hagopian, Karros, Sampels, Wazzan, Hale, and Smith-Lenox, and GRANTS

18             the Individual Defendants' motion as to all other Defendants;

19         (e)    With respect to Plaintiffs' Breach of Fiduciary Duty and Aiding and Abetting

20             cause of action, the Court DENIES Defendant Gifford's motion, DENIES

21             Defendant Jasper's motion, DENIES the Individual Defendants' motion as to

22             Defendants Bergman, Byrd, Hagopian, Karros, Sampels, Wazzan, and Hale,

23             and GRANTS the Individual Defendants' motion as to all other Defendants;

24         (f)    With respect to Plaintiffs' Unjust Enrichment and Rescission causes of action,

25             the Court DENIES Defendants' motions;

26

27

28

_United States District Court_
_For the Northern District of California_

30

1               (g)       With respect to Plaintiffs' Insider Trading causes of action, the Court

2                         DENIES Defendant Gifford's motion, DENIES Defendant Jasper's motion,

3                         DENIES the Individual Defendants' motion to dismiss as to Defendants

4                         Bergman, Byrd, Hale, Hagopian, and Wazzan, and GRANTS the Individual

5                         Defendants' motion as to the other Defendants;

6       (3)     Plaintiffs' motion to stay discovery is DENIED.

7          On or before **September 20, 2008**, Plaintiffs shall amend the Complaint in a manner

8 consistent with this order.  Any claims preserved for appeal shall be labeled as such and listed at the

9 end of the Third Amended Complaint.

10          The parties shall appear for a Case Management Conference on **October 20, 2008 at 10 a.m.**

11 On or before **October 10, 2008**, the parties shall file a Joint Case Management Statement.  The

12 Statement shall, among other things, set forth a good faith discovery plan and update the Court on

13 the various state court proceedings.

14

15 Dated: August 27, 2008                              _____

                                  JAMES WARE

16                                United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28                                    31

**United States District Court**
For the Northern District of California

<div align="right" style="writing-mode: vertical-rl">

**United States District Court**
For the Northern District of California

</div>

1  **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2  Christina Leigh Wu christinawu@quinnemanuel.com
   David Siegel dsiegel@irell.com
3  David Michael Friedman david.friedman@lw.com
   Douglas Leavitt LEAVITT@DS-L.COM
4  Elizabeth B. Wydra elizabethwydra@quinnemanuel.com
   Eric L. Zagar ezagar@sbtklaw.com
5  Heather Lynn Thompson heather.thompson@lw.com
   John Charles Hueston jhueston@irell.com
6  John Mark Potter johnpotter@quinnemanuel.com
   Jonathan Herschel Bornstein jonathan@bornsteinandbornstein.com
7  Lita Monique Verrier lverrier@ropers.com
   Michael J. Ioannou mioannou@ropers.com
8  Monique C. Winkler e_file_sd@csgrr.com
   Ofer Bleiweiss obleiweiss@irell.com
9  Patrick C. Doolittle patrickdoolittle@quinnemanuel.com
   Rees Ferriter Morgan rees.morgan@lw.com
10 Risha Nickelle Jamison risha.jamison@lw.com
   Scott Gregory Lawson scottlawson@quinnemanuel.com
11 Shaunt Toros Arevian sarevian@irell.com
   Shawn A. Williams shawnw@csgrr.com
12 Steven Bauer steve.bauer@lw.com
   Susan Germer susangermer@quinnemanuel.com
13 Travis E. Downs travisd@csgrr.com

14

15 **Dated: August 27, 2008**                    **Richard W. Wieking, Clerk**

16
                                               **By:    /s/ JW Chambers                  **
17                                                   **Elizabeth Garcia**
                                                     **Courtroom Deputy**
18

19

20

21

22

23

24

25

26

27

28                                    32

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2008 AUG 28  PM 4: 17

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

IN RE

Case No.  A-07-CA-212-SS

CIRRUS LOGIC, INC.

_____

**O R D E R**

BE IT REMEMBERED on the *28th* day of August 2008 the Court reviewed the file in the

above-styled cause, specifically Nominal Defendant Cirrus Logic, Inc. (Cirrus)'s Motion to Dismiss

[#62], Plaintiffs' Response [#70], Defendants' Reply [#111], and Plaintiffs' Motion to File Surreply

[#124].  The parties requested extended briefing deadlines in this case to accommodate mediation

discussions.  Accordingly, Cirrus filed its Reply brief on August 13, 2008, approximately eight

months after Plaintiffs filed their Response to the Motion to Dismiss.  In light of the events that have

taken place since Plaintiffs filed their opposition brief, such as the U.S. Securities and Exchange

letter received by Cirrus (Reply at 1), and the several cases involving stock option backdating which

have been decided during this time and cited by Defendants in their Reply, the Court GRANTS

Plaintiffs' Motion for Leave to File Surreply [#124].  Having reviewed the documents listed above,

the applicable law, and the case file as a whole, the Court DENIES the motion for the reasons that

follow.

## Background

In these consolidated shareholder derivative actions, Plaintiffs seek to assert causes of action on behalf of Cirrus Logic, Inc. ("Cirrus") against certain of its current and former officers and directors. Plaintiffs allege wrongdoing in connection with stock option grants awarded between 1997 and 2004.

Cirrus has a shareholder-approved stock option plan (the "1996 Plan") which states the exercise price of stock options "shall be no less than 100% of the Fair Market Value per Share on the date of grant," where fair market value is defined as "the closing sales price for such stock . . . as quoted on such exchange or system for the day of determination." Am. Compl. ¶ 59. The 1996 Plan did not allow the directors or officers discretion to award options at less than 100% of the fair market value per share on the date of grant. Id.

Cirrus' Board of Directors (the Board) properly granted authority to a Compensation Committee to administer the Company's employee stock option plan. Id. Plaintiffs allege the Compensation Committee, from 1997 to 2004, improperly backdated grants of stock options to make it appear as though the options were granted on dates when the market value of Cirrus's stock was lower than the market value on the actual grant dates, thereby granting the options at less than 100% of their real fair market value. Plaintiffs further allege the backdating violated generally accepted accounting priniciples (GAAP) and federal tax laws, which the Board's Audit Committee knew when it nevertheless approved the transactions. Plaintiffs allege members of the Board were responsible for disseminating false financial statements to the SEC and shareholders through annual SEC filings and proxy statements that did not properly account for the backdated options.

-2-

On October 23, 2006, Cirrus announced it had formed a Special Committee of the Board of Directors to conduct an independent, detailed review of Cirrus's historical stock option grant practices using outside counsel and auditors. Am. Compl. ¶ 178. The company's internal review coincided with an informal investigation by the SEC, which began on October 27, 2006. Am. Compl. ¶ 179. On March 2, 2007, Cirrus announced that, based on the Special Committee's internal investigation, "the Board of Directors has concluded that the accounting measurement dates for certain stock options granted between January 1, 1997 and December 21, 2005, differ from the recorded measurement dates previously used for such awards." Am. Compl. ¶ 183. The Company's April 18, 2007 Form 10-Q/A disclosed that the total additional share-based compensation expense arising from misdated option grants was $32.3 million. Am. Compl. ¶ 185. The filing attributed much of the disrepancy to accounting errors, but also stated: "Based on the evidence developed in the [internal] investigation, the Special Committee believes that certain executive officers had knowledge of and participated in the selection of three grant dates for broad-based employee option grants in the 2000 through 2002 timeframe, either *with hindsight* or prior to completing the formal approval process.Of the $32.3 million in additional share-based compensation expense, $12.0 million related to these types of errors." *Id.* (emphasis added).

Plaintiffs contend this amounts to an admission of backdating. *Id.* Plaintiffs further argue the Special Committee's "accounting errors" explanation for the remaining misdated options is not credible in light of Plaintiffs' analysis of the "33 disclosed options granted to officers and directors between 1997 and 2004 which did not coincide with a pre-disclosed annual meeting date." Am. Compl. ¶ 68. Plaintiffs allege 10 of these 33 grants suggest intentional backdating for the purpose of increasing the value of the stock options. Plaintiffs assert the ten challenged grants were

"misdated" to coincide with some of the lowest trading prices of Cirrus stock for the month in which

the grants were made; the ten "misdated" grants each preceded a significant rise in the price of Cirrus

stock; the ten "misdated" grants were timed at the Compensation Committee's sole discretion and

were not made on an annual grant date or other pre-determined, fixed grant date; and the ten

challenged grants were not disclosed to the SEC for periods ranging from over a month to over a year

after the grants were made. Am. Compl. ¶¶ 70–161. Plaintiffs additionally rely on a statistical

analysis suggesting the ten challenged options yielded an abnormally high rate of return compared

to annualized shareholder return. Am. Compl. ¶¶ 64–69.

Plaintiffs now sue the members of the Compensation Committee, the Audit Committee, and

certain executives who received allegedly improper options, asserting derivative claims on behalf

of Cirrus. Defendants move to dismiss the complaint on the grounds that Plaintiff never made a pre-

suit demand on Cirrus' Board of Directors as required by Federal Rule of Civil Procedure 23.1 and

Delaware law.

**Analysis**

**I. Pre-Suit Demand**

Cirrus is a Delaware corporation. "When a shareholder of a corporation discovers acts which

somehow injure the corporation, Delaware law requires that the shareholder 'demand' that the

corporation's board of directors examine the injurious acts and pursue legal redress." *Sanders v.*

*Wang*, C.A. No. 16640, 1999 Del. Ch. LEXIS 203, * 11 (Del. Ch. November 8, 1999) (citing

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)). The demand requirement is a "substantive right

designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to

control any litigation which does arise." *Aronson*, 473 A.2d at 812; DEL. CH. CT. R. 23.1; FED. R.

CIV. P. 23.1. Failure to make proper demand is grounds for dismissal. *Id.*

Plaintiffs never fulfilled the demand requirement of Rule 23.1. They allege, instead, that

demand is excused under Delaware law because it would have been futile to ask the Board, in

essence, to sue itself. *Braddock v. Zimmerman*, 906 A.2d 776, 784 (Del. 2006). Demand futility

under Rule 23.1 must be determined pursuant to either the standards articulated in *Aronson*, 473

A.2d 805, or those set forth in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). *Id.* Under either test,

Plaintiffs must allege particularized facts tending to show that a majority of Cirrus' board is unable

to impartially evaluate the complaint and decide on the best course of action for the company. DEL.

CH. CT. R. 23.1; FED. R. CIV. P. 23.1. Mere conclusory allegations of futility are insufficient to

excuse demand. *In re General Motors Corp. Deriv. Litig.*, 604 F. Supp. 1106, 1112 (D. Del. 1985).

Under the two-part *Aronson* test, demand will be excused if the derivative complaint pleads

particularized facts creating a reasonable doubt that "(1) the directors are disinterested and

independent or (2) the challenged transaction was otherwise the product of a valid exercise of

business judgment." 473 A.2d at 812. The *Aronson* standard applies only to challenged decisions

of the board of directors. When the challenged business decision was not made by the board, for

example when the decision was made by a board that has since been replaced, "demand is excused

only where particularized factual allegations create a reasonable doubt that, as of the time the

complaint was filed, the board of directors could have properly exercised its independent and

disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 933.

At the time the first complaint in the now-consolidated derivative suits was filed, Cirrus had

six Board members, five of whom were also members of the Compensation Committee when the

challenged options grants were made. Am. Compl. ¶ 193–206. At the time the Amended Complaint

was filed, the Board had been increased to seven members, but still included the five members

involved in approving the challenged options. Mot. Dism. at 24. In these circumstances, the

decision to award the allegedly backdated options can be imputed to the entire Board, and the

*Aronson* test applies. *See Ryan v. Gifford*, 918 A.2d 341, 353 (Del. Ch. 2007) ("Where at least one

half or more of the board in place at the time the complaint was filed approved the underlying

challenged transactions, which approval may be imputed to the entire board for purposes of proving

demand futility, the *Aronson* test applies.") Thus, Plaintiffs must allege particularized facts creating

a reasonable doubt that directors are disinterested and independent, or that the challenged transaction

was otherwise the product of a valid business judgment. *In re Bally's Grand Deriv. Litig.*, No.

14644, 1997 Del. Ch. LEXIS 77, *9 (Del. Ch. June 4, 1997) (quoting *Aronson*, 473 A.2d at 812).

      The Delaware Chancery Court recently addressed claims similar to Plaintiffs' and determined

"because the compensation committee attacked by plaintiff constitutes a majority of the board, the

business judgment analysis under the second prong of *Aronson* may be readily applied." *Ryan*, 918

A.2d at 354. The *Ryan* court further reasoned that backdating options "cannot be an exercise of

business judgment" where the terms of a shareholder approved stock option plan give directors no

discretion to alter the date of the grant, but instead *require* that options be granted at the stock's fair

market value on the date the option is granted. *Id.* "Altering the actual date of the grant so as to

affect the exercise price contravenes the plan," *id.,* and "'[a] board's knowing and intentional

decision to exceed the shareholders' grant of express (but limited) authority raises doubt regarding

whether such decision is a valid exercise of business judgment and is sufficient to excuse a failure

to make demand." *Id.* (quoting *Sanders*, 1999 Del. Ch. LEXIS 203, at *14–15).

Defendants question *Ryan's* precedential value, asserting the case is an unfounded extension of Delaware law regarding demand futility. Mot. Dism. at 14–15. In the months since these consolidated actions were filed, however, the Chancery Court has repeatedly cited *Ryan* favorably and applied its reasoning to the issue of demand futility in the context of backdating. *See, e.g. Weiss v. Swanson*, 948 A.2d 433, 449–450 (Del. Ch. 2008) (applying *Ryan's* reasoning to deny motion to dismiss for failure to make presuit demand); *Conrad v. Blank*, 940 A.2d 28, 39–40 (Del. Ch. 2007) (same); *Desimone v. Barrows*, 924 A.2d 908, (Del. Ch. 2007) (applying *Ryan's* reasoning but distinguishing the facts of the case). Moreover, the cases relied on by Defendants that limit or criticize *Ryan* have been explicitly disapproved by the Delaware Chancery Court. *See Conrad*, 940 A.2d at 38 n.22. (stating to the extent *In re CNET Networks, Inc. S'holder Derivative Litig.*, 483 F. Supp. 2d 947 (N.D. Cal. 2007); *In re Linear Tech. Corp. Derivative Litig.*, No. C-06-3290 MMC, 2006 U.S. Dist. LEXIS 90986 (N.D. Cal. Dec. 7, 2006); and *In re Openwave Sys. Inc. S'holder Derivative Litig.*, 503 F. Supp. 2d 1341 (N.D. Cal., 2007) apply a "substantially harsher standard than is applied in Ryan or in this decision, the court declines to follow them.").

Under *Ryan* and its progeny, "[p]articularly in relation to option grants to senior officers or executives pursuant to plans that require at-the-money pricing, a finding of a pattern or practice of assigning improper measurement dates to option grants resulting in the issuance of millions of stock options with strike prices set at a lower price than that required by the plan raises substantial risks of personal liability on the part of both the grant executives who got the options and the directors who approved them." *Conrad*, 940 A.2d at 38 n.22. Defendants attempt to undermine Plaintiffs' allegation of a "pattern or practice" in this case, asserting Plaintiffs' statistical analysis is inadequate and their selection of only ten challenged options over a period of years is "cherry picking." The

Court notes *Ryan* involved only nine challenged options granted over a five year period. 918 A.2d at 346. The Court further notes a recent Delaware Chancery decision found attacks on the methodology of a statistical analysis may not be "appropriate on a motion to dismiss because the defendants' arguments seem to require reference to expert testimony." *Weiss*, 948 A.2d at 445 n.37. In any event, the Court finds Plaintiffs' particularized allegations that ten discretionary grants coincided with monthly low points in Cirrus' stock price, preceded increases in the stock price, and were not reported to the SEC for substantial periods, coupled with Cirrus' own press releases and SEC filings admitting that at least $12 million worth of stock options were backdated "with hindsight," Am. Compl. at ¶ 185, are sufficient to establish a pattern or practice of backdating at the pleadings stage.

Defendants nevertheless argue their case is factually distinguishable from *Ryan,* because the Cirrus board has demonstrated its impartiality by conducting an independent internal investigation of the options grants, using outside counsel and auditors; making public announcements about its expected financial restatements; and firing the executives responsible for the backdating. *See, e.g. Kanter v. Barella*, No. 05-5398, 2007 U.S. App. LEXIS 12220 (3d Cir. May 25, 2007) (an independent investigation, a public statement that the company's financial filings and statements during the relevant period should not be relied on, and the discipline of several employees "appear to be precisely the types of actions an independent board exercising valid business judgment should take when made aware of a serious problem.").

Defendants point out that the Special Committee's independent investigation ultimately determined any backdating was accomplished by Cirrus executives without any "documentary or testimonial evidence" of knowledge on the part of the Compensation Committee or the Board as a

whole. Mot. Dism. Ex. A. Furthermore, Defendants assert the SEC investigation concluded on

March 3, 2008, without any official enforcement action against the company. Reply Ex. B.

Defendants further assert Delaware law generally does not allow any presumption of knowledge or

liability for a challenged transaction based solely on a director's position as a member of a

committee. See, e.g. Cal. Pub. Emples. Ret. Sys. v. Coulter, No. CIV 19191, 2002 Del. Ch. LEXIS

144 (Del. Ch. Dec. 18, 2002)("approving of or acquiescing in the challenged transactions, without

more, [is] insufficient to raise a reasonable doubt of a director's ability to exercise independent

business judgment.").

 While these arguments may prove to exonerate Defendants after a supporting evidentiary

record has been developed, the Court finds them unpersuasive at the pleadings stage. As Plaintiffs

point out, the SEC's decision to take no enforcement action is not a determination on the merits of

the backdating allegations in any sense. See SEC Procedures Relating to the Commencement of

Enforcement Proceedings and Termination of Staff Investigations, 1972 SEC LEXIS 238 at *7 (SEC

1972) (stating the SEC's decision not to take action can "in no way be construed as indicating that

the party has been exonerated" and any "attempted use . . . as a purported defense in any action . . .

would be clearly inappropriate and improper"). The Court further notes the "independent

investigation" relied on by Defendants was conducted by a Special Committee of one— outside

director, William Sherman, who was the Chair of the Compensation Committee during the period

in which options were allegedly backdated. Surreply at 1–2.

 At bottom, the fact remains that "any grant of options had to have been approved by the

[Compensation Committee], and the committee can reasonably be expected to know the date of the

options as well as the date on which they actually approve a grant." Ryan, 918 A.2d. at 355.

Therefore, "[b]ackdating options qualifies as one of those 'rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.'" *Id.* at 356 (quoting *Aronson*, 473 A.2d at 815). The *Ryan* court found a substantial likelihood of director liability for options backdating "if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violations of a shareholder-approved plan, no less) and yet satisfy his duty of loyalty." *Id.* In these circumstances, the directors cannot be said to be impartial or disinterested for purposes of pre-suit demand. *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995) (substantial likelihood of liability is a "disabling interest" excusing pre-suit demand).

Cirrus' internal investigation "found no documentary or testimonial evidence that the Company's independent directors were aware of any attempts by the Company's executive officers to backdate or otherwise select a favorable grant date," Resp. Ex. A., but the internal investigation also found that "prior to 2006, . . . grant dates were routinely established before the receipt of all the signed unanimous written consents [of the Compensation Committee] authorizing those grants" and were "sometimes established before the list of option award recipients had been finalized." *Id.* In light of the specific language in the shareholder-approved 1996 Plan, stating that the exercise price of a stock option must match the fair market value on the date when it was granted, no "documentary or testimonial" evidence is necessary to establish a reasonable doubt as to the directors' business judgment in this situation. Plaintiff alleges the Compensation Committee approved options whose effective date was a day other than the day on which they were granted. This is a direct contravention of the terms of the shareholder-approved 1996 Plan. *Id.* It strains belief to think the

-10-

Compensation Committee did not realize it was required to establish or insist on an effective option

grant date that was the same as the date it actually granted the stock options. This is explicitly

required in the 1996 Plan. *Id.*

Although the Board's independent investigation, public announcements, and firing of certain

executives are all appropriate responses to internal wrongdoing, these actions cannot change the

reality that Plaintiff alleges particularized facts tending to show a majority of the Board actively

participated in the wrongdoing in ways not justified by the business judgment rule. *See Cal. Pub.*

*Emples. Ret. Sys.* 2002 Del. Ch. LEXIS 144, *23. By showing the Compensation Committee did,

in fact, "routinely" approve options after the effective date of the option, Resp. Ex. A., Plaintiffs

have established a reasonable doubt as to the directors' exercise of business judgment in granting

the challenged options and their ability to view demand regarding this alleged misconduct

impartially. Therefore, pre-suit demand is excused under Delaware law and the Federal Rules.

*Aronson*, 473 A.2d at 812; Del. Ch. Ct. R. 23.1; Fed. R. Civ. P. 23.1.

### Conclusion

In accordance with the foregoing,

IT IS ORDERED that Defendants' Motion to Dismiss [#111] is DENIED;

IT IS FURTHER ORDERED that Defendants' Motion to Stay a related state court case

pending resolution of the Motion to Dismiss [# 17] is DISMISSED AS MOOT.

SIGNED this the 28th day of August 2008.

_____

SAM SPARKS

UNITED STATES DISTRICT JUDGE

-11-